IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

|  |  |
|---|---|
| COALITION FOR GOOD GOVERNANCE and DONNA CURLING,<br><br>Plaintiffs,<br><br>v.<br><br>COFFEE COUNTY BOARD OF ELECTIONS AND REGISTRATION,<br><br>Defendant. | Civil Action No. 5:23-mc-00001-LGW-BWC<br><br>In RE Subpoenas issued by the United States District Court For the Northern District of Georgia, Atlanta Division, Civil Action File No. 1:17-CV-2989-AT |

**PLAINTIFF CGG'S MOTION FOR SANCTION AGAINST DEFENDANT CCBOER AND COUNSEL**

Pursuant to Rules 26 and 37, Fed. R. Civ. P., 28 U.S.C. §1927, and the inherent authority of the Court, Plaintiff CGG hereby moves for sanctions against Coffee County Board of Elections and Registration ("CCBOER") and its counsel, Hall, Booth, Smith ("HBS") in the amounts detailed herein and in the declarations filed along with this motion.[1]

---

[1] When Plaintiffs filed their Motion to Compel (Doc. 1) on October 24, 2023, they put CCBOER on notice that "Once the responsive records are produced, Movants anticipate filing a motion for sanctions to recover the significant fees and costs associated with the prolonged multi-step discovery efforts, the disrupted litigation schedule, and unnecessary delays made necessary by CCBOER's failure to produce responsive records in their possession." *See* Motion (Doc. 1), p. 17, FN 6.

## BACKGROUND FACTS

### The Breaches of the Coffee County Elections System

The series of events that resulted in three now infamous breaches of the Coffee County voting system in January 2021 appear to have their origins in a recently unearthed  December 31, 2020 letter from attorney Preston Haliburton to CCBOER Election Supervisor Misty Hampton and board member Eric Chaney seeking access to non-public voting system data.[2] (Exhibit 1) In apparent response to the request, on January 7, 2021, a team of computer forensic specialists from SullivanStrickler visited CCBOER office and copied a broad array of the state's voting system software and electronic election data. (See Exhibit 2, Skoglund Decl. Exhibit A)) The forensic specialists who conducted the breaches were funded by Sidney Powell. (*id* at 10) Within days, SullivanStrickler posted the electronic data captured from the Coffee County election system onto a private file sharing site and shared access with a number of individuals. (*id* at 21)

---

[2] This highly relevant fact was unknown until late November 2023 after Plaintiffs recovered the improperly withheld letter from the files on the CCBOER desktop computer files obtained from the Georgia Bureau of Investigation ("GBI") as a result of Plaintiffs' Motion to Compel (Doc. 1) filed with this Court.

On January 18-19, 2021, Doug Logan, CEO of Cyber Ninjas, and his associate, Jeffrey Lenberg, also visited CCBOER offices where they worked with Misty Hampton and illegally examined non-public voting system data and equipment that are required to be off limits to such unauthorized individuals. (*Id*. at 5) Jeffrey Lenberg returned to the CCBOER office from January 25-29, continuing his illegal and unauthorized testing of the equipment in the presence of Ms. Hampton and with the knowledge of Eric Chaney. (*Id.* at 5)

Individuals involved with the Coffee County breaches have been indicted and are being prosecuted in Fulton County based in large part on the discovery evidence that Curling plaintiffs unearthed over the course of 2022. Indicted individuals directly or indirectly involved with the breaches include Misty Hampton, Sidney Powell, Scott Hall, Cathy Latham, Robert Cheeley, and Rudy Giuliani. Additionally, Plaintiffs took depositions of now-unindicted co-conspirators Robert Sinners, Alex Cruce, Doug Logan, and Jeffrey Lenberg, and Plaintiffs discovered evidence that at least six other unindicted co-conspirators were indirectly involved with the Coffee breaches. There is no doubt that there is a compelling public interest in the timely, reliable, and accurate production of evidence related to the Coffee County breaches--an interest CCBOER and its counsel attempted to frustrate at every turn.

3

## CCBOER Withheld Video Security Records Claiming They Were Not Preserved

CCBOER had four cameras covering the exterior and interior of its office which recorded the activities of the individuals engaged in the breaches and the period leading up to the breaches (the "Videos"). In particular, the Videos revealed the involvement of a number of individuals and the SullivanStrickler team in the January 7 breach and Doug Logan and Jeffrey Lenberg in the subsequent breaches.

The *Curling* Plaintiffs received information regarding the breaches and began to attempt to investigate the situation and encouraged the press to do so as well. The *Curling* Plaintiffs directed numerous Open Records Requests ("ORR") to CCBOER prior to initiation of formal discovery in the *Curling* case, and in response to those ORRs, CCBOER repeatedly falsely represented that key responsive records, including the Videos, did not exist, had been lost, or were otherwise inaccessible.

The national press also began to request information from CCBOER about breaches of the Coffee County election system, and after substantial inquiries and interviews, the media broke the initial reports of the breaches.[3]  By the time Plaintiffs' two subpoenas (Docs. 1-1 and 1-2) were served, CCBOER had committed to its assertions that 1) the security video records from the time of the breaches had

---

[3] https://www.washingtonpost.com/investigations/2022/05/13/coffee-county-misty-hampton-election/

been overwritten and not preserved; 2) Misty Hampton's emails had not been preserved; and 3) the county's electronic election records (including evidence of unauthorized access and tampering by some of the breach participants) had not been preserved when the county failed to keep a copy of the EMS server and central ballot scanning computer seized by the Secretary of State. In response to those assertions, Plaintiffs repeatedly requested the production of the documents and records, particularly the Videos and Hampton's emails, and sought to have CCBOER's counsel account for why they had not been produced. Each such inquiry was initially met with a denial regarding the existence of the Videos and other responsive records.

After national media reports, public pressure, and the State's forensic examination of the CCBOER election management server, on August 2, 2022, the State Election Board and the Secretary of State asked the GBI to investigate the breaches. (Exhibit 3). The GBI investigation turned up important CCBOER records that had been improperly withheld from Plaintiffs for months, primarily the Videos and certain emails. It appears that the Videos, which CCBOER repeatedly denied existed, were only produced after the GBI demanded them. Withholding the Videos from the GBI would have constituted a felony, which appears to have incentivized CCBOER to reconsider its story and produce the Videos.

CCBOER produced the exterior camera Videos to the *Curling* Plaintiffs Videos on August 27, 2022 (Exhibit 4, Marks Decl. ¶ 11), and interior camera Videos on September 17, 2022 (Exhibit 4, Marks Decl. ¶ 12). The production occurred *after* the 30(b)(6) deposition of CCBOER and depositions of Eric Chaney, former election director James Barnes, and Jil Ridlehoover, all of whom were represented by HBS in their depositions. The 30(b)(6) SullivanStrickler deposition, the depositions of Cathy Latham, and forensic analyst Benjamin Cotton were also conducted prior to Plaintiffs' knowledge of and receipt of all Video records. CCBOER's withholding of the Videos (and other withheld documents) significantly prejudiced Plaintiffs' discovery efforts, including those specific depositions, and prolonged and impeded discovery of the documented evidence of the breaches.

Had the Videos been timely produced, the Plaintiffs' initial discovery plan would have been quite different and more efficient given the information disclosed by the Videos. Months of painstaking unnecessarily inefficient investigation and discovery efforts by Plaintiffs ultimately revealed that CCBOER's assertions regarding the Videos and other records (especially Hampton's emails) were false and misleading and exposed a pattern of misrepresentation and obstruction, prejudicing Plaintiffs' litigation and the public policy interests underlying it.

## CCBOER Withheld Misty Hampton's Emails, Falsely Claiming Emails Were Not Preserved

The long history of repeated attempts to obtain the official emails of Ms. Hampton and Ms. Ridlehoover is explained in Plaintiffs Motion to Compel. (Doc. 1 at 6-10)  Through those efforts, Plaintiffs sought access to Hampton's emails on the CCBOER desktop, then in the possession of the GBI. CCBOER's counsel had repeatedly represented to Plaintiffs that the emails had been permanently lost and that no Microsoft Outlook data files (.ost files) existed on the CCBOER desktop because staff only used a web-based email application. (Doc. 1 at 9; Doc. 1-9 Items 9 and 10) Although that representation was inconsistent with certain emails of Charles Dial, the Coffee County IT contractor, concerning the likely existence of .ost files, (Doc. 1-6 at 2) CCBOER and its counsel failed to investigate and validate their claim. (Exhibit 4, Marks Decl.¶ 13)) Indeed, it appears that counsel happily accepted Dial's conflicting and incomplete answers, (*id*. ¶ 13, Exhibit 3) passing them on to Plaintiffs without the slightest bit of incredulity or verification.

On November 20, 2023, Plaintiffs received from the GBI a copy of the desktop image as it existed on June 12, 2023, and delivered it to their expert Kevin Skoglund for his analysis and retrieval of responsive emails. (Exhibit 2, Skoglund Decl. ¶ 5) Mr. Skoglund's analysis not only quickly located the .ost files containing

Ms. Hampton's emails for the relevant period that counsel claimed had been permanently lost, but it also located other responsive highly relevant email communications involving other Coffee County staff and other documents that CCBOER improperly failed to produce. (Exhibit 4, Marks Decl. ¶¶ 15-18))

Hampton's emails on the desktop included the previously undisclosed letter from Preston Haliburton to Misty Hampton and Eric Chaney that initiated the breach activity, (Doc 30 at 6). Obtaining such withheld records just weeks before the *Curling* trial and after required disclosures, prejudiced Plaintiffs' discovery efforts, trial preparations, and the usability of late produced evidence.

### CCBOER Withheld Critical Responsive Communications and Related Documents

Beginning in late November 2023, after Mr. Skoglund organized and segregated the files on the CCBOER desktop image, Mr. Skoglund and Ms. Marks reviewed hundreds of potentially responsive emails and other documents contained on the image and numerous critically important responsive documents were found that CCBOER had failed to disclose or produce, although they were preserved on the desktop *as well as archived by the county central archiver*. Although CCBOER had falsely stated that Hampton's email .ost files did not exist on the desktop, other staff emails and documents were archived, including emails of subsequent election directors James Barnes and Rachel Roberts. Plaintiffs' reviews of Barnes and

8

Roberts's emails on the GBI image, revealed important information concerning the impact of the breaches and election security improperly withheld from Plaintiffs by CCBOER and not previously known. (Exhibit 4, Marks Decl. ¶¶ 15-18).

If CCBOER had complied with the subpoenas and produced the responsive records, relevant information necessary to inform the scope and contents of discovery related to the breaches would have been factored into a more efficient discovery plan. For example, Plaintiffs' July 20, 2022 deposition of James Barnes would have taken an entirely different course if Plaintiffs had access to his communications related to the security conditions of the equipment[4] and emails related to the EMS server passwords and replacement.   Plaintiffs were prejudiced by the withholding of such critical information from the readily available documents and obtained less than complete answers to deposition questions as a consequence.[5]

---

[4] Barnes alerted the SOS investigator, "Coffee ICPs [scanners] were stored in a room with an unlocked door to the outside of the building, a leaking roof, and walls with sunlight streaming through crevices. Pollen and dust coated the equipment and there was evidence of water accumulation….The faces of units were detached, and all units were tied to carts using their power cord….The routine maintenance and charging, of equipment had not been performed and documented." (Doc. 30-1)

[5] Examples of documents that could not be used at trial because of the last-minute production include Rachel Roberts's email asking SOS about recertifying the equipment after the breaches and response email in which HBS attorney Herzog who urged her not to address such subjects in writing and claimed there was no proof of breaches. (July 2022); Deb Cox email saying the passwords were not the reason for

## **CCBOER Withheld Relevant Documents Improperly Asserting Privilege**

CCBOER improperly withheld documents asserting attorney-client privilege where there was none, as has been briefed in conjunction with the Motion to Compel (Doc. 1) and the Motion for In Camera Review (Doc. 51) In response to the Motion to Compel, CCBOER argued its 3½ page privilege log with seventeen (17) entries was sufficient to enable Plaintiffs and the Court to assess the validity of its privilege claims. The Court quite rightly rejected that assertion and directed CCBOER to compile and produce a proper privilege log. When it did so on January 4, 2024, CCBOER's privilege log had grown from 3½ pages to a staggering 311 pages (referencing 2,670 withheld documents), still without document titles, email subject lines, or to/from identifications, with inaccurate dates and times of transmission on 847 email attachments, and only with a Bates number and privilege assertion. CCBOER's response to the privilege log issue, even with the intervention of this Court, demonstrated their continuing reckless approach to their discovery obligation.

---

the Secretary of State seizing of the CCBOER server; evidence in e-mail that the Secretary of State investigator, Josh Blanchard, requested a report on the security conditions from James Barnes; photos of poor security conditions in CCBOER offices after one of the machines had been tampered with by one of the breachers; James Barnes's e-mail regarding his need to get a password for the server; the document that initiated the breaches--Preston Haliburton requesting access for experts to the voting system. Not only could Plaintiffs not use these effectively at trial, but they had no ability to develop the facts through related discovery.

Given the demands of the then-looming 17-day trial, counsel simply did not have time to review, evaluate, and challenge the massive privilege log or the validity of the entries on it. However, a limited review and subsequent challenge to the designation of certain documents strongly suggests CCBOER's claims of privilege lacked merit or credibility.[6] Indeed, with every designation of the few Plaintiffs had time to challenge, including those in Plaintiffs' Motion for In Camera review, concerning communications with Dial, the IT contractor, CCBOER withdrew the privilege designation and produced the documents.  With most of those, CCBOER did not even attempt to defend the designations when challenged,[7] certainly raising

_____

[6] A few examples lend support to the question of CCBOER's credibility and compliance with its disclosure obligations. Even though CCBOER has stated that that no Secretary of State or State Election Board investigation of breach-related activities began until July 25, 2022, over 200 privilege log entries during January 2021 - July 2022 reference "Privileged internal communication between HBS counsel for the purpose of providing legal advice related to investigations or inquiries by the Secretary of State and/or State Elections Board," as the reason for withholding of the communications. Remarkably, no breach-related communications with the Secretary of State or the State Election Board concerning an investigation were produced in response to Plaintiffs' subpoenas, raising the question of how 208 privileged documents could have been generated in response to investigations/inquiries that are not reflected in any documents produced, and when purportedly no breach-related investigation was occurring.

[7] *See* Declaration of Cary Ichter, attached hereto as Exhibit "9."

questions as to hundreds of other privilege log entries and documents withheld, which Plaintiffs had no time to analyze during trial.

### CCBOER's 30(b)(6) Designee's Testimony Demonstrates CCBOER and its Counsel's Bad Faith in Discovery

The necessity of this Motion to address the obstruction and deceit of CCBOER and its counsel, HBS, in the Curling discovery process is illuminated in the manner in which CCBOER responded to Plaintiffs' subpoenas requesting documents and testimony concerning governmental agencies' investigations of the breaches.

On September 1, 2022, Plaintiffs took the 30(b)(6) deposition of the CCBOER, with Vice-Chairman Wendell Stone as its designee.[8]  HBS attorney Stephen Delk represented the witness in the deposition. In response to questions concerning any potential GBI inquiry or investigation, Mr. Stone testified he was not aware of any such investigation, nor had he or anyone he knew of been contacted by the GBI concerning this matter.  (Exhibit 5, Stone Depo. pp. 218-219) CCBOER had produced no documents at that time to suggest there was an active GBI investigation.

GBI files released to Plaintiffs in November 2023 tell a different story.  Mr. Stone, accompanied by HBS attorneys Mr. Delk and Mr. Rowell, and Stone's

---

[8] Mr. Stone served as Board Vice-Chair and Chair of the Board.

12

personal attorney met with the GBI on August 8, 2022, ***three weeks before the deposition***, and Mr. Stone had refused to be interviewed by the GBI. (Exhibit 5, Stone Depo. pp. 218-219)  Mr. Stone, as the 30(b)(6) witness did not disclose, that CCBOER member Matthew McCullough and Mr. Delk met with the GBI on August 9, 2022, a fact he certainly should have been advised of in his role as CCBOER's designated witness.

The testimony was false, and the HBS attorneys representing the CCBOER at the deposition knew it. CCBOER never produced any documents evidencing the scheduling or occurrence of these GBI meetings. Further, according to the GBI report, CCBOER member Andy Thomas falsely told the GBI that his service on the CCBOER Board did not begin until 2022 and that he was not acquainted with Eric Chaney, despite serving with him on the CCBOER for 20 months.  He also denied being acquainted with Misty Hampton, although the Video records disclose that they worked together on the January 5, 2021 election. (Exhibit 7). In short, the CCBOER's lack of candor in sworn testimony and GBI interviews in efforts to mislead and conceal the breach information from Plaintiffs in this civil litigation and from law enforcement is shocking and should not go unaddressed.

## **ARGUMENT**

**CCBOER'S DISCOVERY MISCONDUCT WARRANTS SANCTIONS**

"District courts have broad authority and discretion to fashion sanctions against parties who fail to engage in discovery . . . or otherwise disobey court orders." *United States v. Twenty-Nine Pre-Columbian & Colonial Artifacts*, 695 F. App'x 461, 466 (11th Cir. 2017); *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542 (11th Cir. 1993) ("[Rule 37] gives district judges broad discretion to fashion appropriate sanctions for violation of discovery orders"). As the Court noted in *Githieya v. Glob. Tel*Link Corp.*, 2020 WL 7022451 (N.D. Ga. Nov. 30, 2020), "[i]f [a party] were able to escape any real consequences for its obfuscating course of discovery and litigation posturing, the discovery and judicial process would be stripped of all integrity and functionality." *Id.* at *28. *See also Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1453 (11th Cir. 1985) (listing one of the permissible purposes of sanctions as "deterring others from engaging in similar conduct").

**A.     Rule 37(a)(5) Mandates an Award of Plaintiffs' Fees and Costs**

Rule 37(a)(5), Fed. R. Civ. P., provides that when a motion to compel discovery is granted—or if the disclosure or requested discovery is provided after such motion was filed—the court must, after giving an opportunity to be heard, require the party whose conduct necessitated the motion, the party or attorney advising that conduct, or both, to pay the movant's reasonable expenses incurred in

making the motion, including attorney's fees.  The Eleventh Circuit reached the "inescapable conclusion," in construing the predecessor version of Rule 37(a)(5), that "sanctions under Rule 37(a)(4) are mandatory unless the court finds a substantial justification for discovery delays." *Devaney v. Continental American Ins. Co.*, 989 F.2d 1154, 1162 (11th Cir. 1993).  "Where the producing party's actions necessitate the motion to compel, or where the objections and failure to respond are not substantially justified, an award of sanctions is appropriate." *Murphy v. Cooper Tire & Rubber Co.*, No. 8-cv-40, 2008 WL 5273548, at *6 (N.D. Fla. Dec. 18, 2008).

CCBOER's response to Plaintiffs discovery efforts cannot be justified. CCBOER resisted Plaintiffs' efforts to obtain copies of documents from the CCBOER desktop, falsely claiming that the documents were inaccessible.  In fact, the emails and other documents from the desktop were easily accessible, as reported by Kevin Skoglund (Exhibit 2, Skoglund Decl. ¶ 11), and still other requested documents (Roberts' and Barnes' emails) were resident on and easily accessible on the county archiver.  Apparently, CCBOER purposefully ignored or negligently failed to investigate either the desktop or the county archiver in response to Plaintiffs' requests.

No substantial justification can be shown to justify false representations made where a party and its counsel failed to take rudimentary steps to confirm their

representations.  In *Go Med. Indus. Pty, Ltd. v. Inmed Corp.*, 300 F. Supp. 2d 1297, 1307–08 (N.D. Ga. 2003), *aff'd*, 471 F.3d 1264 (Fed. Cir. 2006), in discovery the defendants represented the tip of their allegedly infringing catheter device did not measure 1.5 centimeters without taking the simple step of measuring the device.  *Id.* at 1308.  The court found that "Defendants' apparent failure to take the obvious step of measuring the length of their catheter's insertion tip is not substantial justification for failing to comply with the requirements of the discovery process." *Id.* at 1308.

Additionally, CCBOER and its counsel's conduct with respect to the privilege log is the definition of bad faith. CCBOER's implicit claim that a 3 ½ page, 17 entry privilege log is a reasonable proxy for a 311 page, 2,670 item log is simply outrageous. The purpose of a privilege log is to enable the receiving parties, initially, and the Court, eventually, to be able to make at least a preliminary assessment of whether the withheld documents are in fact privileged.  It is incredible to imagine that a 3 ½ page log could possibly enable Plaintiffs or the Court to evaluate the validity of privilege claims with respect to 2,670 documents.  But CCBOER apparently succeeded in what it set out to do: it delayed disclosure of the volume of withheld documents until Plaintiffs were incapable of doing much of anything about

it. Such stratagems should not be countenanced by the Court and should be punished to deter future similar misconduct.

Because the Court granted Plaintiffs' motion to compel, in part, Rule 37 mandates an award fees and costs, unless CCBOER can demonstrate that its conduct and/or the conduct of its counsel was substantially justified.  They cannot.

### B.     Rule 26(g) Mandates Sanctions

Rule 26(g)(3) imposes sanctions for failing to conduct a reasonable inquiry prior to signing a discovery response or objection.  Rule 26(g) was "designed to curb discovery abuse by explicitly encouraging the imposition of sanctions."  Fed. R. Civ. P. 26(g) Advisory Committee's Note (1983 Amendment).  The Rule requires an attorney to sign "every request for discovery or response or objection thereto."  Fed. R. Civ. P. 26(g).  The signature certifies, in relevant part, "that the signer has read the request, response, or objection, and that to the best of the signer's . . . belief formed after a reasonable inquiry it is . . . not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation."  *Id.*

If a certification is made in violation of Rule 26(g), the court . . . *shall* impose upon the person who made the certification, the party on whose behalf the request, response, or objection is made, or both, an appropriate sanction,

which *may* include an order to pay the reasonable expenses incurred because of the violation, including reasonable attorney's fee." *Id.* (emphasis added). In short, sanctions are "mandatory" where a certification violates Rule 26(g). *See Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1545 (11th Cir. 1993).

CCBOER's counsel signed multiple objections and responses in which they certified demonstrably false responses. As is detailed above, the response that the CCBOER desktop did not contain Ms. Hampton's responsive emails was false. Also, counsel clearly either failed to inquire as to whether Roberts and Barnes's responsive documents would be found on the desktop and/or county archiver or, whether once they located them, they simply did not produce such records.

Courts in this circuit have imposed sanctions under Rule 26(g) under circumstances like those here, where counsel failed to corroborate representations by their clients. For example, in *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d 1335, 1350–51 (N.D. Ga. 2012), the court sanctioned Delta's counsel for failing to confirm that certain hard drives were searched and for failing to independently confirm discovery representations made by their client. The *Delta* court particularly noted that given "extensive questioning" raised as to the evidence in question, Delta's counsel should have conducted further inquiry. *Id.* Moreover, the court found sanctions particularly warranted given counsel's "repeated" and

"unequivocal" false representations, and because counsel "did not promptly correct its factual misrepresentations to the Court." *Id.  See also Bernal v. All Am. Inv. Realty, Inc.*, 479 F.Supp.2d 1291, 1334 (S.D. Fla. 2007) (finding Rule 26(g) violated where attorney relied on client's assurances in drafting discovery responses without confirming assurances by reviewing underlying financial records).

Additionally, as is noted above, counsel first offered a woefully inadequate privilege log and when ordered by the Court to serve a compliant log, continued to advance privilege objections that were so plainly meritless that when they were challenged, counsel withdrew the objections without contesting the challenge.

### C.    Sanctions Are Warranted under 28 U.S.C. § 1927

28 U.S.C. § 1927 authorizes the court to sanction an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously."  The statute permits the court to "assess attorney's fees against litigants, counsel, and law firms who willfully abuse the judicial process by conduct tantamount to bad faith." *Avirgan v. Hull*, 932 F.2d 1572, 1582 (11th Cir. 1991).  This analysis is an objective one.  Therefore, "the district court . . . must compare the attorney's conduct against the conduct of a 'reasonable' attorney and make a judgment about whether the conduct was acceptable according to some objective standard." *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239–42 (11th Cir. 2007).

19

Notably, the "court may impose sanctions for egregious conduct by an attorney even if the attorney acted without the specific purpose or intent to multiply the proceedings." *Id.* Instead, "objectively reckless conduct is enough to warrant sanctions even if the attorney does not act knowingly and malevolently." *Id.* at 1241. CCBOER's counsel's repeated misrepresentations were, at minimum, objectively reckless and warrant sanctions.

It is both noteworthy and important here that a motion for sanctions pursuant to Section 1927 need not be tethered to a discovery motion. Hence, the Court can award sanction related to CCBOER and its counsel's misconduct related to the delayed production of the Videos. There is no question as to CCBOER and its counsel's culpability in connection with their willfully persistent denial of the existence and accessibility of the Videos when Plaintiffs requested them. CCBOER and its counsel only admitted to the continued existence of the Videos when they were demanded by the GBI, knowing that repeating their dishonest denials could result in being charged with a felony. CCBOER and its counsel repeatedly misrepresented the status of the Videos without the slightest regard for the substantial cost to Plaintiffs and the significant prejudice from preventing Plaintiffs' counsel from taking deposition after deposition without readily available knowledge regarding the breaches—how they were conducted, when they were conducted, who

had conducted them, and the scope of the unauthorized intrusion.  Nor did CCBOER

consider the compelling public interest in protecting the integrity of elections and

the voting system. Their obstinacy was, at best, objectively reckless and, more

precisely, actual bad faith.  Sanctions are warranted to punish and deter such

egregious misconduct.

### D.   The Court Should Impose Sanctions Pursuant to Its Inherent Authority

The Court also possesses inherent power to sanction parties or counsel

appearing before it.  "[D]eeply rooted in the common law tradition is the power of

any court to 'manage its affairs [which] necessarily includes the authority to

impose reasonable and appropriate sanctions upon errant lawyers practicing before

it.'" *Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1447 (11th Cir.1985). A court

may appropriately sanction a party or attorney who "shows bad faith by delaying or

disrupting the litigation or by hampering enforcement of a court order." *Hutto v.

Finney*, 437 U.S. 678, 689 n. 14 (1978). "The key to unlocking the court's inherent

power is a finding of bad faith," and a party may demonstrate bad faith by delaying

or disrupting litigation.  *In re Sunshine Jr. Stores, Inc.,* 456 F.3d 1291, 1304 (11th

Cir. 2006).

"Courts have held that requests for sanctions under  §  1927  and  the

Court's inherent authority are similarly analyzed."  *Mack v. Delta Air Lines, Inc.*,

21

No. 3-cv-1162, 2014 WL 12628620, at *8 (N.D. Ga. Aug. 11, 2014), *report and recommendation adopted*, No. 3-cv-1162, 2014 WL 12629941 (N.D. Ga. Sept. 24, 2014), *aff'd,* 639 F. App'x 582 (11th Cir. 2016), and *aff'd,* 639 F. App'x 582 (11th Cir. 2016).

Additionally, CCBOER's designee's blatant dishonest regarding meetings with the GBI should not be ignored.  Lawyers should not sit idly by and passively observe their clients perjuring themselves. Dishonesty by public officials and their counsel, particularly when it involves false swearing, is simply unacceptable and should be punished.

## II.    THE SANCTIONS PLAINTIFFS SEEK ARE REASONABLE AND JUSTIFIED

Given CCBOER and its counsel's repeated misrepresentations—which were either knowingly false or reckless—Plaintiffs seek their reasonable attorneys' fees and costs incurred in filing the Motion to Compel and in pursuing the production of the Videos withheld and late produced emails and other documents as well as fees associated with the unnecessary discovery costs incurred by Plaintiffs caused by the misconduct of the CCOBOER and its counsel. Again, Rules 26(g) and 37(a)(5) mandate an award of such fees and costs under the circumstances here.  Although sanctions under 28 U.S.C. § 1927 and the Court's inherent authority are discretionary, such sanctions are warranted here for the reasons described above.

Plaintiffs' counsel and their experts have not completed their full review and categorization of hours billed and expenses, given the still-ongoing demands of the *Curling* post-trial activities, including the preparation and submission of proposed findings of fact and conclusions of law for a three-week trial.  That said, Plaintiffs submit herewith accumulated partial estimates of the incremental costs incurred by Plaintiffs as a consequence of the Coffee County breach discovery work showing an accumulated total of approximately $684,208.83 of allocable billable fees. The fee calculations will be supplemented by March 4, 2023, as explained below.[9] These partial fees are summarized by professional as follows and are reflected in their attached declarations:

Bruce Brown—attorney, $4,500 (Exhibit 8).  When Plaintiffs submit Mr. Brown's estimated costs associated with the incremental additional costs caused by CCBOER and its counsel's misconduct as described herein, it is expected to be roughly $190,375.  With the $4,500, that is $194,875.

Cary Ichter—attorney, $ 77,333.83 (includes expenses) (Exhibit 9).

Kevin Skoglund—voting systems and software expert--$29,000.  (Exhibit 2) (partial estimate).

Dr. Philip Stark—election auditing and verifiability expert $175,000. (Exhibit 10).

Susan Greenhalgh—election technology and administration expert $33,000 (Exhibit 11)

---

[9]  March 4. 2024, is shortly after Plaintiffs' proposed findings of fact and conclusions of law must be submitted to the Court in *Curling*.

Marilyn Marks: recognized by Judge Totenberg as a critical consultant for Plaintiffs--Detailed estimate in progress with counsel for review and categorization--partial and preliminary exceeds estimate $175,000.

As set forth in Mr. Ichter and Mr. Brown's declarations, the fees and costs are reasonable and include the many hours *Curling* Plaintiffs' counsel spent communicating with CCBOER counsel about this issue, drafting discovery filings, engaging in teleconferences with CCBOER counsel and this Court and the *Curling* Court.

Plaintiffs also seek reimbursement of the cost incurred for the time their experts Kevin Skoglund, Dr. Philip Stark, and Susan Greenhalgh and consultant Marilyn Marks were required to spend on this issue, including assisting attorneys in preparing for depositions, monitoring depositions, and conferring with legal team during the depositions, reviewing documents and transcripts, drafting declarations, assisting with Court filings, and related activities. Mr. Skoglund devoted scores of hours to the forensic analysis of the Coffee EMS server and other breached equipment, as well as organizing and extracting data from the CCBOER desktop image obtained from the GBI.

Unfortunately, nothing can remedy the significant prejudice Plaintiffs suffered from this wholly unnecessary and colossal waste of time and resources that

distracted their counsel from critical preparations for the January 2024 trial on the merits. Nor should this Court countenance the misuse of its time and resources and the *Curling* Court's time and resources CCBOER caused with its months of concealing key evidence and meritless discovery disputes.

This sanctions motion attempts to describe the scope of the prejudice to Plaintiffs' discovery efforts and related litigation activities as a consequence of CCBOER and its counsel's conduct. From the earliest days of attempting to obtain case-relevant information about the breaches, Plaintiffs were met with obstruction and misrepresentation by CCBOER and related stakeholders. Plaintiffs' legal teams, experts, accountants, and litigation support teams are still attempting to review and finalize time and expenses supporting this motion, the preliminary partial estimate of fees and expenses attributable to Coffee-related discovery is approximately $684,208.83, as stated above. To assist the Court in determining appropriate sanctions amounts and approach, with the Court's permission, Plaintiffs will supplement this motion prior to March 4, 2024, with any necessary adjustments, including out of pocket expenses, and categorized details of time and expenses organized in the following categories:

1. <u>Discovery Efforts for Breach Organizers</u>:   Organizers not directly associated with CCBOER include Sidney Powell, Scott Hall, and Cathy Latham.

Discovery efforts involving those individuals were unnecessarily expanded or impaired because of the refusal of CCBOER to disclose emails and video security records in their possession prior to Plaintiffs conducting discovery efforts related to the organizers.

      2.    <u>Discovery Efforts for Breach Participants (non-CCBOER Officials)</u>: Discovery efforts were undertaken for participants in the breaches who were not directly associated with CCBOER include SullivanStrickler firm, Ed Voyles, Cathy Latham, Scott Hall, Alex Cruce, Jeffrey Lenberg, and Doug Logan. Discovery efforts related to their activities were unnecessarily hampered, delayed, and expanded because of CCBOER's failure to disclose information in its possession prior to Plaintiffs' undertaking such efforts.

      3.    <u>Discovery efforts Related to CCBOER Officials</u>:   Officials involved in or knowledgeable about the breaches include Wendell Stone (board member) as the 30b6 witness, Misty Hampton (Election Supervisor), Eric Chaney (board member), and Jil Ridlehoover (Assistant Election Supervisor), James Barnes (former Election Supervisor), all CCBOER board members, and CCBOER staff.  Records in the possession of CCBOER, including its members, but not timely produced impeded discovery, and created inefficiencies in obtaining evidence from CCBOER officials and former officials. Without relevant responsive documents, Plaintiffs

inquiries were incomplete and inefficient, requiring significantly more work to piece together needed evidence. Plaintiffs sought responsive official documents and communications from individual CCBOER board members who claimed they did not preserve such communications.

4. <u>Discovery Efforts Related to Fact-Finding From Third Party Witnesses:</u> CCBOER's failure to timely produce responsive records required Plaintiffs to seek discovery from witnesses not directly involved in the breaches but who were thought to have relevant information concerning the breaches. Forensic analyst Ben Cotton and former Trump campaign staffer Robert Sinners are two such individuals, whose depositions were taken by Plaintiffs.

5. <u>Relevant Evidence Produced Too Late to Develop/Disclose/Introduce</u>: A significant volume of evidence was produced or located in 2022 and 2023 through third parties that was in the possession and control of CCBOER during the subpoena period. CCBOER did not timely produce, or produce at all, much of that evidence, as is shown herein, which prevented Plaintiffs from timely conducting related discovery or making required disclosures in the pre-trial order.

6. <u>Efforts related to the Motion to Compel</u>:     The Motion to Compel resulted in successful efforts to obtain certain withheld documents both from the

GBI image of the CCBOER desktop and documents improperly withheld under privilege assertions.

Additional time is needed for Plaintiffs' legal and expert teams to comprehensively segregate the time and expenses related to each of the above categories and apply appropriate estimates and billing judgment. If a different manner of categorizing the efforts would be more helpful to the Court, Plaintiffs welcome the opportunity to construct the claim in a manner dictated by the Court. Plaintiffs trial team and experts were consumed with trial requirements through February 1, and are still investing considerable time with post-trial filings and matters for which the record is still open, and but expect to be able to submit a properly thoughtful analysis to provide the Court with a set of quantified elements of determining an appropriate sanction amount by February 29, 2024.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this motion and award Plaintiffs' the fees and costs sought here, needlessly and inappropriately caused by CCBOER and its counsel's repeated false representations to Plaintiffs and this Court.

Respectfully submitted this 20th day of February, 2024.

*/s/ William Daniel Davis*
WILLIAM DANIEL DAVIS
Georgia Bar No. 746811
CARY ICHTER, *Pro Hac Vice*
Georgia Bar No. 382515
ddavis@ichterdaivs.com
cichter@ichterdavis.com

**ICHTER DAVIS LLC**
400 Interstate N. Pkwy, SE, Suite 860
Atlanta, Georgia 30339
(404) 869-7600
*Attorneys for Coalition for Good Governance*

and

*/s/ Bruce P. Brown*
BRUCE P. BROWN
Georgia Bar No. 064460
bbrown@brucepbrownlaw.com
**BRUCE P. BROWN LAW LLC**
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

*Attorneys for Coalition for Good Governance*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 20, 2024, a copy of the foregoing ***Plaintiffs'***

***Motion for Sanctions*** was electronically filed with the Clerk of Court using the

CM/ECF system which will automatically send notification of such filing to all

attorneys of record.

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
cichter@ichterdavis.com
**ICHTER DAVIS LLC**
400 Interstate N. Pkwy, SE
Suite 860
Atlanta, Georgia 30339
(404) 869-7600

*Attorneys for Coalition for Good
Governance*
