IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

| | |
|---|---|
| COALITION FOR GOOD GOVERNANCE and DONNA CURLING, <br><br> Plaintiffs, <br><br> v. <br><br> COFFEE COUNTY BOARD OF ELECTIONS AND REGISTRATION, <br><br> Defendant. | Civil Action No. 5:23-mc-00001-LGW-BWC <br><br> In RE Subpoenas issued by the United States District Court For the Northern District of Georgia, Atlanta Division, Civil Action File No. 1:17-CV-2989-AT |

## PLAINTIFF COALITION FOR GOOD GOVERNANCE'S REPLY TO DEFENDANT'S RESPONSE TO MOTION FOR SANCTIONS

Defendant CCBOER has repeatedly noted throughout this process that it is not a party to the underlying *Curling* case. While that is true, it does not change the fact that CCBOER was engaged in unlawful activities central to the case by acting in concert with others to enable, participate in, and ultimately conceal, one of the most serious and dangerous election security breaches in our nation's history.[1]

---

[1] CCBOER claims in its Response that CCBOER allowed unauthorized individuals to enter its office and "inspect" elections equipment. That is definitely putting lipstick on the pig. What actually happened is reported in the Sanctions Motion. (Doc. 60, p.2-3) A team of computer forensic specialists breached the system and copied a broad array of voting system software and electronic election data. *See* Doc. 60, Exh. 2, Skoglund Decl. ¶¶ 11-155. Within days the electronic data captured from the Coffee County election system was posted to a private file sharing site and access was shared with multiple individuals. In the second breach days later, Doug Logan, CEO of Cyber Ninjas, and his associate, Jeffrey Lenberg, worked with Misty

CCBOER is not an innocent bystander that has been swept into the vortex of this litigation by circumstance beyond its control. In fact, the entire CCBOER staff all assisted in the breach activities over eight (8) days, with the knowledge of Eric Chaney, a CCBOER member. The criminal acts of CCBOER's 2021 management and staff drew CCBOER into this maelstrom.

Through the sanctions motion, Plaintiff is seeking to have CCBOER held publicly accountable for violations of the discovery rules and hiding evidence of the criminal culpability.  Plaintiff also wishes to deter similar conduct by other election officials. CCBOER's claim (Doc. 73, FN 1, p.3) that Plaintiff is seeking to hold it responsible for criminal activities is simply off base. Plaintiffs leave that to the criminal justice system.

CCBOER argues that Plaintiff has not produced evidence that it "withheld" documents, but a review of the August 1, 2022 CCBOER responses to the Plaintiffs' subpoenas reveals a serious conflict with the January 2024 privilege logs of documents withheld. *See* Exhibits "A" and "B" attached hereto; Doc. 1-1 and 1-2. In August 2022, in response to virtually all 65 document subpoenas topics, counsel represented that *no* additional responsive documents existed not previously

---

Hampton at the CCBOER offices and illegally examined non-public voting system data and equipment.  Mr. Lenberg returned to the CCBOER office from January 25-29, and continued his illegal and unauthorized testing of the equipment, literally tampering with the settings, in the presence of Ms. Hampton and her assistants, and with the knowledge of Eric Chaney. (*Id.* ¶ 97)

produced in response to Open Records Requests.  Yet, the 2024 privilege log shows roughly 2,700 responsive documents withheld through July 25, 2022. Plaintiffs were egregiously misled by CCBOER counsel's representations that virtually ***no*** responsive documents were being withheld in August 2022, only to learn in January 2024, the very month of the *Curling* trial, that at least 2,700 responsive (but unidentified) documents were withheld. This macro picture alone suggests the level of prejudice Plaintiff CGG suffered because of Hall, Booth, Smith ("HBS") and CCBOER misrepresentations related to the undisclosed withheld documents.

With respect to security video and Misty Hampton's responsive emails, CCBOER claims it was prevented from producing materials because it was not conscious of their availability. CCBOER has not explained why they did not produce numerous relevant documents available on the county archiver from the accessible emails of Election Directors Barnes and Roberts. Like so much of what emanates from the circumstances and the efforts to overturn the 2020 election, CCBOER's claims and excuses reek of "the odor of mendacity," as is shown below.

### The Privilege Log

CCBOER's Response brief (Doc. 73) and Ms. Herzog's Declaration (Doc. 73-3) raise the very real question of whether CCBOER and counsel ever conducted a privilege review. CCBOER attempted to justify its original August 26, 2022 category-based privilege log by claiming such logs are justified where a document-

by-document log would be unduly burdensome. Ms. Herzog states in her declaration that "there were thousands of documents that would take an overly burdensome number of hours to *review* and designate as privileged…" (emphasis added) (Doc. 73-3 ¶25) She continued, "Creating a privilege log in compliance with the Court's Order required my colleagues and me to *establish criteria* for *searching for* and *locating* responsive records, review approximately 9,000+ emails, text messages and other documents and designate grounds for privilege, if applicable." (*Id.* at ¶ 28) She states the January 2024 privilege log required over 100 attorney hours.  Certainly, if the documents had been searched for in response to Plaintiffs' 2022 subpoenas, "establishing criteria for searching," searching for and locating documents in late 2023 would have been unnecessary. Simply logging the previously located privileged documents would comply with the Court's December 2023 Order.

However, Ms. Herzog and other HBS attorneys signed the August 2022 subpoena document responses repeatedly falsely stating that virtually all responsive documents *were* in fact produced, (with minimal reference to any privileged documents). (Exhs. A and B) The apparent inconsistency in counsel's representations raises questions of whether searches for responsive documents were even undertaken in 2022, much less whether a good faith privilege analysis was conducted.

CCBOER notes that in granting Plaintiff's motion to compel as to the privilege log, the Court rejected the categorical approach because it was "unclear

4

how many documents [were] withheld on privilege grounds." In short, CCBOER and its counsel never even attempted to make an appropriate showing of burden to justify the generalized nature of the privilege log, perhaps because it was in such extreme contrast to its document subpoena response representations.

Ms. Herzog states in her declaration that she never received an objection to the August 26, 2022 privilege log. (Doc. 73-3 ¶ 26) Setting aside the inaccuracy of that claim, Ms. Herzog fails to point out that she had represented in August 2022 that virtually all documents had been produced in her signed subpoena response. A fight over a 3½ page privilege log at that time would have been a low priority given her representations that virtually all documents had been produced.

As the Court rightly noted in its December 22, 2023 Order, CCBOER's claim that the original log was proper is unreasonable and meritless when one considers that the log is supposed to enable the adverse party and the Court to make a judgment concerning the propriety of the assertion of privilege. (Doc. 41, pp. 13-14) CCBOER also ignores the fact that the categorical format of the log was not the only defect identified by the Court in its Order.  There were many: The date fields contained no specific dates in many instances, only references to when and where authors and recipients were employed. (Doc. 41, pp. 13-4) The Court's decision was entirely reasonable, and reasonable people would not disagree as to the inappropriateness of CCBOER flawed and deficient privilege log.

The January 3, 2023 log was approximately 2,700-line items with no descriptions of the content of each document other than the basis for the assertion of the privilege, providing no detail upon which Plaintiff or the Court could understand or challenge the privilege assertion. For example, there were over 850 email attachments listed in the log, but the attachments are not described with identification of authors, recipients, subject, or date. Additionally, the privilege log includes 172 withheld emails, attachments, and text messages exchanged on April 12, 2022, the date a Washington Post reporter inquired of Herzog and Rowell about allegations of the first breach. *See* Exhibit "C" attached hereto. The reporter noted Ms. Hampton's report of Board Member Eric Chaney's presence during the breach. (Exh. C, p. 1). Some of the 172 emails on that day alone, withheld from production, included Chaney and included 79 attached documents with no description at all, although they are presumably responsive to the subpoena and relevant to Plaintiffs' claims. It is hard to imagine that virtually all the 172 purportedly "privileged" documents exchanged that day were seeking or providing legal advice, but it is impossible to determine whether that is the case based upon the information provided in the log.

Further, the January 2024 privilege logs end on July 25, 2022, although the original log recorded documents through August 26 and noted that privileged communications were "ongoing." (Doc. 29-2) The CCBOER 30(b)(6) deposition

did not take place until September 1, 2022, when documents were still purportedly being reviewed by CCBOER, and documents were produced on August 26, in response to CGG's subpoena. A July 25, 2022 cut-off date would obviously exclude the month of activity between July 25 and August 26. No explanation has been offered for the shortening of the reporting period.

On January 17, 2024, during the *Curling* trial, CCBOER served a new and different log also with a July 25, 2022 cut-off, changing the recipient list for dozens of emails but still excluding document descriptions, subject matter, identification of authors, and dates of creation. When they completed *Curling* post-trial briefings on March 1, 2024, Plaintiff CGG's trial team undertook the painstaking review of the new 2700-line privilege log and counsel identified the deficiencies and areas of failure to comply in a letter to opposing counsel dated March 18, 2024.[2] The letter described the following critical issues:

- Of 2,669 documents listed, 2,581 are emails (or attachments) without a description (other than the purported basis for the claim of privilege), subject line, document title, or number of pages.

- 893 of the documents are email attachments but without a description, document title, number of pages, or author or sender/recipient listed.

- The January 17 log disclosed senders and addresses for numerous emails different than the January 3 log, requiring a tedious analysis to determine the differences between the logs. For example, the name "Herzog" appears in the January 3 version 2,576 times but 2,706 times on the January 17 version.

---

[2] A copy of the letter and supporting documents was emailed to the Court on March 29, 2024.

"Chaney" appears 93 and 125 times respectively, and "Vickers" 1,859 and 2,090 respectively. (The reference is not to the number of emails affected, merely the differences in the times the names appear).

In short, *all* privilege logs served to date are wholly inadequate, incomplete, non-compliant, and wildly inconsistent with 2022 representations made by CCBOER counsel, in ways that prejudiced Plaintiff in the *Curling* case. Importantly, CCBOER's resulting concealment of numerous highly relevant documents severely harmed the strong public interest in having the fuller story of the breaches exposed, including the names and relationships of all participants.

### Production of Election Office Videos Showing Breach Activities

Election Office Security video was ultimately produced to Plaintiffs covering the period November 15, 2020, through February 26, 2021, a period of 103 days. *See* Exhibit "D," Marks Declaration, attached hereto. However, CCBOER Rule 30(b)(6) witness Wendell Stone testified that the standard preservation period before overwriting videos was 60 days. Exhibit "E," Tr. 17:19-18:4, attached hereto. For some reason, the videos were preserved for 103 days, stopping when the office was closed for a few weeks on February 26, 2021.

CCBOER claims its IT contractor and staff represented to counsel that the videos from CCBOER's office security system had been overwritten and that videos of the breaches were therefore unavailable. (Doc. 73-3 Herzog Decl. ¶16) As is

discussed below, Rule 26(g) states that by signing discovery responses, counsel represents that a discovery response has been made only "after a reasonable inquiry."

CCBOER's counsel signed multiple responses and objections in which they certified demonstrably false responses, including the response that the videos were unavailable. (Exhs. A and B) Notably absent from CCBOER's argument is a description of any diligence efforts undertaken to confirm the representation regarding the videos. [3] Ms. Herzog's declaration reports she was advised of availability of the video of the exterior of the CCBOER offices sometime after she had told Plaintiff the video was not available but does not disclose when she obtained that information. The declaration does not disclose how or when the Coffee County staff became aware of the continuing existence of the videos or what level of diligence was required to discover the exterior videos could be accessed. Presumably, an explanation would not have been helpful to CCBOER or HBS.

Then in September 2022 the Coffee County staff advised Herzog that CCBOER's IT consultant, SGCCE, found a copy of interior videos, which she then produced to Plaintiff and the GBI. Again, Ms. Herzog's declaration does not disclose

---

[3] As Plaintiff argued in its Sanctions Motion (Doc. 60), courts in this circuit have imposed sanctions where counsel failed to corroborate representations by their clients. *See In re Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d 1335, 1350–51 (N.D. Ga. 2012) (counsel sanctioned for failing to confirm that certain hard drives were searched and for failing to independently confirm discovery representations made by their client).

9

what level of added diligence was required for SGCCE to discover the interior videos could be accessed. And again, the Court should therefore presume an explanation would not have been helpful to CCBOER or HBS.

While Herzog personally may have been unaware, whether reasonably or not, Wesley Vickers, the county manager, was likely aware the videos existed and were available, as was Charles Dial, the IT contractor for the County. Also aware were the Open Records Request (ORR) Officer (Tracie Vickers) and Princess Porter, the Human Resources Manager. They all knew the exterior video existed (starting November 2020 through February 2021) because they used the video as a basis for firing Misty Hampton, claiming her reported work hours did not match the video records of her arriving at and leaving the CCBOER offices.  Additionally, they were all on notice that the exterior videos were saved and delivered to President of the county NAACP in April 2021 in response to an open records request for which there had been considerable communication regarding the production of the video records. (Exh. E) CCBOER acknowledges at page 11 of its Response that a copy of the video was made available pursuant to an ORR, but CCBOER claims it was not picked up. In fact, the requestor, Ms. Paulk, the NAACP President, reported to Marilyn Marks that she promptly picked up the copy when she was informed on April 15, 2021, it was available (Exh. D Marks Decl.¶ 12), after considerable internal and external communications about the

prolonged efforts to produce the video footage. On July 15, 2021, Ms. Hampton was informed that her ORR copy of the video, requested March 31, 2021 (Exhibit "G," attached hereto), was ready for pickup (Exhibit "H," attached hereto).

If Ms. Herzog's declaration reference was to Ms. Hampton's March 31, 2021 request for the video, she fails to explain why the security video, would have been available in April 2021 for footage dating back to November 15, 2020, without some intervening event to preserve the video. Why had it not been overwritten? All these people knew or should have known with the application of the slightest diligence, that the county kept copies of fulfilled ORRs, which would have revealed the existence of the videos. The lack of interest in producing highly relevant (but damning) records is also apparent from the fact CCBOER produced no documents indicating any attempt to obtain the copy it had produced to Ms. Paulk in April 2021.

CCBOER claims Plaintiff's timeline is inaccurate because the depositions of James Barnes, Jill Ridlehoover, Cathy Latham, and Benjamin Cotton were all taken before videos were due under CGG's subpoena. This argument looks at history too narrowly.  Months before the subpoenas were issued and before the depositions were taken, Marilyn Marks and CGG served ORRs on CCBOER which sought many of the same records sought by the subpoenas. In response to the ORRs, CCBOER, through Ms. Herzog, claimed on multiple occasions the videos had been overwritten

and no longer existed. (Exh D Marks Decl. ¶7) Plaintiffs agreed that CCBOER could treat previous responses to the ORRs as responses to the subpoenas. (Exh. A ¶¶ 7, 8 ,10-13); Doc. 73-3 Herzog Decl. ¶ 13) Had CCBOER not repeatedly denied in ORR responses that the videos existed, CGG would likely have delayed the Barnes deposition—the only deposition taken before August 1—until responses to the subpoenas were served. On August 1, 2022, before all depositions other than Barnes, CCBOER served responses to the Curling subpoena. Those responses again denied the existence of the videos. (Exh. A ¶¶ 1-5, 11-12, 14) Additionally, had CCBOER timely revealed the existence of all the videos, Plaintiffs could have undertaken to reconvene certain depositions.[4]

Finally, CCBOER claims it genuinely believed the videos of the election office had been overwritten are inconsistent with other known facts. Specifically, in February 2021, CCBOER relied upon "camera time" records for the period November 16, 2020, through February 19, 2021, (a period that includes all the known breaches) to conclude that Hampton had mis-reported her work time, and she was terminated for that offense on February 25, 2021. *See* Exhibit "I," example

---

[4] CCBOER argues that it cannot be sanctioned under Rule 37(a)(5) for failing to timely produce the videos because the videos were not the subject of the motion to compel. While it is true that the motion to compel did not include then late-produced videos, the argument ignores that Plaintiff relied upon other sources that empower the Court to sanction CCBOER and counsel in connection with the videos, those being 28 U.S.C. §1927 and the inherent power of the court.

timesheet with "camera time," attached hereto. So, despite the video being the purported sole basis for Hampton's termination, CCBOER claims it believed it had been deleted with no copy preserved for personnel files to support the termination, although County Manager Vickers, Human Resources Officer Porter, County Clerk Tracie Vickers, and IT Contractor Dial were all involved in responding to March 2021 requests for the videos related to the staff terminations. (Exh. K)

HBS attorney Anthony Rowell attended the February 25, 2021 CCBOER meeting convened to terminate Ms. Hampton and her staff, at which (unidentified) security video was used to support the termination according to CCBOER's 30(b)(6) designee, Wendell Stone. *See* Exhibits "J" and "E," Stone Tr. 16:12-24, attached hereto. The video resided on the desktop of the county manager. (Exh. E Stone Tr: 16:25-17:1) Stone further testified that the security video produced to Plaintiffs was "on the county system" and "saved by the County." (*Id*. at 20:22-21:4) It seems highly implausible that video used to terminate the entire CCBOER staff for timesheet discrepancies, with the County Attorney present at the meeting, after documenting months of daily camera time personnel entries and exits, and weeks of communications and efforts to produce the security video to Ms. Paulk, would have been simply forgotten or not preserved by the CCBOER, their counsel, or County Human Resources.

**CCBOER exercised no diligence with respect to the CCBOER/Hampton desktop computer**

CCBOER claims that Charles Dial advised Ms. Herzog that he could not locate or retrieve email from Ms. Hampton's desktop computer or through web-based services and that he believed those emails to be permanently lost. But in one email on July 2, 2021, Mr. Dial informed County Manager Vickers he should be able to recover the emails from .ost files on the desktop, assuming Ms. Hampton did not delete them. *See* Exhibit "L," attached hereto; *see also* Doc. 1-6 at 2. Ms. Herzog was aware of that email and produced it to Ms. Marks.  In fact, on July 2, 2021, James Barnes and staff were instructed to leave their computers on at night for Dial to access them to recover Hampton's emails. *See* Exhibit "N-12," attached to Exhibit "N" hereto.  CGG was persistent in its efforts to have CCBOER explore all potential avenues of recovery.  (Doc. 60-4 Marks Decl. ¶14).  Ms. Herzog asked Mr. Dial to confirm that he searched the desktop, as CGG had requested, and he gave an equivocal response. *See* Exhibit "P," attached hereto; see also Doc. 60-4 at 17. The emails produced by CCBOER to Plaintiff, ended there. However, Plaintiff located a follow-up email on the same thread on the GBI image, *not* produced by CCBOER, in which the County Manager, Wesley Vickers, followed-up on Dial's unclear response, and asked Dial, copying Herzog, Rowell, and two other HBS attorneys, whether Dial "personally searched the desktop computer" or if he was just agreeing to the information about the email account. *See* Exhibit "R," attached hereto. To Plaintiff's knowledge, Dial did not answer the email. Exercising minimal diligence,

Ms. Herzog, other attorneys copied on the email, and CCBOER management should have confirmed whether Dial personally searched the desktop and requested documentation showing the desktop had been searched for available .ost files. That would have been basic due diligence, particularly after being told by Dial that he should be able to recover .ost files from the desktop and had arranged for overnight access to the desktops to retrieve the emails. (Exh. N-12)

Given the allegations of criminal activity by the entire CCBOER staff and one board member, HBS and CCBOER had an obligation to secure the desktop computer and preserve and inspect its contents. Instead, they failed to secure the computers, stop the overwriting of files, or conduct the most basic due diligence when requested to do so. A responsible official or attorney would have ordered immediate preservation and forensic examination to ensure that records of potential criminal activity would be preserved.[5]

CCBOER argues its position regarding the Hampton desktop computer was substantially justified because it relied upon its IT consultant's conclusion that the records Plaintiff sought were not accessible, despite his earlier statements that

_____

[5] It is notable that after being notified no later than March 2022 of the suspected breaches and their severity, CCBOER and counsel have still to this day undertaken no effort to investigate or review the breaches, the internal failures, or the security impacts on their election infrastructure.  Instead, it appears their efforts have been primarily directed toward concealing the evidence of the unlawful breaches.

there .ost files might be accessible. Plaintiffs were repeatedly told the "email *account*" was inaccessible, as CCBOER often side-stepped repeated questions as to whether the email records *themselves* were preserved.

CCBOER calls Charles Dial an IT "expert" but tells the Court nothing about his background, and it described no credentials possessed by Mr. Dial for data extraction or retrieval.[6]  What we do know is that the GBI and CGG's expert had no apparent difficulty extracting data that Mr. Dial purportedly declared unretrievable. CCBOER claims it followed "best practices" by consulting with Mr. Dial, and Dial represented that he was unable to retrieve Hampton's emails. Kevin Skoglund's declaration filed on February 20, 2024, as Exhibit 2 to the Sanctions Motion (Doc. 60-2) flatly declared that CCBOER's position is "false."  *Id.* at ¶11. "The emails for Misty Hampton…were located exactly where any IT professional would expect to find them and easily discovered by anyone who put in a small amount of effort to search for them." *Id.*  Mr. Skoglund went on to explain how Microsoft Outlook stores emails in .ost files—also known as Outlook Data Files.  Mr. Skoglund explained how he located 8,572 of Ms. Hampton emails and that his search of files for Hampton,

_____

[6] Nothing on the web site for Southeast Georgia Computer Consulting & Engineering Inc. suggests that the company has any background in litigation support or in data access, extraction, or retrieval.  *See* http://www.sgcce-inc.com/.  Just as it would not be "best practice" to have a bookkeeper conduct a lost profits analysis, it is not best practice to have a computer installer provide advice regarding data retrieval, particularly given the seriousness of the criminal activities involved.

Barnes, and Rachel Roberts generated "approximately 1,000 emails that were responsive to the search." *Id.* at ¶13. Searching the GBI hard drive, Skoglund easily found approximately 145 responsive emails and documents among thousands of additional documents from Hampton, Barnes's, and Roberts's files that had not been produced. CCBOER has consistently maintained that after Ms. Hampton's termination, it obtained a county archiver which preserved emails sent and received by James Barnes, Rachel Roberts and other county officials. Yet, in his preliminary review of the Barnes and (partial)[7] Roberts's emails on the GBI image, Mr. Skoglund found numerous directly responsive and highly relevant emails that had not been produced, nor disclosed as privileged, further raising the question of whether CCBOER and counsel actually conducted a review of the emails.

Despite the seriousness of the unlawful breach activities, Counsel did not engage data extraction or litigation support professionals to ensure that relevant records were preserved, unaltered, and accessible. Mr. Skoglund noted that if one performing a search does not know how to retrieve .ost files, "one could search the internet for 'how to find Outlook files.'" Such a search would direct the person inquiring to a Microsoft Support article that explains: 'The offline Outlook Data File

---

[7] The GBI image contained only 12 months of Ms. Roberts's emails, (6/12/22-6/12/23) although her employment began in December 2021. Plaintiff assumes her emails for the period December 2021 through June 12, 2022 are preserved on the county archiver and may not have been reviewed by CCBOER prior to its subpoena responses.

(.ost) is also saved at drive:\Users\user\DataApp\Local \Microsoft\Outlook.'" *Id.* at ¶13. CGG requested documentation (such as Windows logs) that Dial had checked for .ost files (Doc.1-4 at 4 ¶¶ 9,11,12), but Ms. Herzog represented that no such documentation existed. (*Id*.) That alone should have prompted HBS and CCBOER to obtain assurance that a thorough review had been made. *See* Response Brief, Exh. H (Doc. 73-8), pp. 6-7, Resp. Nos. 9 and 11. Finally, Mr. Skoglund reported, "There is evidence on the GBI Image that indicates that additional documents may still reside on a networked server in Coffee County's possession or control." Doc. 60-2 at ¶16. CCBOER's failure to produce so many responsive documents, again raising the question of whether the county archiver and network drives were diligently searched.

Interestingly, CCBOER goes on to impeach its IT "expert," reporting that Mr. Dial "incorrectly stated that he was not asked to preserve Hampton's emails." *See* Doc. 73, p. 26 n. 5.  CCBOER then forgives itself by arguing that Dial's statement if true is irrelevant because it had no duty to preserve records in October 2021.  That is incorrect.  Boards of elections are required under state law to preserve election related documents and administrative emails. *See* O.C.G.A. §21-2-73; Georgia Archives Local Government Record Retention Schedules.[8]

### The GBI takes possession of the Hampton desktop

---

[8] https://www.georgiaarchives.org/records/local_government/schedules/80/P20.

CCBOER argues that the GBI seized Ms. Hampton's desktop computer in June 2023, but Ms. Herzog, Mr. Dial, Mr. Vickers, and Rachel Roberts were aware ahead of time of the planned seizure. When the seizure occurred, the GBI permitted CCBOER to copy and retain any of the resident files. CCBOER apparently chose not to retain the files subject to the subpoenas despite knowing there were multiple investigations and lawsuits ongoing regarding the breaches.

In October 2023, Plaintiffs learned the GBI had recovered Ms. Hampton's emails from the desktop. There is no evidence suggesting that extraction of those emails required any specialized knowledge or experience that was not shared by Mr. Dial or other technology consultants—none of which CCBOER apparently consulted.  Some 13,0000 plus emails were extracted from the drive by CGG expert beginning November 17, 2022. Election data had to be segregated from personal data by CGG experts who were also preparing for trial, and by the time the emails were in useable form, there was little that could be done with them that would have assisted counsel in the looming *Curling* trial, given that dates for disclosing evidence and exhibits had passed.

CCBOER claims that the Hampton desktop documents present a "unique circumstance." *See* Doc. 73, pp. 27-8. True, the situation was unique for multiple reasons, all of which justify sanctions.  It was a unique circumstance that CCBOER turned over control and possession of Hampton's desktop without keeping copies of

its official records, because it was legally required to maintain those records. While it may have been justified to surrender the computer to the GBI, CCBOER has never even attempted to justify the complete surrender of the desktop to the GBI, keeping no copies of highly relevant records, containing evidence of crimes under investigation.[9] The only logical explanation for such an act is to render CCBOER unable to produce documents it preferred never be seen. And we now know it is incorrect to conclude that "the documents were only uncovered because of the GBI's involvement." Had CCBOER retained a copy of the desktop and produced its contents when requested, counsel and experts would have analyzed the data and retrieved relevant documents for Plaintiff to use in connection with prosecution of its claims.

### The Recovered Documents were responsive to the subpoenas

CCBOER next argues Plaintiff has not shown any of the documents ultimately recovered from the Hampton desktop are responsive to the subpoena requests and

---

[9] CCBOER was permitted to copy the contents of the desktop before delivering it to the GBI. CCBOER and HBS knew the data on the computer was the subject of ongoing investigation and litigation, and CCBOER was required by federal and state law to retain the documents. *See* O.C.G.A. §21-2-73; 52 U.S.C. § 20701). *See also* the DOJ's letter to Arizona officials regarding record preservation obligations at https://www.justice.gov/crt/case-document/file/1424586/dl, ironically, addressing concerns about providing access to Cyber Ninjas, one of the firms that accessed CCBOER election records. Instead of complying with state and federal law, CCBOER and HBS chose to park the subject records with GBI where they would be inaccessible to CGG, the press, and public.

were not previously produced by CCBOER.  The most efficient way to show the falsity of that assertion is to examine the Timeline attached hereto as Exhibit "N," documenting examples of improperly withheld or untimely produced documents, prejudicing Plaintiffs' discovery efforts. The Timeline has various categories of documents, including examples of relevant documents never produced by CCBOER that CGG obtained from other sources. There are documents CCBOER untimely produced after November 2022 when discovery ended in the *Curling* case.  Finally, there are documents CCBOER produced late in discovery, limiting the utility of the production.

It is worth repeating that a movant in connection with a motion to compel is not obligated to show prejudice.  If the opponent of the motion has violated the rules, absent justification, there is strict liability. That is only sensible. The movant has no way of knowing what has and what has not been produced until the motion is granted and compliance with the Court's order is complete.  Only at that point can prejudice be assessed; but i to reach that point, the movant has invested money, time, and effort in requiring compliance, and those costs are by themselves a prejudice.[10]

---

[10]  That said, CGG did suffer prejudice from CCBOER's failure to produce relevant documents. For example, Plaintiffs did not know to direct discovery at Preston Haliburton and Robert Cheeley, who apparently initiated the January 7, 2021 breach. (Doc.60-1 Until they examined the GBI image of the desktop in November 2023, Plaintiffs were unaware that Misty Hampton had been corresponding with Carissa Keshel, Sidney-Powell's co-counsel, and a key player in the multi-state efforts to steal voting system software, concerning voting system issues. Timely production of

## **Argument and Citation of Authority**

CCBOER argues that pursuant to Rule 37(a)(5)(C), sanctions are not mandatory if the motion to compel is granted in part and denied in part. If the motion is granted, under Rule 37(a)(5)(A), sanctions are mandatory. Rule 37(a)(5)(C) provides as follows: "If the motion is granted in part and denied in part, the court may issue any protective order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion." Rule 37(a)(5)(C) is not a "get out of jail card free" because it calls for apportioning costs, not ignoring them as CCBOER suggests.

---

the communications and the affidavits produced for Sidney Powell, would have permitted Plaintiffs to question Ms. Hampton, Ms. Keshel, and other witnesses about such efforts being undertaken. Plaintiffs recovered an affidavit concerning alleged voting system deficiencies drafted for Eric Chaney's signature dated January 8, 2021, (Exhibit N-3) one day after the first breach and "deleted" at 4:07pm on February 25, 2021 by Misty Hampton when she returned to her office after being terminated. Plaintiffs were deprived of the opportunity to examine Hampton, Chaney, and CCBOER's 30(b)(6) witness about the document and its allegations. Recovered withheld documents in Barnes's emails on the desktop (also available to the county on the county archiver) included emails concerning the improper and insecure storage of equipment. (Exh.N17-N20) Those emails were produced too late to obtain deposition testimony concerning their content. Plaintiffs did not have the opportunity to examine state and county election officials concerning Ms. Deb Cox's email to James Barnes' disclosing that the reason for the SOS seizing of the EMS server was not related to a password change. (Exh.N-18) Barnes's withheld emails implied he had been able to access Hampton's emails and sent a relevant (and improperly withheld) Hampton affidavit to Tony Rowell concerning system security. (Exh. N-10) The timeline (Exh. N) documents such examples of withheld relevant documents CGG recovered from the GBI image. In short, these examples of such discoveries were located too late to take further discovery related to what they disclosed or to use them as extensively as needed at trial.

## <u>Rule 26(g): Counsel's certification</u>

The issue under Rule 26(g) analysis is whether counsel made reasonable inquiry to support the position being taken in connection with some discovery response. In connection with the privilege log issue, reasonable inquiry is not an issue because counsel presumably has access to the documents and is the preparer of the log. Ms. Herzog's Declaration makes clear that she had extensive hands-on access to CCBOER records as well. (Doc. 73-3 ¶¶10-13) If there were defects and deficiencies in the privilege log—and the Court rightly found there were many—it is the responsibility of counsel.  If the shortcomings were not reasonably justified—and they were not—sanctions are mandatory.

Similarly, with respect to the Hampton desktop, the failures in judgment were principally the responsibility of counsel.  The failure to engage competent litigation support professionals to assess and document the accessibility of Hampton's emails and other documents is a failure to exercise reasonable case, and that failure could quite logically be traced back to CCBOER and HBS's desire to see to it that certain materials were never produced and publicly exposed.

As explained above and in footnote 7, there is no question about CCBOER's preservation of emails and documents of previous election directors James Barnes and Rachel Roberts.  But consideration of all relevant facts reveals there is a serious

question of whether CCBOER and counsel conducted an appropriate search of those county archives for responsive records.[11]

Likewise, CCBOER's failure to follow the law and retain copies of election records and related administrative matters can never be classified as reasonable. Violations of legal standards are *per se* unreasonable. Turning over the desktop to the GBI without securing a copy of its contents is inexplicable—except to the extent that it was calculated to place documents beyond the reach of Plaintiffs and others determined to get to the bottom of the breach.

It is difficult to prove knowledge, particularly when dealing with actors who stubbornly insist on maintaining blissful ignorance. But standards for reasonable diligence exist, and those standards do not make allowances for stubbornly maintained ignorance. Had CCBOER and its counsel performed minimal due diligence, the videos that were available after the depositions were taken would have been available before the depositions were taken, and the emails that were produced in November 2023 by the GBI would have been produced in 2022 by CCBOER and its counsel. The videos existed; the emails were retrievable; the only thing truly missing was the will to locate and produce them.

---

[11] The GBI image does not include Rachel Roberts's emails between December 2021 and June 2022. Those are therefore inaccessible to Plaintiff, although they should be accessible to CCBOER on the county archiver. CCBOER and counsel should ensure that such emails have been reviewed for responsiveness to the Plaintiffs' subpoenas.

## 28 USC § 1927

The parties agree: Bad faith is the touchstone of a Section 1927 sanction.  As Plaintiff argues above, there is sufficient evidence (a pattern of such evidence) from which the Court should logically infer that counsel engaged in conduct that was designed to thwart Plaintiff's efforts to secure relevant evidence through discovery. Bad faith was exhibited in HBS's representations throughout the responses to Plaintiffs' subpoenas that no additional responsive documents existed (Exhs. A and B), while 2,700 documents were being concealed and even more were not located as a consequence of the absence of apparent effort to find them.  Further, on July 15, 2022, even after the Coffee County breaches were national news, Herzog counseled Rachel Roberts, the then-Elections Director of CCBOER, not to state in writing the fact that the system had been compromised. (Doc. 31-8) Herzog went on to represent to Roberts there was no evidence of a breach. (*Id*.) In short, Herzog was not only misleading Plaintiff; she was misleading her client and advising her on how to avoid detection and avoid production of required records.

CCBOER argues Plaintiff's claims of prejudice are misleading because certain of the depositions of key Coffee County witnesses were taken before August 26, 2022, when CCBOER responded to one of the subpoenas.  *See* Doc. 73, p. 42. That argument fails to consider that there were two related subpoenas from co-plaintiffs working jointly on discovery, and the response to the Curling subpoena

was served on August 1, 2022. Plaintiff relied on representations made in that subpoena and in previous ORR responses because the response to the CGG subpoena had not yet been served.  Also, although the videos were produced long before trial, that fails to account for the fact that discovery ended in the case in the fall of 2022. CCBOER did not produce the exterior camera Videos to the *Curling* Plaintiffs Videos until August 27, 2022 (Exh. D, Marks Decl.) and the interior camera Videos until September 16, 2022 (*Id*.).  There had been many extensions of the discovery period, and the Court had made plain that there would be no further extensions.

## Inherent Authority of the Court

As with 28 U.S.C. § 1927, an award of sanctions pursuant to the Court's inherent authority requires a showing of bad faith.  As is argued above, there is more than ample basis for the Court to infer an intention plan by CCBOER and its counsel to prevent Plaintiff from being able to fully conduct discovery.

## Conclusion

Plaintiff seeks to address the misconduct of CCBOER and HBS as detailed in the Motion for Sanctions. Additionally, Plaintiff requests that the Court order the production of discovery materials improperly withheld by CCBOER. If civil litigation is to function as intended under the Rules, the parties are obligated to conduct themselves in faithful adherence to the Rules, and counsel must act as guardrails.  When counsel acts to facilitate the avoidance of disclosure the entire

ecosystem of proper litigation is disrupted: battles between lawyers erupt, costs skyrocket, and the Court's resources are squandered on detailed and tedious discovery battles. For that reason, it is incumbent upon counsel to demand and ensure fidelity to the Rules. Here, in an apparent effort to avoid accountability, counsel made no such demands on their client, and the client, left to its own devices, sought to avoid disclosure rather than accept transparency.  If the system is to function properly, that cannot happen without consequences.

Respectfully submitted this 12th day of April, 2024.

 /s/ William Daniel Davis
WILLIAM DANIEL DAVIS
Georgia Bar No. 746811
CARY ICHTER, *Pro Hac Vice*
Georgia Bar No. 382515
ddavis@ichterdavis.com
cichter@ichterdavis.com
**ICHTER DAVIS LLC**
400 Interstate N. Pkwy, SE, Ste. 860
Atlanta, Georgia 30339
(404) 869-7600

/s/ Bruce P. Brown
BRUCE P. BROWN, *Pro Hac Vice*
Georgia Bar No. 064460
bbrown@brucebrownlaw.com
**BRUCE P. BROWN LAW LLC**
1123 Zonolite Rd. NE, Suite 6
Atlanta, Georgia 30306
(404) 881-0700

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2024, a copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF which will automatically send notification of such filing to all attorneys of record.

/s/ Cary Ichter
Cary Ichter