# EXHIBIT E

Civil Action File No. 5:23-mc-00001-LGW-BWC
*Plaintiff Coalition for Good Governance's Reply to Defendant's Response to Motion for Sanctions*

# EXHIBIT 1

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

1
2
3
4

Donna Curling, et al.,

5
                    Plaintiffs,
                                        CIVIL ACTION FILE
6
            vs.
                                        NO. 1:17-cv-02989-AT
7
Brad Raffensberger, et
8       al.,
9                    Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~
10
11
12              VIDEO 30(b)(6) DEPOSITION OF
    COFFEE COUNTY BOARD OF ELECTIONS & REGISTRATION
13                        THROUGH
                    WENDELL STONE
14
15
                    September 1, 2022
16
                      9:07 a.m.
17
18
19          Suite 3250, One Atlantic Center
                1201 W. Peachtree Street
20                  Atlanta, Georgia
21
22
23
            S. Julie Friedman, CCR-B-1476
24
25

```
                                                       Page 2
 1                    APPEARANCES OF COUNSEL
 2      On behalf of the Curling Plaintiffs:
 3          MORRISON & FOERSTER LLP
            DAVID D. CROSS, ESQ.
 4          VERONICA ASCARRUNZ, ESQ. (Via Zoom)
            JENNA CONAWAY, ESQ. (Via Zoom)
 5          WAIL JIHADI, ESQ. (Via Zoom)
            MARY KAISER, ESQ. (Via Zoom)
 6          CAROLINE MIDDLETON, ESQ. (Via Zoom)
            DONNA PRICE, ESQ. (Via Zoom)
 7          SONJA SWANBECk, ESQ. (Via Zoom)
            Suite 900
 8          2100 L Street, NW
            Washington, DC  20037
 9          202.887.8795
            dcross@mofo.com
10      AND
            KREVOLIN & HORST LLC
11          ADAM M. SPARKS, ESQ.
            JESSICA CINO, ESQ. (Via Zoom)
12          Suite 3250, One Atlantic Center
            1201 W. Peachtree Street NW
13          Atlanta, Georgia  30309
            404.835.8067
14          404.888.9577 Fax
            sparks@khlawfirm.com
15
        On behalf of the Coalition for Good Governance
16          Plaintiffs:
17          BRUCE P. BROWN LAW LLC
            BRUCE PERRIN BROWN, ESQ.  (Via Zoom)
18          MARILYN MARKS, ESQ. (Via Zoom)
            Suite 6
19          1123 Zonolite Road
            Atlanta, Georgia  30306
20          404.386.6856
            bbrown@brucepbrownlaw.com
21
22
23
24
25
```

Page 3

```
 1              APPEARANCES OF COUNSEL (CONTINUED)
 2     On behalf of the State Defendants:
 3          ROBBINS ALLOY BELINFANTE LITTLEFIELD LLC
            CAREY A. MILLER, ESQ.
 4          VINCENT R. RUSSO, ESQ. (Via Zoom)
            500 14th Street NW
 5          Atlanta, GA  30318
            678.701.9381
 6          cmiller@robbinsfirm.com
       AND
 7          TAYLOR ENGLISH DUMA LLP
            DIANE F. LaROSS, ESQ.
 8          BRYAN TYSON, ESQ. (Via Zoom)
            Suite 200
 9          1600 Parkwood Circle
            Atlanta, Georgia  30339
10          678.336.7228
            dlaross@taylorenglish.com
11
       On behalf of the Deponent:
12
            HALL BOOTH SMITH PC
13          STEPHEN D. DELK, ESQ.
            1564 King Road
14          Tifton, Georgia  31793
            229.382.0515
15          229.382.1676 Fax
            sdelk@hallboothsmith.com
16
17     Also Present:
            Donna Curling
18          Susan Greenhall
            Joseph Oluwasegun
19          Kevin Skoglund
            Danielle Stucchi, Paralegal
20           Krevolin & Horst LLC
            Ernestine Thomas-Clark
21          Jesse Wiggins, Videographer
22
23
24
25
```

Page 4

1                    INDEX OF EXAMINATIONS
2      WITNESS:
       Wendell Stone
3                                                    Page
4       Cross-Examination                               9
          By Mr. Cross
5       Cross-Examination                             210
          By Mr. Brown
6       Cross-Examination                             221
          By Mr. Miller
7       RECROSS-EXAMINATION                           266
         BY MR. CROSS
8       RECROSS-EXAMINATION                           277
         BY MR. MILLER
9
10                    INDEX TO EXHIBITS
11     Plaintiff's
         Exhibit        Description          Page
12
       Exhibit 1    8-25-22 Subpoena to Testify At A    12
13                  Deposition in a Civil Action,
                    Coffee County Board of Elections
14                  & Registration
15     Exhibit 2    1-7-21 and 1-8-21 -- Three Screen   32
                    Shots From Video of Two Men
16                  Entering Office Carrying/Pulling
                    Items
17
       Exhibit 3    Screen Shots from Camera 1 1-7-21   34
18
       Exhibit 4    E-mail Chain Ending with Tuesday,   56
19                  May 11, 2021 3:30 PM E-mail, from
                    Watson, to Jones, Subject: Fwd:
20                  Coffee County
21     Exhibit 5    5-6-21 Dominion Voting, Customer     60
                    Notification:  Maintaining Secure
22                  Chain of Custody for Your
                    Dominion Voting System,
23                  CONFIDENTIAL,
                    STATE-DEFENDANTS-00101937
24
25

Page 5

1                    INDEX TO EXHIBITS
2     Plaintiff's
        Exhibit         Description           Page
3
4     Exhibit 6    A Series of Photographs Showing     78
                   Compact Flash Cards with
5                  Handwritten Tags, Flash Drives,
                   Etc., 08122022-000236-265
6     Exhibit 7    Screen Shots from Camera 1 on       89
                   1-27-21 Through 1-29-21
7
      Exhibit 8    1-28-21 and 1-29-21 Screen Shots    91
8                  of Individuals Entering and
                   Leaving the Elections Office
9
      Exhibit 9    Two Photographs of Jeffrey          99
10                 Lenberg
11    Exhibit 10   Composite Exhibit of Coffee         100
                   County Board of Elections and
12                 Registration Board Meeting
                   Minutes Beginning with 10-6-20
13
      Exhibit 11   8/12/22 12:20 PM (GMT-05:00)        106
14                 E-mail, from Chaney, to
                   Thomas-Clark, et al., Subject:
15                 Coffee Co Board of Elections
16    Exhibit 12   Typewritten Sheet Beginning:        116
                   3.4.22 (3) All documents,
17                 including communications...;
                   E-mail Chain Ending with Tuesday,
18                 4-12-20 3:50 PM E-mail, from
                   Herzog, to Germany, Subject: FW:
19                 Response to 4/12/22 Emma Brown
                   Washington Post inquiry
20
      Exhibit 13   Photograph of Voyles and Eric       122
21                 Chaney Sitting at a Table with
                   Laptop in Elections Office
22
      Exhibit 14   Messages - Eric Chaney (With        126
23                 Hampton) Beginning 3/15/18 7:40
                   PM
24
25

Page 6

```
1                      INDEX TO EXHIBITS
2      Plaintiff's
         Exhibit         Description           Page
3
       Exhibit 15   Messages - Andy Thomas &        146
4                   Ernestine Thomas-Clark & Eric
                    Chaney & Matthew McC & Wendell
5                   Stone, Beginning with 1-4-12 7:21
                    PM Text
6
       Exhibit 16   2-25-21 Resignation Letter, from   153
7                   Ridlehoover, to Board of
                    Elections  Chairperson
8
       Exhibit 17   2-25-21 Resignation Letter, from   153
9                   Hampton, to Board of Elections
                    Chairperson
10
       Exhibit 18   Juha, Keskinen (@MacFinn44),       156
11                  TWITTER (Feb. 26, 2021, 6:05 PM)
                    Twitter Post
12
       Exhibit 19   Text Message Between Hampton and   158
13                  Rowell (Withdrawn to
                    Attorney-Client Privilege)
14
       Exhibit 20   Message # 249 - From Vickers, to   160
15                  Hampton, Subject: FW
                    [EXTERNAL]Re: Open Records
16                  Request
17     Exhibit 21   Summary, Dyanna Hours Claimed      163
                    Period 11-16-20 - 2-19-21
18
       Exhibit 22   Screen Shots from Camera 1 1-8-21  165
19                  Man Leaving with Equipment
20     Exhibit 23   E-mail Chain Ending with           174
                    Thursday, 7-15-21 1:57 PM E-mail,
21                  from Hampton, to Vickers,
                    Subject: Re: Open Records Request
22
       Exhibit 24   4-12-22 Letter, to Marks, from     178
23                  Herzog, Consolidation of
                    Outstanding Open Records Requests
24
25
```

Page 7

INDEX TO EXHIBITS

Plaintiff's

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 25 | 1-8-21 3:48:30 PM E-mail, from Maggio, to Powell, Subject: RE: SSA1722: Jim Penrose - Coffee County GA Forensics Engagement Agreement, 08122022-000034 - 53 | 183 |
| Exhibit 26 | 11-30-20 SullivanStrickler Engagement Agreement Forensic Analysis, 08122022-000110 - 122 | 185 |
| Exhibit 27 | SSA1722 HARD DRIVE CONTENTS | 187 |
| Exhibit 28 | Spreadsheet of E-mail Addresses with Access to Coffee County Data, 08122022-000126-136 | 190 |
| Exhibit 29 | Spreadsheet of IP Addresses That Have Downloaded Coffee County Data, 08122022-000137-161 | 192 |
| Exhibit 30 | CISA - ICS Advisory (ICSA-22-154-01) Vulnerabilities Affecting Dominion Voting Systems ImageCast X | 200 |
| Exhibit 31 | 12-17-20 Still v. Raffensperger Lawsuit, Verified Petition for Emergency Injunctive and Declaratory Relief | 214 |

INDEX TO EXHIBITS

Defendant's

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 0001 | Ga Comp. R. & Regs. 183-1-12-.04, 183-1-12-.04. Storage, Maintenance, and Transport of Statewide Voting System Components | 229 |

1                          INDEX TO EXHIBITS
2        Defendant's
          Exhibit          Description           Page
3
         Exhibit 0002 1-7-21 Screen Shots of Men        249
4                     Entering Front Door of Elections
                      Office with Equipment
5
         Exhibit 0003 E-mail Chain Ending with Friday,  255
6                     May 7, 2021 1:51:10 PM E-mail,
                      from Germany, to Feehan, et al.,
7                     Subject: RE: [EXTERNAL] RE:
                      Dominion notice to Customers re:
8                     Chain of Custody, Ending Dominion
                      089394
9
10
              (Original Plaintiff's Exhibits 1 through 31 and
11       Defendant's Exhibits 1 through 3 have been attached
         to the original transcript.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          THE VIDEOGRAPHER:  Today's date is

2    September 1st, 2022, and we are on the record at

3    9:07 a.m.  This will be the videotape 30(b)(6)

4    deposition of Coffee County Board of Elections

5    given by Wendell Stone.

6          Would counsel present please identify

7    themselves for the record.

8          MR. CROSS:  David Cross of Morrison &

9    Foerster on behalf of the Curling Plaintiffs;

10    and with me is my colleague, Adams Sparks.

11          MR. DELK:  Steven Delk on behalf of the

12    witness.

13          MR. MILLER:  Carey Miller here on behalf

14    of the State Defendants.

15          I will be having, joining me later Diane

16    LaRoss also on behalf of the State Defendants.

17          THE VIDEOGRAPHER:  Thank you.

18          Would the court reporter please swear in

19    witness.

20          WENDELL STONE, having been first duly

21    sworn, was examined and testified as follows:

22    CROSS-EXAMINATION

23    BY MR. CROSS:

24    Q.    Good morning, Mr. Stone.

25    A.    Good morning.

1       Q.      Can you just state your full name for the
2    record.
3       A.      My name is Wendell Stone.
4       Q.      So no middle name?
5       A.      No middle name.
6       Q.      Okay.  And where do you currently live.
7       A.      I live in Coffee County in the Ambrose
8    community of Coffee County, Douglas as the county
9    seat.
10      Q.      Okay.  What's your current address?
11      A.      ███████████████████████████████
12    ███████
13      Q.      Okay.
14              MR. DELK:  And, David, if I can just
15          stipulate here at the beginning, I'll try to
16          stay out of your hair.  Mr. Stone is testifying
17          solely today in a representative capacity on
18          behalf of the Board, and no answer he provides
19          will be representative of any of his individual
20          thoughts or opinions or testimony in this case.
21              MR. CROSS:  Okay.  Understood.  There
22          maybe be some questions that get to him
23          personally, but if they do we can --
24              Mr. Delk:  Sure.
25              MR. CROSS:  -- take them as they come.

Page 11

1    Q.    (By Mr. Cross)  Okay.  So, Mr. Stone, you
2    understand you're -- you've taken the same oath you
3    would take if you were testifying in a courtroom?
4    A.    I do.
5    Q.    Okay.  Have you been deposed before?
6    A.    No.
7    Q.    Just briefly then --  I'm sure Mr. Delk
8    has gone over it with you.
9         The court reporter next to you is going to
10   take down everything we say.  There's a video.  It's
11   just important that we not speak over each other, so
12   she can get a complete record.
13        If you have any questions about anything I
14   ask you, please just let me know.  I'm happy to
15   clarify.
16        If you want to take a break at any point,
17   absolutely fine.  The only thing is if there's a
18   question pending, you have to answer that question
19   before we break.
20   A.    Thank you.
21   Q.    Mr. Delk may object from time to time.
22   You still have to answer the question unless he
23   instructs you not to.
24   A.    I understand.
25   Q.    Okay.  So you understand you're here

1      testifying as a representative on behalf of the

2      Coffee County Board of Elections; is that right?

3          A.     I do.

4          Q.     Okay. And what did you do to prepare for

5      today's deposition?

6          A.     To prepare for today's deposition, I read

7      the subpoenas. I met with counsel.

8          Q.     And how long did you meet with counsel?

9          A.     You mean for a total, how long did I meet

10     with counsel?

11          Q.     Yeah. About how long did you meet with

12     counsel to prepare for today?

13          A.     I probably met with counsel for four

14     hours.

15          Q.     Okay. And did you speak with anyone other

16     than counsel to prepare for today?

17          A.     No.

18          Q.     Okay. Did you look at any documents?

19          A.     Other than the subpoenas, no.

20          Q.     Okay. All right. Let me hand you what

21     we're going to mark as Exhibit 1.

22          (Exhibit 1 was marked for identification.)

23          Q.     (By Mr. Cross) This is a copy of one of

24     the deposition subpoenas. You can flip through it,

25     and just tell me if you've seen this before.

```
 1          A.    Okay.

 2          Q.    Grab some glasses?

 3          A.    I'm going to have to get my glasses

 4    because --

 5          Q.    We're all getting there.

 6          A.    -- I mean, the text is beyond what I can

 7    do here, so let's see.

 8                So yes.  I have seen this before.

 9          Q.    Okay.  So take a look.  Yeah.  Right where

10    you are is fine.

11                You see the heading that says, "TOPICS"?

12          A.    I do.

13          Q.    And are you prepared to testify on the

14    topics that are listed here through Page 7 today?

15          A.    I am.

16          Q.    Okay.  And so do I understand --

17                Well, let me ask you -- let me ask you

18    this.

19                Do you understand that the County produced

20    some documents in response to a subpoena?  Were you

21    aware of that?

22          A.    I'm aware that documents were requested.

23    I --  I'm not aware of the documents that were

24    produced by the County.

25          Q.    Okay.  So in preparation for today, you
```

Page 14

```
 1      didn't look at any documents that were produced?
 2          A.    When you say documents, do you mean --
 3                Okay.  Are you referring to video?
 4          Q.    Well, that's part of it.  I was going to
 5      ask you separately about that.
 6          A.    Okay.  I have seen that.
 7          Q.    Okay.  You've seen the video that was
 8      produced to us?
 9                MR. DELK:  And I'll object to the extent
10          anything that was from me or our firm is
11          privileged.
12                He's asking about other generalized
13          documents.
14                THE WITNESS:  Uh-huh.
15          Q.    (By Mr. Cross)  Well --
16          A.    They came from the County.  That were
17      requested by the County, and I'm not aware of what
18      those are, and the Board is not aware of what those
19      are.
20          Q.    (By Mr. Cross)  So let --  Let's make sure
21      we're talking about the same thing, so we served a
22      documents subpoena.
23          A.    Give me an example of the documents you're
24      talking about.  That was --
25                MR. DELK:  And, David, if it helps, you
```

1          may be able to help out, some specific examples.

2          Much of the document production was handled by

3          counsel.

4                    MR. CROSS:  Okay.

5                    MR. DELK:  But if you want to go through

6          specific documents, that may be helpful.

7          Q.    (By Mr. Cross) Okay.  Yeah.  We're going

8     to do that.  I was trying to figure out.

9                    So you mentioned a video.  Is that video

10    that shows the outside of the Coffee County Elections

11    Office and people coming and going?

12         A.    It is.

13         Q.    Okay.  And is --  Where did that video

14    come from?

15         A.    The video, well, it was retained on the

16    system that is used in the County.  I mean, video

17    cameras are at various places throughout the county,

18    and so that's where that video came from.

19                    And yes.  That video is from the door of

20    the Elections Office.

21         Q.    Okay.

22                    MR. MILLER:  And, David, can I just

23          interject real quick before we get too far down

24          the road.  The Exhibit Share online, I realize

25          we only have limited paper copies.  Are we

Page 16

1          admitting these as we go?

2               MR. CROSS:  Yeah.

3               MR. MILLER:  I figure this one, I mean,

4          it's easy enough; but it -- it's not showing in

5          my Marked Exhibits under issue.

6               MR. CROSS:  Oh, yeah.  Somebody should be

7          introducing them into Exhibit Share.  Let me

8          make sure the team knows that.

9               THE COURT REPORTER:  Do we need to go off?

10              MR. CROSS:  Actually, can you just e-mail

11         my folks and make sure somebody's doing that.

12         Q.   (By Mr. Cross)  Okay.  And the -- the

13    video that was produced to us that you're talking

14    about, was that video that was reviewed by the

15    Elections Board with respect to letting Miss Hampton

16    and Miss Ridlehoover go in February of 2021?

17         A.   Okay.  Now on behalf of the Board and to

18    my knowledge, the Board has not seen that video.  The

19    video was not utilized by the Board to let Miss

20    Hampton go, but the video -- a -- not that video, but

21    video did contribute to them being let go from their

22    positions, but that video is -- is not in question.

23    Not --  I mean, it's not a part of what you're asking

24    me about.

25              In other words, everything is on video and

```
1     as desktop video for the county manager.  And I don't
2     know who else has access to it within the county
3     management, but I mean --
4              So I mean, are you asking me about
5     their -- about their dismissal?
6              And they did resign.  I mean, they weren't
7     dismissed.  Now if --  Well, I mean, effectively,
8     they were.
9              But are --  Are you asking me about how
10    we -- how it was decided?
11        Q.    No.  I'll --  I'll come to that.
12             What I'm trying to understand is sort of
13    the providence of the video we got.
14             Are you aware that the video that we
15    received ends on February 19, 2021?
16        A.    February 19.  I'm terrible with dates.
17             I'm not aware of the date that the video
18    ended.
19        Q.    Do you know why the video doesn't go
20    beyond whatever date it ends at, which I can tell you
21    is February 19th, twenty --
22        A.    The --
23        Q.    -- twenty one.
24        A.    I know that the --
25             Unless there's a reason to capture video,
```

1    the video writes over every 60 days.  I -- It's not

2    my system.  I don't know how to run the system, but I

3    know that it writes over, and so that's what happens

4    to the video.  In other words, there's not a video

5    that's going to last from that day till this day.

6        Q.    Right.  So what I'm trying to understand

7    is then how do you have video that goes back before

8    February 19, 2021.

9        A.    Okay.  Are you referring to the video

10   that --

11       Q.    That was produced --

12       A.    -- I looked at --

13       Q.    -- to us.

14       A.    -- yesterday?

15       Q.    Well, I don't know what you looked at.

16       A.    Okay.

17            MR. DELK:  We've got to be --  Try not to

18       talk over him, but y'all work together.

19            MR. CROSS:  Yeah.  Yeah.

20       Q.    (By Mr. Cross)  So let me make sure I

21   finish my question and -- and --

22       A.    Uh-huh.

23       Q.    -- before you start talking.

24            So I don't --  I don't know what video you

25   looked --

```
 1              MR. CROSS:  Can you tell me.  Did he look
 2        the video that you guys produced?
 3              MR. DELK:  We hit what I suspect will be
 4        the most pertinent parts.
 5              MR. CROSS:  Okay.  But it's the same --
 6              MR. DELK:  Now it's what was recently
 7        produced, the out -- the exterior footage of --
 8              MR. CROSS:  Yeah.
 9              MR. DELK:  -- the front door of the
10        election building.
11              MR. CROSS:  Okay.
12              THE WITNESS:  And that was a January 6th,
13        January 7th.
14              MR. DELK:  There were several dates, but
15        it encompasses that.
16              THE WITNESS:  Uh-huh.
17        Q.    (By Mr. Cross)  Okay.  So we're talking
18     about the same video that was produced to us, and it
19     sounds like maybe you looked at portions of it.
20        A.    Exactly.
21        Q.    Okay.  So what I'm trying to understand is
22     why does the County have video from that time period
23     if the video would otherwise get overwritten.
24        A.    Okay.
25              MR. DELK:  Object to the form to the
```

```
1              extent that you're talking about the County

2              separately and apart from the Board of

3              Elections.

4                   THE WITNESS:  As I know --  As I know of,

5              that the video was Open Records requested by

6              Misty Hampton, who is our former elections

7              supervisor.  That was in -- as -- as far as I

8              know and as far as the Board would know.

9                   And as I say again, the Board did not see

10             that video, to my knowledge; but that's where it

11             came from.

12             Q.   (By Mr. Cross)  I see.  So the video that

13        we got was pulled at some point in the past in

14        response to an Open Records Request from Miss

15        Hampton?

16             A.   Uh-huh.

17             Q.   Yes?

18             A.   Yes.

19             Q.   Okay.  And sorry.  You have to say yes or

20        no just so it's clear.

21             A.   And I understand that.

22             Q.   Okay.  Where was that video pulled from to

23        produce to us?

24                  Do you know where it was saved?  Like was

25        it on somebody's computer?  Was it on a county
```

1    system?

2            A.    It was on the county system; but exactly

3    how that is done, I'm not sure; but it was saved by

4    the County.

5            Q.    And is it your understanding that there's

6    no other video available for the late 2020, early

7    2021 time period for the Elections Office?

8            A.    That's my understanding.

9            Q.    And what is that based on?

10           A.    It would be outside of the 60 days.

11           Q.    Oh.  Do you know if any efforts were made

12   to confirm --

13           A.    And listen.  I'm not trying to be evasive.

14           Q.    Sure.

15           A.    But I am absolutely terrible with dates

16   and remembering, you know, when things specifically

17   happened; and now that's just --  I think it's a

18   product of getting old.  I don't know but --

19           Q.    I understand.  No worries.  No worries.

20   Do your best.

21                 Do you know what efforts were made to see

22   whether there is any other video that exists for the

23   Elections Office?

24           A.    I'm --  I assume.

25           Q.    And I don't want you --

Page 22

```
 1              MR. DELK:  No.
 2       Q.    (By Mr. Cross) --  to guess.
 3              MR. DELK:  Don't assume.
 4              MR. CROSS:  Yeah.
 5              MR. DELK:  If you know, you know.  If you
 6       don't, you don't.
 7              THE WITNESS:  Okay.
 8              MR. DELK:  But don't assume.  Just --
 9              THE WITNESS:  I --
10              MR. DELK:  -- listen to his question, and
11       through.
12              THE WITNESS:  Then I'm going to have to
13       say that I don't know.
14       Q.    (By Mr. Cross)  That's fine.
15       A.    I don't know the answer to that.
16       Q.    That's fine.  Definitely do not want you
17     to guess or speculate on anything.  If you don't
18     know just --
19       A.    Uh-huh.
20       Q.    -- feel comfortable saying you don't know.
21              THE COURT REPORTER:  If I could make a
22       request.  Can you face forward.  You're having a
23       private conversation.  I need to hear you.
24              THE WITNESS:  And I -- I --
25              THE COURT REPORTER:  I'm having to look at
```

Page 23

1          the screen.

2               THE WITNESS:  I understand that, and thank

3          you for reminding me.

4               THE COURT REPORTER:  It will make our

5          video nicer, too.

6               THE WITNESS:  Uh-huh.

7               THE COURT REPORTER:  I know it's awkward.

8               THE WITNESS:  That's okay.  Do the best I

9          can.

10               Q.    (By Mr. Cross)  So when was the first time

11     you saw that video?

12               A.    Yesterday.

13               Q.    It sounds like you looked at particular

14     days?

15               A.    Uh-huh.

16               Q.    Yes?

17               A.    Yes.

18               Q.    Okay.  And --  And what days did you

19     review?

20               A.    January 7th.

21               Q.    Anything else?

22               A.    I don't recall the date of any other --

23               Q.    Okay.

24               A.    -- other.  Possibly January 8th.

25               Q.    And did you see anything in that video

```
 1        that you had not seen or heard about before?
 2             A.    I did.
 3             Q.    Which was what?
 4             A.    I saw people that I did not recognize
 5        going into the Elections Office, as well as people
 6        that I did recognize going into the Elections Office.
 7             Q.    And this on January 7th of 2021?
 8             A.    That's correct.
 9             Q.    Okay.  And are you aware that on January 7
10        of 2021, a team of individuals with forensic
11        expertise went into the Coffee County Elections
12        Office and copied software and elections data from
13        various equipment?
14             A.    On behalf of the Board, we have not been
15        notified by the Secretary State's Office, by the
16        County Commission, by any governing authority that
17        anyone breached our security.
18                  I'm not going to sit here and try to act
19        like I don't know, and the extent of my knowledge
20        before yesterday and after working with counsel was
21        the media presentations that have come out related to
22        what you're asking me about.
23             Q.    So the first -- The first that the Board
24        of Elections learned that individuals had breached
25        the Coffee County voting equipment in January of 2021
```

```
 1      was through the press?
 2              MR. DELK:  Object to the form.
 3              You can answer.
 4              THE WITNESS:  That's the -- my
 5          understanding.
 6          Q.   (By Mr. Cross)  Okay.  And that's true for
 7      you personally?
 8              MR. DELK:  Object to the form.
 9              He's not here to answer questions
10          personally.  This was noticed as a 30(b)(6).  If
11          you guys want to ask him individual questions,
12          we'll schedule that at a later date.
13              MR. CROSS:  Well, he's a member of the
14          board.  If he knew something earlier --
15              MR. DELK:  Then you can ask him on behalf
16          of the Board, but I'm -- I'm trying to avoid --
17              MR. CROSS:  I understand.  I understand.
18              MR. DELK:  -- any issues like we've had in
19          past ones, so if we can keep it to the Board,
20          'cause that's how it was noticed.
21              MR. CROSS:  Steve, we haven't had any
22          issues.
23              MR. DELK:  And I'm not trying to make any
24          now.  I'm trying to make it neat, so we'll --
25              MR. CROSS:  I know.  I hear you.
```

```
1              MR. DELK:  -- have no trouble with the
2        Board.
3              MR. CROSS:  I know.  I'm kidding with you.
4              THE WITNESS:  And -- and, again --
5              MR. DELK:  Well, no.  No.
6              MR. CROSS:  Yeah.  We're good.
7              THE WITNESS:  Don't say --
8              MR. DELK:  Wait till --
9              THE WITNESS:  -- anything.
10             MR. DELK:  -- the question's on the table.
11             MR. CROSS:  Yeah.  Yeah.
12        Q.    (By Mr. Cross)  All right.  So just so
13    we're clear, your testimony on behalf of the Coffee
14    County Elections Board is that the Board itself was
15    not aware of the events that you saw in the video
16    that you reviewed for January 7 of 2021.  The Board
17    was not aware of those events before press reports
18    came out in recent weeks; is that fair?
19        A.    That's correct.
20        Q.    Okay.  But there's one exception at least
21    to that, right, which is Eric Chaney?
22             MR. DELK:  Object to the form.
23             THE WITNESS:  Excuse me?
24             MR. DELK:  I'm just stating an objection.
25             Listen to his question.  Unless I tell you
```

Page 27

```
 1          otherwise, answer as you're able.
 2                  THE WITNESS:  I am aware that Eric
 3          Chaney's name was in --  It was in the articles
 4          that -- that I read.
 5          Q.    (By Mr. Cross)  But you saw Eric Chaney
 6     going to and from the Elections Office on January 7
 7     of 2021?
 8          A.    On that video, yes.  I did.
 9          Q.    Okay.  So there was at least one member of
10     the Board before yesterday, a former member of the
11     board who was aware of the events that you saw on
12     that video, right?
13          A.    A former member of the board, are you
14     referring to Ed Voyles?
15          Q.    No.  To Eric Chaney.
16          A.    Eric.  A former member of the board.
17     Yeah.  Okay.  And I meant because Eric's resignation
18     is only recent.
19          Q.    Right.
20          A.    Yes.  He is a former member of the board.
21     Yes.
22          Q.    And so Mr. Chaney, you know now from the
23     video you saw, was aware of -- of the events that
24     happened in the Elections Office on January 7 of 2021
25     while he was a member of the board?
```

Page 28

1        MR. DELK:  Object to the form.

2        THE WITNESS:  The --  Now when the article

3     came out, I myself questioned Eric Chaney.  Are

4     you guilty?  Are you involved in this, as it

5     states in the article?

6        He told me no.

7        And I don't know if I need to answer that

8     question.  That is what I did.  That is not what

9     the Board did.

10       Q.   (By Mr. Cross)  Okay.  But you know that

11    when Mr. Chaney told you no, that that was not a

12    truthful statement?

13       A.   I suspect that that is true.

14       MR. DELK:  Object to the form.

15       Q.   (By Mr. Cross)  Well, to be clear, Mr.

16    Stone, you don't suspect.  You know, because you saw

17    him in the video on that day, right?

18       A.   I did.

19       Q.   Okay.  And you -- you sort of anticipated

20    where I was going to go.  You said that you

21    personally asked him about the events.

22       Did anyone officially on behalf of the

23    Board of Elections ask Mr. Chaney about his

24    involvement in the events in the -- the Elections

25    Office from January 2021?

Page 29

```
 1              MR. DELK:  Object to form.
 2              You can answer.
 3              THE WITNESS:  Not in a --  Not in a board
 4        setting.  No.
 5         Q.    (By Mr. Cross)  What about just one on
 6    one?
 7              Any --  Any official questions for Mr.
 8    Chaney about those events on behalf of the Board?
 9         A.    Other than what I asked Mr. Chaney myself,
10    I'm not aware of any -- any questions that were asked
11    of Mr. Chaney.
12         Q.    All right.  Were you surprised to see him
13    in the video in light of what he said to you?
14              MR. DELK:  Object to the form.
15              THE WITNESS:  I was surprised.
16              MR. DELK:  Hold on.  Hold on.  That's
17        getting into individual stuff outside of the
18        30(b)(6) capacity, so I'm going to object.
19              MR. CROSS:  Well, I was asking him as the
20        Board.  I mean, I can --
21         Q.    (By Mr. Cross)  Look, look, Mr. Stone,
22    when I say you today, I'm referring to the Board --
23         A.    To the Board, yeah.
24         Q.    -- 'cause that's your representative
25    capacity.
```

 1            MR. DELK:  And, remember, you're not here
 2       as Wendell.  You're here as --
 3            THE WITNESS:  As --
 4            MR. DELK:  -- the Board.
 5            THE WITNESS:  -- the Board.
 6            MR. DELK:  So --
 7            THE WITNESS:  Yes.
 8            MR. DELK:  -- let's keep --
 9            THE WITNESS:  Uh-huh.
10            MR. DELK:  -- it in that box.  Okay?
11            THE WITNESS:  Uh-huh.  Uh-huh.
12            MR. DELK:  With that understanding, try to
13       respond.
14       Q.    (By Mr. Cross)  So I'll ask the question
15    again.
16            Was the Coffee County Elections Board
17    surprised to see Mr. Chaney in that video?
18       A.    And I mean, on behalf of the Board, I
19    don't know what their reaction would have been.  Had
20    we discussed this in a group setting, in a board
21    meeting setting, I don't know what their reaction.
22            And if -- if --  I mean, if I continue to
23    answer that, it's going to be speculation on my
24    part --
25       Q.    No, no.

```
 1           A.     -- to answer.

 2           Q.     I don't want you to speculate.

 3                  So there --  So there hasn't been any

 4     discussion among the members of the board about the

 5     video showing Mr. Chaney there; is that fair?

 6           A.     That's fair.

 7           Q.     Okay.  And then you also mentioned Ed

 8     Voyles.  He is a former chair of the Coffee County

 9     Elections Board, right?

10           A.     He's our immediate past chairman.

11           Q.     Right.  And --  And you also saw in the

12     video that Mr. Voyles was in the Elections Office on

13     January 7 of 2021?

14           A.     I did see that.

15           Q.     Was it a surprise to the Board that Mr.

16     Voyles was there?

17           A.     Well, the Board has not seen that

18     information as far as I know.

19           Q.     Okay.  So as far as you know, you're the

20     only member of the board who has reviewed this video?

21           A.     Yes.

22                  MR. CROSS:  Okay.  Adam --

23                  MR. SPARKS:  Yes.

24                  MR. CROSS:  -- can you grab the screen

25           shots.  So it's 52, beginning of 52.
```

Page 32

1      Q.    (By Mr. Cross)  So, Mr. Stone, I'm going

2   to show you some screenshots we have taken from the

3   video; and we have the video itself, if we need to

4   look at it; but I thought this might be easier.  So

5   if you --

6           MR. CROSS:  And we'll mark this as Exhibit

7      2.  I'm looking at Tab 52.

8           (Plaintiff's Exhibit 2 was marked for

9      identification.)

10      Q.    (By Mr. Cross)  So if you look, you can

11   see that the --  The video has some helpful

12   information.  If you look at the top just above the

13   photo, do you see where it says, "Camera 1"?

14      A.    Uh-huh.  Yes.

15      Q.    And then it's got a date -- January 7,

16   2021.

17           Do you see that?

18      A.    I do.

19      Q.    And then the next to that, that's the time

20   that the video was recorded at 12:28 p.m. on January

21   7, right?

22      A.    It is.

23      Q.    Okay.  And so this is a camera that sits

24   outside of the front of the Coffee County Elections

25   Office; is that right?

```
1          A.    That's correct.
2          Q.    And so it's looking away from the door
3    into the -- into the -- the walkway?
4          A.    It is.
5          Q.    Okay.
6                MR. MILLER:  And, David, I -- I'm --  Now
7          that we're getting into more substantive
8          exhibits, we just need to get this figured out.
9                MR. SPARKS:  It should be a couple minutes
10         more.  On the horizon --
11               MR. CROSS:  Yeah.
12               MR. SPARKS:  -- right now.
13               MR. CROSS:  It's coming up.  Yeah.
14               MR. SPARKS:  Yeah.
15         Q.    (By Mr. Cross)  And so the individual
16   who's walking in here, that's Eric Chaney, right?
17         A.    I would identify that person as Eric
18   Chaney.
19         Q.    Okay.  And then if you flip to the second
20   page of Exhibit 2 -- just flip it over -- now we're
21   on -- you see we're on the next day, January 8, 2021
22   at 1:52 p.m.?
23         A.    Yes.
24         Q.    And that's also Eric Chaney, right?
25         A.    It is.
```

Page 34

1      Q.    And in both of these pictures, he's

2   walking towards the building as if he's entering the

3   building, right?

4      A.    Appears to be.  Yes.

5          MR. CROSS:  Okay.  Can you grab 53.  You

6      can hand me 54, 55, too.  Let me do this.

7          MR. SPARKS:  All right.

8          MR. DELK:  I need to grab one now, so

9      they'll be --  You all right?

10          MR. MILLER:  They're starting to show up

11      here.

12          MR. DELK:  All right.

13          MR. MILLER:  I've got the subpoena here at

14      least.  That one was easy enough.

15      Q.    (By Mr. Cross)  All right.  I'm going to

16   hand you what's been marked as Exhibit 3.

17      A.    Oh, lord.

18      Q.    And this is Tab 53 from the binder.

19          (Exhibit 3 was marked for identification.)

20          THE WITNESS:  A lot of pictures.

21      Q.    (By Mr. Cross)  Yeah.  All right.  So, Mr.

22   Stone, if you look at Exhibit 3, we have more screen

23   shots from the video you guys produced.

24          Do you see that?

25      A.    I do.

Page 35

```
 1          Q.    And here, we've got the same camera.

 2                And actually, let me just take it back, a

 3      step back for a minute.  All of the video that was

 4      produced to us, do you understand that it's -- all

 5      comes from this same camera that sits just outside

 6      the front entry door to the office?

 7          A.    Yes.

 8          Q.    Okay.  And there are other cameras that

 9      capture the Elections Office, including inside,

10      right?

11          A.    That's correct.

12          Q.    Include -- there's --  There's a camera

13      that sits over the break room door, right?

14          A.    There's a camera that sits in the -- in

15      the main conference room right near where the

16      election equipment is held.  I mean, all that's under

17      video.

18          Q.    And your understanding is that there's no

19      video that exists for any other camera for the

20      Elections Office for this time period of late 2020,

21      early twenty twenty --

22          A.    I --

23          Q.    -- one?

24          A.    I'm not aware of any other video that

25      exists or doesn't exist.  I --  I'm not aware of the
```

1    video.

2         Q.    Okay.  All right.  So looking back at

3    Exhibit 3 --

4              MR. CROSS:  Is that a phone?

5         Q.    (By Mr. Cross)  All right.  Looking back

6    at Exhibit 3, we're at January 7, 2021, 8:32 a.m.

7              And does that look like Jil Ridlehoover

8    coming into the office?

9         A.    It does.

10        Q.    Okay.  And then if you flip to the next

11   page, January 7, 2021, 8:39 a.m., do you recognize

12   that individual?

13        A.    I do.

14        Q.    Who is that?

15        A.    That's Misty Hampton.

16        Q.    Okay.  And then the next page, January 7,

17   we're now at 10:40 a.m.  Do you recognize those

18   individuals?

19        A.    I --  I recognize them.  I don't know

20   their names, but I -- I recognize that as Miss

21   Hampton's daughter and her boyfriend.

22        Q.    And --

23        A.    And I --  I'm sorry.  I cannot recall

24   their names right now, but I --

25        Q.    Does Diane -- does --

Page 37

```
 1              Sorry.  Does Diane (sic) sound right
 2      for --
 3         A.    It does.
 4         Q.    -- the daughter?
 5         A.    It does.  Yes.
 6              MR. DELK:  Wendell, you're doing fine; but
 7         try not to talk --
 8              MR. CROSS:  Yeah.
 9              MR. DELK:  -- over him.  Okay.  Let him
10         finish.
11              THE WITNESS:  Yeah.
12              MR. DELK:  You're doing fine.
13         Q.    (By Mr. Cross)  And you recognize him as
14      Diane's boyfriend?
15         A.    Yes.
16         Q.    Okay.  You just don't remember his name?
17         A.    I don't know exactly the relationship; but
18      I -- I mean, I'm not --  I'm going to say boyfriend.
19         Q.    Okay.  That's fine.  That's fine.
20              And then we get to the next page.  We're
21      on January 7, 10:52 a.m.  And that's Eric Chaney
22      walking in, right?
23         A.    That's correct.
24         Q.    And then the next page, January 7th, 10:53
25      a.m., that's Ed Voyles, right?
```

1          A.     That's correct.

2          Q.     Then the next page, January 7, 11:37 a.m.,

3     That's Cathy Latham, right?

4          A.     That's correct.

5          Q.     And Cathy Latham at this time was the

6     chair of the Republican Party for Coffee County,

7     right?

8          A.     Yes.

9          Q.     Did she have any official responsibilities

10    with respect to elections in Coffee County?

11         A.     No.

12         Q.     So she --  You wouldn't consider her an

13    elections official for Coffee County?

14         A.     I would not consider her an elections

15    official.

16                Her role was to provide supervision, if

17    you want to call it.  That is also offered to the

18    Democratic side as well, and so --  And she

19    participated in elections in only that way.

20         Q.     For -- for example --

21         A.     I know she's not an election official

22    for -- for Coffee County.

23         Q.     And --  And, for example, what you're

24    talking about is during the adjudication process,

25    each party -- Republican Party, Democratic Party --

Page 39

1       can have a representative there to supervise?

2           A.    That's correct.

3           Q.    And Miss Latham might perform that role

4       for the Republican Party?

5           A.    That's correct.

6           Q.    All right.  If we come to Page 7, now

7       we're on January 7, 2021 at 11:40 a.m.  Do you see

8       that?

9           A.    I do.

10          Q.    And that's --

11          A.    This is 11:43.

12          Q.    Oh.

13          A.    Oh --

14          Q.    Yes.

15          A.    Wait a minute.  You're on --  You're on

16      this page.  That's still Cathy Latham.  Yes.

17          Q.    Right.  Okay.  And then the next page for

18      January 7, 2021 at 11:43 a.m., do you see that?

19          A.    I do.

20          Q.    And that's Cathy Latham escorting three

21      individuals into the office.

22                Do you see that?

23          A.    I do see that.

24          Q.    Okay.  And the three people she's

25      escorting in, do you recognize them?

```
                                                      Page 40

 1           A.    I don't.
 2           Q.    Are you familiar with a local forensics
 3     firm in Atlanta called Sullivan|Strickler?
 4           A.    No.
 5           Q.    Do you recall learning through the press
 6     or otherwise, that Sullivan|Strickler is the firm
 7     that came in on this date and copied software and
 8     voting data from the equipment in Coffee County?
 9           A.    I'm not aware of that.
10           Q.    Are you familiar with the name Paul
11     Maggio?
12           A.    I'm only familiar with that name from
13     reading the subpoenas.
14           Q.    Okay.  Are --  Are you aware that Paul
15     Maggio was one of the people who led the team to do
16     the copying in the county office on this day?
17           A.    I was not aware of that.
18           Q.    Are you familiar with the name Jennifer
19     Jackson of Sullivan|Strickler?
20           A.    I am not.
21           Q.    But fair to say the three individuals Miss
22     Latham is escorting into the office here on January
23     7, they are not Coffee County election officials.
24           A.    They are not.
25           Q.    And then we come to the next page, Page 9,
```

```
 1      January 7, 2021, just a few seconds later, still

 2      11:43 a.m., we have Miss Latham opening the door for

 3      these same individuals, right?

 4           A.   Yes.

 5           Q.   Okay.

 6           A.   Yes.

 7           Q.   The next page, January 7, 2021, 11:45

 8      a.m., Miss Latham is standing outside the door on her

 9      phone, right?

10           A.   She is.

11           Q.   Next page, January 7, 2021 a.m., 11 --

12      I'm sorry.  Try that again.

13                On the next page, January 7, 2021, 11:50

14      a.m., Miss Latham is escorting two more individuals

15      into the office, right?

16           A.   Yes.

17           Q.   And do you recognize those two

18      individuals?

19           A.   I don't.

20           Q.   Are you familiar with the name Scott Hall?

21           A.   As I said, only from reading the

22      subpoenas.  I --  I do recall that name, Scott Hall;

23      and he was referenced in one of the articles.

24           Q.   Okay.  And so do you understand from

25      anything you've read or heard that Mr. Hall was one
```

Page 42

1    of the individuals who came into the office on

2    January 7, 2021 to help orchestrate the copying?

3         A.    I'm not.  I mean, if you tell me that's

4    Scott Hall --

5         Q.    I --  I'm just asking what you know.

6         A.    I -- I'm -- don't know that Scott Hall was

7    involved.

8               I mean, you're showing me a picture that

9    says he -- he entered the -- the office there so --

10        Q.    But you don't recognize those two

11   individuals?

12        A.    I do not.

13        Q.    That's fine.  And fair to say neither of

14   the two individuals Miss Latham is escorting into the

15   office here were elections officials with Coffee

16   County?

17        A.    That's fair to say.  They are not election

18   officials.

19        Q.    And then in the next picture, January 7,

20   2021, still 11:50 a.m., we have another shot of Miss

21   Latham about to open the door for those same two

22   individuals, right?

23        A.    Yes.

24        Q.    Then in the next picture on Page 13,

25   January 7, 2021 at 12:56 p.m., we have three

1     individuals standing outside, one of them holding the

2     door open, right?

3          A.    Yes.

4          Q.    Do you recognize any of these individuals?

5          A.    I don't.

6          Q.    They're not Coffee County elections

7     officials?

8          A.    They are not.

9          Q.    And --  And the individuals that we have

10    looked at so far that you don't recognize, to your

11    knowledge, those people are not any sort of state

12    officials either, right?

13         A.    To my knowledge, they're not.

14         Q.    Okay.  Then Page 14, January 7, still on

15    2021, 1:19 p.m., Miss Latham is standing at the door

16    with another individual in a hat.

17         Do you recognize him?

18         A.    I don't.

19         Q.    Okay.  So that's not someone you recognize

20    as a county or state official?

21         A.    No.

22         Q.    January 7, 2021 at 4:46 p.m., there's an

23    individual leaving and a backpack.

24         Do you recognize him?

25         A.    I don't.  I'm not -- I --

Page 44

```
 1              I can't identify who that is.
 2        Q.    Not someone that looks like a county or
 3     state official to --
 4        A.    No.
 5        Q.    -- you?
 6              You said no?
 7        A.    No.
 8        Q.    Okay.  Next, January 7, 2021 at 4:49 p.m.,
 9     there's an individual looks to be leaving the office
10     holding two bags.
11              Do you see that?
12        A.    I do.
13        Q.    Do you recognize that individual?
14        A.    I don't.
15        Q.    Not someone you recognize as a county or
16     state official?
17        A.    No.
18        Q.    Do you know what he's got in his bags?
19        A.    I do not.
20        Q.    January 7, 2021 at 5:24 p.m., individual
21     coming in, in a hoodie.
22              Do you recognize him?
23        A.    I can't identify from the picture --
24        Q.    Well --
25        A.    -- who that might be.
```

Page 45

1          Q.    Not someone you recognize as a state or
2    county official?
3          A.    No.
4          Q.    Then this if you come to the next page,
5    January -- still on January 7, 5:24 p.m., do you see
6    the individual in the hoodie now has his hood off?
7          A.    I do.
8          Q.    Do you recognize him there?
9          A.    I don't.
10         Q.    Then we get on the next page to January 7,
11   6:19 p.m.  The same individual in the blue hoodie is
12   leaving with Cathy Latham out the office door.
13               Do you see that?
14         A.    I do.
15         Q.    On the next page, January 7, 2021, 7:42
16   p.m., we see Eric Chaney leaving the office, right?
17         A.    That's correct.
18         Q.    The next page, January 7, 2021, still at
19   7:42 p.m., we see Mr. Voyles leaving the door, right?
20         A.    That's correct.
21         Q.    And then we see two other individuals
22   from the -- the folks who came in earlier in the day
23   that you didn't recognize, right?
24         A.    That's correct.
25         Q.    And you see they're taking some equipment

Page 46

1    with them?
2          A.    I do.
3          Q.    The --
4          A.    I see that they have something that they
5    are removing, apparently.
6          Q.    The --  The guy in the short-sleeved
7    shirt, you see he looks to be carrying a case behind
8    him?
9          A.    Uh-huh.
10         Q.    Yes?
11         A.    I do see that.  Yes.
12         Q.    Does that look to you like one of the
13   cases the BMDs are stored in?
14               MR. DELK:  Object to the form.
15               THE WITNESS:  I --  I can't identify that
16         as a BMD case.  I'd --
17         Q.    (By Mr. Cross)  Have you seen the
18   suitcases that the BMDs are stored in?
19         A.    Yes.  I have seen those.  They are black.
20         Q.    Does it look similar to that?
21         A.    I can't identify if that's a -- a BMD or
22   not.
23         Q.    Okay.  Does the Board require any regular
24   inventory of the voting equipment in the Elections
25   Office?

1        A.     The Board does not --

2               Whatever policies are in place for

3     maintaining the inventory, that's what we do.  We

4     have --  We have only recently dismissed --  Well, I

5     mean, you know, Misty's no longer our employee; and

6     so that inventory has recently taken place under

7     another elections supervisor who came; and so our --

8     our inventory should be up to date.

9        Q.     Does the Board have any written policies

10    on doing any sort of inventory check?

11       A.     I'm --  I'm not certain of that.

12       Q.     Has the Board undertaken any efforts to

13    determine whether the team that came in, in January

14    of 2021 took any of the voting equipment with them?

15       A.     Now on behalf of the Board, we have not

16    investigated this.  Before I saw the video from

17    counsel, all we had to go on was the media reports.

18               And so all of the --  All of the

19    inventorying, all of the equipment lists, everything

20    would have been under the direction at that time of

21    Misty Hampton.  She's the person that was hired by

22    the Board to carry out the duties.

23               As board members, we're not involved in

24    the minutia of running the day-to-day operations of

25    the -- of the Elections Board.  We hired a person

```
 1      that we expected to carry out the policies in
 2      accordance with the law and the requirements of the
 3      Secretary of State.
 4           Q.   Did the Board approve any of these
 5      individuals coming in to do what that they did on
 6      January 7 of 20 --
 7           A.   The Board --
 8                MR. DELK:  Make sure you let him finish
 9           his question.  I know you know where you're
10           going with it, but --
11                THE WITNESS:  Yeah.
12                MR. DELK:  -- just try to let him finish,
13           so it makes everything --
14                THE WITNESS:  You know me, Steve.
15                MR. CROSS:  It's okay.
16                MR. DELK:  Okay.  You're doing fine.
17           Q.   (By Mr. Cross)  You were doing fine.
18                Let me try the question again just so we
19      get it out.
20                Did the Board approve any of the
21      individuals coming in on January 7, 2021, to be in
22      the office and do any of the work they did there?
23           A.   The Board did not approve that.
24           Q.   Okay.  Do you know whether Eric Chaney
25      approved that on behalf of the Board or as a member
```

```
 1    of the Board?
 2              MR. DELK:  Object to the form.
 3              THE WITNESS:  I do not know if Eric Chaney
 4         approved of that.
 5              I will say any decision made requires a
 6         quorum of the Board.
 7         Q.    (By Mr. Cross)  So Mr. Chaney would not
 8    have the authority on his own to approve that work?
 9         A.    No.
10         Q.    Okay.  And as you sit here, the -- the
11    Board does not have any insight or understanding as
12    to why Mr. Chaney was here for that work that
13    occurred.
14         A.    The Board --  The Board does not.
15         Q.    Is that something the Board is looking
16    into now?
17              MR. DELK:  Object to form.
18         Q.    (By Mr. Cross)  Or are you relying on the
19    State for that?
20         A.    When the Secretary of State notifies us of
21    its findings.  As I said, as a Board, we have not had
22    any official notice from anyone that our security
23    was -- was breached; and when the Secretary of State
24    notifies us, I'm sure we will properly investigate
25    the situation.
```

1     Q.    Do you know if any members of the Board

2     have had any communications with Ed Voyles about his

3     participation in the events?

4     A.    I -- I don't -- I don't know.

5     Q.    So we'll look through a few pictures in a

6     moment.

7           But do I understand correctly?  There has

8     been no communication from anyone at the state level

9     with the Board of Elections about what occurred in

10    the Elections Office on January 7, 2021?

11    A.    There has been no communication with the

12    Secretary of State's Office.

13    Q.    So to your --  To the knowledge of the

14    Board, no one on a behalf of the State has, for

15    example, contacted any of the individuals who were,

16    you know, present for those events?

17          MR. DELK:  I'll object to the extent --  I

18        don't know if he's aware of any communication

19        between respective counsel.

20          But subject to that, you can respond.

21          THE WITNESS:  I'm not aware.

22    Q.    (By Mr. Cross)  And fair to say no one for

23    the State has contacted any of the board members

24    about the events of January 7th?

25    A.    That's correct.

1      Q.    Is that a concern to the Board, that

2      something that happened over a year and a half ago,

3      the State has not indicated --

4      A.    Uh-huh.

5      Q.    -- any investigation of?

6      A.    We -- We have not discussed this as a

7      Board, so to be able to answer, there're concerns

8      concerning this.  I -- I'm a -- unable to answer

9      that.

10           I mean, I can tell you what I think

11     personally.  Steve is not going to let me but --

12          MR. DELK:  Okay.  Don't.  Do not.  You're

13          not personally testifying.  You're testifying as

14          the Board.

15          THE WITNESS:  And I --

16          MR. DELK:  They want to stick to the

17          Board.

18          THE WITNESS:  And I appreciate that.

19          MR. DELK:  Okay.

20          THE WITNESS:  Thank you.

21     Q.    (By Mr. Cross)  Was the Board aware that

22     the Secretary of State's Office seized the EMS server

23     and the ICC from Coffee County in or around May or

24     June of --

25     A.    The Board --

Page 52

```
 1          Q.     -- 2021?
 2          A.     -- was aware of that.
 3          Q.     When did the Board first learn that?
 4          A.     I don't -- I don't recall the specific
 5     date that the Board learned that.
 6          Q.     All right. And what's the Board's
 7     understanding for why that was done?
 8          A.     The Board was notified by the newly hired
 9     elections supervisor, not the one who's currently in
10     place, but the -- James Barnes. And he notified us
11     that there was a piece of equipment that he could not
12     access.
13          Q.     And do you recall that happening in, say,
14     around late spring of 2021?
15          A.     It was in -- It was in that neighborhood.
16     Yes.
17          Q.     And what do you recall learning from Mr.
18     Barnes about his inability to access certain
19     equipment and equipment being replaced by the State?
20          A.     As I recall, Mr. Barnes was concerned that
21     the password was a -- was the incorrect password.
22          Q.     Was that the password to the EMS server?
23          A.     I'm not certain.
24          Q.     But it was password to some voting
25     equipment?
```

Page 53

1     A.    Yes.  As --  As I recall, it was a server.

2     Q.    And what did Mr. Barnes convey to the

3  Board about that situation?

4     A.    He conveyed that he would continue to

5  trying to access the equipment and that he would need

6  to involve the Secretary of State's Office to access

7  the equipment.

8     Q.    And how was that information conveyed to

9  the Board?

10         Like was it in a Board meeting?

11    A.    In a Board meeting.

12    Q.    Do you know why that doesn't appear in any

13 of the Board minutes?

14    A.    I don't know why.

15    Q.    The practice with the Board meetings is to

16 capture in the minutes, at least at a topical level,

17 everything that's addressed --

18    A.    Uh-huh.

19    Q.    -- right?

20    A.    It is.

21    Q.    Do you know if there was a decision made

22 not to include that in the Board minutes?

23    A.    There --  To my knowledge, no.  There was

24 no decision made to include it or to not include it.

25    Q.    Okay.  Something as significant as being

1    locked out of a voting server and having that

2    equipment replaced discussed in a Board meeting, you

3    certainly would expect that to appear in the minutes,

4    wouldn't you?

5            MR. DELK:  Object to the form.

6            THE WITNESS:  Okay.  In the -- the

7        day-to-day running of the Election Board office,

8        okay, we -- we are a governing Board.  We don't

9        manage what the election supervisor does.

10           We hired the election supervisor, and the

11       election supervisor is aware of the equipment

12       they need to access, the data they need to

13       gather from that equipment.  We don't know.

14           And so it's very likely that that was just

15       provided to us, and then we very likely did not

16       recognize the significance of it as a Board;

17       because as I said, we had the person to run the

18       office.

19       Q.    (By Mr. Cross)  Does the --  In the

20   ordinary course, the election supervisor is

21   responsible for writing up the Board meeting minutes,

22   right?

23       A.    Yes.

24       Q.    So that would have been Misty Hampton and

25   then James Barnes?

Page 55

```
 1        A.    That's correct.
 2        Q.    And before each Board meeting starts, the
 3   Board approves the minutes that are written up,
 4   right?
 5        A.    That's correct.
 6        Q.    Is there any more information the Board
 7   has about why the State replaced the EMS server and
 8   the ICC in Coffee County last year?
 9        A.    From my understanding and the Board's
10   understanding, the server was replaced because it was
11   inaccessible at that time.
12        Q.    Was there any discussion with the Board
13   that there was a concern that the equipment may have
14   been compromised by outsiders, like we now see in the
15   video?
16        A.    I do not recall that discussion
17   whatsoever.
18        Q.    Were you aware that James Barnes testified
19   in his deposition that that was his concern and his
20   understanding of why it was replaced?
21        A.    I read in the --  I read in the article
22   that James Barnes found the Cyber Ninja business
23   card.
24              THE COURT REPORTER:  I'm sorry.  James
25        Barnes found the cyber engine?
```

Page 56

1          THE WITNESS:  Cyber Ninja --

2          THE COURT REPORTER:  Ninja.

3          THE WITNESS:  -- business card.

4          That's what I read in the article.

5     Q.   (By Mr. Cross)  Was that article the first

6    time you had learned that James Barnes had found a

7    business card for Cyber Ninjas in the Elections

8    Office?

9     A.   And I don't recall exactly if that was the

10    first time I had learned it or not but --

11    Q.   Well, do you recall any discussion at the

12    Board level about the possibility Cyber Ninjas had

13    been in the Elections Office?

14    A.   I do not recall that.

15         MR. CROSS:  Ah, 46.  Thanks.

16         Are you loading these in, or is my team?

17         MR. SPARKS:  Jenna is doing that.

18         MR. CROSS:  Okay.

19         (Exhibit 4 was marked for identification.)

20    Q.   (By Mr. Cross)  All right.  So we're going

21   to look at --

22         MR. CROSS:  It's Exhibit 4?

23         MR. DELK:  Yeah.  We're on four.

24    Q.   (By Mr. Cross)  Okay.  Which is Tab 46.

25         And you can take a moment to read through

Page 57

```
1     that, Mr. Stone, and then just let me know when
2     you're ready for some questions.
3         A.    Okay.
4         Q.    And here's a bottle of water if you need
5     it, Mr. Stone.
6         A.    I've got one right down here.  Thank you.
7         Q.    Okay.  Have you seen Exhibit 4 before now?
8         A.    This letter?
9         Q.    Yes.
10        A.    I have seen that.
11        Q.    Okay.  When's the first time you recall
12    seeing this?
13        A.    As I was reading the information provided
14    by counsel.
15        Q.    Okay.  So is this something you saw in the
16    last few weeks?
17        A.    Yes.
18        Q.    Okay.  This isn't something you saw back
19    in the timeframe that it was sent in May of 2021?
20        A.    No.
21        Q.    Do you know whether anyone else on the
22    Board saw this communication with the State in or
23    around May of 2021?
24        A.    I'm not aware.
25        Q.    Do you know whether Board was aware of
```

Page 58

```
 1      this communication at all at that time?
 2           A.    I'm not aware.
 3           Q.    So if you look at --
 4                 Flip to the second page --
 5           A.    Uh-huh.
 6           Q.    -- so here, you've got an e-mail from
 7      James Barnes, May of 2021.  He's the election
 8      supervisor at that time, right?
 9           A.    That's correct.
10           Q.    And he e-mails Chris Harvey at the
11      Secretary of State's Office, May 7, 2021, 3:57 p.m.
12                 Do you see that?
13           A.    I do.
14           Q.    And you understand Chris Harvey was the --
15      the state elections director at that --
16           A.    Yes.
17           Q.    -- time?
18                 And let me just get the question done.
19           A.    Excuse me?
20           Q.    Make sure I get the question done.
21                 MR. DELK:  Try not to cut him off.
22           Q.    (By Mr. Cross)  Yeah.  Yeah.
23           A.    Okay.
24                 MR. DELK:  You're doing fine.
25           Q.    (By Mr. Cross)  Yeah.  Doing fine.
```

Page 59

```
 1              The subject, "Coffee County."  And
 2    attachment, you see it says, "cyber ninja.pdf"?
 3         A.    I do.
 4         Q.    And if you flip to the next page, do you
 5    see there's a -- a picture of what looks to be a
 6    business card.  It says "Doug Logan, Cyber Ninjas" in
 7    the bottom left?
 8         A.    I do.
 9         Q.    And do you understand this is a business
10    card that Mr. Barnes reported to Mr. Harvey that he
11    found in the -- in the Elections Office attached at
12    the base of Misty Hayes' computer monitor?
13         A.    Yes.
14         Q.    Okay.  And do I understand correctly that,
15    to the best of your knowledge on behalf of the Board,
16    no one on the Board was aware that Mr. Barnes had
17    made this report to the Secretary's Office until just
18    recently?
19         A.    I don't recall the Board being notified of
20    that.
21              MR. CROSS:  And okay.  47.
22         Q.    (By Mr. Cross)  You can set that aside;
23    but just keep it close, 'cause we may look at it
24    again.
25         A.    Okay.
```

Page 60

```
1          Q.    So all right.  Let me show what's going to
2     be marked as Exhibit 5, and this is Tab 47.
3                (Exhibit 5 was marked for identification.)
4          Q.    (By Mr. Cross)  And you can take a moment
5     and tell me if this is something you've seen before.
6          A.    I have not seen this before.
7                MR. CROSS:  So did I say Exhibit 5?
8                MR. DELK:  That's correct.
9                MR. CROSS:  Okay.
10               MR. SPARKS:  The 5 Exhibit.
11         Q.    (By Mr. Cross)  So Exhibit 5, you see it's
12    got "Dominion Voting" at the top.  It's dated May 6,
13    2021, and the title is "Customer Notification:
14    Maintaining Secure Chain of Custody for Your Dominion
15    Voting System."
16               Do you see that?
17         A.    I do.
18         Q.    And so this is not something, to your
19    knowledge, that the Board has seen before today?
20         A.    To my knowledge, they have not seen this.
21         Q.    And do you see that --
22               If you look at the substance of it, do you
23    see that this is a notification that came out on May
24    6 of 2021 from Dominion warning elections officials
25    like in Coffee County that there were efforts made by
```

Page 61

```
 1    some to get improper access to Dominion Voting

 2    equipment?

 3              If you need a chance to read through it,

 4    go ahead.

 5         A.    Okay.  What was your question?

 6         Q.    So if you just look at the first sentence

 7    do you see Dominion alerted -- has been alerted that

 8    customers are being approached with offers or

 9    requests to conduct a, quote, forensic audit of their

10    voting equipment.  It is critically important that

11    only authorized, legal users be granted access to

12    voting equipment in order to maintain secure chain of

13    custody for your system.

14              Do you see that?

15         A.    I do.

16         Q.    And so you're seeing on May 6 of 2021,

17    Dominion sent out an alert to individuals like those

18    in Coffee County responsible for voting equipment,

19    that there were efforts made by some to get

20    unauthorized access to voting equipment.

21              Do you understand that?

22         A.    I do.

23         Q.    Okay.  And so that's context.  If we go

24    back to Exhibit 4, because it's the very next day

25    that Mr. Barnes sends the Cyber Ninjas card to Chris
```

Page 62

1    Harvey.

2              Do you understand that?

3         A.    I do.

4         Q.    Does it surprise you that the Board was

5    not made aware that your election supervisor was so

6    concerned after receiving this notification from

7    Dominion that he alerted the state elections director

8    that Cyber Ninjas may have compromised the voting

9    equipment in your County?

10             MR. DELK:  Object to the form.

11             THE WITNESS:  I don't remember when our

12        meeting was held in May.

13             But as board members, we are -- we

14        participate in a one-hour meeting one day a

15        month.  Information will be shared at that time;

16        and I mean, in all honesty, none of --

17             I mean, this is not -- this is not unlike

18        alerts that are sent out by your bank.  I mean,

19        it's like keep your information safe.

20             Okay.  And so even the business card, the

21        Board, if they knew about it or not, may not

22        have been aware of the significance at that

23        time.

24             But now as we look back, of course, we see

25        that it is significant.

Page 63

1      Q.    (By Mr. Cross)  But the Dominion Voting

2   alert provides the significance for the -- the Cyber

3   Ninjas card, right?

4              You understand that?

5              MR. DELK:  Object to the form.

6              THE WITNESS:  It would --  Again, I'm

7         going to say, as we look back on it now, yes.

8         Of course.

9      Q.    (By Mr. Cross)  But wouldn't you expect

10   your elections supervisor to alert the Board not just

11   that some equipment has been replaced because the

12   password's not working, but that he also had a

13   concern that bad actors, namely, Cyber Ninjas, had

14   come into the office and compromised that equipment?

15      A.    And I -- I do not recall James Barnes

16   notifying the Board that he had a suspicion that bad

17   actors had come into the Elections Office; and so had

18   he done that, this may all have been viewed very

19   differently.

20      Q.    Okay.  And had he had that conversation

21   with the Board, fair to say, we -- we should expect

22   to see that in the meeting minutes, right?

23      A.    The meeting minutes are kept by them, by

24   the elections employees.  Not by us, and so they --

25   they add what they think are the pertinent issues

Page 64

```
 1    that we discuss in -- in the meeting.
 2         Q.    And at this time, the person who would
 3    have been doing that would have been James Barnes?
 4         A.    It would.
 5         Q.    All right.  So if you look back at Exhibit
 6    6?  I should have written on each one of those.
 7              Oh, sorry.  Grab Exhibit 4.  The e-mail
 8    that --
 9         A.    The business card people for right --
10         Q.    Yes.
11         A.    -- here?
12              Okay.
13         Q.    So we looked at the e-mail that Mr. Barnes
14    sends to Mr. Harvey.
15              And if you look at the bottom of the first
16    page of Exhibit 4, do you see that same e-mail starts
17    at the bottom -- James Barnes, to Mr. Harvey, May 7,
18    2021 3:57 --
19         A.    The Dominion --
20         Q.    -- p.m.
21         A.    -- e-mail today?
22         Q.    Yeah.  If you look down at the bottom, do
23    you see this is the same e-mail that we looked on the
24    other page?
25         A.    Uh-huh.
```

1        Q.      It just the start of it.

2        A.      I do.

3        Q.      And then if you come up, you have a

4    response from Chris Harvey on May 11th.

5                Do you see that in the middle of the page?

6                Right here (indicating).

7        A.      Yes.

8        Q.      And Mr. Harvey adds Frances Watson and

9    Michael Barnes to the e-mail thread.

10               Do you see that?

11       A.      I do.

12       Q.      Do you recall that at this time, Frances

13   Watson was the head of the investigative unit for the

14   Secretary of State?

15       A.      I'm not aware of that.

16       Q.      Do you recognize Michael Barnes as the

17   head of CES for the Secretary of State?

18       A.      Their names are familiar in training that

19   I've been to, but the specific positions that they

20   held, I -- I --  I don't recall those.

21       Q.      Do --  Do you recall that both of them

22   were part of the Secretary's Office?

23       A.      Yes.

24       Q.      Okay.  And so then Mr. Harvey writes back,

25   "James, Thanks for sending this.  I think it might be

1    prudent to see if there has been any contact between

2    the person on the card and anyone in your office

3    and/or if they... had any access to any of your

4    equipment.

5              "I have let our investigations division

6    and CES know, and they might follow with you.

7              "Let me know if you have any questions or

8    concerns."

9              Do you see that?

10        A.    I do.

11        Q.    And so here we have the state elections

12   director writing back to Mr. Barnes saying that the

13   State needs to find out whether there has been any

14   access to any of the equipment in the Coffee County

15   office by Cyber Ninjas.

16             You with me?

17        A.    Yes.

18        Q.    And then Miss Watson forwards this on to

19   Pamela Jones in the Secretary's Office the same day.

20             Do you see that at the top?

21        A.    Up here.  Yeah.

22        Q.    And she writes to Miss Jones, "Can you

23   contact the County and verify what, if any, contacts

24   Cyber Ninjas had with any election equipment."

25             Do you see that?

```
 1        A.    I do.

 2        Q.    Are you aware of any contact anyone on

 3   behalf of the State had with anyone in Coffee County

 4   to investigate this report for Mr. Barnes?

 5        A.    And I'm not aware --  The Board is not

 6   aware any investigation.

 7        Q.    Do you have any insight into why the State

 8   did not follow up on an investigation that was called

 9   for by the state election director and the head of

10   the investigative unit into what Mr. Harvey refers to

11   as possible access to the voting equipment in Coffee

12   County?

13             MR. DELK:  Object --

14             THE WITNESS:  I don't.

15             MR. MILLER:  Object to form.

16             MR. DELK:  -- to the form.

17             THE WITNESS:  I don't.

18        Q.    (By Mr. Cross)  Is it a concern that when

19   your -- your election supervisor alerted the

20   Secretary's Office in May of 2021 to possible access

21   to the Coffee County equipment, that there is no

22   indication that any further -- any investigation was

23   done with respect to contact with the County

24   officials?

25             Is that a concern to the Board?
```

Page 68

```
 1        A.    Well, it -- it was --
 2              Investigations are ongoing with the state
 3     Election Board and with the Secretary of State's
 4     Office, and various things happen.
 5              And so was it a concern?  In retrospect,
 6     yes.  At that time, probably not.
 7        Q.    Because your recollection on behalf of the
 8     Board is that the Board didn't even know about this
 9     at the time, right?
10        A.    That would be my --  That would be my
11     recollection.
12        Q.    Okay.  And so we have on May 11, Chris
13     Harvey and Frances Watson calling for an
14     investigation into possible access to the voting
15     equipment; and then the State claims that on or
16     around June 8, 2021 is when they replaced the EMS
17     server and the ICC.
18              Are you aware of that?
19        A.    Yes.
20        Q.    All right.  Are you aware of any
21     communication between the State and anyone with
22     respect to Coffee County election officials,
23     including the Board --
24        A.    On the Board?
25              MR. DELK:  Let him --  Let him finish.
```

Page 69

```
 1              MR. CROSS:  Yeah.

 2              THE WITNESS:  Uh-huh.

 3              MR. DELK:  You're doing okay.  Just make

 4         sure he's done.

 5         Q.    (By Mr. Cross)  Are you aware of

 6    communications between anyone in the Secretary's

 7    Office and the Coffee County Board regarding efforts

 8    to determine whether the EMS server or the ICC had

 9    been improperly accessed?

10         A.    I'm not aware.

11         Q.    Are you aware of whether the Secretary's

12    Office has found any evidence that the EMS server was

13    at some point improperly accessed?

14         A.    I am aware of that.

15         Q.    And how are you aware of that?

16         A.    That information was shared by counsel.

17              MR. DELK:  Well, I'm going to instruct

18         you.  Don't get into anything we've talked

19         about.  If he's referencing documents, you can

20         discuss that; but anything else, do --

21              THE WITNESS:  Okay.

22              MR. DELK:  -- not discuss.

23              THE WITNESS:  Well, I'm --  He asked me if

24         I was aware of it.

25         Q.    (By Mr. Cross)  That's fine.  That's fine.
```

Page 70

```
 1              And I'm not going to ask you to get into
 2       the substance of communications with counsel.
 3       A.    Uh-huh.
 4       Q.    When did you first learn of that?
 5       A.    Only recently.
 6       Q.    Within the last few weeks?
 7       A.    Yes.
 8       Q.    Within the last few days?
 9       A.    Yes.
10       Q.    Just yes or no.  Do you have any insight
11       or knowledge about when the Secretary's Office found
12       evidence on the EMS server that it had been
13       improperly accessed?
14       A.    No.
15       Q.    Do you know why the Secretary's Office
16       took nearly a year to figure that out?
17              MR. DELK:  Object to the form.
18              THE WITNESS:  I don't have any idea.
19       Q.    (By Mr. Cross)  You said it was the
20       understanding of the Board that Mr. Barnes --  Well,
21       strike that.
22              Mr. Barnes, at some point in the spring of
23       2021 --  So after he became the elections supervisor,
24       he conveyed to the Board at some point that he had a
25       password problem accessing a server, right?
```

Page 71

1      A.    Yes.

2      Q.    Okay.  Does the Board have any

3   understanding about how the password or why the

4   password stopped working for that server?

5      A.    No.

6      Q.    Was there any concern at the Board about

7   the fact that that password no longer worked?

8      A.    No.

9      Q.    Do you recall in late 2020 a video went

10  online with Misty Hampton and others in the Elections

11  Office in Coffee County using the -- the voting

12  equipment?

13     A.    I do.

14     Q.    And that video was actually filmed during

15  an official Board meeting, right?

16     A.    To my knowledge, yes.

17     Q.    Were you there for that meeting?

18     A.    Yes.

19     Q.    Okay.  What was the purpose of that video?

20     A.    Now you're going to have to tell me which

21  video you're referring to.  Are you talking about --

22          MR. DELK:  Let him ask the question, and

23       you answer if you're able.

24          THE WITNESS:  Well, he needs to --

25          MR. DELK:  He's talking about the video

Page 72

1          that was posted online.

2                  THE WITNESS:  The video that --  The

3          YouTube video?

4                  MR. DELK:  Yes.

5                  THE WITNESS:  Okay.  What was the purpose

6          of that video?

7                  You will have to ask Misty Hampton the

8          purpose of that video.

9                  I'm getting a cramp in my leg.

10                 That as a Board member and as the Board

11         participated in it, we were led to believe that

12         the system was not secure, and my -- my belief

13         is that that was the reason; but as I said,

14         you'll have to ask Misty Hampton why that video

15         was posted online.

16                 We were led to believe in that video that

17         things could be done to alter the outcome of an

18         election.  However, in retrospect, the things

19         that we were shown had to be the -- the --

20         the --  In the adjudication process, a person

21         who has knowledge and training in the system is

22         the person who could change the outcome of or

23         the -- the voter's intent in some kind of way.

24                 Now I couldn't do it.  I don't have that

25         training.  You couldn't do it.  I mean, nobody

```
1          in here could do it, unless they've had that
2          training, and the person with the training at
3          that time in our -- in our County was Misty
4          Hampton.
5               That --  I just want to say this.  That
6          video was not posted with the approval of the
7          Board of Elections.  There was nobody that said
8          are you in favor of this.  That video appeared;
9          and so, again, I'm going to say you will have to
10         ask Misty Hampton why that video.
11         Q.    (By Mr. Cross)  Are you aware that
12    somebody made an Open Records Request for that video?
13              Was the Board aware of that is what I
14    mean.
15         A.    An Open Records Request for that video?
16         Q.    Before it went public?
17         A.    I'm not aware of that.
18         Q.    Are you --  Are you aware of any knowledge
19    the Board has about Ed Voyles encouraging or
20    facilitating an Open Records Request for that video?
21         A.    I'm not aware of that.
22         Q.    Are you aware the video posted online was
23    put up by a local journalist?
24         A.    I'm not aware of that.
25         Q.    Was it the Board's understanding that
```

```
1      Misty Hampton posted that video?
2            A.    I'm going to say yes.  I'm not certain of
3      that.
4            Q.    Sure.  You said it's your understanding
5      now that to -- to manipulate votes in the way that
6      was shown in the video, someone would have to have
7      training with the system; is that right?
8            A.    That's correct.
9            Q.    Are you aware that the Dominion software
10     voting data that was taken from the Coffee County
11     Elections Office in January of 2021 was uploaded to
12     the Internet?
13           A.    I was not aware of that.
14           Q.    Were you aware that numerous individuals
15     including, for example, Doug Logan of Cyber Ninjas,
16     downloaded that data from the Internet?
17           A.    I was not aware of that.
18           Q.    Was the Board aware before now that
19     numerous individuals have had a year and a half to
20     gain the sort of training on this system through the
21     information that's available on the Internet?
22           A.    Not aware of that.
23           Q.    Would that be a concern to the Board about
24     the security of the voting system that you're
25     responsible for?
```

1    A.    I -- I'd have to speculate that that

2    would be a concern of the Board.

3    Q.    And would the Board expect the Secretary

4    of State's Office to take some sort of measures to

5    help protect the system against that type of

6    intrusion?

7    A.    Yes.

8    Q.    And would the Board expect the Secretary

9    of State's Office to take some sort of measures to

10   hold those individuals accountable?

11           MR. MILLER:  Object to the form.

12           THE WITNESS:  I have no idea.

13   Q.    (By Mr. Cross)  Okay.  Well, you expect

14   someone to hold those individuals accountable if they

15   committed a crime, right?

16           MR. DELK:  Object --

17           THE WITNESS:  I would --

18           MR. DELK:  -- to the form.

19           THE WITNESS:  I would expect that if a

20       crime has been committed, that those people

21       would be held responsible.

22   Q.    (By Mr. Cross)  And just so we're clear,

23   the individuals that we've looked at in some of the

24   photos so far that went into the Elections Office on

25   January 7, 2021, the Board is not aware of any legal

Page 76

1      authority that was given those individuals to do

2      anything they did in that office that day?

3           A.   On the behalf of the Board, no authority

4      was granted to examine our systems, our computers,

5      our data.  No.  That was not provided by the Board.

6           Q.   Does the Board have any knowledge into

7      anything -- any of those individuals might have left

8      behind in the system such as malware?

9           A.   No.  Not that I know of.

10          Q.   And, well, fair to say it would be a

11     serious concern to the Board of Elections if someone

12     had, for example, left malware in the system?

13          A.   I would say that would be --

14               MR. DELK:  Let -- Let him finish.  Okay?

15               THE WITNESS:  Uh-huh.

16          Q.   (By Mr. Cross)  That was the question.  Go

17     ahead.

18               MR. DELK:  Object to the form.

19               THE WITNESS:  What was the question?

20     Concern --

21          Q.   (By Mr. Cross)  Yeah.  I --

22          A.   -- if anything --

23          Q.   I'll ask it again.

24          A.   -- had been left behind.

25          Q.   I'll ask it again.

1            Fair to say it would be a serious concern

2       to the Board of Elections if someone had left

3       something behind in the system like malware that

4       could alter votes or election outcomes?

5            A.    I --

6            MR. DELK:  Object to the form.

7            THE WITNESS:  I would say that it's --  It

8       would be a concern to the Board.  Yes.

9            Q.    (By Mr. Cross)  And --  And given the

10      extent of the intrusion that we've seen into the

11      system, does the Board expect the State to undertake

12      some measures to figure out whether that happened?

13           A.    Yes.

14           Q.    Do you think as the Board, it is

15      appropriate to require voters in your County to vote

16      on equipment that no one has looked to see whether it

17      has been compromised, whether it still works?

18           MR. DELK:  Object to the form.

19           THE WITNESS:  The equipment in question

20      has been removed; and, again, I'm going to say

21      that the election equipment --

22           MR. CROSS:  33.

23           THE WITNESS:  -- the election results are

24      secure based on -- based on the knowledge and

25      use of the computer operator --

Page 78

```
 1              MR. CROSS:  What exhibit number?  What
 2         exhibit number?
 3              MR. SPARKS:  Six.
 4              THE WITNESS:  -- the person who has the
 5         training to run the -- the system.
 6         Q.   (By Mr. Cross)  Okay.  Let me show you
 7    some pictures here, Mr. Stone, 'cause it sounds like
 8    the Board may not have a correct understanding of the
 9    facts.
10              MR. CROSS:  This is going to be Exhibit 6,
11         I believe.
12              (Exhibit 6 was marked for identification.)
13              MR. DELK:  Yeah.
14              MR. CROSS:  And it's Tab 33.
15         Q.   (By Mr. Cross)  So you just testified that
16    it's the Board's understanding that the equipment
17    that was accessed on January 7, 2021 was replaced; is
18    that right?
19         A.   That's my understanding.
20         Q.   Okay.  So what I'm handing you here are
21    photos that were produced by Paul Maggio of the
22    Sullivan|Strickler firm, who came in and actually did
23    the copying in the office that day.
24              Do you understand?
25         A.   Yes.
```

1       Q.    So if you flip through these photos, if

2    you look at the first one, these are pictures of

3    compact flash cards that are used with the voting

4    equipment in the Coffee County Elections Office.

5              Do you understand that?

6              MR. MILLER:  Objection.  Lack of

7         foundation.

8              MR. DELK:  Join.

9              MR. CROSS:  We'll get that foundation

10        tomorrow.  Don't you worry about it so --

11             MR. MILLER:  You want us to do the side

12        comments throughout the whole thing?

13             THE WITNESS:  They're used with the

14        computer --

15             MR. CROSS:  That's not even an appropriate

16        objection in a deposition.

17       Q.    (By Mr. Cross)  Go ahead.

18       A.    These are the --  These are the disks that

19    are used with the computer system.

20       Q.    All right.  The --

21             MR. DELK:  To be clear, Mr. Stone, are you

22        asking a question; or are you testifying right

23        now?

24             If you don't know what those are, then

25        state that; but I want to --

Page 80

```
 1            MR. CROSS:  Had --
 2            MR. DELK:  -- be clear what you're saying.
 3       Q.   (By Mr. Cross) Yeah.  Let me --  Let me
 4   just ask the question.
 5            Do you recognize these as compact flash
 6   cards that are used with the voting equipment in
 7   Coffee County?
 8       A.   I --  I don't recognize that.  That's not
 9   under my purview --
10       Q.   Okay.
11       A.   -- as a Board member.
12       Q.   And if you flip to the next page, do you
13   recognize that as a flash drive that's used with the
14   Coffee County voting equipment?
15       A.   I recognize that as a flash drive.  I
16   don't know what equipment that is used with but --
17       Q.   So if you flip through these photos, what
18   you're going to see is lots of pictures of compact
19   flash drives, jump drives, a Dell computer, which is
20   at the page ending 242, all of which was copied by
21   the Sullivan|Strickler firm on or around January 7,
22   2021 in the Coffee County Elections Office.
23            Are you aware of that?
24       A.   I'm not.
25       Q.   So you had not seen these photos before
```

Page 81

1      now?
2             A.    I have not.
3             Q.    So do you understand that much of the
4      equipment and devices used in Coffee County with
5      elections, in fact, was not ever replaced and still
6      has not been replaced with respect to what was
7      accessed by the Sullivan|Strickler firm and others?
8                   MR. DELK:  Object to the form.
9                   THE WITNESS:  I'm --  I'm not aware
10            because of my role as a Board member of what was
11            actually replaced and what was left in the
12            office.
13            Q.    (By Mr. Cross)  Okay.
14            A.    My --  And if I say my assumption,
15     Stephen's going to yell at me.
16                  I'm not going to say.  I mean, I'm not
17     aware of the equipment that was replaced or was left.
18            Q.    But your understanding on behalf of the
19     Board is that the only equipment that was replaced
20     was the EMS server and the ICC?
21            A.    That was my understanding.
22            Q.    Okay.  And so is it a concern to the Board
23     that compact flash drives, thumb drives, a variety of
24     other equipment that also shows up in the documents
25     produced by Paul Maggio that were copied and accessed

Page 82

1    by the -- by this team, that that equipment has

2    continued to be used for elections for a year and a

3    half?

4              MR. DELK:  Object to the form.

5              THE WITNESS:  It would be a concern to the

6         Board.

7         Q.    (By Mr. Cross)  It would be?

8         A.    It would be.

9         Q.    Okay.  And do you think on behalf of the

10   Coffee County Elections Board that it is appropriate

11   to require -- to require your voters in Coffee County

12   to vote using equipment and devices that was breached

13   by third parties a year and a half ago?

14             MR. DELK:  Object to the form.

15             THE WITNESS:  The --  Well, I mean, we

16        would look to the Secretary of State to ensure

17        that our voting equipment is up to date and is

18        free of any malware or any problems that may

19        alter the outcome of an election.

20        Q.    (By Mr. Cross)  Right.  But you've

21   testified previously that you haven't received any

22   assurances or communications at all from the

23   Secretary of State's Office about this intrusion,

24   right?

25        A.    Not that I recall.  No.

Page 83

1    Q.   Okay.  So as you sit here, the Coffee
2    County Election Board cannot provide any assurances
3    to the voters in its County that the equipment that
4    the State is requiring it to vote -- the voters to
5    vote on still functions as it's supposed to?
6            MR. DELK:  Object to the form.
7    Q.   (By Mr. Cross)  You just don't know one
8    way or the other, right, sir?
9    A.   That's correct.
10   Q.   Okay.  Has the Coffee County Board
11   examined whether it has the authority to use
12   hand-marked paper ballots in lieu of the BMDs, since
13   state law allows that as an emergency backup?
14   A.   Because of this?
15   Q.   Yes.
16   A.   No.
17   Q.   Are you familiar with Ed Lindsey?
18   A.   No.
19   Q.   Are you aware that Ed Lindsey is one of
20   the state Election board members.
21           Does that help ring any bells?
22   A.   No.
23   Q.   Okay.  Are you aware that Ed Lindsey
24   testified yesterday that the counties have the
25   authority to invoke hand-marked paper ballots in

Page 84

1     emergency situations?

2          A.    I'm not aware of that.

3          Q.    Do you think it would be worthwhile for

4     the County Board of Elections to look into its

5     authority to allow its voters to use hand-marked

6     paper ballots at the polls in light of the intrusion

7     we've seen here and the lack of assurances from the

8     Secretary's Office?

9          A.    I don't feel --

10               MR. DELK:  Object to the form.

11               THE WITNESS:  -- comfortable in answering

12          that question.

13               THE COURT REPORTER:  I'm sorry.  That was

14          too many people at one time.

15               MR. DELK:  Make sure he's finishes.  Give

16          me a moment if I need to object.  And then

17          respond.  Okay?

18               THE COURT REPORTER:  I didn't get the end

19          of the question.

20               (Whereupon, the record was read by the

21          reporter.)

22          Q.    (By Mr. Cross)  In light the intrusion

23     that -- that you're now aware of in January of 2021

24     and the lack of assurances from the Secretary's

25     Office that the system still operates as it's

Page 85

1    supposed to?

2              MR. DELK:  Object to the form.

3              Now you may answer, if you can.

4              THE WITNESS:  Again, I'm going to say I

5         don't know the answer to that question without

6         the equipment being verified as suitable for

7         voting.

8         Q.    (By Mr. Cross)  And you would rely on the

9    State for that?

10        A.    Yes.

11             THE COURT REPORTER:  Would it be possible

12        to have a bathroom break?

13             MR. CROSS:  Yeah.  I was just thinking

14        that.  I was just figuring if there was a couple

15        more things on this before we do, if that's

16        okay.

17        Q.    (By Mr. Cross)  Has --  Has the Coffee

18   County Election Board, at any time in the last couple

19   years, discussed the possibility of using hand-marked

20   paper ballots on an emergency basis?

21        A.    No.

22             MR. CROSS:  All right.  Yeah.  Let's --

23        We can take a break.

24             THE WITNESS:  Okay.

25             THE VIDEOGRAPHER:  The --  The time is

Page 86

1           10:34 a.m.  We are off video record. &&&

2                   (Recess from 10:34 a.m. to 10:50 a.m.)

3                   THE VIDEOGRAPHER:  The time is 10:50 a.m.

4           We are back on video record.

5           Q.     (By Mr. Cross)  Mr. Stone, to go back to

6      the video that -- that ended up on YouTube we talked

7      about earlier, you were there when that video was

8      filmed, right?

9           A.     That's correct.

10          Q.     Did the Board learn at some point that in

11     that video, once it ended up on YouTube, there was a

12     Post-it note with a password on it that was readable?

13          A.     Yes.

14          Q.     And what's the Board's understanding about

15     what that password is used for or was used for?

16          A.     The Board did not know what the password

17     was for --

18          Q.     All right.

19          A.     -- which piece of equipment it opened.

20          Q.     All right.  Was that something the Board

21     was concerned about when that information came to

22     light, that some sort of password useable for

23     equipment in Coffee County was on the Internet?

24                  MR. DELK:  Object to the form.

25                  THE WITNESS:  I don't know what the Board

Page 87

1          would have thought about that.

2          Q.     (By Mr. Cross)  Oh.  Let me ask a

3     different question then.

4          A.     Well, I mean --

5          Q.     Go ahead.

6          A.     -- I just want to say passwords are often

7     changed; and so I mean, that's the nature of

8     technology; and so --

9          Q.     Was there ever any discussion at the Board

10    level about the issue of this password being on the

11    Internet?

12         A.     Not that I recall.  No.

13         Q.     Oh.  Are you aware of any outreach by the

14    State to anyone in Coffee County regarding this

15    password being on the Internet?

16         A.     I'm not aware of that.

17         Q.     Are you aware of any efforts made to

18    change the password for whatever equipment that

19    password was used for?

20         A.     Beyond what James Barnes would have done,

21    no.

22         Q.     Okay.  And you're not aware of Mr. Barnes

23    actually changing any passwords on any equipment,

24    right?

25         A.     I'm not aware of that.

Page 88

```
 1        Q.    All right.  Let's go back -- and sorry, we
 2    jumped around a little bit -- to this --  Sorry.  No.
 3    That one (indicating).
 4              MR. DELK:  No. 3?
 5              MR. CROSS:  Yeah.
 6        Q.    (By Mr. Cross)  All right.  So we're
 7    looking at Exhibit 3, which is some screen shots from
 8    the video the County produced, and we left off at
 9    Page 21.  So flip to Page 22, if you would.
10              So we're on January 7, 2021 at 7:43 p.m.
11    And here do you see that this is the back of Ed
12    Voyles, and he's escorting out some of the
13    individuals we saw in earlier photos, right?
14        A.    Yes.
15        Q.    Okay.  And --  And, again, these
16    individuals, other than Mr. Voyles, you don't
17    recognize as state or County officials?
18        A.    I don't.
19        Q.    Then if we go to the next page, January 7,
20    2021, still at 7:43 p.m., we have Mr. Voyles.  And is
21    that Misty Hampton standing in the door?
22        A.    It is.
23        Q.    All right.  You can put that aside.
24              MR. CROSS:  What are we up to, seven?
25              MR. SPARKS:  Seven.
```

Page 89

1              (Exhibit 7 was marked for identification.)

2        Q.    (By Mr. Cross)  All right.  Let me hand

3    you what has been marked as Exhibit No. 7.

4              So these are additional screen shots from

5    the video the County produced.  If you look at the

6    first page, do you see now we're on January 27 of

7    2021?

8        A.    Yes.

9        Q.    And it's at 9:59 a.m., right?

10       A.    It is.

11       Q.    And there's an individual who's walking in

12   who's holding a box in front of his face.

13             Do you see that?

14       A.    Yes.

15       Q.    Do you have any idea who that is?

16       A.    I don't.

17       Q.    If you come to the next page --

18             MR. MILLER:  Hold on a second.  Just we

19        need to have the exhibits introduced.  On behalf

20        of the County, I -- I can't see them all.

21             MR. CROSS:  Okay.  There's one right

22        there.

23       Q.    (By Mr. Cross)  On the next page still at

24   9:59 a.m., the person gets a little closer to the

25   camera, but still hiding his face behind a box,

Page 90

1    right?

2          A.    He is.

3          Q.    Okay.  And then we get to the next page.

4    Still 9:59 a.m.  Now he's lowered the box just before

5    he goes in the door.

6                Do you recognize his face?

7          A.    I don't.

8          Q.    So that's not someone you recognize as a

9    state of county officials?

10         A.    No.

11         Q.    Okay.  And then January 27, 10:22 a.m., we

12   see the same individual leaving, right?

13         A.    Yes.

14         Q.    And then the next day, January 28, 2021 at

15   2:11 p.m., the same individual coming back into the

16   office, right?

17         A.    Appears to be the same individual.  Yes.

18         Q.    And then later that same day, it looks

19   like about 10 minutes later at 2:21 p.m., he's

20   leaving, right?

21         A.    Yes.

22         Q.    Then on January 29, 2021, 2:33 p.m., the

23   same individual comes back to the office, right?

24         A.    Yes.

25         Q.    Okay.  And then later that day at 3:57

Page 91

1      p.m., we see that individual leave, right?

2           A.    Yes.

3           Q.    And you don't have any idea who that man

4      is?

5           A.    I don't.

6                 MR. CROSS:  Okay.  I'm getting too old to

7           keep up with this.

8                 All right.  Here's Tab 8.  And, Steve, if

9           you don't mind just sharing that with Carey.

10                MR. DELK:  No.

11                MR. CROSS:  Sorry.  Exhibit 8.  Tab 55.

12                (Exhibit 8 was marked for identification.)

13          Q.    (By Mr. Cross)  All right.  So this is

14     January 18 of 2021 at 4:20 p.m., and we see an

15     individual coming to the office.

16                Do you see that?

17          A.    I do.

18          Q.    Do you recognize him?

19          A.    I don't.

20          Q.    So not someone you recognize as a state of

21     county officials?

22          A.    No.

23          Q.    Okay.  Have you ever met Doug Logan of

24     Cyber Ninjas?

25          A.    I have not.

Page 92

1      Q.    Have you ever seen a picture of him?

2      A.    I've seen the picture that was in the

3   article.

4      Q.    Okay.  Do any of the people we've looked

5   at here look like Doug Logan to you, or you just

6   don't remember?

7      A.    I don't recall if that would be Doug Logan

8   or not.

9            MR. CROSS:  Picture.  Picture.

10     Q.    (By Mr. Cross)  Are you familiar with the

11  name Jeffrey Lenberg?

12     A.    I'm not.

13     Q.    All right.  Have you ever seen him before?

14     A.    No.

15     Q.    Oh.  All right.  Flip to the second page

16  of Exhibit 8.

17     A.    (Witness complies with request of

18  counsel.)

19     Q.    So January 18, 2021, 4:20 p.m., this is

20  still the same time.  This is the same individual we

21  see walking in, in the prior picture, right?

22     A.    Yes.

23     Q.    Okay.  And you still don't recognize him?

24     A.    I don't.

25     Q.    The next page, January 18, also, at 4:20

Page 93

1       p.m.  I see a gentleman, gray hair, beard walking in.

2              Do you see that?

3       A.    I do.

4       Q.    If you'd grab Exhibit 7 again, which is

5       that one there.

6       A.    This one (indicating)?

7       Q.    Yeah.  And flip to Page 5.

8       A.    (Witness complies with request of

9       counsel.)

10      Q.    Does that look to you to be the same

11      individual who shows up in Page 3 of Exhibit 8 on

12      January 18?

13             And you can put them side by side, if you

14      need to.

15      A.    They both have the same hair style.  Have

16      the same beard.  Eyewear appears to be --

17             It appears to be the same person.

18      Q.    Yeah.  Seem to be --

19      A.    I cannot --

20      Q.    -- wearing the same clothes, right?

21      A.    Yes.  Except with the addition of the

22      jacket.

23      Q.    Right.  The jacket on January 18?

24      A.    Yeah.

25      Q.    Okay.  And if you look --  Well, strike

Page 94

1    that.  Sorry.

2              Go to the --  Going back to Exhibit 8 --

3         A.    This one (indicating)?

4         Q.    Yes, sir.

5         A.    Uh-huh.

6         Q.    Go to Page 4.  So this is January 18, 2021

7    at 8:06 p.m.

8         A.    Uh-huh.

9         Q.    Do you recognize any of the individuals

10   who are leaving there?

11        A.    That appears to be Misty Hampton in the

12   lead.

13        Q.    And she looks like she's escorting out the

14   other two individuals we saw in these photos, that

15   the guy with the gray hair we were just talking about

16   and the other guy with the khaki pants?

17        A.    Yes.

18        Q.    Okay.  And, again, just so we're clear,

19   the two individuals she's escorting out of the office

20   at 8:06 p.m. on January 18 of '21, those are not

21   people you recognize as state or County officials?

22        A.    That's correct.

23        Q.    All right.  Come to the next page, January

24   19 at 8:52 a.m.  Here we see these same two

25   individuals, the guy with the gray hair and the

Page 95

1    beard, the guy in the khaki pants, returning to the

2    office, right?

3         A.   Yes.

4         Q.   The next page, January 19, 2021 at 6:19

5    p.m., we see the same guy in the khaki pants in the

6    doorway, right?

7         A.   Yes.

8         Q.   The next page, the same date, same time,

9    but a few seconds later, who do you recognize in this

10   photo?

11        A.   Misty standing in the door, and that

12   appears to be her daughter.

13        Q.   In the white sweatshirt and jeans?

14        A.   In the white sweatshirt.

15        Q.   Okay.  And it's those same two individuals

16   we've just been looking at, right?

17        A.   Yes.

18        Q.   Okay.  So it looks like at January 19,

19   2021 at 6:00 p.m. Miss Hampton escorts those two

20   individuals, the gray-haired guy and the guy in the

21   khaki pants, out of the Elections Office, right?

22        A.   Yes.

23        Q.   All right.  Does the Board have any

24   insight as to what these individuals were doing in

25   the Elections Office on January 18 and January 19 of

Page 96

1    2021?

2         A.    The Board has no idea why those people

3    were in the Elections Office.

4         Q.    Had you learned before this moment that

5    these individuals were in the Elections Office then?

6         A.    Before this moment?

7         Q.    Yes.

8         A.    Yes.

9         Q.    All right.  And when did you first learn

10   that?

11             MR. DELK:  And I will instruct him not to

12        get into the details of what you discussed with

13        counsel; but generally, you can respond.

14             MR. CROSS:  I'm just looking for a

15        timeframe --

16             MR. DELK:  Sure.

17             MR. CROSS:  -- not substance of

18        communication.

19             THE WITNESS:  Recently.

20        Q.    (By Mr. Cross)  Last few days?

21        A.    Yes.

22        Q.    Did -- have you seen --

23             Just yes or no.  Have you seen the video

24   that correlates to these screen shots for January 18

25   and January 19 before today?

Page 97

1      A.    January 18 and January 19, not to my

2   knowledge.  No.

3      Q.    Okay.  And then same with Exhibit 7.  Were

4   you aware before --

5      A.    What --

6      Q.    Sorry.  You can go back.  It's the one on

7   the right.

8      A.    This (indicating)?

9      Q.    Yes, sir.

10          Were you aware before today that the --

11   that the gentleman who visited the office on January

12   27 of 2021, as well as January 28 and January 29 --

13   were you aware before today that that individual was

14   in the Elections Office?

15      A.    No.

16      Q.    Do you recall at any point -- just yes or

17   no -- reviewing the video that corresponds to those

18   screen shots?

19      A.    What's the day?  What are the dates on

20   this?

21      Q.    January 27 to 29.

22      A.    No.

23      Q.    All right.  So fair to say that the Board,

24   to your knowledge, does not have any insight into why

25   this individual was there or what he was doing?

Page 98

```
 1          A.    That's correct.
 2          Q.    But also fair to say this -- this isn't
 3   something you have discussed with the Board before
 4   now, because you personally weren't even aware of
 5   this before now?
 6          A.    That's correct.
 7          MR. CROSS:  Okay.  Sorry.  Hand me the --
 8      that one, the book.
 9          Grab Exhibit 7, if you would.  It's the
10      one where --
11          A.    This (indicating)?
12          Q.    -- the guy has got the box.  He's holding
13   up --
14          A.    Oh, yeah.
15          Q.    -- a box as he goes in.
16          A.    It's this one right here.  This right
17   here.
18          Q.    Yeah.  And flip to --  I think it's the
19   third page.
20          A.    Okay.
21          Q.    So I'm going to show you a picture of a
22   man named Jeffrey Lenberg.  Does that look like
23   Jeffrey Lenberg to you in Exhibit 7?
24          And there --  If you flip through Exhibit
25   7, there's another photo of him coming out, if I
```

```
 1      recall.
 2                  MR. MILLER:  Dave, are we marking Mr.
 3           Lenberg's picture as an exhibit?
 4                  MR. CROSS:  I wasn't going to, but I can.
 5                  MR. MILLER:  I think for clarity of the
 6           record, it might be helpful, but do you really.
 7           Q.    (By Mr. Cross)  Okay.
 8           A.    It appears to be the same person.
 9                  MR. CROSS:  Okay.  Do we have a copy we
10           can upload for that?
11                  MR. SPARKS:  Oh, yeah.
12                  MR. CROSS:  Okay.  All right.  So we'll
13           mark this picture as Exhibit 9.  Is that right?
14                  MR. DELK:  Yeah.
15                  MR. SPARKS:  It will be nine.
16                  MR. CROSS:  Yeah.  Hand it to you guys.
17           We'll -- We'll make sure that gets into Exhibit
18           Share.
19                  (Exhibit 9 was marked for identification.)
20           Q.    (By Mr. Cross)  And to your knowledge, the
21      Board does not have any information on why Jeffrey
22      Lenberg would be in the Elections Office at any
23      point?
24           A.    That's correct.
25           Q.    Do you any familiarity with Jeffrey
```

1    Lenberg?

2         A.    I don't.

3         Q.    Never heard of him?

4         A.    Never heard of him.

5              MR. CROSS:  All right.

6              MR. SPARKS:  What are on, 9 or 10?

7              MR. CROSS:  10.

8              (Exhibit 10 was marked for

9         identification.)

10        Q.    (By Mr. Cross)  All right.  Let me hand

11   you what's been marked as Exhibit 10.  This is a

12   collection of monthly Board meeting minutes that we

13   received from the County.

14              And actually, before you look at that, do

15   I understand correctly that the elections supervisor

16   and the assistant to the elections supervisor, those

17   individuals report to the County Board of Elections?

18        A.    That's correct.

19        Q.    Okay.  So they work --  They work for the

20   Board?

21        A.    The elections supervise --

22              You mean they're under their direction.

23   Yes.

24        Q.    Okay.

25        A.    Yeah.

Page 101

```
 1        Q.    Okay.  And in preparing for your testimony
 2   today, did you speak with the current elections
 3   supervisor or assistant?
 4        A.    No.
 5        Q.    Okay.  Did you speak with any former
 6   employees?
 7        A.    No.
 8        Q.    Oh.  All right.  So do you recognize
 9   Exhibit 10 as some of the Board meeting minutes?
10        A.    I do.
11        Q.    Okay.  Flip to January 12th of 2021, the
12   meeting minutes, if you would, please.
13        A.    Okay.
14        Q.    So these minutes reflect the discussion
15   the Board had on a meeting -- in a meeting at 9:30
16   a.m. on January 12th of 2021.  Is that fair?
17        A.    It is.
18        Q.    There's no indication of these -- in these
19   Board meeting minutes of any of the individuals that
20   we had seen in the video that came into the office on
21   January 7 and January 8; is that right?
22        A.    That's correct.
23        Q.    Was there any discussion in this Board
24   meeting about those individuals coming into the
25   office and what they did?
```

Page 102

```
 1          A.    No.
 2          Q.    Okay.  Do you know why there was no
 3    discussion with the Board about that?
 4                MR. DELK:  Object to the form.
 5                THE WITNESS:  I don't recall that any of
 6          this had come to light at that time.
 7          Q.    (By Mr. Cross)  Had come to light for the
 8    Board?
 9          A.    Had come to light for -- had --
10                I don't remember when -- when I learned
11    about it, and we didn't discuss it in a Board meeting
12    situation.
13          Q.    Okay.  Again, we know that Eric Chaney was
14    there on January 7th and January 8th, right?
15          A.    According to the photographs?
16          Q.    Yes.
17          A.    Yes.
18          Q.    And does the Board have any insight as to
19    why Eric Chaney did not share those events with the
20    rest of the Board?
21                MR. DELK:  Object to the form.
22                THE WITNESS:  No.
23          Q.    (By Mr. Cross)  That's not something the
24    Board has discussed as far as you know?
25          A.    No.
```

Page 103

```
 1          Q.    Is that something the Board would like to
 2     understand?
 3               MR. DELK:  Object to the form.
 4               THE WITNESS:  I think it's fair to say
 5          we'd like to get to the bottom of what happened.
 6          Q.    (By Mr. Cross)  Yeah.  Including Mr.
 7     Chaney's involvement?
 8          A.    Yes.
 9          Q.    Okay.  Mr. Chaney left the Board on August
10     12th of this year; is that right?
11          A.    That's correct.
12          Q.    What is the Board's position on why Mr.
13     Chaney left the Board?
14          A.    The Board's position is that Mr. Chaney
15     moved his residence from -- to another commissioner's
16     district, which gives two representatives from one
17     district; and this was the explanation that he gave
18     us, was that he was going to resign so that the
19     respective commissioner could appoint somebody from
20     their district.
21          Q.    But that was not a new issue on August
22     12th, right, sir?
23          A.    The residence issue, we -- we had heard
24     that before.  Yes.
25          Q.    In fact --  In fact, the Board had
```

Page 104

1    discussed it almost a year earlier and decided that

2    it was not a problem for him to serve on the Board

3    right?

4              MR. DELK:  Object to the form.

5              THE WITNESS:  That's correct.

6         Q.    (By Mr. Cross)  Okay.  And --  And to help

7    you out, if you flip to the Board meeting minutes in

8    Exhibit 10 on November 9th of 2021 --

9         A.    November 9th?

10        Q.    Yes, sir.

11        A.    Yeah.  March.  Okay.  I'll get it.

12              We're December.

13              Okay.  Here I am.

14        Q.    If you come down to No. 10 on the meeting

15   minutes, it reads, "Eric Chaney notified the Board

16   that he had recently moved out of his Commissioner's

17   district.  Upon further research, he discovered there

18   is no stipulation that Board of Elections &

19   Registration members must live the same district as

20   the person who appointed them.  He has decided to

21   remain on the Board at least 2 more years."

22              Do you see that?

23        A.    I do.

24        Q.    So nearly a year before he resigned, the

25   Board discussed the fact that he moved out and agreed

```
 1      that he could stay on the Board at least two more
 2      years, right?
 3               MR. DELK:  Object to the form.
 4               THE WITNESS:  I --  I don't recall if we
 5          discussed two more years.  I do --  I do recall
 6          that discussion.
 7          Q.    (By Mr. Cross)  You --  You recall that
 8      the Board agreed in November of 2021 that -- that Mr.
 9      Chaney could continue to serve on the Board, despite
10      not living in the same district as his commissioner,
11      right?
12          A.    I do.
13          Q.    All right.  And so what happened between
14      November of 2021 and August 12th that led him to
15      resign purportedly on that basis?
16               MR. DELK:  Object to the form.
17               THE WITNESS:  Now in all honesty, I don't
18          know; but the bylaws state that --  The bylaws
19          of the Board of Elections states that each
20          Commissioner will -- will appoint a respective
21          member from their -- from their district.
22               The state legislation doesn't stipulate,
23          and so --  And that may be something we need to
24          review in the bylaws to make sure that they both
25          jibe.
```

```
 1        Q.    (By Mr. Cross)  How did the Board first
 2     learn about Mr. Chaney's resignation?
 3        A.    He --  He announced it.
 4        Q.    How?
 5        A.    In a meeting --
 6              MR. CROSS:  That will be eight.
 7              THE WITNESS:  In executive session.
 8              Am I allowed to say executive session?
 9        Q.    (By Mr. Cross)  When was that?
10              MR. DELK:  I'll assert an objection about
11           anything that was an executive session, if I can
12           just have a standing objection on that.
13              THE WITNESS:  He announced it.
14        Q.    (By Mr. Cross)  Okay.  Let me hand you
15     what's been marked as Exhibit 11.
16              (Exhibit 11 was marked for
17           identification.)
18        Q.    (By Mr. Cross)  Do you recognize this as
19     an e-mail that Eric Chaney sent to you and others on
20     the Board on August 12th of 2022?
21        A.    I think this was more recently.
22        Q.    This is the day that he resigned, right?
23        A.    Yes.
24        Q.    And in fact, he indicates, "Please accept
25     this letter as my formal resignation..." in the last
```

 1    sentence.

 2                 Do you see that?

 3         A.    I do.

 4         Q.    Was the Board aware of his forthcoming

 5    resignation before this e-mail came in?

 6         A.    Only to the point that we had discussed

 7    it.  As you say, we hadn't discussed it.  He

 8    announced it.

 9         Q.    Okay.  When was the meeting where he

10    announced it?

11         A.    I don't recall the date.

12         Q.    Was it shortly before he e-mailed the

13    resignation in?

14         A.    I don't recall.  I don't recall.

15         Q.    And just yes or no.  He announced it in a

16    executive session of the Board?

17         A.    The first time, as I recall, yes.

18         Q.    Okay.  You say the first time.  Was there

19    a second time where he announced his resignation in a

20    Board meeting?

21         A.    Well, I mean, all this came about after

22    that.

23         Q.    Okay.  Was the Board --  Again, just yes

24    or no.  Was the Board in executive session

25    specifically to address his resignation --

```
 1         A.    No.

 2         Q.    -- or for some other purpose?

 3         A.    The only reason that we enter executive

 4    session is to discuss personnel.

 5               A Board member can ask for executive

 6    session.  As I recall, he asked for executive session

 7    for that.

 8         Q.    To --  To announce his resignation.

 9         A.    So the answer to your question, I guess,

10    is yes then.

11         Q.    Okay.  Well, he -- you're -- he --  He

12    asked for executive session to announce his

13    resignation.  That's your understanding?

14         A.    Yeah.  He didn't say I'm going to

15    announce -- announce my --  He just said may we enter

16    executive session.

17         Q.    And then he announced his resignation?

18         A.    Yes.

19         Q.    Do you recall if that was in the month of

20    August of this year?

21         A.    I don't recall.

22         Q.    Okay.  But fair to say it was recent?

23         A.    I can't recall.

24         Q.    Okay.  Well, do you have any reason to

25    believe that he would announce his resignation in a
```

1    meeting with the Board and then continue to serve on

2    the Board for months before sending in his formal

3    resignation, or would you expect those to be close in

4    time?

5              MR. DELK:  Object to the form.

6              THE WITNESS:  Well, I just thought that he

7         had gotten the permission from his commissioner

8         to remain on the Board.

9         Q.    (By Mr. Cross)  Okay.

10        A.    We --

11        Q.    Go ahead.

12        A.    Well, I -- I mean, as with all personnel,

13   it's hard to fill vacancies; and so for board

14   members, it is easier to wait until the end of the

15   commissioner's term or maybe to the end of -- of a

16   year, I mean, and say.

17              That was not discussed, however --

18        Q.    Okay.

19        A.    -- but --  But it's just a byproduct of

20   trying to fill seats on the commission and then, you

21   know, even employment in the office.

22        Q.    Okay.  Were you aware that Eric Chaney was

23   scheduled to be deposed on August 15, the very next

24   business day after he sent in his formal resignation?

25        A.    I was not.

1     Q.    Do you have any insight as to whether the

2     fact that he was going to be deposed on the events

3     regarding the intrusion in the office of January,

4     whether that was a factor in his resignation?

5               MR. DELK:  Object to the form.

6               THE WITNESS:  I have no idea.

7     Q.    (By Mr. Cross)  Were you aware that he

8     asserted the Fifth Amendment numerous times in his

9     deposition?

10     A.    I was not.

11     Q.    Were you aware that Eric Chaney was

12     originally going to do what you're doing; he was

13     going to be the corporate representative of the Board

14     of Elections to testify in this deposition?

15     A.    I was aware of that.

16     Q.    Do you know why a change was made?

17               MR. DELK:  Object to the form.

18               THE WITNESS:  I don't --

19               MR. DELK:  It's in the -- possibly the

20          purview of privileged communication.

21     Q.    (By Mr. Cross)  Well, it sounds like you

22     don't know one way or the other.

23     A.    I don't know why.

24     Q.    Okay.  All right.  Flip back to Tab 10, if

25     you would the -- or sorry -- the Exhibit 10, the

Page 111

```
 1    Board meeting minutes, and go back just one page to
 2    September 7 of 2021.
 3                 Do you see here under No. 9 -- I'm
 4    sorry -- No. 7, it says James Barnes said Beau
 5    Roberts from Dominion Voting Systems is looking into
 6    the missing mobile ballot printer?
 7         A.    Do I recall the discussion of that?
 8         Q.    Yeah.  Do you recall Mr. Barnes
 9    discovering that a mobile ballot printer was missing
10    from the Coffee County Elections Office?
11         A.    I don't recall that.
12         Q.    Do you know whether that printer was
13    found?
14         A.    I don't.
15         Q.    Is there any information you can share
16    about that printer being missing?
17         A.    No.
18         Q.    Okay.  All right.  Flip to --
19                 Oh, by the way, do you know why there are
20    no meeting minutes for October 2021?
21         A.    I don't.
22         Q.    Do you have any reason to believe you
23    would not have met in the month of October?
24         A.    I don't.
25         Q.    Okay.  All right.  Flip to January 4th of
```

1    2022, a couple pages later.

2        A.    January 4th.  Okay.

3        Q.    So as of January 2022, James Barnes was no

4    longer the election supervisor, right?

5        A.    That's right.

6        Q.    And he was replaced by Rachel Roberts?

7        A.    That's right.

8        Q.    And she's still there today, right?

9        A.    She is.

10        Q.    If you come down at the bottom here, do

11    you see where it says, "Rachel's Updates"?

12        A.    Yes.

13        Q.    And it says, "GEMS room relocating to a

14    bigger room?"

15        Do you see that?

16        A.    Yes.

17        Q.    Has the GEMS room relocated to a different

18    spot in the Elections Office since Miss Hampton and

19    Mr. Barnes were there?

20        A.    I'm not certain.

21        Q.    Why was the GEMS room being relocated to a

22    bigger room?

23        A.    There's always a question of having enough

24    storage space for everything, and that is very likely

25    what that was about.

Page 113

```
 1        Q.    And --  And I don't want you to guess.  If
 2   you don't know why, that's fine.
 3        A.    And I don't know why.
 4        Q.    Okay.  So as you sit here today, you --
 5   you don't know whether the EMS --
 6        A.    Well -- well --
 7             MR. DELK:  Let --  Let him finish.
 8             THE WITNESS:  Okay.
 9        Q.    (By Mr. Cross)  As you sit here today, you
10   don't know -- the Board doesn't know whether what's
11   referred to as the GEMS room in the Coffee County
12   Elections Office has relocated since Mr. Barnes left?
13        A.    I don't know, and I --  But I want to ask
14   a question.  When you say GEMS room, what is the
15   specific equipment that you're referring to when you
16   say GEMS room?
17        Q.    Have you heard the terminology?  Well --
18        A.    I've heard GEMS before.  But is that the
19   computer that everything is tabulated on, or is
20   that --
21             Well, what is the GEMS room?
22        Q.    So are you aware that the GEMS room is the
23   terminology in Coffee County that they refer to
24   the -- the room in the Elections Office where the EMS
25   server and the central scanner sit and where they
```

Page 114

1    do --
2         A.   It's where they run the ballots and where
3    it's visible to the public to see what's going on?
4         Q.   (Attorney nods head.)
5         A.   Okay.  That has not been relocated to a
6    bigger room.  No.
7         Q.   Okay.  That's still in the same spot --
8         A.   Yes.
9         Q.   -- to your knowledge?
10             Okay.  Is --  Is there still consideration
11   of relocating that?
12        A.   Well, I think that's all going to be
13   figured out when they get the new office; and I think
14   Rachel was -- was expressing a need for more room.
15        Q.   Okay.  And there's consideration of moving
16   the Elections Office; is that right?
17        A.   All of that construction --  And I don't
18   know the extent of -- of everything that will happen,
19   but my understanding is that the Elections Office
20   will be relocated into more updated office.  Yes.
21        Q.   Okay.  Do you know the --
22        A.   It has not yet been built.
23        Q.   Okay.  So that's not imminent?
24        A.   No.
25        Q.   Okay.  All right.  Flip to the meeting

1     minutes for February 1 of 2022, please.

2         A.    Uh-huh.

3         Q.    Okay.  So here, you see again where it

4     says, "Rachel's Updates"?

5         A.    I do.

6         Q.    And if you come down, it looks like about

7     five or six bullets --

8         A.    Uh-huh.

9         Q.    -- the last one, it refers to, "Completed

10    inventory missing..."

11         Do you see that?

12         A.    Uh-huh.

13         Q.    Yes?

14         A.    I do.

15         Q.    And it indicates missing from the

16    inventory in Coffee County is two printer bags --

17         A.    Uh-uh.

18         Q.    -- a printer power code, a BMD bag, 14

19    charging cords, 7 charging cubes, and 1 ID tray.

20         Do you see that?

21         A.    I do.

22         Q.    What information can you share about why

23    these materials were missing from the office?

24         A.    Now I don't.  I don't have any information

25    for why those would be missing.

Page 116

1       Q.    Do you know whether any of them have been
2    located?
3       A.    I don't.
4       Q.    Do you know whether any of them have been
5    replaced?
6       A.    I don't have any information that any of
7    that was replaced; or if they were currently in use,
8    I -- I don't have the information on that.
9       Q.    Okay.  Do you know whether any of the
10   individuals who visited the Coffee County Elections
11   Office in January of 2021, whether they took a BMD
12   with them when they left?
13      A.    I don't have any information.
14      Q.    Do you know whether they took any election
15   equipment with them?
16      A.    I don't have any information.
17      Q.    Okay.
18           MR. CROSS:  Adam, Tab 6.  Exhibit 12.
19           (Exhibit 12 was marked for
20       identification.)
21      Q.    (By Mr. Cross)  All right.  Let me hand
22   you what's been marked as Exhibit 12, which is Tab 6.
23           MR. CROSS:  Did we load the picture of
24       Jeff Lenberg?
25           MR. SPARKS:  It's Exhibit 9.

Page 117

1        Q.   (By Mr. Cross)  Okay.  Mr. Stone, do you

2   recognize Exhibit 12?

3        A.   I don't.

4        Q.   Okay.  If you look at the top of the

5   second page, the first substantive page of the e-mail

6   thread, do you see there's an e-mail from Jennifer

7   Herzog, to Ryan Germany at the Secretary's Office,

8   copying Anthony Rowell on April 12th of 2022?

9        A.   I do.

10       Q.   And Anthony Rowell is an attorney for the

11  County Board of Elections?

12       A.   That's correct.

13       Q.   And Jennifer Herzog is one of his

14  partners; is that right?

15       A.   That's correct.

16       Q.   And they're at the same firm that Mr. Delk

17  is at?

18       A.   That's correct.

19       Q.   Okay.  If you look at the start of this

20  e-mail on the second page of the e-mail thread, you

21  see it starts with an e-mail from Emma Brown at "The

22  Washington Post" on April 12th of 2022?

23       A.   Okay.  Where are you referring to that?

24       Q.   Right here (indicating).

25       A.   Right here.  Yeah.  Okay.

Page 118

```
 1          Q.    And so Miss Brown reaches out on behalf of
 2     "The Washington Post" to Wesley Vickers, Anthony
 3     Rowell, Jennifer Herzog.
 4                Do you see that?
 5          A.    I do.
 6          Q.    What is Wesley Vickers' role in Coffee
 7     County?
 8          A.    He's County manager.
 9          Q.    Okay.  And if you read this e-mail -- and
10     you can take a moment with it, if you need to --
11     you'll see that Miss Brown is reaching out asking
12     about the visit by Scott Hall and others that we now
13     see in the video that's been produced in January of
14     2021.
15                Do you see that?
16          A.    I do.
17          Q.    If you come up, Miss Herzog forwards this
18     on to Eric Chaney.  Do you see at the top of the
19     page?
20                She writes, "Eric, we received the below
21     correspondence at 5:05 a.m. today."
22          A.    Yes.
23          Q.    And then if you come to the bottom of the
24     first page of the thread, you'll see that Eric Chaney
25     responds to Miss Herzog that same day at 2:29 p.m.
```

Page 119

```
 1              Do you see that?
 2        A.    I do.  Where it says, Tony, Jennifer, I do
 3   not know?
 4        Q.    Yes, sir.
 5        A.    I do see that.
 6        Q.    And Mr. Chaney wrote to Mr. Herzog.  "I do
 7   not know Scott Hall; and, to my knowledge, I am not
 8   aware of nor was I present at the Coffee County Board
 9   of Elections and Registration's office when anyone
10   illegally accessed the server or the room in which it
11   is contained."
12              Do you see that?
13        A.    I do.
14        Q.    You now know from the video that you've
15   seen that that was not a true statement, right?
16              MR. DELK:  Object to the form.  It calls
17         for one witness -- lay witness to comment on the
18         veracity of another's testimony or credibility,
19         should I say.
20        Q.    (By Mr. Cross)  You now know that that's
21   not a true statement, right?
22        A.    I do.
23        Q.    Okay.
24        A.    Well, if Scott Hall was in those pictures
25   at the same time that he was in the Elections Office.
```

Page 120

```
 1    Is that what the pictures show?

 2         Q.    Well, we're not specifically referring to

 3    Mr. Hall.  I mean, Mr. Chaney makes a much broader

 4    statement.  Right.  What he says is I'm not aware of

 5    nor was I present at the County Coffee County Board

 6    of Elections and Registration's office when anyone --

 7         A.    Uh-huh.

 8         Q.    -- illegally accessed the server or the

 9    room in which it is contained.

10              And you now know that that was not a true

11    statement, right, sir?

12              MR. DELK:  Object to the form.

13              THE WITNESS:  Yes.

14         Q.    (By Mr. Cross)  Okay.  Then if you come

15    down, do you see in the middle of the paragraph about

16    five lines down, there's a sentence that reads, "I

17    have no knowledge..."?

18         A.    I do.

19         Q.    And there Mr. Chaney wrote, "I have no

20    knowledge whether or not Misty allowed anyone without

21    authorization to access the server room (which

22    remains locked; and because of the layout of the

23    Elections Office, which is very small, you have to

24    walk through Misty's office to access that room.

25    Therefore, it is highly unlikely, if not impossible
```

Page 121

```
 1    for her not to know who did or did not enter the
 2    server room."
 3              Do you see that?
 4         A.   I do.
 5         Q.   You now know that the statement, "I have
 6    no knowledge whether or not Misty allowed anyone
 7    without authorization to access the server room," you
 8    now know that was not a true statement, right, sir?
 9              MR. DELK:  Object to the form.
10              THE WITNESS:  Misty --  I mean, is it not
11         true that Misty could have portrayed the people
12         as being legitimate Secretary of State
13         officials?
14         Q.   (By Mr. Cross)  Are you suggesting that
15    Eric Chaney thought that the individuals we've seen
16    in the photos, that -- that Eric Chaney thought --
17         A.   I'm -- I'm not -- I'm not --
18              I don't know the answer to that.
19         Q.   Okay.  But we know that Eric Chaney was in
20    the office on January 7 and 8?
21         A.   According to the photographs, we do.
22         Q.   Okay.  And we know that the access those
23    individuals had was not authorized, right?
24         A.   That's true.
25         Q.   Okay.  All right.  You can put that aside.
```

```
1        A.    (Witness complies with request of
2    counsel.)
3        Q.    Are you aware that the County produced the
4    video that you reviewed earlier this week to us, that
5    that's when we got it?
6        A.    Yes.
7        Q.    Okay.  Do you have any insight as to why
8    the County first told us in discovery and told
9    Marilyn Marks in response to Open Records Request
10   that no such video existed?
11       A.    I don't.
12             MR. CROSS:  Adam, can you grab 11.
13             MR. SPARKS:  11?
14             MR. CROSS:  Yeah.
15             13.
16             (Exhibit 13 was marked for
17        identification.)
18       Q.    (By Mr. Cross)  Let me hand you what's
19   been marked as Exhibit 13.
20             And do you recognize Exhibit 13 as a
21   picture inside the Coffee County Elections Office?
22       A.    Yes.
23       Q.    Okay.  And that's Ed Voyles on the right?
24       A.    Yes.
25       Q.    And does that look like Eric Chaney to you
```

Page 123

1      in that ball cap?

2            A.    It does.

3            Q.    Yeah.  Okay.  You can put that aside.

4                  Does the Board ever use Signal for

5      communications?

6            A.    No.

7            Q.    Do you know whether any member of the

8      Board personally uses Signal?

9            A.    I don't.

10                 MR. DELK:  Object to the form.

11           Q.    (By Mr. Cross)  Okay.  How does the Board

12     typically communicate with respect to -- to Coffee

13     County elections business?

14           A.    We establish a calendar one time a year.

15     We know that it's the first Tuesday morning at 9:30

16     of every month, so we know when our meetings are; but

17     we many times are reminded on text -- meeting at

18     9:30.  So text.

19                 What was the rest of your question?

20           Q.    How does the Board communicate about

21     elections business?

22           A.    That's essentially the way that we --

23     of --

24                 Of course, now board members don't have --

25     We don't have any County-assigned devices, a

Page 124

```
 1      computer, a phone.  We don't have --  We don't have
 2      County assigned e-mails; but I mean, we may get a
 3      message from time to time.
 4              For instance, I had -- I recall and
 5      submitted a communication I had with Misty on L&A
 6      testing, logic and accuracy testing.  Okay.  You see
 7      so we communicated on e-mail that way as well, but
 8      that's not --
 9              That's not the way that we communicate.
10      For one thing we know when our meetings are and then
11      we are reminded about meetings on text.
12              And I was asking her to describe what is
13      L&A testing.
14          Q.    Okay.  Do you know what efforts were made
15      for the -- the Board responding to the document
16      subpoenas it received in this case for board members
17      and employees to search text messages and e-mails and
18      personal devices for responsive --
19          A.    Yes.
20          Q.    -- doc --
21          A.    Yes.  We were --
22              MR. DELK:  Object to the form.
23              THE WITNESS:  We were told to search our
24          devices for any communications that we had.
25          Q.    (By Mr. Cross)  And do you know whether
```

```
 1    members of the Board found text messages that were

 2    responsive?

 3         A.   I'm -- I'm not --  I'm not certain that

 4    they did.

 5         Q.   All right.  You're not aware of any Board

 6    member finding responsive text messages?

 7         A.   I --  I'm not --

 8              MR. DELK:  Object to form.

 9              THE WITNESS:  -- aware of that.

10         Q.   (By Mr. Cross)  What about the employees,

11    Rachel and her assistant?

12         A.   You mean did we have communications with

13    Rachel?

14         Q.   Sorry.  Let me ask a better question.

15    Yeah.

16              Do you know whether the current elections

17    supervisor or her assistant searched their e-mails

18    and personal devices as well?

19              MR. DELK:  Object to the form to the -- to

20         the extent some of this was managed by counsel;

21         but to the extent either way, you can respond.

22              THE WITNESS:  I --  I don't know about

23         Rachel's text messaging.  I would verify that

24         she sent text messages that said reminder of

25         meeting on Tuesday morning type of message.
```

Page 126

1         Q.   (By Mr. Cross)  Did board members, from

2    time to time, exchange text messages with Misty

3    Hampton when she was the elections supervisor?

4         A.   In the same way, and then I would have no

5    idea.  Everybody had everybody's number, so I would

6    have no idea if they communicated that way or not.

7              MR. CROSS:  39.

8              (Exhibit 14 was marked for

9         identification.)

10        Q.   (By Mr. Cross)  All right.  Let me hand

11   you what's been marked as Exhibit 14, and this is Tab

12   39.  So these are text messages that Misty Hampton

13   produced in response to a subpoena.

14          And if you look at the top, do you see

15   where it says, "Messages - Eric Chaney"?

16        A.   I do.

17        Q.   So these are text messages between Miss

18   Hampton and Eric Chaney, according to Miss Hampton.

19          Do you understand that?

20        A.   I do.

21        Q.   And were you aware that Mr. -- I asked Mr.

22   Chaney about some of these messages in his

23   deposition?

24        A.   I'm not.

25        Q.   Have you read his deposition transcript?

Page 127

```
 1          A.    I have not.

 2          Q.    Has anybody talked to you about his

 3    deposition?

 4          A.    No.

 5                MR. DELK:  Object to the form to the

 6          extent any of that would be privileged

 7          communication.

 8          Q.    (By Mr. Cross)  If you look at the bottom,

 9    you'll see these little page numbers.  Sorry.

10    They're kind of small --

11          A.    Uh-huh.

12          Q.    -- and gray.  Flip to, if you would,

13    please --  Let's see.  Oh, flip to Page 15 of 24.

14          A.    (Witness complies with request of

15    counsel.)

16          Q.    So if you look in the middle, do you see

17    there's a date November 19, 2020 at 5:19 p.m.?

18          A.    I do.

19          Q.    And this is --  Because this is from Misty

20    Hampton's phone, do you understand the green texts

21    are texts that Misty Hampton sent.  The gray texts

22    are texts that Mr. Chaney sent?

23          A.    Okay.

24          Q.    And so Mr. Chaney texts her.  "Do you have

25    the election bulletin from the Secretary of State
```

Page 128

```
 1      Office about how the audit had proved the machines
 2      reliable and that notes should certify the original
 3      numbers?"
 4                  Do you see that?
 5          A.    I do.
 6          Q.    She responds, "I will go back on firefly
 7      and find them."
 8                  Mr. Chaney then responds e-mail them to
 9      me, please.  Trump's man wants them.
10                  Do you see that?
11          A.    I do.
12          Q.    Do you have any insight as to who the
13      Trump's man was?
14          A.    I don't.
15          Q.    Are you familiar with the name Robert
16      Sinners?
17          A.    I'm not.
18          Q.    Are you aware that Robert Sinners works in
19      the Secretary of State's Office?
20          A.    I'm not aware of that.
21          Q.    Are you familiar with an issue involving
22      an effort in Georgia to create a slate of electors
23      for the electoral college that would have voted for
24      Trump instead of Biden?
25          A.    Only through --
```

Page 129

```
 1              MR. DELK:  Object to the form.
 2              THE WITNESS:  Only through the media.
 3         Q.   (By Mr. Cross)  Are you aware that Cathy
 4    Latham was one of the individuals?
 5         A.   I'm not aware of that.
 6         Q.   Were you aware that Robert Sinners was one
 7    of the people who organized that effort?
 8         A.   I'm not.
 9         Q.   So you've never heard of Robert Sinners?
10         A.   I have not.
11         Q.   All right.  Flip to Page 19 of 24.
12         A.   (Witness complies with request of
13    counsel.)
14         Q.   Do you see at the top there's a date,
15    December 30 of 2020 at 4:00 p.m.?
16         A.   I do.
17         Q.   And here, these are three images of poll
18    pads in Coffee County that Miss Hampton sent to Mr.
19    Chaney on this date.
20              Do you see that?
21         A.   I do.
22              MR. DELK:  Object to the form.
23         Q.   (By Mr. Cross)  I'm sorry.  Did you say
24    yes?
25         A.   Yes.
```

```
 1         Q.    Okay.  If you look at the first one, do
 2    you see that there's a Netflix screen on the poll
 3    pad?
 4         A.    There's a Netflix screen.
 5               Okay.  I don't see where it says Netflix
 6    but --
 7         Q.    If you look in the top left corner of that
 8    picture.
 9         A.    I do.  I do now.
10         Q.    You see?
11         A.    Yes.
12         Q.    Okay.  Did the Board ever discuss the fact
13    that the elect -- that the poll pads used in Coffee
14    County could be used to access the Internet?
15         A.    No.
16         Q.    Miss Hampton, to your knowledge, never
17    informed the Board that -- that her daughter, in
18    fact, would watch videos on the poll pads while --
19         A.    No.
20         Q.    -- while elections were ongoing?
21               MR. DELK:  Make sure you let him --
22               THE WITNESS:  Wait till he finishes the
23         question.
24               No.  She never informed us of that.
25         Q.    (By Mr. Cross)  All right.  And I gather
```

1    Mr. Chaney never raised that with the Board, even

2    though we can see here that Miss Hampton alerted him;

3    is that fair?

4          A.    That's correct.

5          Q.    Is it a concern to the Board that the poll

6    pads that are used at the polls are connected to the

7    Internet?

8          A.    I can't answer that.

9          Q.    Okay.  But you didn't know that before

10   now?

11         A.    That they could be used to watch Netflix,

12   no.  I didn't know that before now.  No.  And that

13   they connect to the Internet that way.

14         Q.    Okay.  If you turn to the next page, so 20

15   of 24 --

16         A.    I mean, can I ask you a question.  Did

17   these pictures come from our Elections Office?

18         Q.    Well, I'm not the witness, so I will -- I

19   will tell you that our understanding is that Misty

20   Hampton took these photos of the poll pads in the

21   Elections Office and sent them to Eric Chaney showing

22   him the Internet connectivity.

23         A.    Okay.

24         Q.    But --

25             MR. DELK:  Well, I object --

```
 1          Q.    (By Mr. Cross) -- again, I'm --
 2              MR. DELK:  -- to the extent there's a lack
 3          of foundation, but you --  I know you qualified
 4          that with that's your understanding; but since
 5          Misty's not been deposed, I don't know that's
 6          record evidence.
 7              MR. CROSS:  I --  I am not offering that
 8          as record evidence.
 9          Q.    (By Mr. Cross)  Just answering your
10      question, Mr. Stone.
11          A.    Yeah.
12          Q.    Okay.  So we're still on the same day
13      going to the top of the next page, and I actually --
14              I don't recall if Mr. Chaney testified
15      substantively on this and acknowledged this.  I'd
16      have to go back and look at his testimony, so it may
17      actually be in the record, but I --  I don't know.
18              So looking on the top of the same page,
19      you can see here that Miss Hampton sends some
20      additional screen shots to Mr. Chaney on December 30.
21              Do you see that?
22          A.    I do.
23          Q.    And the first one, she indicates, is a
24      screenshot of the computer that the IC scanner -- ICC
25      scanner is connected to.
```

Page 133

```
 1              You see that?
 2      A.      I do.
 3      Q.      And then the next one is a screenshot.
 4   She says that the EMS server computer.
 5              Do you see that?
 6      A.      I do.
 7      Q.      Has there ever been any discussion at the
 8   Board level about the fact that the computers used
 9   with the ICC and the EMS server include software that
10   is not necessary for or used with running elections
11   in the County?
12      A.      No.
13      Q.      So to your knowledge, that's not something
14   that Miss Hampton or Mr. Chaney raised with the --
15   with the full Board?
16      A.      No.
17      Q.      Okay.  Are you aware of any measures by
18   the State or the County to deal with the issue of the
19   poll pads connecting to the Internet?
20      A.      No.
21      Q.      Are you aware of any measures by the State
22   or the County to deal with any risk associated with
23   unnecessary software on the ICC and EMS computers?
24      A.      Not aware.
25      Q.      Fair to say that's something that the
```

Page 134

1    County would rely on the State to deal with?

2         A.    Yes.

3         Q.    Okay.  All right.  Flip to --  All right.

4    Flip to --

5              MR. CROSS:  You all right, Julie?  You

6         need a break?

7              THE COURT REPORTER:  I'm good.

8              MR. CROSS:  Okay.  Do they have the --

9         Q.    (By Mr. Cross)  So just to answer your

10   question, Mr. Stone, Eric Chaney testified in his

11   deposition in response.

12             Regarding these same screen shots, I asked

13        him.

14             And there are three screen shots of poll

15        pads, three photos of poll pads that Miss

16        Hampton sent to you.  Do you see that?

17             Yes.

18             And on the first one, she shows that the

19        poll pad is accessing Netflix, right?

20             Yes.

21             And on the second one, she shows that the

22        poll pad is accessing -- what is she --  What is

23        that?  Do you know what that is, some sort of

24        game?

25             He says I'm not sure.

Page 135

1          One of the things that Miss Hampton had

2      raised as a concern with you and others was the

3      that the poll pads used in Georgia are connected

4      to the Internet, right?

5          That's correct.

6          So Mr. Chaney testified that this was

7      raised with him and others.  But is it your testimony

8      that that concern was never raised with anyone else

9      on the Board?

10         A.    It is.

11         Q.    Okay.  All right.  Come back to Page 22.

12     So we're on January 6 of 2021, 4:26 p.m. in the

13     middle of the page.  It's right down here

14     (indicating), if you see that.

15          And you see Misty Hampton texts Eric

16     Chaney.  Scott Hall is on the phone with Cathy about

17     wanting to come scan our ballots from the general

18     election like we talked about the other day.  I'm

19     going to call you in a few.

20          Do you see that?

21         A.    I do.

22         Q.    Was the Board aware that Scott Hall or

23     anyone else was coming in, in January of 2021 to scan

24     ballots?

25         A.    The Board was not.

Page 136

1      Q.    So that's not something the Board

2   authorized?

3      A.    It is not something the Board authorized.

4      Q.    Okay.  And was the Board aware at or

5   around this time that Eric Chaney, Cathy Latham, and

6   Misty Hampton were working together to allow Scott

7   Hall and others access to the Elections Office in

8   early January of 2021?

9          MR. DELK:  Object to the form.

10         THE WITNESS:  The Board was not aware of

11      that.

12      Q.    (By Mr. Cross)  Okay.  Except for Mr.

13   Chaney himself?

14      A.    Except for Mr. Chaney.

15         MR. DELK:  Object to the form.

16      Q.    (By Mr. Cross)  All right.  Look at the

17   top of the next page, January 7, 2021.

18         So this is 7:24 p.m. January 7, so this is

19   the end of the day where we've seen from the video

20   that various individuals came into the Elections

21   Office and copied equipment.

22         Are you with me?

23      A.    Yes.

24      Q.    Okay.  And Mr. Chaney sends to Misty

25   Hampton a phone number.

Page 137

1        Do you see that?

2    A.    I do.

3    Q.    Do you recognize that number?

4    A.    That 864 number there?

5    Q.    Yes, sir.

6    A.    I don't --  I don't recognize that number.

7    Q.    Okay.  We looked that up online.  That's a

8    number registered to Robert Sinners.

9        Do you have any idea why Mr. Chaney was

10   sending Robert Sinner's number to Misty Hampton the

11   same day that the office was breached?

12   A.    I don't.

13        MR. DELK:  Object to the form.

14   Q.    (By Mr. Cross)  And then Mr. Chaney

15   writes, "Let's switch to Signal..."

16        Do you see that?

17   A.    I do.

18   Q.    Are familiar with Signal?

19   A.    I'm not.

20   Q.    So that's not --

21   A.    I mean, I'm not familiar with it beyond

22   this discussion; and I've never looked at it.  I've

23   never used it.  I know that it's a communication

24   website that makes the messages disappear.

25   Q.    Oh.

Page 138

1      A.    Okay.  That's what I know about it.

2      Q.    Okay.  I appreciate that.

3      A.    I mean, is that fair assessment of --

4      Q.    Yes.

5      A.    -- what it is?

6      Q.    Yes.  Thank you.

7            Do you --  Does the Board have any insight

8   as to why Eric Chaney was asking Misty Hampton to

9   switch to Signal instead of text at this time?

10     A.    The Board --

11           MR. DELK:  Object to the form.

12           THE WITNESS:  The Board does not.

13     Q.    (By Mr. Cross)  All right.  Do you --  Are

14  you aware that the Plaintiffs in this case first

15  served their subpoenas for documents and testimony

16  back in June or July?

17     A.    When you say the Plaintiffs, you're

18  referring to?

19     Q.    The --  My clients and the other

20  Plaintiffs in this case.

21     A.    I --  I don't recall exactly when they

22  were.

23     Q.    That's fair.  Let me ask a different

24  question.

25           Do you understand that the Plaintiffs

```
 1    served our subpoenas on the -- on the -- the County
 2    Board of Elections before Eric Chaney resigned?
 3         A.   Yes.
 4         Q.   All right.  Are you aware of any efforts
 5    made by the County Board of Elections to collect
 6    documents from Eric Chaney responsive to the
 7    subpoenas?
 8              MR. TYSON:  Same object --  Same objection
 9         as earlier to the extent some of those efforts
10         were coordinated by counsel.
11              THE WITNESS:  Okay.
12              MR. DELK:  You can answer if you
13         understand it.
14              THE WITNESS:  I'm not aware of any.
15         Q.   (By Mr. Cross)  Who would you ask if you
16    wanted to know whether such efforts were made?
17         A.   Who would I ask?  I'm not certain.
18              Counsel.
19         Q.   Okay.  Is it your understanding that
20    the -- the Board relied on its counsel to search for
21    and -- and produce documents responsive to the
22    subpoenas?
23         A.   I --  That's not necessarily my
24    understanding.
25              My --  My understanding was that we were
```

1   to supply any documentation that we had.  At the same

2   time, without knowing what was being sought, I mean,

3   any communication is what we were to come up with, so

4   I mean, if that answers your question and --

5          Q.    Anything --

6          A.    And --

7          Q.    Go ahead.

8          A.    -- efforts were made with board members to

9   provide that documentation.

10         Q.    Okay.  And when you say any communication,

11  what do you mean?

12         A.    I mean any communication -- phone calls,

13  texts, conversations, e-mails.

14         Q.    Regarding what?

15         A.    Regarding the subpoenas.

16         Q.    So the -- the scope of what was called for

17  in the document subpoenas, is that the idea?

18         A.    I --  I don't understand your question

19  from here.

20         Q.    So when you say --

21              MR. DELK:  I think you're saying

22         documents.  He's thinking subpoena.  Y'all are

23         on the same page; but you know, clarify.

24              MR. CROSS:  All right.

25              THE WITNESS:  We were asked to give any

Page 141

1          communications that we had with Misty, Jil.

2          Q.    (By Mr. Cross)  What about among the board

3     members themselves?

4          A.    And above --  And among the board members,

5     yes.

6          Q.    Okay.  And with -- with subsequent

7     Elections Office employees such as Mr. Barnes,

8     Rachel?

9          A.    I don't recall.

10         Q.    Oh.  Do you have any insight as to why the

11    County has not produced any communications from Mr.

12    Chaney?

13         A.    I don't.

14         Q.    And you don't know what efforts, if any,

15    were made before he left the Board to collect

16    communications from him?

17              MR. DELK:  Object to the form.

18              THE WITNESS:  Same --  Same requests were

19         made of him that were made of us.

20         Q.    (By Mr. Cross)  Do you know whether he

21    provided any responsive communications to the

22    County's counsel?

23         A.    I do not.

24         Q.    All right.  Looking a back at Exhibit

25    14 --

Page 142

1              MR. SPARKS:  Yes.

2         Q.   (By Mr. Cross)  So we're still on --  We

3    were on January 7.  Now the next text is January 8,

4    2021.

5              Do you see that?

6         A.   I do.

7         Q.   Then we get to January 12th, 2021.

8              Do you see that?

9         A.   Yes.

10        Q.   And Miss Hampton texts Eric Chaney.  Well,

11   there's a name "Bob" and then "Chris Linscheid,"

12   L-I-N-S-C-H-E-I-D, and a phone number.

13             Do you see that?

14        A.   I do.

15        Q.   Do you know who Chris Linscheid is?

16        A.   I don't.

17        Q.   Any insight as to why she was sending that

18   information to Mr. Chaney?

19        A.   No.

20             MR. DELK:  Object to the form.

21        Q.   (By Mr. Cross)  All right.  Then on

22   January 15, 2021, do you see that Miss Hampton sends

23   a text to Mr. Chaney -- "Do you have Snapchat?

24   Signal is down!"

25        A.   I see that.

Page 143

1      Q.    Did members of the Board or employees of
2      the Elections Office sometimes communicate using
3      Snapchat?
4      A.    No.
5      Q.    And how do you know that?
6      A.    You know, I really don't know; but I can
7      tell you that I never --
8      Q.    Okay.
9      A.    -- communicated with anybody on Snapchat,
10     and I never got a Snapchat, and so I'm 100 percent
11     confident that members of the Board do not use
12     Snapchat to communicate with each other.
13     Q.    But you don't know whether Eric Chaney
14     used Snapchat to communicate with Miss Hampton, as
15     she suggests here; is that right?
16     A.    I don't know.
17     Q.    Okay.
18     A.    And I mean, in all honesty, I don't know
19     what the other board members have on their phone; but
20     I wouldn't --  I would think no.  They did not
21     communicate on Snapchat.
22     Q.    Okay.
23     A.    My official answer is, no, we didn't
24     communicate on Snapchat.
25     Q.    For official Board business?

```
 1        A.    In any way.  And especially for official
 2   Board business.
 3        Q.    So then we come to January 19, 2021; and
 4   Misty Hampton, writes to Eric Chaney.  "If you happen
 5   to be in town, the guys measuring my desk are still
 6   here."
 7             Do you see that?
 8        A.    I do.
 9        Q.    There was no one measuring her desk at
10   that time, right, sir?
11             MR. DELK:  Object to the form.
12             THE WITNESS:  I don't know.
13        Q.    (By Mr. Cross)  Are you aware that that
14   was code that she and Eric Chaney worked out for her
15   to convey to him in a stealthy way that she -- the
16   individuals we saw in these photos that visited on
17   January 19, that she had helped them get access to
18   the equipment?
19             Had you heard that before today?
20        A.    No.
21        Q.    Oh.  That's not something that she or Mr.
22   Chaney shared with the Board, to your knowledge?
23        A.    To my knowledge, no.
24        Q.    Okay.
25        A.    They didn't share that information with
```

Page 145

1    us.

2         Q.    Then you get to January 2021, the next

3    day; and she asked Mr. Chaney, "Do you have a high

4    capacity scanner in your office?"

5              Do you see that?

6         A.    I do.

7         Q.    Any insight as to why she wanted a

8    high-capacity scanner?

9         A.    No.

10             MR. DELK:  Object to the form.

11        Q.    (By Mr. Cross)  Are you aware that for a

12   few weeks in January, Miss Hampton scanned cast

13   ballots from the January Senate runoff in 2021 and

14   the November General Election in 2020, that she

15   scanned those cast ballots and put them on a drive

16   that she then shipped off to someone?

17        A.    I'm not aware of that.  The Board is not

18   aware of that.

19        Q.    And if you come further down.  You'll see

20   a text that she sends on January 27 of 2021, 9:23

21   a.m.  She writes to Eric Chaney.  "I took care of the

22   people measuring my desk."

23             Do you see that?

24        A.    I do.

25        Q.    So fair to say, you -- you had not heard

Page 146

 1    before that that was her way of letting Mr. Chaney

 2    know that she had sent the cast ballots off to the

 3    individuals who wanted them?

 4         A.    I had not.  Not before this minute right

 5    here.

 6              MR. CROSS:  40.  Thank you.

 7              (Exhibit 15 was marked for

 8         identification.)

 9         Q.    (By Mr. Cross)  All right.  Let me hand

10    you what's been marked as Exhibit 15.

11         A.    Uh-huh.

12         Q.    And this is Tab 40.

13              And I can tell you these are more text

14    messages that were produced by Miss Hampton in

15    response to the subpoena; and if you look at the top,

16    it indicates the individuals who are on the thread.

17    It says Messages - Andy Thomas, Earnestine

18    Thomas-Clark, Eric Chaney, Matthew McC, and Wendell

19    Stone.

20         A.    Uh-huh.

21         Q.    Do you see that?

22         A.    I do.

23         Q.    And those were all individuals on the

24    Board for Coffee County Elections as of January 2021,

25    right?

Page 147

```
 1          A.    That's correct.
 2          Q.    Yeah.  If you --  If you turn to the
 3     second page, at the bottom, there's a date of
 4     February 24, 2021 at 9:19 p.m.
 5                Do you see that?
 6          A.    I do.
 7          Q.    And here, Misty Hampton texted you and
 8     others on the Board.  "I have been asked to go speak
 9     at the rotary club tomorrow at noon.  I was asked to
10     talk about the election process."
11                Do you see that?
12          A.    I do.
13          Q.    So this is --  Do you recall that Miss
14     Hampton was let go on February 25th of 2021?
15          A.    That's correct.
16          Q.    Okay.  And then Matthew McC, that's
17     Matthew McCollough, right?
18          A.    That's correct.
19          Q.    He responds Tony had mentioned us
20     discussing any conversations about elections with him
21     first.  We have another new lawsuit and the
22     possibility of another after that.  So would prefer
23     we check with him on any speaking engagements,
24     interviews et, cetera.
25                Do you see that?
```

Page 148

```
 1          A.    I do.

 2          Q.    Tony is Tony Rowell, the County attorney?

 3          A.    That's correct.

 4          Q.    What was the new lawsuit that was filed as

 5    of this time --  Well, strike that.

 6                What -- what is --  What did Mr.

 7    McCullough refer to here as the new lawsuit?

 8                MR. DELK:  Objection to the extent this --

 9                THE WITNESS:  I'm not --

10                MR. DELK:  -- involves any attorney-client

11          communications.

12                THE WITNESS:  And I don't recall what that

13          lawsuit was about, and the --  And the -- the

14          request, Open Records Requests have been

15          ongoing, and so I --  I don't recall

16          specifically what that was in reference to.

17          Q.    (By Mr. Cross)  But you understand Open

18    Records Requests are not the same as a lawsuit?

19          A.    I do.

20          Q.    Okay.  Do you --

21          A.    And you understand I'm not a lawyer and

22    subpoenas and Open Records Requests and everything to

23    me is all legal jargon, and I know that it's serious

24    to respond respectfully to this, and so --  Okay.

25    So --
```

1    Q.    Okay.  Do you -- Do you recall a lawsuit

2    that was actually filed or threatened against Coffee

3    County in the February 2021 timeframe?

4              MR. DELK:  Object to the form.

5              THE WITNESS:  You'll have to give me some

6         more details.  I --

7    Q.    (By Mr. Cross)  I -- I'm asking you.  Do

8    you recall one way or the other?

9    A.    I don't recall that.  No.

10   Q.    And when Mr. McCollough wrote "and the

11   possibility of another," do you have any recollection

12   of -- of any kind of lawsuit, two, multiple lawsuits

13   being threatened against the County?

14   A.    Against the Election Board?

15   Q.    Or against Coffee County at all.

16             MR. DELK:  Object to the form.

17             THE WITNESS:  I don't -- I don't know.

18   Q.    (By Mr. Cross)  Has Dominion ever

19   threatened a lawsuit against Coffee County?

20   A.    Not to my knowledge.

21   Q.    Do you have any insight as to whether

22   Dominion is aware of the breach of the Coffee County

23   election system in January of 2021?

24   A.    I'm not certain.

25   Q.    Was there ever any communications between

1   the Board or anyone in the Elections Office or anyone

2   employed by Coffee County and Dominion regarding that

3   breach?

4        A.   I'm not certain.

5        Q.   Was the threat of a lawsuit regarding the

6   breach of the Coffee County office --  Did that

7   factor into the decision to let Misty Hampton and Jil

8   Ridlehoover go in February of 2021?

9             MR. DELK:  Object to the form.

10            THE WITNESS:  Ask the question again.

11       Q.   (By Mr. Cross)  Did the threat of a

12  lawsuit regarding the breach of the Coffee County

13  Elections Office, did that factor into the Board's

14  decision to let Misty Hampton and jidle (ph.) -- Jil

15  Ridlehoover go?

16       A.   No.

17       Q.   What was the basis for that decision?

18       A.   The basis to let them go?

19       Q.   (Attorney nods head.)

20       A.   They falsified their timesheets indicating

21  that they were at work when clearly they were not.

22       Q.   How did that concern first get raised with

23  the Board?

24       A.   I didn't recall exactly how it was first

25  raised with the Board; but when the attorney met with

1      them, we were all present; and I think, as I recall,

2      a meeting was held prior to the attorney showing up.

3      That's the way that was raised for the Board.

4          Q.    A --  A meeting was held with whom?

5          A.    Board members.

6          Q.    The same day that -- that you met with

7      Miss Hampton or before?

8          A.    And I can't recall if it was on the same

9      day or if it was --  It was pretty in close proximity

10     to it.

11         Q.    Okay.  What we -- we see in this thread on

12     February 24th, Mr. McCollough, Ms. Thomas-Clark, and

13     Mr. Chaney all respond to Miss Hampton thinking about

14     speaking at the Rotary Club.  And there's no

15     suggestion that she's being let go, right?

16         A.    That's right.

17         Q.    So was the decision made to let her go,

18     was that made the same day the Board met with her?

19         A.    Yes.

20         Q.    Okay.  And how --  Was it --  Was it the

21     county's counsel, Mr. Rowell, for example, that

22     raised this concern with the Board about her

23     timesheets?

24         A.    As I recall, yes.

25         Q.    All right.  And I understood you said

Page 152

```
 1    earlier the board members themselves did not review

 2    any video with respect to checking the hours that she

 3    was there; is that right?

 4              MR. DELK:  Object to the form.

 5              THE WITNESS:  No.

 6         Q.   (By Mr. Cross)  So fair to say the Board

 7    relied on a review that was performed by the County

 8    counsel?

 9              MR. DELK:  Object to the form.

10              THE WITNESS:  Yes.

11         Q.   (By Mr. Cross)  Did Miss Hampton deny in

12    the meeting that she had fraudulently recorded her

13    hours?

14         A.   It was her contention that she was allowed

15    to come to work based on comp time.

16         Q.   Right.  It was her contention that she

17    wasn't overpaid, because the time she had factored in

18    comp time that she was owed; is that right?

19         A.   That's right.

20         Q.   And did Eric Chaney acknowledge that in

21    the meeting?

22         A.   Did he acknowledge what?

23         Q.   That that arrangement had been worked out

24    with her to approach comp time in that way?

25         A.   I don't recall that.  I don't recall what
```

Page 153

1     specific board members said in the meeting.

2          Q.    Did anyone acknowledge or disagree with

3     what she said on that topic?

4          A.    Counsel.

5          Q.    Mr. Rowell?

6          A.    Uh-huh.

7          Q.    Yes?

8          A.    Yes.

9          Q.    And did he agree or disagree?

10         A.    Disagreed.

11              MR. CROSS:  All right.  Let me show you

12         quickly 16 -- tab -- or Exhibit 16, which is Tab

13         19.

14              (Exhibit 16 was marked for

15         identification.)

16         Q.    (By Mr. Cross)  And let me go ahead and

17    hand you Exhibit 17 as well, which is Tab 20.

18              (Exhibit 17 was marked for

19         identification.)

20         Q.    (By Mr. Cross)  And you can look at

21    Exhibits 16 and 17.  But just ask you.  Exhibit 16,

22    that's a copy of the resignation letter that Jil

23    Ridlehoover signed on February 25th of 2021; is that

24    right?

25         A.    Yes.

Page 154

1    Q.    Yeah.  And that resignation letter was

2    prepared by the county's counsel.  It was not written

3    by Miss Ridlehoover, right?

4        A.    That's correct.

5            MR. DELK:  Object to form.

6        Q.    (By Mr. Cross)  And then Exhibit 17, that

7    is the resignation letter signed by Miss Hampton on

8    February 25th of 2021, right?

9        A.    It is.

10       Q.    And that letter was also prepared by

11   Ms. -- I'm sorry -- by County counsel?

12       A.    Yes.

13       Q.    Okay.  At the meeting with Miss Hampton,

14   was she told that if she did not sign the resignation

15   letter and, instead, was terminated by the County,

16   that she would forfeit any kind of retirement that

17   she was owed?

18       A.    I -- I do not recall.

19       Q.    Did she come to the meeting with her own

20   resignation letter that she had drafted and had ready

21   to hand over?

22       A.    I don't recall.

23       Q.    You don't recall any discussion that --

24   that she had to sign the letter that was prepared by

25   counsel, instead of the letter that she had prepared

1    herself?

2         A.   I don't --  I don't recall if she had

3    brought or written her own letter.

4         Q.   So the County lets Miss Hampton and Miss

5    Ridlehoover go on February 25th.

6              Oh.  Are you aware that the very same day

7    Mike Lindell flew in on his private plane to Douglas,

8    Georgia airport?

9         A.   I'm not.

10             Mike Lindell?

11        Q.   You know who Mike Lindell is, right?

12        A.   That's the pillow guy.

13        Q.   My Pillow Guy.  Yeah.

14             And you're --

15        A.   Mike Lindell, I'm not aware of his

16   presence in Douglas at all.

17        Q.   And you're -- you're familiar that Mr.

18   Lindell has had a prominent role with respect to

19   the -- the Trump action and -- and allegations that

20   the November 2020 election -- presidential election

21   was stolen?

22        A.   Only through media reporting.

23             MR. CROSS:  All right.  All right.  Let me

24        hand you what's been marked as Exhibit 18.

25   ///

Page 156

1          (Exhibit 18 was marked for

2      identification.)

3      Q.    (By Mr. Cross)  So you see here that

4  there's an indication Mike Lindell's My Pillow Guy

5  indicates that he flew into Douglas, Georgia,

6  February 25th to February 26th.

7          Do you see that?

8      A.    I do.

9      Q.    And do I understand correctly that the

10  Board did not have any awareness before this moment

11  that Mike Lindell had flown into Douglas, Georgia,

12  the very same day that Miss Hampton and Miss

13  Ridlehoover were let go?

14      A.    That's correct.

15      Q.    And there were no employees in the

16  Elections Office besides the elections supervisor and

17  the assistant to the elections supervisor.  They're

18  the only employees that work in that office, right?

19      A.    That's correct.

20      Q.    So as of February 25th before Mr. Lindell

21  flew in, there were no employees in that office at

22  all, right?

23          MR. DELK:  Object to the form.

24      Q.    (By Mr. Cross)  'Cause both had been let

25  go that morning?

Page 157

1        A.     That's correct.

2        Q.     Do you know whether Mr. Lindell and anyone

3   with him visited the Elections Office in Coffee

4   County while he was in Douglas, Georgia?

5        A.     I don't.

6        Q.     Do you think it would be important to find

7   that out?

8        A.     I --  I don't know.

9        Q.     If you come back to the text thread we're

10  looking at, Exhibit 15, this is the one between Miss

11  Hampton and the -- the board members in January of

12  2021.  So in this last --

13            Turn to the last page, if you would,

14  please.

15        A.     Last page.

16        Q.     Here, Mr. McCullough writes here

17  (indicating), "I believe they sent it directly to

18  Tony or possibly even verbally notified him.  I'm not

19  saying don't go.  I'm just saying clear speaking

20  engagements or interviews with him.  But 4 other

21  board members can certainly weigh in if I'm being too

22  cautious."

23            Do you see that?

24        A.     I do.

25        Q.     And then Miss Thomas-Clark writes back,

1     "Now that I'm fully aware of the lawsuits, yes, you

2     need to consult Tony before making a commitment."

3            Do you see that?

4     A.   I do.

5     Q.   Does that help your recollection at all on

6     what these lawsuits were?

7     A.   It does not help me recollect what the

8     lawsuits are.  No.

9            MR. CROSS:  Oh.  43.  19.

10           (Exhibit 19 was marked for identification

11           and subsequently withdrawn.)

12     Q.   (By Mr. Cross)  All right.  Let me hand

13     you what's been marked as Exhibit 19.  This is Tab

14     43.

15            So, Mr. Stone, this is a text message that

16     Miss Hampton produced that she indicates was between

17     her and Tony Rowell, the County attorney.

18            You understand that?

19     A.   This is from Tony?

20     Q.   This is --  The blue is text that Miss

21     Hampton sent in response to the black text, which is

22     from Tony Rowell.  That's what Miss Hampton writes.

23            MR. DELK:  I'm going to object.

24           This is communication with counsel when

25          she was still employed, so although she's

Page 159

```
 1          obviously produced it to you, that's covered by
 2          attorney-client privilege is our contention; and
 3          it's improper to put it in as an exhibit or
 4          otherwise question the witness on it.
 5               And this had been produced up to this
 6          juncture without our knowledge.
 7               MR. CROSS:  Are --  Are you saying he
 8          cannot answer questions on this?
 9               MR. DELK:  I'm saying it's improper for
10          you to even have it.  We would have objected to
11          it and dealt with it otherwise had we known
12          about it before this very moment.
13               She's clearly, well, still employed in her
14          official capacity at this point.
15               MR. CROSS:  All right.  We'll put this to
16          the side for now.  We can talk about it, Steve.
17          Q.    (By Mr. Cross)  You can put that to the
18     side.  I'll figure that out.
19          A.    (Witness complies with request of
20     counsel.)
21               MR. CROSS:  48.
22               MR. SPARKS:  We'll mark this as 20, even
23          though I'm instructing them not to put it on the
24          system unless it's resolved.
25               MR. CROSS:  Keep it marked for now, and
```

Page 160

```
1              then we'll figure out what we do.

2                   MR. SPARKS:  Okay.

3                   48?

4                   MR. CROSS:  Yeah.  48.

5                   (Exhibit 20 was marked for

6              identification.)

7              Q.   (By Mr. Cross)  All right.  Let me hand

8         you what's been marked as Exhibit 20, which is Tab

9         48.

10                  Have you seen Open Records Requests come

11        into the County Board before or to the County

12        Elections Office?

13             A.   Well, they come --  They come to us.

14        We're included in the e-mails, and so --

15             Q.   So if you look --

16             A.   -- yes.

17             Q.   Oh, sorry.  Did I cut you off?

18             A.   Uh-huh.  I look --

19             Q.   You see them from time to time?

20             A.   Over and over.

21             Q.   Okay.  All right.  So if you look at

22        Exhibit 20, start at the bottom of the first page.

23        You'll see the first e-mail in the thread is from

24        Georgia EDO.

25             A.   Third page.  Now right -- right here?
```

1    Q.    Yeah.  Right down here (indicating).

2    A.    EDO.

3    Q.    And it's Georgia EDO@donaldtrump.com.

4          Do you see that?

5    A.    I do.

6    Q.    And that's an e-mail that's sent on

7    November 10, 2020.

8          Do you see that?

9    A.    Yes.

10   Q.    And it's sent to Misty Hampton.

11         Do you see that?

12   A.    Yes.

13   Q.    And the subject is "Open Records Request."

14         You with me?

15   A.    Yes.

16   Q.    And the e-mail reads, "I hope all is well.

17   I am seeking the official meeting minutes and audio

18   of this morning's" -- and the date is given of

19   November 10th -- "Board of Elections (or,

20   Commissioners) meeting.  I understand Coffee County

21   voting systems were discussed in detail, and I would

22   like to obtain as much information as possible under

23   Georgia Open Records laws."

24         Do you see that?

25   A.    I do.

1    Q.    Now if you go to the top of the next page,
2    do you see the e-mail is sent from Robert Sinners?
3    A.    I do.
4    Q.    Does this refresh your recollection on as
5    to who Robert Sinners is or the County's dealings
6    with him?
7    A.    It does not.
8    Q.    Okay.  And here it's indicated that it --
9    that Mr. Sinners, he signs it.  His signature block
10   says, "Donald J. Trump for President."
11         Do you see that?
12   A.    I do.
13   Q.    Miss Hampton then responds to Mr. Sinners
14   the same day.  I'm sorry.  Yes.  Responds to Mr.
15   Sinners the same day.  "Would you please address the
16   open record request to Tracie Vickers..."
17         Do you see that?
18   A.    I do.
19   Q.    Do you have any insight as to why Robert
20   Sinners, on behalf of -- of Donald Trump, was looking
21   for meeting minutes and as much information as
22   possible under Georgia open records laws from Coffee
23   County at this time?
24   A.    I don't.
25   Q.    Does the Board have any insight as to why

1    the Secretary of State's Office hired Robert Sinners

2    in the office in February of 2021, only a few weeks

3    after the intrusion into the Coffee County Elections

4    Office?

5              MR. DELK:  Object to the form.

6              THE WITNESS:  They don't.

7         Q.    (By Mr. Cross)  Does the Board know why

8    Mr. Sinners still works there today and has been

9    promoted since?

10             MR. DELK:  Object to form.

11             THE WITNESS:  The Board does not.

12        Q.    (By Mr. Cross)  You can put that aside.

13        A.    (Witness complies with request of

14   counsel.)

15        Q.    Did the Board also let Miss Hampton's

16   daughter go for timesheet issues?

17        A.    Miss Hampton's daughter was -- was not an

18   employee of the County beyond that of --  You'd call

19   it a kind of a temporary worker, a poll worker; but

20   she submitted payroll timesheets -- and I don't know

21   how many times -- but inappropriately for work that

22   was not done.

23             (Exhibit 21 was marked for

24        identification.)

25        Q.    (By Mr. Cross)  Okay.  So let me hand you

Page 164

```
 1    what's been marked as Exhibit 21.

 2              Do you recognize this as a calculation by

 3    the Board or its counsel of an overpayment of Dyanna,

 4    Misty Hampton's daughter, on timesheets?

 5         A.   That's what it says right here.

 6         Q.   Okay.  So do I understand correctly that

 7    the -- the Board identified a similar timesheet issue

 8    with Miss Hampton's daughter as it did with Miss

 9    Hampton and Miss Ridlehoover?

10         A.   Yes.

11         Q.   Okay.  And Miss Hampton's daughter, you

12    said, worked on a part-time basis?

13         A.   I --  Yes.

14         Q.   So she --

15         A.   She was not officially hired in the

16    Elections Office to work there.

17         Q.   So who paid her?

18         A.   County.

19         Q.   Was she a part-time employee of the County

20    to help with elections?

21         A.   Beyond a poll worker, that's -- was my

22    understanding that was what her employment consisted

23    of.

24         Q.   Okay.  And Miss Hampton was a full-time

25    employee of the County, right?
```

Page 165

1        A.    Yes.

2        Q.    And she was salaried?

3        A.    Yes.

4        Q.    Okay.  Since she was salaried, whatever

5     she put on her timesheets didn't actually cause any

6     overpayment by the County, 'cause she was paid the

7     same salary no matter what, right?

8        A.    Yes.

9        Q.    Miss Ridlehoover was hourly?

10       A.    That's my understanding.  Yes.

11             MR. CROSS:  All right.  I think we're at a

12       good breaking point.  Let's go off the record.

13             MR. MILLER:  Oh.

14             THE VIDEOGRAPHER:  The time --

15             MR. MILLER:  Yeah.  Go ahead.

16             THE VIDEOGRAPHER:  The time is 12:27 p.m.

17       We are off video record.

18             (Recess from 12:27 p.m. to 1:11 p.m.)

19             THE VIDEOGRAPHER:  The time is 1:12 p.m.

20       We are back on video record.

21             (Exhibit 22 was marked for

22       identification.)

23       Q.    (By Mr. Cross)  All right.  Mr. Stone, let

24     me hand you --

25             MR. CROSS:  Were we at 21?  22?

Page 166

1          MR. SPARKS:  You're now at 22.

2      Q.    (By Mr. Cross)  All right.  Let me hand

3   you what's marked as Exhibit --

4          Oh, wait.  Sorry.

5          MR. CROSS:  Do we only have one copy of

6      this?

7          MR. SPARKS:  It should be three.

8          MR. CROSS:  Are they all --

9          MR. SPARKS:  These three stapled --

10         MR. CROSS:  Oh.

11         MR. SPARKS:  -- are copies.  This is

12     yours.

13         MR. CROSS:  I got it.

14         MR. SPARKS:  Yeah.

15     Q.    (By Mr. Cross)  All right.  So let me hand

16   you what's been marked as Exhibit 22.

17     A.    All right.

18     Q.    And this is Tab 56.

19     A.    Uh-huh.

20     Q.    So these are more screen shots from the

21   video the County produced.  I just wanted to see if

22   you might know this person.

23         So if you look on -- make sure I know

24   where.  8:53.  8:55 a.m.  Oh, okay.

25         So if you look at Page 1 --

```
 1          A.      Uh-huh.
 2          Q.      -- you should have --  You've got a young
 3     man coming into the building January 8, 2021 at 8:51
 4     a.m. in a black mask.
 5          A.      Uh-huh.
 6          Q.      Do you see?
 7          A.      I do.
 8          Q.      Do you recognize him?
 9          A.      I don't.
10          Q.      And then the next page, he's walking out
11     at 8:53 a.m. with some sort of equipment in his
12     hands.
13          A.      Carrying something.
14          Q.      Do you know he's carrying?
15          A.      I don't.
16          Q.      Then if you go to Page 3, he's standing in
17     front of the Elections Office, same day, 8:55 a.m.
18     with sort of a hand cart and equipment on it.  It
19     looks like it might be a printer or scanner.
20                  Do you know what he's got?
21          A.      I don't know what that is.
22          Q.      Okay.  And then at 8:55 a.m.  You see him
23     roll it away from the building.
24                  Do you see that?
25          A.      I do.
```

1       Q.    So you don't know who he is?

2       A.    I don't know who he is.  No.

3       Q.    You don't recognize him as any kind of

4 county or state official?

5       A.    I don't.

6       Q.    All right.  Okay.  Is the Board aware that

7 during --  Oh, strike that.

8           Is the Board aware that an outside scanner

9 was brought into the County Elections Office on or

10 about January 7, 2021 to scan ballots?

11      A.    We were aware that that was the --  That

12 was the election that Misty conducted, and we were

13 aware that there was a problem with the scanner, and

14 that another scanner had to be got from another

15 County.  And it was late in the night, whenever that

16 scanner was -- was brought back to Douglas.

17          But now is that what you're referring to?

18      Q.    No.  And --  And sorry.  I should be

19 clear.  We're talking about two different things.  I

20 know what you're talking about.

21      A.    Uh-huh.

22      Q.    Let me ask you a better question.

23      A.    That's --  That's the only scanner that I

24 know about.

25      Q.    Okay.  So we've seen in the video that

Page 169

1    there were these individuals who came into the

2    office.  We know they copied voting equipment and

3    data on January 7, 2021.

4              You with me?

5         A.   Yeah.

6         Q.   Okay.  Had --  Has the Board heard before

7    that as part of those efforts, someone brought in

8    a -- a generic scanner --

9         A.   No, no.

10        Q.   -- not like a Dominion equipment, but a

11   generic scanner?

12        A.   Not --

13             MR. DELK:  Let him finish now.

14             THE WITNESS:  Not that I'm aware of.  Not

15        that I recall.  No.  That there was --  That

16        would have been on January 7th?

17        Q.   (By Mr. Cross)  Yes.  It would have been

18   brought in on or around that day and used as part of

19   the efforts in the office.

20        A.   No.

21        Q.   The Board has not heard that Cathy Latham

22   borrowed a scanner from her church and brought it

23   into the Elections Office?

24        A.   No.

25        Q.   Are you aware that the church where Cathy

Page 170

```
 1      Latham is a secretary, Matthew McCullough is also one
 2      of the officers of that church?
 3              A.    I'm not aware of that.
 4              Q.    All right.  Grab Exhibits 16 and 17.  They
 5      are --
 6              A.    Okay.
 7              Q.    -- the Ridlehoover and Hampton resignation
 8      letters.
 9              A.    Okay.
10              Q.    If you want to just grab just one of them.
11              A.    Okay.
12              Q.    So let's take a look at Exhibit 17, Miss
13      Hampton's.
14                    And if you look at both, actually, you'll
15      see that behind the letters there are several pages
16      that looks like where somebody went through and
17      actually calculated what the Board said was a -- an
18      overpayment.
19                    Do you see that, the data sitting behind
20      those resignation letters?
21              A.    I do.
22              Q.    Who actually did the calculations for
23      the -- what's identified as a difference in pay for
24      both of those two individuals?
25              A.    Mr. Vickers.
```

```
 1          Q.    Oh, that's Wesley Vickers?

 2          A.    Wesley Vickers.

 3          Q.    Okay.  And so did -- did Wesley Vickers

 4     watch the camera footage himself and then calculate

 5     the difference in pay?

 6               MR. DELK:  Object to the form.

 7               THE WITNESS:  To my knowledge, he --

 8          that's the way he calculated it.

 9          Q.    (By Mr. Cross)  Okay.  And presumably

10     that -- that took a lot of time.  This is pretty

11     extensive.  Mr. Vickers, obviously, put in quite some

12     effort to do that.  Is that fair?

13               MR. DELK:  Object to the form.

14               THE WITNESS:  I would --  I would think

15          that took quite some time to do.

16          Q.    (By Mr. Cross)  Okay.  And do I understand

17     right, the first the Board learned of a concern about

18     Miss Hampton and Miss Ridlehoover's compensation was

19     the day it decided to let her go on February 25th?

20          A.    Yes.

21          Q.    Okay.  So do you have any insight as to

22     why Mr. Vickers and no one else informed the Board

23     before that day that this investigation was being

24     undertaken?

25          A.    I don't.
```

Page 172

1    Q.    Does the Board have any insight as to what
2    prompted Mr. Vickers to undertake this investigation?
3              MR. DELK:  Object to the form.
4              THE WITNESS:  People would try to access
5         the office.  I'm talking about customers,
6         voters; and it would not be --  It wouldn't --
7         It wouldn't be open while the other County
8         offices were open.
9              And so now a specific complaint, I can't
10        identify; but that type of -- that type of
11        thing.
12   Q.    (By Mr. Cross)  But you're not aware of a
13   specific complaint that came in, in February of 2021
14   about the office not being open when it was supposed
15   to?
16   A.    February --  What happened on February
17   2021?  I mean --
18   Q.    Well, remember, she's let go on February
19   20 --
20   A.    That's the day she's let go.
21   Q.    February 25th.
22   A.    February 25th.
23   Q.    And what I'm asking is you --
24   A.    I'm not aware any specific complaints, but
25   just an ongoing -- ongoing employment --  I mean,

Page 173

1    it --  It's not like this is the reason she was let

2    go in itself.  This is what's cited here, but she

3    demonstrated over time that --  I mean, she's got a

4    personnel file, in other words.

5         Q.    There were other performance issues?

6         A.    Yes.

7         Q.    What were those?

8         A.    There was an issue where they turned in an

9    amount of money to get reimbursed for and had altered

10   the receipts in a way that you could tell they had

11   been altered and so --

12        Q.    Who is they?

13        A.    Misty and Jil.

14        Q.    And when did that happen?

15        A.    That happened -- that must have been --

16             I cannot recall the date on that.  2017

17   year.  2017.

18        Q.    Okay.

19        A.    There was also an issue where she had to

20   be --

21             MR. CROSS:  57.

22             THE WITNESS:  She had to be reprimanded by

23        the County management on acquiring rooms for

24        trainings and for conferences for board members;

25        and there -- I mean, there's just --  I don't

Page 174

1          remember everything that was in her personnel

2          file, but there'd been other issues before.

3          Q.    (By Mr. Cross)  Okay.  All right.  Let

4     hand you --

5               MR. CROSS:  Is it 23.

6               MR. SPARKS:  23.

7          Q.    (By Mr. Cross)  You can set that aside.

8     Thank you, Mr. Stone.

9               (Exhibit 23 was marked for

10          identification.)

11         Q.    (By Mr. Cross)  Let me hand you what's

12    Exhibit 23.  And if you start at the second page,

13    they're reverse order chronologically, so if you want

14    to flip to the second page, Mr. Stone.

15         A.    (Witness complies with request of

16    counsel.)

17         Q.    So you see here is an e-mail from Misty

18    Hampton, March 31, 2021.  It says, "To:

19    openrecordsrequest."

20         A.    Uh-huh.

21         Q.    That --  That openrecordsrequest, is that

22    what you're saying earlier.  That's an e-mail

23    distribution that the board members would receive?

24         A.    Okay.  Is this something that we would we

25    would have received, or are you asking me is this in

Case 3:17-cv-00089-GWT-BDC Document 482-15 Filed 09/22/24 Page 167 of 291
Case 3:17-cv-00089-GWT-BDC Document 481-15 Filed 08/14/22 Page 767 of 291

Page 175

```
 1     the form of something we would receive?

 2          Q.    First, is it in the form of something you

 3     would have received?

 4          A.    Yeah.  I mean, what we would receive would

 5     be the person's name who is requesting the specific

 6     time in question and whatever they're asking for,

 7     whatever the communications are so --

 8          Q.    But was there an e-mail distribution list

 9     called openrecordsrequest that -- that someone could

10     e-mail that specific account, and then it would --

11     that e-mail would get distributed to members of the

12     Board?

13          A.    Not that I'm aware of.

14          Q.    Okay.

15          A.    Not that --  No.  I don't recall that.

16          Q.    So as you sit here, when it says, "To:

17     openrecordsrequests," you're not sure what that

18     refers to?

19          A.    I'm not.

20          Q.    Okay.

21          A.    This came from Tracie Vickers?

22          Q.    This came from Misty.

23                Well, Tracie Vickers --

24          A.    Provided this.

25          Q.    Exactly.
```

Page 176

```
 1          A.    Yeah.

 2          Q.    It came from her e-mail account.

 3          A.    Okay.

 4          Q.    And then Misty Hampton, you can see, sent

 5     it; and here the first thing she asked for is a

 6     digital copy of all video recordings of the Elections

 7     Office from October 1, 2020 until February 25th of

 8     2021.

 9               Do you see that?

10          A.    Uh-huh.

11          Q.    Yes?

12          A.    Yes.

13          Q.    Okay.  And then come to the next page.

14               So a few months later, July 15, 2021,

15     Vicky -- Tracie Vickers e-mails Miss Hampton, if you

16     look in the middle here, and says, "I have just

17     received the downloaded media from Charles to

18     complete your request."

19               Do you see that?

20          A.    I do.

21          Q.    And it goes on to indicate that she can

22     come by and pick up the video that she's requested on

23     a portable store drive.  The cost is $59.39.

24               Do you see that?

25          A.    I do.
```

1        Q.   And then Miss Hampton writes back, "I will

2   be by tomorrow with cash to pick it up.  Thank you."

3         Do you see that?

4        A.   Okay.  Where is that?

5         I do see that.  Yes.

6        Q.   And are you --  Are you aware, testifying

7   on behalf of the Board, that Miss Hampton did, in

8   fact, pick up this video?

9         MR. DELK:  Object to the form.

10         THE WITNESS:  I haven't been --  I do not

11      recall that the Board knew that the video was

12      picked or was not picked up.

13        Q.   (By Mr. Cross)  Okay.  So she asked for

14   the video through February 25th of 2021.  Tracie

15   Vickers indicates the video she's requested is being

16   provided.

17        But the video we got from the County cuts

18   off on February 19.  Do you know why that is?

19        A.   I don't.

20        Q.   If you wanted to know why that is, who

21   would you ask?

22        A.   I would ask --  I would ask Wesley.

23        Q.   Wesley Vickers?

24        A.   Wesley Vickers.  Yes.

25        Q.   Okay.  All right.  You can set that aside.

1        A.    (Witness complies with request of

2    counsel.)

3               MR. CROSS:  Tab 58.

4               (Exhibit 24 was marked for

5        identification.)

6        Q.    (By Mr. Cross)  Let me hand you --

7               MR. CROSS:  24?

8               MR. SPARKS:  Uh-huh.

9        Q.    (By Mr. Cross)  -- Exhibit 24.

10            It's kind of long.  Mr. Stone, you're

11   welcome to flip through it; but I'm only going to ask

12   you about a couple of specific parts.

13        A.    Uh-huh.

14        Q.    If you look at the top, you'll -- you'll

15   see.  This is a -- a letter from Hall Booth Smith.

16        A.    Uh-huh.

17        Q.    And it's Jennifer Herzog at the top.  Do

18   you see that?

19        A.    I do.

20        Q.    And, again, Hall Booth Smith is

21   representing the Coffee County Board of Elections in

22   this deposition, right?

23        A.    That's correct.

24        Q.    And that's where Tony Rowell is?

25        A.    That's correct.

Page 179

1      Q.    And, here, you see this is addressed to
2    Marilyn Marks, Coalition for Good Governance?
3      A.    I do.
4      Q.    And if you look at the very first
5    paragraph, you'll see that it's a response to -- it
6    says, "... the consolidation of all outstanding Open
7    Records Requests to Coffee County from you personally
8    or on behalf of the Coalition for Good Governance..."
9           Do you see that?
10     A.    I do.
11     Q.    Now if you flip to the second page --  And
12   so I should have pointed out.  The date on this is
13   April 12th of 2022.
14     A.    Okay.
15     Q.    So that's the time period where we are.
16          The second page, do you see where it says
17   "Filed," and there's a date, March 4th, 2022?
18     A.    I do.
19     Q.    And then the request there is security
20   video recordings for the period 8:00 a.m. November
21   16, 2020 through 6:00 p.m. November 20, 2020 for the
22   following areas:  Elections Office, election
23   equipment storage area, Elections Office parking lot.
24          It indicates how the video can be sent.
25          Do you see that?

Page 180

 1          A.    I do.

 2          Q.    And then it states the response.  No

 3   documents responsive to this request exist in the

 4   personnel file of Hampton or Ridlehoover.  Because of

 5   storage capacity limitations, the security vistum

 6   (ph.) -- security video system overwrites

 7   automatically every 90 days if not archived or

 8   exported prior to that time period.

 9                Do you see that?

10          A.    Yes.

11          Q.    Do you know why the County stated in April

12   of 2022 that the requested video did not exist, when

13   we now know as of this week that it did exist?

14                MR. DELK:  Object to the form.

15                THE WITNESS:  I don't know the answer to

16          that.

17          Q.    (By Mr. Cross)  And if you wanted to know,

18   who would you ask?

19          A.    I would begin by asking Wesley, Wesley

20   Vickers.  The --

21                Now I recognize that name, Charles, as

22   being the IT person for the County, who would have

23   insight into it.

24                But as a Board member and the Board, we

25   don't have any -- we don't have any communication

Page 181

1    with Charles about that.  So my --  Our question on

2    that would be to Wesley.

3        Q.    Well, and what is Charles's last name?

4        A.    And I wish you hadn't asked me, because I

5    could have thought of it then.  Charles --

6              MR. DELK:  If you know, then tell him.  If

7         not, that's fine.

8              THE WITNESS:  I cannot recall Charles's

9         last name.

10       Q.    (By Mr. Cross)  That's okay.  That's okay.

11             And do you see at the bottom of the same

12   page, there's also a request in March of 2022 for

13   Elections Office visitor logs?

14       A.    Yes.

15       Q.    And are you aware that we have made, as

16   Plaintiffs in this, requests in discovery, similar

17   requests for visitor logs?

18             Had you heard that before?

19       A.    That you've asked for them?

20       Q.    Yes.

21       A.    I have heard that before.

22       Q.    Do you know why there are no visitor logs

23   for January of 2021 and February of 2021?

24       A.    I don't know.

25       Q.    Are you aware that those are supposed to

1    be preserved by the County?

2         A.    Yes.

3         Q.    If you wanted to know where those are and

4    whether they still exist, who would you ask?

5         A.    Again, this was January of 2021 and

6    February of 2021.

7         Q.    Yes, sir.

8         A.    Okay.  That's --  Is that the time when

9    Misty was dismissed?

10        Q.    Yes.

11        A.    Right through that time.  I have to begin

12   with questioning Misty on where those logs are and --

13        Q.    Is there any practice or policy in -- in

14   the County that visitor logs for the Elections Office

15   are supposed to be stored or maintained in some

16   particular way or location?

17        A.    Well, the -- the policies are all in

18   place; and being able to state the policies to you,

19   I'm not going to be able to do that.

20        Q.    Uh-huh.

21        A.    But, again, that's under the direction of

22   the person that we hired to carry out the job; and it

23   is their responsibility to maintain all of that

24   documentation, as required.

25        Q.    Yeah.  Well --

```
 1              Oh, yeah.  Sorry.  Look back at this.
 2     Actually, I misread this.
 3              So if you look at, again, the file, March
 4     4th, 2022 --
 5        A.    Uh-huh.
 6        Q.    -- we're looking at this request for video
 7     recordings.
 8        A.    Uh-huh.
 9        Q.    I accidentally read the wrong response.
10     The response actually states --  Do you see here in
11     the brackets?  It says --
12        A.    "Partially closed"?
13        Q.    Yeah.  Partially closed, as Coffee County
14     stated that no video exists because of overwriting.
15              Do you see that?
16        A.    I do.
17              MR. CROSS:  Okay.  All right.  13.
18        Q.    (By Mr. Cross)  You can put that aside.
19        A.    (Witness complies with request of
20     counsel.)
21              MR. CROSS:  25.
22              (Exhibit 25 was marked for
23         identification.)
24        Q.    (By Mr. Cross)  All right.  Let me hand
25     you what's been marked as Exhibit 25.
```

Page 184

1          So Exhibit 25 is an e-mail thread that was

2     produced to us by Paul Maggio of the

3     SullivanStrickler firm, which is the firm that did

4     the -- the copying of the election equipment on

5     January 7th of 2021.

6          Have you seen this e-mail thread before?

7          A.    I have not.

8          Q.    And, sir, I can't remember if I asked you

9     before.

10         Were --  Were you aware before today that

11    Sidney Powell associated with the Trump action

12    retained SullivanStrickler in Atlanta to come in and

13    copy the election equipment and voting data in Coffee

14    County in January of 2021?

15         A.    We're --  We're not aware of that.  The

16    Board is not aware of that.

17         Q.    Is that something you've seen at least in

18    the press, or you just weren't aware at all --

19         A.    I'm not aware --

20         Q.    -- before today?

21         A.    -- of -- of the names connected to the

22    activities you mentioned.

23         Q.    But you've heard of Sidney Powell?

24         A.    I've heard that name, and it would have

25    strictly been through the media.

Page 185

```
 1        Q.    So you --  Do you know whether anyone on
 2    the Board has ever met with Sidney Powell?
 3        A.    I don't.
 4        Q.    Do you know whether Eric Chaney has ever
 5    had any meetings or communications with --
 6        A.    I don't.
 7        Q.    And with Sidney Powell?
 8        A.    I don't.
 9              (Exhibit 26 was marked for
10        identification.)
11        Q.    (By Mr. Cross)  All right.  Let me hand
12    you what -- you can set that aside -- Exhibit 26.
13              Exhibit 26 is the engagement agreement for
14    forensic analysis that was produced to us by Tom
15    Maggio between his firm and Jesse Binnall.
16              Tell me if you've seen this before.
17        A.    I have not.
18        Q.    Okay.  Are you familiar with Jesse
19    Binnall?
20        A.    No.
21        Q.    Have you at least heard his name in the
22    press, that he represents Donald Trump?
23        A.    I don't recall hearing his name.
24        Q.    Okay.  If you look at --  Flip to the
25    third page of the document at the top.  It says,
```

```
 1        "Exhibit 1, Overview."

 2                 Flip back.

 3                 One more back.

 4                 Now one more back.

 5                 Yeah.

 6                 Do you see here "Requirements"?

 7                 It says the following were defined during

 8        phone call, face-to-face meetings and/or e-mail

 9        interactions between customer and SS --

10        SullivanStrickler -- representatives as requirements

11        to be satisfied through the performance of Services

12        by SullivanStrickler?

13                 Do you see that?

14            A.     I do.

15            Q.     And then it goes on to explain customer is

16        requesting that SullivanStrickler provide services

17        such as computer forensic collections and analytics

18        on the Dominion Voting Systems equipment; from the

19        poll pads, in parentheses, iPads, to the Windows

20        machines that run the scanners, to Linux machines

21        that tabulate the votes in the State of Nevada and

22        subsequent work in the State of Georgia.

23                 Do you see that?

24            A.     I do.

25            Q.     So what information, if any, does the
```

1   Board have on the engagement by one of Donald Trump's

2   lawyers of SullivanStrickler to do the -- the

3   forensic work that's described here in the state of

4   Georgia?

5         A.    The Board has no knowledge of this.

6         Q.    Are you familiar with someone by the name

7   of Benjamin Cotton?

8         A.    Only from the subpoenas.

9         Q.    Okay.

10        A.    His name was mentioned, several of the

11  subpoenas.

12        Q.    Are you aware that Benjamin Cotton has

13  testified under oath in a proceeding in Arizona that

14  he has forensically examined Dominion software and

15  voting data that was taken from Coffee County?

16        A.    I'm not aware of that.

17              MR. CROSS:  34.

18              (Exhibit 27 was marked for

19        identification.)

20        Q.    (By Mr. Cross)  All right.  Let me show

21  you --

22              MR. CROSS:  26?

23              MR. SPARKS:  27.

24        Q.    (By Mr. Cross)  -- Exhibit 27.

25              So Exhibit 27, Mr. Stone, is a -- a

Page 188

1    listing of folders and files that were on a hard

2    drive produced to us by Paul Maggio of the

3    SullivanStrickler firm in response to a subpoena.

4            Have you seen this before?

5        A.    I have not.

6        Q.    If you look just at the -- the first page,

7    you see at the top?  It says, "SSA1792 HARD DRIVE

8    CONTENTS."

9        A.    Yes.

10       Q.    And then below, "Name."

11           And there's folders.  The first is

12   "Compact-Flash."

13           Do you see that?

14       A.    I do.

15       Q.    Do you understand that indicates, like the

16   photos I showed you before, that the

17   SullivanStrickler team came in and forensically

18   copied compact flash drives in the office in January

19   of 2021?

20           MR. DELK:  Object to the form.

21       Q.    (By Mr. Cross)  Or you just --  You just

22   don't know one way or the other?

23       A.    What are you asking me?

24       Q.    I'm asking you if you understand that; and

25   if you don't, that's fine.  You can say you don't

1    know.

2          A.    Okay.  I don't know under -- I don't

3    understand what that's really referencing --

4          Q.    Okay.

5          A.    -- to tell you the truth.

6          Q.    So if you look at all the folder names,

7    it's Compact-Flash, Dominion-Supplied-Laptop, EMS

8    Server, miscellaneous thumb drives, Polling-Pads,

9    Reports, Tabulation System.

10         A.    Uh-huh.

11         Q.    Do you that?

12         A.    I do.

13         Q.    And what concerns does the Board have

14    about the fact that SullivanStrickler, according to

15    the hard drive that's been produced, copied about a

16    half a terabyte of data across virtually all of the

17    electronic equipment in the Coffee County Elections

18    Office in January of 2021?

19         A.    Well --

20         MR. DELK:  Object to the form.

21         THE WITNESS:  -- I'm sure that the Board

22        would be concerned about this, but the Board has

23        no knowledge of this, and so it's hard for me to

24        say what concerns the Board would have.  I --

25        Q.   (By Mr. Cross)  This is the first

Page 190

1    you're -- you're learning of this?

2        A.   This is the first I'm learning of this.

3    Yes.

4        Q.   And to your knowledge, no one else on the

5    Board was aware of this except for Eric Chaney?

6        A.   To my knowledge, that's correct.

7        Q.   Eric Chaney would be the only exception,

8    since he was there?

9        A.   And --

10        MR. DELK:  Object to the form.

11        THE WITNESS:  And I don't know the answer

12        to that.  To tell you the truth, I don't know

13        the answer to that.

14        Q.   (By Mr. Cross)  Fair enough.  Thank you.

15        MR. CROSS:  All right.  35.

16        (Exhibit 28 was marked for

17        identification.)

18        Q.   (By Mr. Cross)  All right.  Let me hand

19    you what's been marked as Exhibit 28, and you can --

20        You're welcome to flip up through this.  I

21    don't have a lot of questions on it.

22        Mr. Stone, this is another document

23    produced by Paul Maggio and the SullivanStrickler

24    firm that was explained to us.  It indicates

25    individuals who were given access to the Coffee

Page 191

1      County software and data that was put up online after
2      it was taken from the Coffee County office.
3                  Have you seen this document before?
4          A.     I have not.
5          Q.     And you see it goes on for several pages,
6      about ten pages, with a list of names and e-mail
7      addresses.
8                  Do you see that?
9          A.     I do.
10         Q.     And just flip to the page that ends in
11     131.  See these little numbers in the bottom
12     right-hand corner.
13         A.     (Witness complies with request of
14     counsel.)
15         Q.     And just to give you some examples, if you
16     come down, look in the middle.  See the third column?
17     Come down about ten names.  You'll see where it says
18     Doug.
19         A.     I do.
20         Q.     And then it says, "Doug Logan."
21                You --
22         A.     I do.
23         Q.     -- see that?
24         A.     Yes.
25         Q.     Then there's an e-mail address,

Page 192

```
1        doug@fightbacklaw -- fightback.law.

2                 Do you see that?

3        A.    I do.

4        Q.    And so had you learned at any point --

5   Had the Board learned that Doug Logan, for example,

6   had access to the Dominion software and voting data

7   taken from Coffee County, that he had access to that

8   online?

9        A.    The Board wasn't -- unaware of that.

10       Q.    Is that true for the other names on this

11  list, like Jim Penrose, for example?

12       A.    I'm going to say that's true for all the

13  names.  The Board had -- I --

14                To my knowledge, the Board has not seen

15  this.

16       Q.    Okay.

17                MR. CROSS:  All right.  36.

18                THE WITNESS:  And this was not discussed

19       with the Board.

20                MR. CROSS:  All right.  29?

21                MR. SPARKS:  29.

22                (Exhibit 29 was marked for

23       identification.)

24       Q.    (By Mr. Cross)  All right.  Let me hand

25  you what's been marked as Exhibit 29.
```

Page 193

```
 1              All right.  So what we just looked at,
 2       like I said, Mr. Stone, was a document from Paul
 3       Maggio's firm indicating who had access to the data
 4       online.
 5              This, we are told, is a log of who -- who
 6       downloaded the data from the online.  So if you look
 7       at this, see where it says "Activity," second column?
 8       A.    Yes.
 9       Q.    And it says "Download."
10              Do you see that?
11       A.    I do.
12       Q.    And then there's a user name.  On the
13       first page, it's "Conan H."
14              Do you see that?
15       A.    I do.
16       Q.    And then it's got an e-mail address
17       associated with that person, their company name,
18       their IP address, and their location.
19              Do you see that?
20       A.    Yes.
21       Q.    And then if you look over to the left,
22       "ItemName," it indicates what they're downloading
23       with a date and time.
24              Do you see that?
25       A.    I do.
```

 1          Q.    Do you see that this document goes on

 2    for -- so from 137 to 161, so for 20 -- about 24 or

 3    25 pages.

 4              Do you see that?

 5          A.    Uh-huh.  Yes.

 6          Q.    And was the Coffee County Board of

 7    Elections aware that the soft -- the Dominion

 8    software and data taken from its elections equipment

 9    had been downloaded by numerous people on the

10    Internet after that intrusion occurred?

11          A.    The Board is not aware of that.

12          Q.    What --  Well, strike that.

13              So is it fair to say that since no one had

14    alerted the Coffee County Election Board that half a

15    terabyte of Dominion software and voting data had

16    been taken and uploaded to the Internet a year and a

17    half ago and downloaded by numerous people, is it

18    fair to say the County itself has not taken any

19    measures to mitigate whatever risk this presents for

20    the voting system?

21              MR. DELK:  Object to the form.

22              THE WITNESS:  Well, I mean, much of this

23         information, I'm hearing for the first time.

24              The Board has not heard this information

25         that you're -- you're showing me right now; and

Page 195

 1           in all honesty, I don't know what the County

 2           knows about it.

 3                And, of course, there are policies and

 4           procedures in place to prevent things from

 5           happening; but it's going to go back to what I

 6           originally said.  Any access that was granted,

 7           was granted by the computer operator, the

 8           elections supervisor, the person that had the

 9           training and the person that we hired to do the

10           job and keep the keys to the door.

11           Q.    (By Mr. Cross)  And --  And, Mr. Stone, I

12      apologize.  I have --  I have to push back on a

13      little bit only because --

14           A.    Uh-huh.

15           Q.    -- we do know that a member of the

16      Board --

17           A.    Uh-huh.

18           Q.    -- who was currently on the Board at the

19      time --

20           A.    Uh-huh.

21           Q.    -- was there.  Eric Chaney was there, too,

22      for these events, right?

23           A.    Okay.

24           Q.    It wasn't just Miss Hampton.

25           A.    I agree with that.

1          However, he, even he does not have access
2     to any --  I mean, to my knowledge, he does not have
3     a computer.  He does not have training.  He does not
4     have a key to the front door.  He does not have --
5     now that's --
6          And --  And I -- I understand what you're
7     saying, what you're telling me.
8          But it's kind of go back to Misty.  The
9     role of additional bad actors in this, I do not know.
10     Q.   Well, I -- I understand your point.  And
11     Misty Hampton has the keys to the office, so she's
12     the one who has to physically unlock the office,
13     right?
14     A.   Yes.
15     Q.   Okay.
16     A.   Well, I mean, Jil may have had a key as
17     well.
18     Q.   Right.
19     A.   But --  But board members don't have keys.
20     Q.   But what we know is that beyond just
21     either Miss Hampton or Miss Ridlehoover physically
22     unlocking the doors, we do know that Eric Chaney was
23     there; and we know from the video, that Cathy Latham
24     literally escorted the forensic team into the
25     building, along with others who came later --

Page 197

1        A.    Uh-huh.

2        Q.    -- right?

3              We do know that, right?

4        A.    Well, I mean, we can look at the

5   photographs.

6        Q.    And the video?

7        A.    Yeah.

8        Q.    All right.

9        A.    I agree with that.

10       Q.    Yeah.  And so would --  Is it fair to say

11  that because the County has not received information

12  like we've looked at here from Paul Maggio, for

13  example, about the intrusion, that the County is

14  relying on the State to figure out how to deal with

15  whatever risk this presents for the voting system?

16       A.    I --

17             MR. MILLER:  Object to the form.

18             THE WITNESS:  I don't --  I would have no

19       idea of knowing what the County is waiting for.

20       If you're asking me about an investigation from

21       the County standpoint, I don't know what

22       information they would need to be able to launch

23       an investigation.

24       Q.    (By Mr. Cross)  You made the good point

25  earlier that -- that if someone wanted to, you know,

Page 198

1    manipulate votes or election outcomes, they need to

2    understand how the system works.

3              Do you remember saying that?

4         A.   That's my understanding.  Yes.

5         Q.   Okay.  And is it a concern to the Board

6    that the Dominion software -- half a terabyte of

7    Dominion software and voting data was uploaded to the

8    Internet and downloaded by numerous individuals over

9    a period of months, many months going back a year and

10   a half?

11             MR. DELK:  Object to the form.

12        Q.   (By Mr. Cross)  Is that a concern?

13        A.   And only -- and it's not -- I'm not trying

14   to be --  I'm not trying to be evasive about that at

15   all, but I'm going to go back to what I said while

16   ago.

17             The Board is unaware of this.  And would

18   it be a point of concern if we brought this

19   information to the Board?  I would say yes.  It would

20   be a point of concern.

21        Q.   And --  And you made the point that

22   only -- only certain people, like Miss Hampton, Miss

23   Ridlehoover in 2021, even have keys to the Elections

24   Office, right?

25        A.   That's my understanding.  Yes.

1         Well, I mean, I don't know who else in

2 County management, for instance, County manager or

3 maintenance people.  I don't know who else has a key.

4      Q.   Do you know if Wesley Vickers has a key to

5 the office?

6      A.   I don't know.

7      Q.   All right.  But the -- the keys are

8 limited to that office, and the -- the reason for

9 that is because as part of trying to secure the

10 voting system, you want to limit who can get access

11 to that equipment, right?

12      A.   Yes.

13      Q.   And that's important?

14      A.   It is.

15      MR. CROSS:  All right.  Seven.  Tab 7.

16      Q.   (By Mr. Cross)  I'm almost done, Mr.

17 Stone.

18      A.   All right.

19      Q.   I very much appreciate your patience.

20      A.   Yes.

21      Q.   All right.  Let me hand you --

22      MR. CROSS:  30?

23      MR. SPARKS:  Uh-huh.

24      Q.   (By Mr. Cross) -- what's going to be

25 marked as Exhibit 30.

Page 200

```
 1              (Exhibit 30 was marked for
 2         identification.)
 3         Q.    (By Mr. Cross)  All right.  Do you
 4    recognize Exhibit 30?  Is this something you've seen
 5    before?
 6         A.    I don't recall seeing this.
 7         Q.    All right.  Are you familiar with the
 8    federal agency that sits inside of DHS called CISA,
 9    C-I-S-A?
10         A.    C-I-S-A, what does that stand for?
11         Q.    I always get that question.  I always
12    screw it up.
13         A.    Yeah.
14         Q.    Cyber security infrastructure --
15         A.    I read it in --  I think it was mentioned
16    in the subpoenas.
17         Q.    Okay.
18         A.    I recall that.
19         Q.    Did --  Well, let me ask you this.
20              Are you aware that there is a -- there is
21    a federal agency that has some responsibility for
22    election security in the country?
23              Is that something you've learned as part
24    of being on the Board?
25         A.    Yes.
```

```
 1          Q.    Okay.  So were you aware that in June of
 2     2022, that agency, typically referred to as CISA,
 3     issued this advisory to all jurisdictions in the
 4     country using the Dominion Voting Systems that are
 5     addressed in the advisory?
 6               Had you heard that before now?
 7          A.    No.
 8          Q.    All right.  If you look at the summary, it
 9     explains here that, "This advisory identifies
10     vulnerabilities affecting versions of the Dominion
11     Voting Systems Democracy Suite ImageCast X, which is
12     an in-person voting system used to allow voters to
13     mark their ballot."
14               Do you see that?
15          A.    I do.
16          Q.    And you understand that's referring to the
17     same BMD system used in Georgia?
18          A.    Okay.
19          Q.    Were you aware that this advisory --  It
20     says that it sent this same advisory to the Secretary
21     of State's Office in Georgia?
22          A.    I'm not aware of that.
23          Q.    So this is not something that the Board
24     has received any information about, has it?
25          A.    I don't recall that the Board got this.
```

Page 202

```
1        Q.     And if you come down to the next paragraph

2   under summary, do you see it says, "Exploitation of

3   these vulnerabilities would require physical access

4   to individual ImageCast X devices, access to the

5   Election Management System..., or the ability to

6   modify files before they are uploaded to ImageCast X

7   devices."

8              Do you see that?

9        A.     I do.

10       Q.     Given we now know that a -- a number of

11  individuals had access to the election management

12  system in Coffee County physically on -- in January

13  of 2021 and then over the Internet for some period of

14  months, does this raise any concerns for you about

15  these vulnerabilities and continuing use of the

16  system, you, as the Board?

17       A.     Okay.  You're asking me about -- about

18  things other than the -- the training and the

19  information that I've had, so based on what I know

20  about the system and the little bit of training that

21  I've had the -- the system is secure.  It is

22  accurate.

23             But I mean, you're telling me about these

24  things right here, except I don't know the extent to

25  which they can be utilized; and so it's difficult for
```

Page 203

1  me to answer that question.

2       Q.    All right.  And so when you say your

3  understanding is the system is secure and reliable,

4  you don't have any insight into what CISA found here

5  and what the implications are of -- of the -- the

6  intrusion we saw?

7       A.    I don't.

8       Q.    Okay.  'Cause that's not something that

9  the Secretary of State's Office has been in touch

10 with the Board about?

11      A.    No.

12      Q.    No one has been in touch with the Board

13 about the vulnerabilities identified here, right?

14      A.    To my knowledge, no.

15      Q.    And no one has been in touch with the

16 Board about what the access to the EMS and the other

17 election equipment in January of 2021, what that

18 means for the reliability of the system, right?

19      A.    No.

20      Q.    All right.  Turn to third page.  You'll

21 see there's a heading, "3. Mitigations."

22            And here it reads, "CISA recommends

23 election officials continue to take and further

24 enhance defensive measures to reduce the risk of

25 exploitation of these vulnerabilities.  Specifically,

Page 204

```
 1        for each election, election officials should:"
 2                And then there's a list of about a dozen
 3        bullets that go to the top of the next page.
 4                Do you see all that?
 5        A.    I do.
 6        Q.    To what extent has Coffee County or the
 7        State of Georgia through its own actions in Coffee
 8        County implemented any of the -- the mitigation
 9        measures listed here?
10        A.    Okay.  Like I said --
11                MR. MILLER:  Objection to form.
12                THE WITNESS:  -- what were -- what were
13             some of the mitigation measures?
14                Let's see.  Firmware.  Software updates
15             need to be applied.  Physically protected.
16             Chain of custody procedures.
17                I can't answer that question.  I don't
18             know.
19        Q.    (By Mr. Cross)  If you wanted to know, who
20        would you ask?
21        A.    Secretary of State's Office.
22        Q.    And who specifically would you reach out
23        to?
24        A.    It'd probably begin with our liaison, and
25        I cannot recall that person's name.
```

1          Again, that -- that's somebody that our
2     elections person has access to.  We don't communicate
3     individually with that person.
4          And, listen, you're asking me very
5     involved and deep questions about all of this.  You
6     understand I attend a Board meeting once a month for
7     one hour, and I'm there to make sure that the funding
8     for a new table is available or that voters are not
9     unhappy about the setup of the elections area.
10          These -- These are very involved concepts
11     that you're -- you're bringing to me; and while
12     absolutely the first -- furthest thing in the world
13     from my mind is that I want to be uncooperative or
14     evasive.  I don't want to be that.  I want to be
15     helpful.  I don't know the answer to much of what
16     you're asking me about.
17          Q.    Do you understand the Secretary of State's
18     Office has taken the position that the counties
19     themselves are responsible for securing the voting
20     system?
21          A.    Well, I understand that.
22          Q.    Okay.  So who in Coffee County is
23     responsible for implementing the mitigation measures
24     identified in the CISA advisory or otherwise ensuring
25     that the vulnerabilities identified there are not

Page 206

```
 1      exploited?  Who has that responsibility?
 2                  MR. DELK:  Object to the form.
 3                  THE WITNESS:  We would have to --  We
 4          would have to work with the County management,
 5          but the Board of Elections would be responsible
 6          for that.
 7          Q.    (By Mr. Cross)  Okay.  And does the Board
 8      of Elections look to the Secretary of State's Office
 9      to provide guidance and resources for the type of
10      mitigation measures that are here?
11          A.    Well, I would say that we would.  We
12      haven't, but we would.
13          Q.    Okay.  And --  And, in fact, as I
14      understood before I handed you this document, you
15      weren't even aware of this document or the
16      mitigations?
17          A.    I don't --  I don't recall seeing this
18      document at all.
19          Q.    Okay.  I think we covered this before.
20                  But the -- the Board has only two --
21      Well, strike that.
22                  The County has only two employees that are
23      responsible for elections in the County -- the
24      elections supervisor and the assistant, right?
25          A.    That's correct.
```

```
 1          Q.    And fair to say it is not a job
 2     requirement that those people have cybersecurity
 3     expertise?
 4          A.    It's not a job --
 5                MR. DELK:  Object to form.
 6                THE WITNESS:  -- requirement.
 7          Q.    (By Mr. Cross)  So also fair to say that
 8     for the type of understanding and mitigating the type
 9     of serious cybersecurity vulnerabilities as
10     identified, that's not something the County would
11     even have the personnel to -- to understand and
12     implement; is that fair?
13                MR. DELK:  Object to the form.
14                THE WITNESS:  I don't know.  I don't know.
15          You're asking me about the skills of people who
16          work in the County.  It takes a very involved
17          and deep level of knowledge to be able to -- to
18          do this, and so you're asking me if they have a
19          person that can do that.
20                Charles is the IT administrator; and so
21          he's not on site; but he is available, should we
22          need him.
23          Q.    (By Mr. Cross)  But Charles has not
24     undertaken any of the mitigation measures here, to
25     your knowledge?
```

Page 208

```
 1          A.     Not to my knowledge.

 2          Q.     And would you expect the Board --

 3          A.     And he would have to answer that question,

 4     because I don't know the answer to that.

 5          Q.     Okay.  What steps, if any, has Coffee

 6     County taken to avoid another breach like we've seen

 7     in January of 2021, if any steps?

 8          A.     The --  It's understood that the elections

 9     equipment is off limits to anyone.  Okay.  And so the

10     policies are in place.  The doors are locked.  We

11     take any step that we can.

12                 Now as far as what's been done with the

13     technology, I can't answer the question.  I don't

14     know the answer to that.  I can only answer the

15     topical -- the -- I hate to say the easy things --

16          Q.     Uh-huh.

17          A.     -- that we could do to -- to make our

18     election supervisor aware of the requirement of -- of

19     security.

20          Q.     Is there anything that the County is doing

21     that's new, that's different from what it was --

22     already had in place as a policy in January of 2021

23     that's in response to the intrusion that we've seen

24     in that time?

25          A.     I'm not aware of anything that's new.
```

Page 209

1          Q.    All right.  And --  And no guidance or

2    direction from the Secretary of State's Office on

3    something more different you should be doing in light

4    of that?

5          A.    Not that I'm aware of.

6                MR. CROSS:  Okay.  All right.  Let's take

7          a break.

8                THE VIDEOGRAPHER:  The --  The time is

9          2:02 p.m.  We are off video record.

10               (Recess from 2:02 p.m. to 2:13 p.m.)

11               THE VIDEOGRAPHER:  The time is 2:14 p.m.

12         We are back on video record.

13               MR. CROSS:  Mr. Stone, I do not have any

14         further questions for you; and I very much

15         appreciate your time and particularly your

16         willingness to do this in Atlanta.

17               THE WITNESS:  Thank you.

18               MR. CROSS:  A couple things just for the

19         record.  We have withdrawn Exhibit 19 in light

20         of the concern raised by Mr. Delk.

21               We can deal with this separately, Steve;

22         but I did just want to put on the record that we

23         do have some concerns about the thoroughness of

24         his knowledge as a corporate rep with respect to

25         particular things, particularly, the fact that

1       Mr. Chaney was on the Board until August 12th;

2      and we have not seen any production from him.

3          And then the video looks like it should

4      have gone at least through February 25th based

5      on the e-mails, and so we'd ask you to take

6      another look at that.

7          So we'll just reserve.

8          And thank you, sir.

9          THE VIDEOGRAPHER:  Bruce, it's all you.

10     CROSS-EXAMINATION

11     BY MR. BROWN:

12       Q.   Hello, I'm Bruce Brown.  I represent the

13    Coalition Plaintiffs.

14          Mr. Stone, can you hear me okay?

15       A.   I can.

16       Q.   Okay.  Thank you for appearing today.

17          I just have a few questions.  They may

18    overlap a little bit with Mr. Cross's, but

19    they'll be --  I promise.

20          You testified that you were aware that the

21    Secretary of State had taken Coffee County's EMS

22    server in approximately June in 2021.

23          Do you recall that?

24       A.   Yes.

25       Q.   Did the --  Did the Secretary of State ask

 1    the Board, to your knowledge, anybody associated with

 2    Coffee County Elections permission to do that?

 3         A.    I do not recall that they asked permission

 4    to do that.

 5         Q.    And I believe your testimony was that they

 6    didn't leave a copy of -- of any of the election

 7    records that they took; is that right?

 8         A.    Okay.  I don't work in the Elections

 9    Office in that capacity, so I don't --  I'm not aware

10    of what may have been left.

11              You'd have to ask the person who was the

12    elections supervisor at that time, James Barnes.

13         Q.    Are you aware that -- that Coffee County

14    does not have a copy of those election records for

15    the 2020 election?

16         A.    I'm --  I'm not aware of that.

17         Q.    But you are --  Are you aware that Coffee

18    County is supposed to have a copy of the election

19    records, because they're public records?

20         A.    It seems logical.

21         Q.    Okay.  Do you know if Coffee County has

22    made any efforts to get a copy or the originals back

23    from Secretary of State so that it would have a copy

24    like it's supposed to?

25         A.    I'm not aware that we tried to get a copy;

Page 212

```
1     but, again, that would fall under the responsibility

2     of the elections supervisor, who is now a different

3     person.

4          Q.    All right.  Let me change topics a little

5     bit.

6                Were you aware that in January of 2021,

7     that somebody put on the Internet a link to the cast

8     vote records of Coffee County?  Did you know that?

9          A.    I'm not aware of that.

10         Q.    And did you know that the Secretary of

11    State was informed at least by July of this year that

12    that was the case?

13         A.    No.  I'm not aware of that.

14         Q.    Do you know if the Secretary of State

15    never told you or, to your knowledge, told anybody

16    associated with Coffee County that Coffee County's

17    cast vote records had been posted to the Internet?

18         A.    I'm not aware that that was ever provided

19    to the Board.

20         Q.    Right.  And that the issue with that is

21    that cast vote records may be public, but the way

22    that they are created indicated that they came from a

23    version or a copy of Coffee County's EMS server.

24               Are you aware of that?

25               MR. MILLER:  Objection to form.
```

1         THE WITNESS:  Not aware of that.

2         Q.    (By Mr. Brown)  Now the --  I think you

3    testified about certain lawsuits that -- the --  The

4    Board gets sued from time to time.  Is that fair to

5    say?

6         A.    There are ongoing problems.

7         Q.    And just, typically, if -- if the Board

8    gets sued, you would find out about it, right?

9         A.    We would --  We would be aware of it as a

10   Board.  Yes.

11        Q.    And it would probably come into the County

12   attorney and then maybe to the Board chairman; is

13   that right?

14        A.    That's correct.

15        Q.    And in December of 2020, the -- who was

16   the chairman of --  Who would have gotten it in

17   December of 2020.  The -- the --

18        A.    In December of 2020 --

19        Q.    The attorney?

20        A.    The attorney would get any -- any lawsuit,

21   and then the information would be provided to us as a

22   Board.

23        MR. BROWN:  All right.  Can we -- can

24        you --  Johnny, can you pull up the Stills

25        lawsuit.

Page 214

```
 1              MR. CROSS:  What exhibit?

 2              MR. SPARKS:  31.

 3              THE VIDEOGRAPHER:  Exhibit 31, sir.

 4              (Plaintiff's Exhibit 31 was marked for

 5         identification.)

 6         Q.   (By Mr. Brown)  Handed to you has been

 7    Exhibit 31, which for the record is what we call the

 8    Still's lawsuit.

 9              And have you seen that lawsuit before?

10         A.   I don't recall seeing this lawsuit.

11         Q.   Do you see that up in the right-hand

12    corner, it was filed in the Fulton County Superior

13    Court December 17, 2020?  Do you see that?

14         A.   I do.

15         Q.   And you see it's brought by Shawn Still as

16    the petitioner and then Brad Raffensperger is

17    defendant, along with the Coffee County Board of

18    Elections?

19              Do you see that?

20         A.   I do.

21         Q.   And then you're also named in your

22    official capacity as vice-chairman on the Board.

23              Do you see that?

24         A.   I do.

25         Q.   And --  And do you know why the typical
```

1    process for these lawsuits being provided to the

2    Board was not followed with respect to the Still

3    lawsuit?

4             MR. DELK:  Object to the form.

5             THE WITNESS:  I don't --  I don't know why

6       that would have happened; and I mean, in all

7       honesty, this may have been provided to us.

8    Q.   (By Mr. Cross)  You just don't remember?

9    A.   I don't remember.

10    Q.   Okay.  And --

11    A.   It seems I would remember a document with

12    a hundred pages in it, but I just -- I --  I don't

13    remember.

14    Q.   Also, one that names you personally,

15    right?

16    A.   That's correct.

17    Q.   And you've been asked some questions about

18    a Mr. Robert Sinners, I believe, in -- in the

19    lawsuit.  You don't know him; is that right?

20    A.   I don't.

21    Q.   And I think I know the answer to these

22    questions, but I need just to ask them for the

23    record.

24          Are you aware of any meeting in Douglas in

25    December between Mr. Sinners and other people

Page 216

```
 1      associated with Coffee County to collect evidence to

 2      file this lawsuit?

 3               Are you familiar with that?

 4      A.    I am not.

 5      Q.    All right.  Did you know if or whether he

 6      was meeting with Mr. Chaney or Robert Preston or

 7      Cathy Latham or any of the others to come up with

 8      evidence to file this lawsuit?

 9      A.    I am not aware of that.

10      Q.    If you would, turn in your Exhibit 31 to

11      Page 32 of that PDF.  It's going to be, you know,

12      halfway down.

13               Oh, yours isn't a PDF.  Yours is the real

14      thing.  Mine is a PDF.  So if you go down about

15      halfway through --

16      A.    Page 32.

17               MR. CROSS:  Are you looking for Exhibit 8,

18          Bruce --

19               MR. BROWN:  Eight.

20               MR. CROSS:  -- the --  Was it a Hope

21          Taylor declaration?

22               MR. BROWN:  Yeah.

23               THE WITNESS:  Exhibit 1?

24               MR. CROSS:  So just flip until you get to

25          Exhibit 8.
```

Page 217

1                    THE WITNESS:  Exhibit 8.

2                    Okay.

3                    MR. CROSS:  Now flip one more page.

4                    Okay.  He's got the declaration.

5           Q.    (By Mr. Brown)  Okay.  Are you at

6      Exhibit --  Are you at Exhibit 8 now?

7           A.    Yes.

8           Q.    Flip over a couple.  You'll see that

9      Alyssa Taylor signed that; is that right?

10          A.    Yes.

11          Q.    And it's notarized by Robert Sinners.

12                Do you see that?

13          A.    I do.

14          Q.    Then if you go up to Exhibit 2, if you

15     would.

16                    MR. CROSS:  It's back.

17                    THE WITNESS:  Exhibit 2.

18                    Okay.

19          Q.    (By Mr. Brown)  Do --  Do you recognize

20     the document after the exhibit number, the table?

21                    THE WITNESS:  Okay.  Is this what he's

22         talking about?

23                    MR. CROSS:  The Hand Recount Recap?

24                    MR. BROWN:  Correct.

25                    MR. CROSS:  He's asking if you recognize

1      this.

2           Q.    (By Mr. Brown)  Do you know what that is?

3           A.    This, the Hand Recount Recap.

4           Q.    Do you know where -- where the plaintiffs

5      in that case would have gotten that recap from?

6                 MR. DELK:  Object to the form.

7                 THE WITNESS:  I --

8           Q.    (By Mr. Brown)  If you --

9           A.    I don't know.

10                Is this not a matter of public record?

11          Q.    I'm not sure.

12                MR. DELK:  Just answer the question, if

13          you know it.

14                THE WITNESS:  I don't know.

15          Q.    (By Mr. Brown)  You --  You may have been

16     asked some these, and I'll just try to sum up quick

17     on that.

18                Are you aware of any investigation of

19     Coffee County by the Secretary of State, the SEB, or

20     the GBI into the breach in January 2021 of Coffee

21     County's election system?

22          A.    I'm not aware.

23          Q.    Have you been contacted by the F -- by the

24     GBI?

25          A.    I have not.

Page 219

```
 1              MR. DELK:  Object to the form to extent he
 2          may not know about communications with counsel.
 3              But subject to that he's welcome to
 4          respond.
 5          Q.    (By Mr. Brown)  Do you know if your lawyer
 6      was contacted by the GB --
 7          A.    Contacted by who?
 8          Q.    GBI.
 9          A.    I don't know if my lawyer was contacted by
10      GBI.
11          Q.    Do you know --  Do you know of anybody
12      being contacted by the GBI as of today?
13              MR. DELK:  Same objection.
14              You can respond.
15              THE WITNESS:  I don't know.
16          Q.    (By Mr. Brown)  And you -- you knew that
17      my client, Coalition for Governance, has informed
18      Coffee County many months ago of the suspicion of
19      this breach, right?
20          A.    I'm not wind --  I'm not sure of when
21      Coffee County was informed of the breach.  The real
22      concern came through the media presentations.
23          Q.    You mean more recently?
24          A.    Well, I mean, whenever they first came
25      out.
```

Page 220

1      MR. BROWN:  I just want to look at my

2    notes here real quick.

3      Now that --  That's all I have.  Thank

4    you.

5      THE WITNESS:  Thank you.

6      THE VIDEOGRAPHER:  Anybody else have

7    questions?

8      MR. MILLER:  We will.  But I -- I

9    apologize; and we first need a quick break,

10   probably about ten-minute break, if that's all

11   right.

12     THE VIDEOGRAPHER:  All right.  The time is

13   2:27 p.m.

14     THE WITNESS:  You need a break?

15     MR. MILLER:  Yeah.

16     THE VIDEOGRAPHER:  The time is 2:27 p.m.

17   We are off video record.

18     (Recess from 2:27 p.m. to 2:47 p.m.)

19     THE VIDEOGRAPHER:  The time is 2:47 p.m.

20   We are back on video record.

21     Here you go, sir.

22     MR. MILLER:  All right.

23     THE VIDEOGRAPHER:  Just pull it.  Yep.

24     MR. MILLER:  All right.

25     THE VIDEOGRAPHER:  You've got it.

Page 221

1      CROSS-EXAMINATION

2      BY MR. MILLER:

3      Q.    All right.  Mr. Stone, my name is Carey

4      Miller.  I represent the State Defendants in this

5      litigation.

6      A.    Uh-huh.

7      Q.    I thank you again for -- for being here.

8      A.    Uh-huh.

9      Q.    It's a bit of a drive up, and a long --

10     A.    Uh-huh.

11     Q.    -- day sitting in the hot seat over there.

12     A.    Uh-huh.

13     Q.    I wanted to start off asking you a handful

14     of questions that I'm not sure were covered; and if

15     they were, really just to clarify your testimony

16     and -- and background as a rep -- 30(b)(6)

17     representative of the Coffee County Board.

18     A.    Okay.

19     Q.    When did you first come on to the Coffee

20     County Board of Elections?

21     A.    January 2017.

22     Q.    Okay.  And you were appointed to that

23     post?

24     A.    I was.

25     Q.    And by whom?

Page 222

1        A.    The commissioner's name Scooter Bill Dean,

2    and I cannot remember his real name, but I've

3    suspected you would ask me that.  But Commissioner

4    Dean, Coffee County commissioner has since passed

5    away.

6        Q.    Okay.

7        A.    But that was --  That's how I got on

8    there.

9        Q.    All right.  Fair enough.  I won't quiz you

10   over his vital records.

11       A.    I got you.  Okay.  Thank you.

12       Q.    So when you first came on to the Coffee

13   County Board of Elections, was your role described to

14   you are in terms of the Board's role in administering

15   elections?

16       A.    The role was described --  In the bylaws

17   the role is described; and I was given a copy of the

18   bylaws; and essentially, I -- I was able to

19   participate in training various times to learn what

20   the role of the Board member is.

21              And so that's a good -- really good

22   question, because my understanding of the Board is

23   just as I told him.  It was you attend the meeting

24   once a month, and you facilitate elections to make

25   sure that the elections that you provide are free,

```
 1     fair, and transparent; and that's my understanding, I
 2     mean, in a nutshell of what Board member's role is.
 3          Q.    Okay.  Fair enough.  And -- and when you
 4     talk --  When you refer to trainings there --
 5          A.    Uh-huh.
 6          Q.    -- did you participate in any training
 7     specific to board members, or are you referring to
 8     seeing training for superintendents or elections
 9     directors?
10          A.    And it would be more related to the --
11     Georgia --  Georgia Association of Voter Election
12     Officials training, the conference-type of
13     training --
14          Q.    Sure.
15          A.    -- the general sessions and the meetings
16     that -- that they provided.
17          Q.    Okay.  And --  And just so that I'm clear,
18     that would be the --  I believe it's Georgia Election
19     Officials Association, GEOA.  Does that sound
20     familiar to you?
21          A.    GEOA.  GAVREO.
22          Q.    Yes.
23          A.    Is that familiar?
24          Q.    Yes.
25          A.    Yeah.  They're -- and --  And I don't
```

Page 224

1    remember specifically who sponsored which training,

2    but I've -- I've been to several of those trainings?

3         Q.    Okay.  And that GAVREO, G-A-V-R-E-O,

4    right?

5         A.    Right.

6         Q.    Okay.

7         A.    That's right.

8         Q.    And may have postdated your time on the

9    Board.  Similar to the -- what was previously

10   referred to as VRAG, Voter Registrars Association of

11   Georgia.

12             Are you familiar with that at all?

13        A.    Is that --  That's no longer being used,

14   is it?  The -- I have -- Or I -- I have a

15   recollection of that.

16        Q.    Okay.  And I'll represent to you those

17   GEOA and VRAG eventually merged --

18        A.    Right.

19        Q.    -- and became GAVREO.

20        A.    Right.

21        Q.    Okay.  Did --  How many of those

22   conferences did you attend?  Did you attend them on a

23   regular basis or --

24        A.    I --  I attended several of the

25   conferences, especially at the outset of my tenure on

1   the Board.

2        Q.    Okay.

3        A.    And so I haven't been to one in probably

4   over a year.  The --  The last one that I attended

5   was in Athens.

6        Q.    Okay.

7        A.    So when was that?  That was the last one

8   that I went to.

9        Q.    Fair enough.  And --  And with respect to

10  your attendance at those conferences, were you

11  frequently going with your elections supervisor,

12  Misty?  Was she also there?

13       A.    Yes.

14       Q.    Now with respect to the presentations you

15  guys may have attended --

16       A.    Uh-huh.

17       Q.    -- is it your understanding that Miss

18  Hampton was obtaining a certification, whereas you

19  may have been just observing and -- and gaining

20  knowledge?

21       A.    It was my understanding that she was

22  required to go for a certain amount of time every

23  year.

24       Q.    Okay.  And with respect to your attendance

25  at those conferences, you personally as a Board

Page 226

```
1      member did not studiously review presentations,

2      because it was a statutory responsibility.

3              Does that make sense?

4      A.     It does.

5              MR. DELK:  Object to the form.

6      Q.     (By Mr. Miller)  Okay.  As opposed to just

7      gaining knowledge and observing and that sort of

8      thing?

9      A.     Yes.

10     Q.     Would that be generally accurate?

11     A.     I would say that's generally accurate.

12     Q.     Okay.

13     A.     Yes.

14     Q.     Now I -- I want to ask you a little bit

15     about the election system in Georgia, just kind of

16     basic component pieces.

17     A.     Okay.

18     Q.     As I understood your testimony earlier,

19     you weren't necessarily specifically familiar with

20     the GEMS or EMS server and system.  Knew it to be a

21     part of the election system, but not fluent in your

22     specific knowledge as to that?

23     A.     Not fluent with what each specific piece

24     of equipment does.  No.  I'm not.

25     Q.     Okay.
```

```
 1          A.    I'm not familiar with that.

 2          Q.    And so that would be applicable to the EMS

 3    that we just discussed, right?

 4          A.    Yes.

 5          Q.    Okay.

 6          A.    That's correct.

 7          Q.    Similarly -- and let --  Strike that.  Let

 8    me take a step back.

 9                But as general principles, you do

10    understand the component parts in an election system

11    that, say, a -- a voter interacts with, correct?

12          A.    Yes.

13          Q.    Check in at the poll pad, right?

14          A.    Yes.

15          Q.    Go to the BMD machine?

16          A.    Yes.

17          Q.    Select your choices?

18          A.    Yes.

19          Q.    Print the ballot?

20          A.    (Witness nods head.)

21          Q.    Take it to the scanner, right?

22          A.    Yes.

23          Q.    Okay.  You were shown a picture of various

24    compact flash cards and thumb drives and things of

25    that nature.  Do you recall that?
```

Page 228

```
 1          A.    I do.
 2          Q.    I think it was actually several pictures,
 3    right?
 4          A.    Uh-huh.
 5                MR. DELK:  Yes?
 6                THE WITNESS:  Yes.
 7                MR. DELK:  Yes or no.
 8          Q.    (By Mr. Miller)  Do you have any knowledge
 9    as to what those component pieces are used for?
10          A.    I don't know specifically what they're --
11    they're used for.
12          Q.    But your superintendent or day-to-day
13    elections director employed by the Board, they would
14    know how they're used and what they're used for,
15    right?
16          A.    Yes.
17          Q.    Okay.  And would that similar kind of
18    general understanding apply to, say, the application
19    of State Election Board regulations?
20                MR. CROSS:  Objection to form.
21          Q.    (By Mr. Cross)  Do you understand the
22    question I'm asking?
23          A.    No.  Ask the question again.  I --  I
24    don't understand.
25          Q.    Okay.  So with respect to this sort of
```

1 general understanding you have of the various

2 component pieces --

3        A.    Uh-huh.

4        Q.    -- your understanding of state Election

5 Board rules and regulations, is that a similar

6 general understanding or do you have specific

7 knowledge as to those?

8        A.    I --

9        MR. CROSS:  Objection to form.

10        THE WITNESS:  It's general -- general

11 understanding.

12        Q.  (By Mr. Miller)  Okay.  Mr. Stone, you're

13 aware that there are certain security regulations

14 promulgated by the State Election Board concerning

15 access to component pieces of the voting system,

16 right?

17        A.    Yes.

18        MR. DELK:  Object to the form.

19        Q.  (By Mr. Miller)  Okay.  And I'm going to

20 introduce now what -- it's Tab 1 -- what we'll mark

21 as Defendant's Exhibit 1.

22        (Defendant's Exhibit 1 was marked for

23        identification.)

24        Q.  (By Mr. Miller)  I'm just going to put a

25 sticker on here just so that you don't lose track of

```
 1    it, if that's okay.
 2          A.    I'm fine.
 3          Q.    So we may flip back and forth a little
 4    bit.
 5                MR. DELK:  I'm assuming you guys are
 6          uploading these --
 7                MR. MILLER:  Yes.
 8                MR. DELK:  -- through Exhibit Share as
 9          well?
10                MR. MILLER:  And I believe so.  Has that
11          been introduced?
12                MS. LaROSS:  Sorry.  You're saying?
13                MR. DELK:  I was making sure these are
14          also being uploaded to --
15                MS. LaROSS:  Yeah.  That's --
16                MR. DELK:  -- Exhibit Share.
17                Ms. LaROSS:  Yeah.
18                MR. DELK:  Okay.  Thank you.
19                Ms. LaROSS:  Yeah.
20                It's in, the document.
21          Q.    (By Mr. Miller)  Okay.  Mr. Stone, have
22    you seen this before?
23          A.    Now I probably have seen this before.  I
24    don't recall specifically seeing this, but I am aware
25    of some of these policies and -- and procedures.
```

Page 231

```
 1        Q.    Okay.

 2        A.    Okay.  So --

 3        Q.    You're aware generally of the policies and

 4   procedures?

 5        A.    Yes.

 6        Q.    Okay.  And if you'll look there at

 7   Paragraph 1, it -- it just starts off, "The election

 8   superintendent..."

 9              Do you see that?

10        A.    I do.

11        Q.    And I will represent to you --  You may

12   have awareness of this, but I'll represent to you

13   that election superintendent with respect to these

14   regulations is defined as, in your case, the County

15   Board of Elections.

16              Do you have any reason to doubt me on

17   that?

18        A.    No.

19              MR. DELK:  Object to --

20              THE WITNESS:  That's correct.

21              MR. DELK:  -- the form.

22        Q.    (By Mr. Miller)  Okay.  And you see there,

23   "The election superintendent of the County shall

24   maintain all components of the voting system..."

25              And it goes on to list various pieces
```

1      there in Paragraph 1 -- "... in accordance with the

2      requirements of this rule, the directives of the

3      Secretary of State, and the specifications and

4      requirements of the manufacturer."

5              Do you see that?

6      A.    I do.

7      Q.    Okay.  So generally speaking, you're aware

8      of these procedural safeguards around who has access

9      to certain equipment and how it's stored, right?

10     A.    Yes.

11     Q.    Okay.  But you personally would not be

12     familiar with, say, the specifications and

13     requirements of a manufacturer.  That's --  That's

14     used in paragraph --

15             MR. DELK:  I object to form.

16             MR. CROSS:  Object to the form.

17             THE WITNESS:  I think that's --  I mean, I

18         think that's a fair question.

19     Q.    (By Mr. Miller)  Would that generally be

20     accurate?

21             MR. CROSS:  Objection to form.

22             MR. DELK:  Same.

23             THE WITNESS:  I would think so.  Yes.

24     Q.    (By Mr. Miller)  Okay.  But would it also

25     be accurate that you would rely on the individual

```
 1    employed by the Board --
 2         A.    Yes.
 3         Q.    -- to be familiar with those requirements,
 4    right?
 5         A.    We would --  We would expect that the
 6    person that we hired as the election supervisor with
 7    the terminology being different, superintendent and
 8    supervisor, but the supervisor to maintain all of
 9    the -- the security --
10         Q.    Sure.
11         A.    -- the local security for the -- for the
12    systems and the data.
13         Q.    Okay.  That's fair enough.
14               And, Mr. Stone, when you came on to the
15    Coffee Board of Elections, was Miss Hampton --
16               And I apologize.  I believe her name's
17    changed?
18         A.    Hampton.
19         Q.    Miss Hampton --
20         A.    Uh-huh.
21         Q.    -- was she currently employed when you
22    came on to the Board?
23         A.    She was.
24         Q.    Okay.  Now you talked earlier about the
25    circumstances surrounding her dismissal, right?
```

Page 234

```
 1        A.    I did.

 2        Q.    Okay.  As I understood your testimony, it

 3    was Mr. Rowell who brought the time sheet issue to

 4    the Board's attention; is that accurate?

 5        A.    As I recall --

 6        Q.    Okay.

 7        A.    -- yes.

 8        Q.    And --  And if I say anything wrong --

 9        A.    And then I --

10        Q.    -- please correct me.

11        A.    I can barely remember what I had for

12    breakfast.

13              But yes.  As I recall, yes.  That's the

14    way the -- it came about.

15        Q.    Okay.  So there was no individual Board

16    member that happened to notice it and ask Mr. Rowell

17    to look at this time sheet issue, correct?

18              MR. DELK:  Object to the form.

19              THE WITNESS:  That's correct.

20        Q.    (By Mr. Miller)  Okay.  Mr. Stone, is --

21    is Mr. Rowell still advising the Board of Elections?

22        A.    He is.  To my knowledge, he is.

23        Q.    Okay.  And in that role, he -- he's

24    advising you with respect to the Board's general

25    duties, but not --  For instance, he's not here for
```

```
 1     this deposition, right?
 2               MR. DELK:  Object to the form.
 3               He work --  He and I are with the same
 4          firm, so object to the form.  That's a
 5          misrepresentation.
 6          Q.    (By Mr. Miller)  And, Mr. Stone, let me
 7     clarify what I'm trying to ask here, is that --
 8               Is Mr. Rowell involved in your defense or
 9     response to the subpoenas in this litigation?
10               MR. DELK:  Same objection.
11               You're getting into --
12               THE WITNESS:  Well, I mean --
13               MR. DELK:  -- attorney-client-privileged
14          stuff.
15               THE WITNESS:  -- our --  All of the
16          communication that we had with -- with counsel,
17          he works with them; and so in my opinion, I
18          mean, I'm talking to all of them whenever --
19               I mean, I do --  I'm not a lawyer.  I am
20          assuming that --
21               MR. DELK:  Don't assume.  If you know, you
22          know.  If you don't, you don't.
23               THE WITNESS:  Yeah.
24               MR. DELK:  Do not assume.
25          Q.    (By Mr. Miller)  That's fair enough.
```

1          Mr. Stone, you testified earlier about a

2     video that was posted online of Miss Hampton and

3     adjudicating ballots, right?

4          A.    Yes.

5          Q.    Do you recall that?

6          A.    I do.

7          Q.    And --  And you recall that video

8     generally, right?

9          A.    I do.

10         Q.    Okay.  And would it be accurate to say

11    that that ballot adjudication process only occurs

12    with hand-marked paper ballots?

13              MR. CROSS:  Objection to form.

14              THE WITNESS:  It would be fair to say that

15         that's what we were shown.

16         Q.    (By Mr. Miller)  Okay.  Now I'm going to

17    back up a little bit.  What --  What's your

18    understanding of the purpose of ballot adjudication?

19         A.    A ballot is kicked out of the system for

20    various reasons, if it has a stray mark on it.  If

21    the -- it's not marked correctly, the ballot may be

22    kicked out of the system.

23              Okay.  And then the ballot has to be

24    adjudicated.  In other words, we have to determine

25    the intent of the voter.

Page 237

```
 1              That's my understanding of the
 2      adjudication process.
 3          Q.    Okay.  And you've never --  Strike that.
 4              Have you ever seen a stray mark on a
 5      ballot produced by a ballot-marking device?
 6          A.    By --  By a mallet -- ballot-marking
 7      device?
 8          Q.    A BMD.  The touch screen.
 9          A.    I -- I -- I've never -- I'm not --
10              Not that I recall.  No.
11          Q.    Okay.  And if I recall your testimony
12      correctly, you've said something to the effect of --
13          A.    If --  If a voter votes two people in one
14      race, that ballot gets kicked out.
15          Q.    Right.
16          A.    I mean, that's just another reason for it
17      to get kicked out.  Okay.  So --
18          Q.    Sure.  Okay.  And if I recall your
19      testimony earlier, you testified something to the
20      effect of the adjudication video that Miss Hampton
21      participated in filming and -- and the items around
22      it caused a lack of confidence or concerns that the
23      voting system was insecure.
24              Do you --  Do you recall that testimony?
25          A.    I recall saying --
```

Page 238

```
 1              MR. DELK:  Object to the form.
 2              THE WITNESS:  -- that we knew what was
 3         being provided to us and that it is my testimony
 4         that she provided for the Board ways that the
 5         system could be altered to change an election.
 6         Q.   (By Mr. Miller)  Right.
 7         A.   I mean, we were --  In other words, we
 8    were being made to believe this by her.
 9         Q.   Okay.
10         A.   That --  That's my feeling.
11         Q.   Okay.  That --  That's what understood the
12    testimony.  I was trying to make sure I --
13         A.   Uh-huh.
14         Q.   -- I got the correct understanding --
15         A.   Uh-huh.
16         Q.   -- from that, and that sort of --
17              What she was utilizing to make you believe
18    that, at least in part, was this ballot adjudication
19    process, right?
20              MR. DELK:  Objection to form.
21              THE WITNESS:  Yes.
22         Q.   (By Mr. Miller)  Okay.  Mr. Stone, do you
23    recall who all was on the Board of Elections at the
24    time of your -- or I'm sorry -- as of January 7,
25    2021?
```

1     A.     January 7, 2021.  So that would be --

2     That would be the day that Misty was dismissed.

3            MR. DELK:  No, no, no.

4            THE WITNESS:  20 --

5     Q.     (By Mr. Miller)  Let --  Let me help you

6     here.  So the runoff election for United States

7     Senate occurred on January 5, 2021.

8     A.     Okay.

9     Q.     January 7, two days thereafter, so around

10    the time of certification of the January 5 runoff

11    election --  Are you with me?

12    A.     Yeah.  But the only ones I can

13    specifically name are Ernestine Clark; me, of course;

14    Eric Chaney; and Matthew McCullough.

15    Q.     Okay.

16    A.     Those --  That's all I can --

17    Q.     Now was Mr. Voyles a member of the Board,

18    or am I misunderstanding his -- his role in --

19    A.     Mr. --

20    Q.     -- relation to this?

21    A.     -- Voyles is the immediate past

22    chairperson of the Board of Elections.

23    Q.     But not still on the Board?

24    A.     No.

25    Q.     Okay.

Page 240

```
 1        A.    And please don't ask me when he resigned,
 2   because I cannot recall specifically when he resigned
 3   so --
 4        Q.    Unfortunately, I have to ask you that
 5   question; but I won't ask you specifically.
 6        A.    Okay.
 7        Q.    Generally, do you recall if he resigned,
 8   let's say, before or after the November 2020
 9   election?
10        A.    I don't recall.  I don't recall when he
11   resigned.
12        Q.    Okay.  And I know you spoke earlier about
13   the reasons for Mr. Chaney's resignation.
14              As a representative of the Board, are you
15   aware of the reasons for Mr. Voyles' resignation?
16        A.    My understanding, that he was going to
17   relocate.
18        Q.    Move from Coffee County entirely?
19        A.    Uh-huh.
20        Q.    Okay.  And did that happen?
21        A.    I'm not certain.
22        Q.    Okay.
23        A.    I don't know.
24        Q.    So the individuals that you just listed
25   that were on the Coffee County Board, to the best of
```

```
 1      your recollection, I believe --

 2           A.    Uh-huh.

 3           Q.    -- Mr. Chaney is no longer on the Board,

 4      right?

 5           A.    That's correct.

 6           Q.    Mr. Voyles is no longer on the Board,

 7      right?

 8           A.    That's correct.

 9           Q.    Okay.  I understand Miss Thomas-Clark

10      remains on the Board, right?

11           A.    She does.

12           Q.    Okay.  Who else remains on the Board at

13      this point?

14           A.    Matthew McCollough.

15                 MR. DELK:  In general, or from the ones

16           that were on that list?

17                 MR. MILLER:  That's a fair point.

18           Q.    (By Mr. Miller)  Let me rephrase that.

19           A.    Matthew McCullough.

20           Q.    Okay.

21           A.    Me.  So me, Matthew, Ernestine.  And let's

22      see.  So Eric has resigned from the Board, and we had

23      a new member.  Andy --

24                 I've got a really good memory and -- and

25      the stress of this is causing me to not be able to --
```

Page 242

```
 1              MR. DELK:  He's asking about any --
 2              I believe in reference to January 7th of
 3         '21?
 4              MR. MILLER:  Yeah.  I -- I started to
 5         rephrase and --
 6              MR. DELK:  Okay.
 7         Q.   (By Mr. Miller)  And I think you were
 8    trying to remember the names.
 9         A.   Uh-huh.
10         Q.   So let --  Let me clarify that question.
11         A.   Uh-huh.
12         Q.   Who is currently on the Board right now?
13         A.   Okay.  Andy Thomas is a -- a Board member.
14    Me.  Ernestine.
15              And there's one more person on there.  And
16    it's not Eric.  Matthew.  Matthew McCullough.
17         Q.   Okay.
18         A.   It's a five-member Board.
19         Q.   Right.
20         A.   So when one person --  And Eric has
21    resigned.  I'm -- I'm --  He doesn't want me to
22    assume but --
23              MR. DELK:  But don't assume.
24              THE WITNESS:  The commissioner will --
25         The commissioner will, for that district, will
```

1       appoint someone to fill that seat.

2           Q.    (By Mr. Miller)  Okay.  Nobody's filled

3       the seat yet?

4           A.    To my knowledge, no.

5           Q.    Okay.

6               MR. CROSS:  Carey, the --  He has the

7           November 2020 Board minutes.  I think they may

8           help answer your question, if you want to --

9               MR. MILLER:  Yeah.

10              MR. CROSS:  -- look at them.

11              MR. MILLER:  To be honest, I -- I knew

12          they were introduced, but I didn't want to slow

13          things up to dig back through exhibits.

14              THE WITNESS:  Can I look at yours.

15              MR. MILLER:  And figure out which number

16          it was.

17              MR. DELK:  We have it.

18              MR. CROSS:  Exhibit --

19              MR. DELK:  Exhibit 10.

20              THE WITNESS:  I can look.  Let me see,

21          I've got it up here somewhere.

22              Okay.  What are we doing -- November 2020?

23          Q.    (By Mr. Miller)  Yeah.  Why don't you just

24      go to the last -- most recent Board minutes you've

25      got there.  I think you've got May 3, 2022.

Page 244

1      A.    Okay.  Members present -- Ernestine Clark,

2     Matthew McCullough, Andy Thomas, Wendell Stone.

3            Okay.  Rachel Roberts is listed there as a

4     member, but she's not a member.  She's the -- she's

5     the election supervisor.

6      Q.    Okay.

7      A.    But she was present in that meeting.

8      Q.    Got it.  Okay.

9            MR. CROSS:  Carey, I would suggest you

10           might want to look at the November page on your

11           question.

12                 MR. MILLER:  That was 2020?

13                 MR. CROSS:  Yeah.  Voyles --

14                 THE WITNESS:  November 20 --

15                 MR. CROSS:  -- is listed as a guest.

16                 THE WITNESS:  November 2020?

17     Q.    (By Mr. Miller)  Yeah.

18     A.    All right.  Here's this.

19           Okay.  Ernestine Thomas-Clark, Wendell

20     Stone, Eric Chaney, Matthew McCully -- McCullough,

21     C.T. Peavy.

22           Okay.  So Mr. Peavy was still on the Board

23     at that time, Mr. Travis Peavy.

24     Q.    Okay.  And that's --

25                 MR. DELK:  At the time of November '20,

Page 245

1            just to be clear.  We've bounced around dates,

2            just so the record's clear.

3                  MR. MILLER:  That's fine.

4            Q.    (By Mr. Miller)  And -- and the --

5            A.    Now and when you asked me a few minutes

6       ago, I thought you said November 2021.  I mean, I

7       would never remember that either -- this either, but

8       still --

9            Q.    That's fine.

10           A.    Just to clarify.

11           Q.    I'm glad we're clarified of that.

12                 And -- and truth be told, I --  The large

13      focus was it was unclear to me when you referred to

14      the immediate past chairman, Mr. Voyles --

15           A.    Uh-huh.

16           Q.    -- that that immediate past chairman is in

17      a continuing role on the Board.  You were just

18      referring to he used to be chair.

19           A.    He use to be chair.

20           Q.    He's no longer on the Board?

21           A.    That's correct.

22           Q.    Okay.  Mr. Stone, you were shown a series

23      of pictures from some security footage.

24                 Do you recall that?

25           A.    I do.

```
 1        Q.    Okay.  And to your knowledge, when did the
 2    Board locate that footage?
 3        A.    What was the date on --
 4              MR. DELK:  Object to the form.
 5              THE WITNESS:  -- the footage you're
 6        referring to?
 7        Q.    (By Mr. Miller)  So I'm referring to the
 8    security footage for the front door for which you've
 9    seen various still shots.
10        A.    You're referring to the January 7th.  Is
11    that January 7th right there?
12        Q.    Well, really, I'm referring to all of it,
13    'cause I -- I don't think --
14        A.    Okay.
15        Q.    -- any of the --
16        A.    So when did --
17        Q.    -- the requested footage was located.
18        A.    You're asking me when did the Board --
19    when did --
20              Ask the question again.
21        Q.    So you're aware as part of the subpoena in
22    this case, the Plaintiffs sought security footage for
23    the Elections Office, right?
24        A.    Yes.
25        Q.    Okay.  And, likewise, I think Mr. Cross
```

Page 247

1  showed you documents reflecting an Open Records Act

2  Request from Miss Marks seeking the security footage,

3  right?

4       A.    Yes.

5       Q.    Okay.  And at that time, it's my

6  understanding your testimony was the Board didn't

7  think they had it.  Is that accurate?

8            MR. DELK:  At what time?

9       Q.    (By Mr. Miller)  At the time those

10  requests were made at the time the first subpoena was

11  served.  Do you understand my question?

12       A.    Now I think I sort of understand your

13  question.

14            But if it was beyond 60 days, my

15  understanding is that in 60 days, the video

16  overwrites; and they didn't have immediate access to

17  part of the footage because of that; and that all of

18  this, the footage now comes from the County

19  administration, the IT person, the IT company.  And

20  so that's my understanding for any footage that

21  doesn't exist.

22            Some footage does exist because of an Open

23  Records Request that was submitted by Misty Hampton,

24  and so that's where that footage came from.

25       Q.    Okay.  That footage, that had previously

1    been produced as an Open Records Request --

2        A.    Uh-huh.

3        Q.    -- to Misty Hampton, right?

4        MR. DELK:  Object to the form.

5        THE WITNESS:  As far as I know, yes, sir.

6        Q.    (By Mr. Miller)  Okay.  When was that

7    footage first located?  Do you recall, or do you have

8    any knowledge of that?

9        A.   I don't have any knowledge of that; and I

10   mean, I myself have only viewed that only recently.

11       Q.    Okay.

12       A.   And on behalf of the Board, they have not

13   seen that.

14       Q.    Okay.  Mr. Stone, I'm going to ask you, if

15   you have it there in front of you, to pull up

16   Plaintiff's Exhibit 3.

17       And this is one of the still shots.  The

18   first picture on there is a woman in a red shirt

19   walking towards the door.

20       A.   That would be three.  Woman in a red

21   shirt.

22       Okay.  This one (indicating)?

23       Q.    Yes.  That's it.

24       And if you'll go with me to Page 21 of

25   that exhibit.

Page 249

```
1          A.    Okay.

2          Q.    And you recall looking at this picture and

3    testifying to it of the individual carrying this box

4    out.  Do you recall that?

5          A.    I do.

6          Q.    Okay.  As I recall your testimony at the

7    time, you were asked a series of questions as to

8    whether that box contained a BMD.

9                Do you recall that?

10         A.    I do.

11         Q.    And --  And as I understood it, you've --

12   you were unsure, right?

13         A.    I am unsure.

14         Q.    Okay.  And you're unaware of generally

15   what would be in that box, right?

16               MR. CROSS:  Objection to form.

17               THE WITNESS:  I'm unaware.

18               MR. MILLER:  Okay.  I'm going to introduce

19         another exhibit now.  This is Tab 12, which

20         we'll mark as Defendant's 2.

21               (Defendant's Exhibit 2 was marked for

22         identification.)

23               THE WITNESS:  Okay.

24         Q.    (By Mr. Miller) So if you --  If you'll

25   do me a favor, if you'll keep Plaintiff's 3 in front
```

Page 250

```
 1      of you there, Page 21.  And you see Plaintiff's 3.
 2      There's an individual with a blue-checked shirt
 3      carrying the box out?
 4           A.   That's correct.
 5           Q.   And the time there listed at the top is
 6      January 7, 2021, right?
 7           A.   It is.
 8           Q.   At 7:42:59 p.m., right?
 9           A.   It is.
10           Q.   Okay.  So I'll ask you to look at
11      Defendant's Exhibit 2 that I just handed you.
12           A.   Okay.
13           Q.   You see that individual carrying a box in?
14           A.   I do.
15           Q.   Does that look like the same box to you?
16                MR. CROSS:  Objection to form.
17                THE WITNESS:  I don't know if that's the
18           same box.  It appears to be the same box.
19           Q.   (By Mr. Miller)  Look awfully similar,
20      right?
21           A.   They do.
22           Q.   Okay.  And do you see the time at the top
23      there.  The time and day -- January 7, 2021 12:17
24      p.m., do --
25           A.   I do.
```

Page 251

```
 1          Q.     -- you see that?
 2                 Okay.  And if you'll flip with me to the
 3      next page, and you see this is still 12:17 p.m.,
 4      right?
 5          A.     It is.
 6          Q.     It's a little closer picture of the
 7      individual?
 8          A.     Yes.
 9          Q.     Okay.  And, finally, you can flip to the
10      next page or the third page.
11          A.     (Witness complies with request of
12      counsel.)
13          Q.     And you see this individual walking in the
14      door with a closer photo of that box, right?
15          A.     Yes.
16          Q.     Okay.  And, in fact, if you'll look at
17      Plaintiff's 3, Page 21, the --
18                 So you can hold them up side by side.
19      Might be easiest.
20          A.     This one (indicating)?
21          Q.     Yes.  Yes.
22          A.     Okay.
23          Q.     The second person in that photo is also in
24      the Defendant's Exhibit 2, right?
25          A.     Yes.
```

Page 252

```
 1          Q.     Wearing the same clothes as --  Right?
 2          A.     Yes.
 3          Q.     'Cause it's --  Plaintiff's Exhibit 3 is
 4     later the same day, correct?
 5          A.     Yes.
 6          Q.     Okay.  So having seen that, is it your
 7     understanding these individuals were leaving with the
 8     same equipment they've brought in?
 9               MR. CROSS:  Objection to form.
10          Speculation.
11               THE WITNESS:  And I -- I don't know.  It
12          appears so.
13          Q.     (By Mr. Miller)  Okay.  Mr. Chaney, I'm
14     going to -- I'm sorry.  Mr. Stone.  I apologize.
15               I'm going to shift gears here just a
16     little bit.  If you could go back to your --  I know
17     you've got a pile of papers there but --
18          A.     Uh-huh.
19          Q.     -- Plaintiff's Exhibit 5.
20          A.     Okay.  So what is that?
21          Q.     And that would be a letter that -- from
22     Dominion Voting.  It has Dominion Voting on the top
23     left corner.  I'd show it to you, but I don't --
24               MR. DELK:  It looks like that
25          (indicating).
```

Page 253

1      Q.    (By Mr. Miller) -- have a copy.

2      A.    That's not it.

3            MR. DELK:  No.  It should be a single-page

4      document.

5            Here, look at my copy; and just give it

6      back to me.  Save us a little bit of time maybe.

7            THE WITNESS:  Sorry.  It's probably up

8      here somewhere.

9            MR. DELK:  It's there somewhere.  It's

10     okay.

11           MR. MILLER:  You know, I --

12           MR. DELK:  You can look at that one.

13           MR. CROSS:  Here you go.  You can use that

14     one.

15           MR. DELK:  No.  That's fine.

16           MR. CROSS:  I'll clean up for you.

17           Go ahead.

18     Q.    (By Mr. Miller) So, Mr. Stone, if I

19     recall your testimony correctly, you -- you said you

20     had not seen this particular letter yourself, right?

21     A.    I don't recall seeing it.

22     Q.    Okay.  On a regular basis, as a Board

23     member, do you typically receive notifications or

24     detailed notifications of this nature from Dominion?

25           MR. CROSS:  Objection to form.

1          THE WITNESS:  The detailed notifications

2     would go to the elections supervisor.

3     Q.    (By Mr. Miller)  Okay.

4     A.    And on a regular basis, no.  We don't get,

5     you know, detailed notifications, not as a Board

6     member.

7     Q.    As a Board member, sure.  But your

8     elections supervisor might?

9     A.    Yes.

10    Q.    Is that your understanding that --

11    A.    That is my --

12    Q.    -- the elections supervisor typically

13    would?

14    A.    -- understanding.  Yes.

15          THE COURT REPORTER:  No, no, no.  Let's

16    redo --

17          MR. DELK:  Stop until --

18          THE COURT REPORTER:  -- it, please.

19          MR. DELK:  -- he's done.  Okay.

20    Q.    (By Mr. Miller)  Is that your

21    understanding that the elections supervisor typically

22    would receive those notifications?

23    A.    Yes.

24          MR. CROSS:  Okay.  I'm going to mark

25    another exhibit, Defendant's Exhibit 3.  This

```
                                                       Page 255

 1          is --
 2               (Defendant's Exhibit 3 was marked for
 3          identification.)
 4               MR. DELK:  Let me see that back.
 5               THE WITNESS:  Defendant's Exhibit 3.
 6               Okay.  I don't have this one yet.
 7               MR. MILLER:  If you want a copy, there
 8          they are.
 9          Q.    (By Mr. Miller)  Okay.  And, Mr. Stone,
10     I'll ask you to turn to the last --  Or I say last
11     page.  It's the second page here.
12          A.    Okay.
13          Q.    It says Dominion 89394 down there in the
14     lower corner?
15          A.    Yes.
16          Q.    Okay.  Do you see there where it says,
17     Please see the attached customer notification
18     regarding maintaining a secure chain of custody for
19     your voting system?
20               Do you see that?
21          A.    I do.
22          Q.    Okay.  And do you see the next sentence
23     follows, "Please note, we are sharing this
24     information as a result of the ongoing defamatory
25     action against Dominion and its voting systems,"
```

```
 1    right?

 2          A.    Yes.

 3          Q.    Okay.  As a Board member, are you

 4    generally aware of what that's referring to there,

 5    the ongoing defamatory action against Dominion and

 6    its voting systems?

 7          A.    I am.

 8                MR. DELK:  Object to the form.

 9          Q.    (By Mr. Miller)  Okay.  I --  I'm sorry.

10          A.    I am.

11          Q.    You are?

12          A.    Uh-huh.

13          Q.    Okay.  And what -- what is your general

14    awareness of that?

15          A.    What I've seen in the media.

16          Q.    Okay.  Substantively speaking, these would

17    be allegations of the machines being hacked or

18    intentionally programmed to switch votes, for

19    example.  Is that something of that nature?

20          A.    Well, I don't remember specifically; but

21    I'd say problems with Dominion that I've seen in the

22    media.

23          Q.    Okay.  Fair enough.  So focusing back on

24    the first sentence there that we read just a minute

25    ago, this is referring to the attached customer
```

Page 257

1    notification regarding maintaining a secure chain of

2    custody for your voting system, right?

3         A.    Yes.

4         Q.    All right.  And if you'll look at

5    Plaintiff's Exhibit 5, the -- the letter we were just

6    looking at before, Dominion Voting letter --

7         A.    Uh-huh.

8         Q.    -- and you see this is Customer

9    Notification:  Maintaining a Secure Chain of Custody

10   for Your --

11        A.    Uh-huh.

12        Q.    -- Dominion Voting System, right?

13        A.    Yes.

14        Q.    Okay.  Now as I under --  Strike that.

15              If you'll look back to Defendant's 3, the

16   e-mail chain there and if you'll go to the first page

17   there --

18        A.    Okay.

19        Q.    -- bottom of the first page --

20        A.    Uh-huh.

21        Q.    -- do you see where Ryan Germany

22   @sos.ga.gov --

23        A.    Yes.

24        Q.    -- says, "Thanks Tom."

25              And if you'll look on the to line, do you

1       see tomfeehan@dominionvoting.com?

2           A.      Uh-huh.

3           Q.      Right?

4           A.      I --  Yes.

5           Q.      Okay.  He says, "Did you send this to all

6       the counties in Georgia as well?"  Right?

7           A.      Yes.

8           Q.      Okay.  And in the message above, Tom

9       responds.  "Yes, each CSM (Fran, Scott, and Beau)

10      sent a copy to the counties in their respective

11      regions."

12              Do you see that?

13          A.      Yes.

14          Q.      Okay.  Given this conversation, is it your

15      understanding that your superintendent received this

16      notification?

17          A.      My --

18              MR. DELK:  Object to --

19              THE WITNESS:  -- supervisor?

20              MR. DELK:  -- the form.

21          Q.      (By Mr. Miller)  I'm sorry.  Yeah.  Your

22      elections supervisor.

23          A.      Supervisor.

24              MR. CROSS:  Objection to form.

25          Speculation.

1          THE WITNESS:  I --  I don't know if the
2     supervisor received this or not; but as an
3     Election Board member, I probably would not have
4     gotten this.
5          But yes.  We would expect that the
6     elections supervisor did get it.
7     Q.    (By Mr. Miller)  Okay.
8     A.    But I can't testify that they did get it.
9     Q.    Okay.  Now I -- I may have misheard you
10    earlier.  But towards the end there, I believe that
11    Mr. Brown asked you if you were aware that the
12    Georgia Bureau of Investigation has interviewed
13    individuals related to the incident in Coffee County,
14    right?
15    A.    I'm not aware of any GBI agent
16    investigating any individual or questioning any
17    individual related to this.  I'm not aware of that.
18    Q.    Okay.
19    A.    I mean --  Never mind.
20    Q.    If you're not aware of it, you're not
21    aware of it.
22    A.    I'm not aware of it.
23    Q.    Okay.  Mr. Stone, earlier you testified in
24    sort of general terms about the trust, more or less,
25    that you place in your supervisor to follow the

Page 260

1    applicable rules and regulations?

2         A.    Yes.

3         Q.    Do you recall that?

4         A.    I do.

5         Q.    Okay.  But you also testified that Misty

6    Hampton was eventually dismissed for falsifying her

7    timesheets, right?

8         A.    That's correct.

9         Q.    Okay.  And you testified, in addition,

10   that it wasn't the first time she'd done it either,

11   right?

12              MR. CROSS:  Object.

13              MR. DELK:  Object to the form.

14              MR. CROSS:  Well, what is it?  What did

15        you mean?

16              Sorry.

17              THE WITNESS:  I'm not certain I understand

18        your question.  Is it the first time she

19        falsified her timesheet, or is it the first time

20        she's had a disciplinary action?

21        Q.    (By Mr. Miller)  I'm asking both

22   questions.  First, is it the first time she's

23   falsified her timesheet, to your knowledge?

24        A.    And I'm going to have to say that, I don't

25   know how much evidence.  I don't know how far their

Page 261

1    investigation went back.  It's very likely that, yes,
2    she did falsify her timesheet before.
3          Q.    Okay.
4          A.    What was the second question?
5          Q.    So the second question is we did discuss
6    before she's been subject to disciplinary action --
7          A.    Yes.
8          Q.    -- correct?
9          A.    That is correct.
10         Q.    That was before the most recent falsifying
11   of timesheet issues?
12         A.    Yes.
13         Q.    Okay.  Mr. Stone, was there ever a
14   discussion amongst the Board as to the
15   trustworthiness and reliability of Miss Hampton prior
16   to her dismissal?
17         A.    Trustworthiness.  There was never a
18   discussion about that.  No.
19         Q.    Okay.  Were there any other issues that
20   you're aware of regarding Miss Hampton that came to
21   the Board's attention with respect to her following
22   applicable policies of the Board of Elections or
23   rules and regulations of the State Election Board?
24               MR. DELK:  Object to the form.
25               THE WITNESS:  There was State Election

Page 262

```
1         Board investigation into --

2               Are you referring to the video and to the

3         doors being locked, to security concerns that --

4         Q.    (By Mr. Miller)  So --

5         A.    -- the investigation found and the --

6         Q.    Let me separate this out, 'cause I think

7    it might go a little quicker.

8         A.    Okay.

9         Q.    You've testified earlier to your

10   understanding that in 2017 Miss Hampton allegedly

11   falsified reimbursement receipts --

12        A.    Correct.

13        Q.    -- correct?

14        A.    Yes.

15        Q.    Okay.  Then she was dismissed for

16   falsifying her timesheets, right?

17        A.    That's correct.

18        Q.    Okay.  In between there, she posted a

19   video of herself adjudicating ballots, which you

20   testified led you to believe the voting system was

21   unreliable, right?

22        A.    That's correct.

23        Q.    Okay.  And those issues we talked about,

24   at least the first one was 2017, right?

25        A.    That's correct.
```

Page 263

1        Q.    The adjudication of ballots was sometime

2    shortly after the November 2020 election, right?

3        A.    That's correct.

4        Q.    And the Board continued to employ her,

5    right?

6        A.    That's correct.

7        Q.    You didn't have any discussion about

8    whether Miss Hampton was the right person for the

9    job?

10        A.    We didn't.

11        Q.    Did any Board member raise that issue?

12        A.    In respect to what?

13        In respect to the video or just the

14    ongoing situation with Misty?

15        And -- And the answer to your question is

16    no.  I don't recall that happening at all.

17        Q.    Okay.  And, Mr. Stone, just so I -- I have

18    this accurately, you've not spoken to Mr. Chaney

19    since his resignation, right?

20        A.    I have not.

21        Q.    Okay.  And at no point prior to this --

22    his resignation did he inform the Board of his role

23    with respect to the events on January 7 of 2021,

24    correct?

25        A.    He did not.  That's correct.

Page 264

1           MR. CROSS:  So did you say I did not?

2           THE WITNESS:  He did not.

3           MR. CROSS:  Oh, okay.  Thanks.

4      Q.   (By Mr. Miller)  And, Mr. Stone, at no

5    point before today, were you aware of Mr. Voyles'

6    involvement in events of January 7, 2021; is that

7    accurate?

8           MR. DELK:  Objection to the form.

9           MR. CROSS:  Form.

10          THE WITNESS:  All right.  That's accurate.

11          MR. MILLER:  Okay.  Okay.  All right.  We

12      can take just a five-minute break here.

13          THE VIDEOGRAPHER:  The time is 3:36 p.m.

14      We are off video record.

15          (Recess from 3:36 p.m. to 3:44 p.m.

16          THE VIDEOGRAPHER:  The time 3:44 p.m.  We

17      are back on video record.

18      Q.   (By Mr. Miller)  All right.  Mr. Stone, if

19    you could pull up Plaintiff's Exhibit 15.

20          Do you have that in front of you?

21      A.   (Indicating).

22      Q.   Okay.  If you would go to the

23    second-to-last page towards the bottom.

24      A.   (Witness complies with request of

25    counsel.)

```
 1        Q.    And --  And just so that we're on the same
 2   page here, Mr. Cross asked you about the -- a -- the
 3   new lawsuit mentioned in this text message from
 4   Matthew McCullough, right?
 5        A.    Yes.
 6        Q.    Okay.  And as I recall, at the time,
 7   you -- you were unaware as to which lawsuit that may
 8   be, right?
 9        A.    Yes.
10        Q.    Okay.  And since we began this deposition,
11   you haven't in any way had your recollection
12   refreshed as to which lawsuit that may be?
13        A.    I do not recall.
14        Q.    Okay.  Mr. Stone, are you aware that --
15   Let me back up.
16              Do you recall Mr. Cross asking about an
17   individual named Benjamin Cotton?
18        A.    I do.
19        Q.    Okay.  And that Mr. Cotton viewed data
20   from Coffee County, do you recall that conversation?
21        A.    I do.
22        Q.    Okay.  So I'll represent to you that Mr.
23   Cotton testified he did so in relation to a
24   whistleblower lawsuit on behalf of Misty Hampton.
25              Are you aware of any such whistleblower
```

Page 266

```
 1    lawsuit?

 2         A.    I'm not.

 3         Q.    Okay.  Are you aware of any anticipated

 4    litigation concerning Misty Hampton?

 5         A.    I am not.

 6               MR. DELK:  Object to the form.

 7         Q.    (By Mr. Miller)  And let me clarify that.

 8    It's a fair objection.

 9               Are you aware of any anticipated

10    litigation concerning the termination of Misty

11    Hampton?

12         A.    I'm not aware of that.  No.

13               MR. MILLER:  Okay.  All right.  Mr. Stone,

14         with that -- that -- that's all I have.

15               MR. CROSS:  Mr. Stone, I just have a few

16         follow-up questions.

17               THE WITNESS:  Sure.

18         RECROSS-EXAMINATION

19         BY MR. CROSS:

20         Q.    Mr. Miller asked you some questions about

21    the -- the video that was online on YouTube we talked

22    about earlier that was filmed during a Board meeting

23    in November of 2020.

24               You remember that?

25         A.    I do.
```

Page 267

1      Q.    Were there any other videos that were made

2   in the Elections Office during a Board meeting, to

3   your knowledge?

4            MR. DELK:  So we're clear, aside from that

5       date of the video you're referencing?

6      Q.    (By Mr. Cross)  Well, right now, I'm just

7   saying any other videos --  Could have been the same

8   day.  But any other videos beyond the one that was

9   put online?

10     A.    Oh.  Were there any other videos

11  besides --  I don't recall any videos that were made

12  besides that one.

13     Q.    Okay.  All right.  Grab Exhibit 14, which

14  is the long text thread between Mr. Chaney and Miss

15  Hampton.  It looks like this on the cover

16  (indicating).

17     A.    This?

18     Q.    That is probably it.

19            Yeah.  And you can flip the Page 13, if

20  you would.

21     A.    Okay.

22     Q.    And the question I have for you before you

23  look at that is Mr. Miller asked you about the

24  adjudication process and ballots with stray marks on

25  them --

1          A.     Uh-huh.

2          Q.     -- that might trigger that process.

3                 Do you remember questions along those

4     lines?

5          A.     Yes, sir.

6          Q.     And he suggested to you that that would

7     only happen with hand-marked paper ballots.

8                 Do you remember that question?

9          A.     Yes.

10         Q.     Okay.  Take a look at this Page 13 of this

11    text thread between Miss Hampton and Mr. Chaney.

12         A.     Okay.

13         Q.     And if you look here, you'll see there's a

14    date of November 13, 2020 at 2:25 p.m.

15                Do you see that?

16         A.     I do.

17         Q.     And then there's a screen shot of a

18    ballot.  Do you see that?

19         A.     Yes.

20         Q.     And below that, when Ms. Hampton sends

21    this -- this ballot to Mr. Chaney, she writes, "Why

22    does this one have two QR codes?"

23                And then Mr. Chaney responds, "Wow.

24    Crazy."

25                Do you see that?

1        A.    Yes.

2        Q.    Did Miss Hampton or Mr. Chaney ever raise

3  with the Board that the BMD system used in the state

4  sometimes generates ballots with multiple QR codes?

5        A.    I don't recall that discussion.

6        Q.    All right.  Do you know what would happen

7  if -- if a --

8             If a voter were to receive a ballot with

9  multiple QR codes, do you know if that ballot would

10  be tabulated, or what would happen with it?

11       A.    I don't know.

12       Q.    All right.  Grab Exhibit 5, which is that

13  Dominion letter that you had just a moment ago.

14             And if you've got it, you can grab

15  exhibit -- the Defense Exhibit 3.  You can grab both

16  of them, if you've got them handy.

17          MR. DELK:  Yeah.  Grab this.

18          THE WITNESS:  Okay.  This letter right

19     here.

20          MR. DELK:  And this.

21          THE WITNESS:  This.

22          And Defense 3.

23          MR. DELK:  Yeah.

24          MR. CROSS:  It must be in the other stack.

25     Sorry.

1          THE WITNESS:  Must be in here.

2          MR. MILLER:  There's a couple.  It's the

3     e-mail list.

4          MR. CROSS:  Yeah.

5          MR. DELK:  Is that the one with Ryan

6     Germany --

7          MR. CROSS:  Yeah.

8          MR. DELK:  -- on top?

9          Just take my copy.

10     Q.    (By Mr. Cross)  So just a couple quick

11     questions on this.  Mr. Miller asked you some

12     questions about whether in the ordinary course, you

13     know, sort of typical notice that would come from the

14     State or Dominion regarding the voting system,

15     whether that would go to the elections supervisor,

16     instead of the Board of Elections.

17          Do you remember that?

18     A.    I do.

19     Q.    Okay.  Looking back again at Exhibit 5,

20     this customer notification from May 6 of 2021, the

21     one in front of you, what this concerns is an alert

22     from Dominion, as we looked at before, that -- that

23     customers, namely, jurisdictions like Coffee County

24     that use the Dominion system were being approached

25     with offers to request to conduct a forensic audit of

1     their voting equipment.

2              Do you see that?

3         A.    Yes.

4         Q.    Fair to say that is not at all a typical

5     alert, right?

6         A.    I think that's fair to say.

7         Q.    Now if you look at D-3, which is this

8     e-mail thread that -- that relates to this customer

9     notification and you look at the second page, Mr.

10    Miller directed you to this portion about -- from Tom

11    Feehan, to individuals at the Secretary of State's

12    Office.

13             And it says, "Please see the attached

14    customer notification regarding maintaining a secure

15    chain of custody for your voting system."

16             And that's the same heading on Exhibit 5.

17             Do you see that?

18        A.    Yes.

19        Q.    Okay.  And you understand, as a member

20    of -- as -- as the Board of Elections that it is, in

21    fact, important to maintain a secure chain of custody

22    for the Dominion Voting system, right?

23        A.    Yes.

24        Q.    All right.  Why is that important?

25        A.    Well, I mean, to keep it secure.

1       Q.    Yeah.  And we talked about earlier that

2    the Secretary of State's Office came in and took the

3    EMS server and the ICC in the summer of 2021 in

4    Coffee County.

5            Do you recall that?

6       A.    Uh-huh.

7       Q.    Yes?

8       A.    Yes.

9       Q.    Okay.  Were you aware that Coffee County

10   has told us it does not have a single piece of paper,

11   not any documentation regarding replacing that

12   equipment?  Are you aware of that?

13      A.    I'm not aware of that.

14      Q.    Okay.  Are you aware that the State has

15   told us and the Court it also does not have a single

16   piece of paper regarding replacing the ICC or the EMS

17   server other than a generic L&A test document that it

18   claims was for the new server?

19         MR. MILLER:  Object to the form.

20         THE WITNESS:  I'm not aware of that.

21      Q.    (By Mr. Cross)  Are you aware that neither

22   the County nor the State has produced a single chain

23   of document -- chain of custody document to us

24   showing when the EMS server, ICC was replaced; how it

25   was replaced; who replaced it; and what the chain of

Page 273

1      custody was from the State to the County?

2                 MR. DELK:  Object to the form.

3                 THE WITNESS:  I'm not aware of that.

4           Q.    (By Mr. Cross)  All right.  Well, can you

5      grab this D-2, picture of the guy walking in with the

6      equipment; and grab our Exhibit 3.  I was going to

7      ask you just a couple questions.  So hang on to this.

8                 And then the one with --  I think it's the

9      one with Jil Ridlehoover.

10          A.    It's Jil -- the ridge --

11          Q.    Right.

12          A.    It may be on the bottom, actually.

13          Q.    Sure.  And now look --

14          A.    Let's see.

15          Q.    I think it may be in there.  Is there some

16     on the bottom?  Sorry.  I think it may be this one.

17     Yes.

18          A.    Okay.  So this one and this one.

19          Q.    Yeah.  So flip to Page 21 of our Exhibit

20     3, which Mr. Miller asked you about.

21          A.    Okay.

22          Q.    And flip to the third page of his Defense

23     Exhibit 2, and just put those side by side for a

24     moment.

25                All right.  Now he suggested to you that

Page 274

1      these are the same equipment maybe, maybe not.  Let's
2      see if we can look at that for a moment.
3               If you look at Defense Exhibit 2, so the
4      picture where he's coming in the door with the box --
5           A.    Yes.
6           Q.    -- you see how it's it has these little
7      indentions in it?
8           A.    Yes.
9           Q.    If you look at Page 21 of our Exhibit 3,
10     you see how the box he's rolling out is smooth.
11     There are no indentions on it?
12          A.    Yes.
13          Q.    Okay.  Suffice to say, as you sit here,
14     you just don't know one way or the other whether this
15     man took out the same box that he took in; is that
16     fair?
17          A.    That's fair.
18          Q.    And you also have no idea what might have
19     been in that box when he left, right?
20          A.    I have no idea.
21          Q.    And you don't know what might have been in
22     that box when he came in?
23          A.    That's correct.
24          Q.    So as you sit here, you have no idea, for
25     example, whether there's a BMD inside that box?

Page 275

```
 1          A.    I have no idea.

 2          Q.    Okay.  Well, and sorry.  One just

 3    clarifying thing.  At the end of your examination

 4    with Mr. Miller, he asked you if you were aware

 5    before your testimony today that Mr. -- of Mr.

 6    Voyles' involvement in the events of January 7, 2021

 7    in the Elections Office; and you said, no, not before

 8    your testimony; but you --

 9          I had understood you reviewed video that

10    was produced to us from the day of January 7, 2021

11    before your testimony, right?

12          A.    The video that I looked at yesterday?

13          Q.    Yes.

14          A.    Yeah.

15          Q.    Okay.

16          A.    I mean, I thought he meant and, you know,

17    now.

18          Q.    Right.  And I -- I'm not -- I --  I just

19    want to make sure we understand --

20          A.    Uh-huh.

21          Q.    -- sort of chronology -- chronology of

22    what you learned when.

23          Before your deposition today, you

24    reviewed -- and -- And I don't want to get into any

25    communications with counsel.
```

```
 1            So all I'm asking you is:  Before your
 2       deposition today, you reviewed video that was
 3       produced to us by the County for the day January 7,
 4       2021?
 5            A.   Yes.
 6            Q.   Okay.  When you reviewed that, whenever
 7       that was, did you see at that time that Mr. Voyles
 8       was -- was coming and going from the office with
 9       these individuals who were let in that day?
10            A.   Yes.
11            MR. CROSS:  Okay.  All right.
12            Okay.  I --  I don't have any further
13       questions.
14            The one thing I did neglect to mention
15       earlier is we get asked about attachments to
16       e-mails.  Miss Herzog was going to get us those.
17            MR. DELK:  I think she's still working on
18       it.
19            MR. CROSS:  Okay.
20            MR. DELK:  I'd have to defer to Jennifer
21       on that.
22            MR. CROSS:  Okay.  All right.
23            MR. DELK:  But, by all means, follow up;
24       and we'll --
25            MR. CROSS:  Okay.
```

Page 277

1          MR. DELK:  -- see about it.

2          MR. CROSS:  All right.  Yeah.  Like I said

3     before, we'll reserve on some of the issues we

4     raised today on keeping the deposition open, but

5     we'll talk about that off the record.

6          THE VIDEOGRAPHER:  Anybody else have any

7     questions?

8          MR. MILLER:  Just a couple.

9          MR. BROWN:  No.

10         MR. MILLER:  Very short.

11         Bruce, can go ahead.

12         MR. CROSS:  Bruce, did you say no?

13         MR. BROWN:  I said no.

14         MR. CROSS:  Okay.

15         MR. BROWN:  But that will be Carey.

16         MR. CROSS:  Go ahead, Carey.

17    RECROSS-EXAMINATION

18    BY MR. MILLER:

19         Q.   Mr. Stone, just real briefly, Plaintiff's

20    Exhibit 14, I think you have that in front of you, or

21    just looked at it a second --

22         A.   Which --

23         Q.   -- ago.

24         A.   Which one is 14?

25         Q.   Those are the text messages?

Page 278

1        MR. DELK:  That's the big set of text

2   messages.

3        Q.    (By Mr. Miller)  Yeah.

4        A.    This right here (indicating)?

5        Q.    And if you recall, Mr. Cross represented

6   to you these were text message between Misty Hampton

7   and Eric Chaney, right?

8        A.    Yes.

9        Q.    Okay.  You were never on these text

10  messages, right?

11       A.    No.

12       Q.    Okay.  You've never seen this document

13  before today, right?

14       A.    I've never.

15       Q.    Okay.  And the picture that Mr. Cross

16  showed you, that came from Misty Hampton, correct?

17            MR. DELK:  Which picture.

18            THE WITNESS:  The picture --

19       Q.    (By Mr. Miller)  Let's go to the page.

20  And I could not recall off the top of my head.  With

21  the ballot --

22            MR. CROSS:  He's talking about --

23            THE WITNESS.  This (indicating)?

24       Q.    (By Mr. Miller)  If you'll turn to Page

25  13.  No, no.  With the same --

Page 279

1          MR. DELK:  The text message thing.

2          THE WITNESS:  Oh.  Oh.

3     Q.   (By Mr. Miller)  Plaintiff's Exhibit 14,

4     Page 13.

5     A.   Oh, Page 13.  Okay.  This (indicating).

6     Q.   That picture?

7     A.   The picture of the ballot?

8     Q.   Yes.

9     A.   Oh.

10    Q.   And I believe you and Mr. Cross discussed

11    this.  But you understand that the green messages --

12    Since this was obtained from Miss Hampton's phone,

13    green messages are --

14    A.   Misty.

15    Q.   -- coming from Miss Hampton now?

16    A.   Yes.

17    Q.   Gray coming in from --

18    A.   Yes.

19    Q.   -- Mr. Chaney?

20         Okay.

21    A.   I say yes.  That came from Misty.

22    Q.   That picture came from Misty?

23    A.   Those pictures came from Misty.

24    Q.   Right.  The same Misty that falsified her

25    timesheets, right?

Page 280

```
 1          A.     That's correct.
 2          Q.     And the same Misty that falsified receipts
 3    for reimbursement, right?
 4          A.     That's correct.
 5          Q.     The same Misty that filmed this
 6    adjudication video that encouraged your lack of
 7    confidence in the voting system, right?
 8          A.     That's correct.
 9          Q.     Okay.  Mr. Stone, you were asked about
10    pictures of a large black box.  You had a defense
11    exhibit in front of you and one of the Plaintiff's
12    Exhibits in front of you, right?
13          A.     Yes.
14          Q.     Mr. Cross was pointing out indentions or
15    lack thereof that may or may not exist on that box.
16    Do you recall that?
17          A.     I do.
18          Q.     Okay.  All right.  Are you --  Do you have
19    any training in identifying objects like that?
20          A.     I don't.
21          Q.     Okay.  Mr. Stone, since the incident on
22    January 7th and the replacement of the EMS server,
23    Coffee County has conducted elections, correct?
24          A.     We have.
25          Q.     Okay.  And you've certified the results of
```

Page 281

1     all those elections, right?

2          A.    Yes.

3          Q.    Okay.  Have you had any issues similar to

4     those which arose with Miss Hampton that prevented

5     you from certifying the November 2020 election?

6               MR. CROSS:  Objection to form.

7               What issues?

8               THE WITNESS:  Okay.  Ask the question

9          again.

10         Q.    (By Mr. Miller)  Let me do a backup

11    question.  So in November of 2020, there was some

12    consternation amongst the Board over certifying the

13    election results, right?

14         A.    Yes.

15         Q.    Okay.  You recall that situation?

16         A.    I do recall that.  Yes.

17         Q.    Okay.  My question to you is:  Has any

18    issue arisen in the elections conducted after the

19    replacement of the EMS server that caused similar

20    consternation of the Board?

21         A.    No.

22         Q.    Okay.  And, Mr. Stone, are you aware that

23    Mr. James Barnes testified the issues around the

24    November 2020 election were the result of Miss

25    Hampton not cleaning the scanner as directed by

Page 282

1      Dominion documentation?

2              A.    I --

3                    MR. CROSBY:  Objection to form.

4                    THE WITNESS:  I was aware --

5                    MR. CROSS:  That misstates the record.  He

6          wasn't even there.

7                    THE WITNESS:  I --  I was aware that he

8          mentioned that.

9              Q.    (By Mr. Miller)  That he had come to that

10     that conclusion?

11                   MR. CROSS:  Objection to form.

12                   THE WITNESS:  I was aware of that.

13                   MR. MILLER:  Okay.  That's all I have.

14                   Thank you, Mr. Stone.

15                   THE WITNESS:  Well --

16                   MR. DELK:  And we will read and sign.

17                   THE VIDEOGRAPHER:  The time is 4:03 p.m.

18         This concludes the videotape deposition for

19         today.  We are off video record.

20                   (Whereupon, the deposition was concluded

21         at 4:03 p.m.)

22

23

24

25

Page 283

1                    C E R T I F I C A T E

2

3

4        STATE OF GEORGIA:

5        County OF FULTON:

6

7              I hereby certify the foregoing transcript

8        was taken down, as stated in the caption, and

9        the questions and answers thereto were reduced

10       to typewriting under my direction; that the

11       foregoing pages 1 through 282 represent a true,

12       complete, and correct transcript of the evidence

13       given upon said hearing, and I further certify

14       that I am not of kin or counsel to the parties

15       in the case; am not in the regular employ of

16       counsel for any of said parties; nor am I in

17       anywise interested in the result of said case.

18             This, the 6th day of September, 2022.

19

20                    *S. Julie Friedman*

                 S. JULIE FRIEDMAN, CCR-B-1476

21

22

23

24

25

Page 284

1                    VERITEXT LEGAL SOLUTIONS
2
                  FIRM CERTIFICATE AND DISCLOSURE
3
4
     Veritext represents that the foregoing transcript as
5    produced by our Production Coordinators, Georgia
     Certified Notaries, is a true, correct and complete
6    transcript of the colloquies, questions and answers
     as submitted by the certified court reporter in this
7    case.  Veritext further represents that the attached
     exhibits, if any, are true, correct and complete
8    copy as submitted by the certified reporter,
     attorneys or witness in this case; and that the
9    exhibits were handled and produced exclusively
     through our Production Coordinators, Georgia
10   Certified Notaries.  Copies of notarized production
     certificates related to this proceeding are available
11   upon request to litsup-ga@veritext.com.
12   Veritext is not taking this deposition
     under any relationship that is prohibited by
13   OCGA 15-14-37(a)and(b).  Case-specific discounts are
     automatically applied to all parties, at such time as
14   any party receives a discount.  Ancillary services
     such as calendar and financial reports are available
15   to all parties upon request.
16
17
18
19
20
21
22
23
24
25

Page 285

1    Stephen Delk, Esquire

2    sdelk@hallboothsmith.com

3

4    RE:    Curling, Donna  v. Raffensperger, Brad

5         9/1/2022, Wendell Stone (#5420909)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                  Yours,

23                  Veritext Legal Solutions

24

25

Page 286

1    Curling, Donna  v. Raffensperger, Brad

2    Wendell Stone (#5420909)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____     _____

24   Wendell Stone                              Date

25

Page 287

1    Curling, Donna  v. Raffensperger, Brad

2    CC Bd. of Elections Wendell Stone (#5420909)

3              ACKNOWLEDGEMENT OF DEPONENT

4        I, Wendell Stone, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____   _____

12   Wendell Stone                        Date

13   *If notary is required

14                     SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                     _____ DAY OF _____, 20___.

16

17

18                     _____

19                     NOTARY PUBLIC

20

21

22

23

24

25

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.