IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

| | |
|---|---|
| COALITION FOR GOOD GOVERNANCE and DONNA CURLING,<br><br>Plaintiffs,<br><br>v.<br><br>COFFEE COUNTY BOARD OF ELECTIONS AND REGISTRATION,<br><br>Defendant. | Civil Action No. 5:23-mc-00001-LGW-BWC<br><br>In RE Subpoenas issued by the United States District Court For the Northern District of Georgia, Atlanta Division, Civil Action File No. 1:17-CV-2989-AT |

**PLAINTIFF CGG'S RESPONSE
TO CCBOER'S SURREPLY BRIEF (DOC. 78)**

## I.    Proven Allegations of a Pattern of Misconduct

Adopting the apparent strategy that "a good offense is the best defense," Defendant CBOER attacks Plaintiff claiming it "demands" the court make unreasonable inferences and adopt baseless presumptions in its Reply.  CGG and its counsel know better than to "demand" anything of a court, and CCBOER and its counsel's self-serving skepticism notwithstanding, the facts speak for themselves and reflect a pattern of conduct that individually and taken together, evidence a concerted effort over more than three years by CCBOER to conceal evidence and thwart

discovery related to the largest voting system breach in the nation's history. In doing so and in "running the clock out" in these proceedings, CCBOER and HBS have withheld or not timely produced many relevant documents, prejudicing Plaintiff CGG's pursuit of its claims in the *Curling* case. Without the imposition of sanctions, CCBOER and HBS's concealing of damning records through their violations of law and federal court rules will be effectively successful and rewarded.

CCBOER offers six bullet points containing conclusions Plaintiff has drawn from undisputed facts and events. (Doc. 78, p. 1-2) For example, CCBOER's second bullet point on Plaintiff's conclusion: "The only logical explanation for such an act [turning over Hampton's desktop without making a copy for CCBOER's access and use as required by law] is to render CCBOER unable to produce documents it preferred never be seen." While CCBOER claims Plaintiff cites no evidence for this claim (or the other bullet points), in drawing the conclusion, Plaintiff cited to the fact that CCBOER turned over control and possession of Hampton's desktop to the GBI without keeping copies of all its official records as it was legally required to do, and after being given an opportunity to do so by the GBI. That is undisputed.

CGG noted in its Reply that "CCBOER has never even attempted to justify the complete surrender of the desktop to the GBI, keeping no copies of highly relevant records, containing evidence of crimes under investigation." Although CCBOER attacks the inferences CGG draws from this conduct as being unsupported by evidence, and although these facts are not disputed, remarkably, CCBOER then fails to respond to the argument at all. (Doc. 78, p. 2) *They remain undisputed.*

All the bullet points CCBOER and HBS challenge as being unsupported by evidence are supported by clear evidence of a pattern of conduct that is difficult, if not impossible, to explain in any way other than Plaintiff has explained it. It was repetitive, intentional, and designed to thwart discovery. A privilege log does not go from 3 ½ pages to more than 300 pages by accident or without contemplation. Intent explains all of the issues CGG identifies in its Motion for Sanctions and related filings (Docs. 60, 69, 70, and 75).

CCBOER is correct that Ms. Marks' declaration regarding her conversation with GBI Special Agent Chris Baldwin is hearsay.  It is hearsay because CCBOER has successfully objected to Plaintiff's efforts

to depose witnesses in connection with the proceeding. [1] So, Agent Baldwin is unavailable to Plaintiff.  While this situation is not one of the conditions that give rise to a finding of unavailability under Rule 804, it may be sufficiently analogous for the Court to give the declaration some weight, particularly in the face of no contrary evidence.[2] The same is true regarding Ms. Marks' declaration regarding Tabitha Paulk telling her that Ms. Paulk obtained the security video through an ORR in April 2021 after a February or March 2021 request.  (Doc. 78. p. 3) This, of course, leaves unanswered Ms. Marks' non-hearsay testimony that she viewed the video Paulk obtained. There is, of course, only one place Ms. Paulk could have obtained that video in April 2021. And, if Ms. Paulk did not receive the video in April 2021 in response to an ORR as indicated in the

---

[1] At CCBOER's urging, the Court did not permit Plaintiff to depose Coffee County officials and CCBOER's management concerning the whereabouts of the laptop used by Ms. Hampton in her official duties.

[2] Plaintiff only offered the declaration testimony on this point because CCBOER scoffed at the notion that the security videos were suddenly available when the GBI started asking for them.  Of course, lying to the GBI about evidence can result in far greater penalties than a monetary sanction for thwarting discovery. CCBOER does not refute that the insistence of the GBI to produce the video records was the reason for their sudden availability. Likewise, the CCBOER offered no documentation of the IT consultant's long-delayed discovery of the video and communication of discovery to CCBOER.

County's official records, CCBOER would be in a unique position to prove that assertion incorrect, but it has not.

## II.    <u>The Privilege Logs</u>

### A.    The 2022 log

CCBOER's duplicity is put on vivid display with respect to the manner in which it has asserted privilege. As CCBOER contends, Plaintiff claimed CCBOER's responses to the Curling and CCG subpoenas led the parties to believe since August 2022 that "virtually all responsive documents were in fact produced." CCBOER denies that it and Hall Booth Smith ("HBS") ever made such a representation. (Doc. 78, p. 4) As much as counsel may blanche at the conclusion: ***that is just false.*** The CGG subpoena had 49 categories of requested documents, and the Curling subpoena had 16. This is the breakdown of responses:

| Response | CGG Subpoena | Curling Subpoena |
|---|---|---|
| None | 17 | 9 |
| All documents have already been produced | 14 | 4 |
| Objection: Privilege/Work Product, but documents have already been produced | 8 | 1 |
| Objection: Privilege/Work Product, but documents no such documents exist | 1 | 1 |
| Vague and Overbroad | 4 | 0 |
| Attaching or Will Produce | 2 | 1 |
| Working on it | 2 | 0 |

| Kitchen sink including Privilege, but we are working on it and many documents have already been produced | 1 | 0 |
|---|---|---|

For the CGG subpoena, CCBOER claimed it had no responsive documents for roughly 35% of the requests. For the Curling subpoena, the number was 56%. Of the remaining requests (32 for CGG and 7 for Curling), CCBOER claimed it had produced or would produce the requested documents for 84% of the CGG requests and 100% of the Curling requests.

Displaying more sleight of hand, CCBOER argues it objected to over one-quarter of CGG's document requests on privilege and work product grounds. But CCBOER deceptively does not mention that each and every one of those objections is followed by language purporting to preserve the objection and claiming that "CCBOE has *no additional documents* outside of what has previously been provided to Marilyn Marks or Plaintiff's counsel or attached as Exhibits to the depositions of Eric Chaney and/or Jill Ridlehoover." (Doc. 75-2) In short, CCBOER's claims that it did not represent that the vast majority of existing documents had been produced is bold and blatant dishonesty. Given those August 2022 representations, when the January 2024 privilege log with 2,700

unidentified documents was produced, Plaintiffs were understandably shocked and, (during trial), unprepared to analyze the details of this non-compliant massive list of previously unknown exceptions to the August 2022 representations.

CCBOER continues to insist its decision to offer a non-compliant privilege log that this Court has already found to be unreasonable and inappropriate was proper. (Doc. 78, p. 5) And CCBOER does not address the fact that the categorical format of the log was not the only defect identified by the Court. Plaintiff quoted the Court's order rejecting the original privilege log in its Reply, and CCBOER simply ignores the Court's critique. (Doc. 41, pp. 13-4) The Court's decision was correct, and reasonable people would agree that a generalized 3 ½ page log cannot possibly enable a party to challenge privilege objections when a 498-plus page log (which remains deficient) is needed just to list the withheld documents, without even describing them.

And CCBOER continues to argue that Plaintiff's challenge to the privilege log is untimely, although the Court has already rejected that argument in its Order of April 25, 2024. (Doc. 78 p. 6)

**B.    The 2024 logs**

Plaintiff has repeatedly explained its reasons for being unable to perform a thorough examination of the 301-page privilege log served on January 3, 2024, which became a 498-page still non-compliant privilege log on January 17, 2024. CCBOER had effectively run out the clock. By January 3, the CGG team was fully absorbed in preparation for the trial this entire controversy is about.

The Court ultimately gave Plaintiff until January 29, 2024, to make objections to the log of 498 pages produced January 17 but, to Plaintiff's surprise, the trial was still ongoing at that time. However, the fact that Plaintiff could not raise all the objections that would have been made to the 2024 2,700 line privilege logs had there been adequate time is not relevant to the Sanctions Motion.  The appropriate inquiry in connection with the Sanctions Motion is whether CCBOER violated the standards for a proper privilege log on its first attempt—and the Court has held that it did—and whether it complied with the Court's instructions in preparing the 2024 logs, and clearly it did not. The Sanctions Motion seeks sanctions first for the 2022 log and secondarily for the late-produced January 17, 2024 log.

The January 3, 2024 log (later substantially revised on January 17) is deficient as well, as was pointed out in the Reply; it contained no descriptions of the listed documents other than the nature of the privilege asserted. As noted in the Reply, there were over 850 email attachments listed in the log, but the attachments are not described with identification of authors, recipients, subject, or date. The Surreply offers no explanation for CCBOER's failure to comply with the Court's order in which the requirements and rationale for the details of a privilege log are explained. (Doc. 41 at 12-15)

Also, as is noted in the Reply, the logs end on July 25, 2022, although the original log recorded documents through August 26 and noted that privileged communications were "ongoing." (Doc. 75, p. 6; Doc. 29-2) A July 25, 2022 cut-off date excluded the month of activity between July 25 and August 26.  Again, the Surreply offers no explanation.

On January 17, 2024, during the *Curling* trial, CCBOER served a new 498-page log also with a July 25, 2022 cut-off, changing the recipient list for dozens of emails but still excluding document descriptions, subject matter, identification of authors, and dates of creation.  Plaintiff's Reply also catalogues a variety of issues regarding

9

material differences between the January 3 log and the January 17 log. The Surreply is stunning in its silent inattention to Plaintiff's critique.

In short, *all* CCBOER's privilege logs are wholly inadequate, incomplete, non-compliant, and inconsistent with August 2022 representations of minimal withheld documents made by CCBOER counsel, in ways that prejudiced Plaintiff in the *Curling* case. (See Doc.75-12)

## III.   **The Video Recordings**

### A.    **Rule 26**

HBS seeks to immunize itself from sanctions by arguing it relied on information from CCBOER's IT consultant that the "security video system overwrites previously recorded footage after a certain number of days to accommodate data storage capacity." (Doc. 78, p. 9) "A certain number of days" has been more precisely defined elsewhere by CCBOER as every 60 days.[3] Precision is important here because HBS's excuse does not survive precision. Election Office Security video was ultimately

---

[3] CCBOER Rule 30(b)(6) witness Wendell Stone testified the standard preservation period before overwriting videos was 60 days. *See* Doc. 75-5 Exhibit "E," Tr. 17:19-18:4; 21:5-10; 246:21-24, attached to CGG's Reply. (Doc. 75) The Surreply does not address this fact.

produced to Plaintiffs covering the period November 15, 2020, through February 26, 2021, a period of 103 days.[4] HBS knew of the existence of video covering this period, which included all of known January 2021 breaches of the elections system, because Tony Rowell of HBS conducted a meeting of CCBOER on February 25, 2021, at which he made the same videos available to the Board in considering the termination of Misty Hampton.

The alternating availability and unavailability of the video security records as detailed in the Video Timeline attached hereto as **Exhibit "1"** undercuts the credibility of HBS's representations. CCBOER used the videos well after the 60-day overwriting period to justify the termination of Misty Hampton in late February 2021.  Given that the videos were the linchpin evidence to support Hampton's termination, surely HBS would not have allowed their clients, Coffee County and CCBOER, to destroy the videos after the termination.

On March 12, 2021, Tabitha Paulk was communicating with Coffee County regarding obtaining a copy of the video.  (Doc. 75-10) After

---

[4] *See* Exhibit "D," Marks Declaration, attached to CGG's Reply. The Surreply does not address this fact.

notifying her of the availability of the video on April 15, 2021, (Exh. 2) the video was supplied to Ms. Paulk, and Misty Hampton had also requested a copy of the video on March 31, 2021. (Doc. 75-6) The exchange of emails between Tracie Vickers, Charles Dial (sometimes copying Wesley Vickers) in March and April 2021 discuss getting the videos to Ms. Hampton and Ms. Paulk.  (Doc. 75-10) The communications indicated that the security recordings did indeed exist but more time was required for copying onto another device. (Doc. 75-6 at 3) Indeed, an April 23, 2021 email from Vickers to Dial asks, "Could you please give me an estimate as to when you will have the video ready for Misty"?[5]  (Doc.75-10, p. 3) CCBOER notified Ms. Hampton on July 15, 2021 that the video was ready for pickup, (*see* July 15, 2021 email exchange attached hereto as

---

[5] Further undercutting CCBOER's position, in the Secretary of State's Rule 30(b)(6) deposition, the designee, Gabe Sterling, testified that following the May 2021 inquiry concerning Cyber Ninja's potential visit to CCBOER office (Doc. 75-12) the Secretary of State investigators sought CCBOER video security records and were told by CCBOER that they did not exist. (Exh. 4; Sterling Tr. pp. 74:21-76:23, 80:12-85:10, 97:17-100:1, 110:16-112:11, and 114:15-19) Yet, we now know that only a month before, CCBOER and its IT consultant had supplied the requested video record to Ms. Paulk (*see* April 15, 2021 email exchange attached hereto as **Exhibit "2"**), and a month later, prepared the video record for Ms. Hampton. (Exh. 3)

**Exhibit "3"**), videos that CCBOER purportedly forgot had existed when Ms. Marks began seeking them nine months later.

Given that the videos were eventually produced, plainly they were not destroyed. In short, they were never overwritten, and they were never unavailable. In addition, HBS continues to offer no description of any diligence it engaged in to confirm the representations of its client and IT contractor—representations that HBS's Mr. Rowell, at a minimum, personally knew were untrue.

HBS argues that the certification of its responses to subpoenas predated (or were contemporaneous with) HBS advising CGG that the exterior video had been located—on August 26, 2022. This, of course, begs the question: Why did this revelation not cause HBS to immediately launch an inquiry into how and why the exterior video survived but the interior video did not? What diligence was pursued at that moment?

HBS actually does answer the question, if only by accident, in Ms. Herzog's declaration. Ms. Herzog reports in Paragraph 19 of her declaration that "In September 2022"—note the absence of a specific date—"Coffee County staff notified me that, ***during the course of other duties,*** [the IT contractor] found a copy of the security videos of the

13

interior of the CCBOER office during the relevant time period." (Doc. 73-3, p. 7) (emphasis added). So, the IT contractor, after preparing the exterior video copies for Ms. Paulk and Ms. Hampton in 2021, purportedly stumbled upon the "overwritten" exterior video in August 2022 and then stumbled upon the interior video in September 2022, but we are not told how or why the discoveries took place or how or when they were communicated to CCBOER or counsel. We are told, however, it was ***during the course of other duties,*** so clearly the discovery of the exterior videos, which had purportedly been believed to be overwritten, apparently did not result in any follow-up diligence on HBS's part to see if the interior video had likewise survived.

And while we know that Ms. Herzog reports that Plaintiffs had exterior and interior video on September 16, 2022, Ms. Herzog fails to identify the specific date on which she had access to either video. Interestingly, the depositions of SulivanStrickler, one of the IT consultants who breached the election system and copied the election software, and Wendell Stone, CCBOOER's Rule 30(b)(6) designee, were taken the first week of September 2022. A timely release of the interior videos would have dramatically changed those depositions and the

document subpoenas to SullivanStrickler, Eric Chaney, and Cathy Latham, among others.

In any event, HBS knew what it was being told by the client and the IT consultant was untrue—if that is what it was told—and when it learned the there was solid reason to doubt what it had purportedly been told, it did nothing.

### B.    28 USC § 1927 and the Inherent Power of the Court

In response to Plaintiff's arguments related to these bases for sanctions, HBS simply declares it did not act in bad faith and points to a record that fails to support that contention. CGG submits that the record vividly displays a pattern of deception and outright deceit, and every time HBS defends what has come before they dig a deeper hole of duplicity.

### IV.  <u>The Election Office Desktop</u>

In their Surreply, CCBOER and HBS do little more than regurgitate the positions they took in Response to the Motion. Although styled as a "Surreply," their latest offering does very little to reply to anything related to the desktop. For example, the Surreply does not address the fact that on July 2, 2021, Mr. Dial informed County Manager Vickers he should be able to recover the emails from .ost files on the

desktop, assuming Ms. Hampton did not delete them.[6]  In May, 2021,James Barnes and staff were instructed to leave their computers on at night so Dial could access them for that purpose.[7]

After Dial exchanged vague and unresponsive emails with Ms. Herzog on the existence of the emails, Mr. Vickers plainly asked Dial (in a withheld email), copying Herzog, Rowell, and two other HBS attorneys, whether Dial "personally searched the desktop computer" or if he was just agreeing to previous reports regarding the email account.[8] As CGG indicated in its Reply, to its knowledge, Dial did not answer the email. In declaring their reasonable reliance and "best practices," CCBOER and HBS do not suggest that Dial did respond.[9] Nor do they respond at all to

---

[6] *See* Exhibit "L," (Doc. 75-11) attached to CGG's Reply; *see also* Doc. 1-6 at 2.

[7] *See* Exhibit "N-12," (Doc. 75-12 at 52) attached to Exhibit "N" to CGG's Reply.  (Doc. 75)

[8] CGG located a follow-up email on the same thread on the GBI image, *not* produced by CCBOER—***so much for good faith***. *See* Exhibit "Q," attached to CGG's Reply. (Doc. 75)

[9] As has been seen, Ms. Herzog at times had encouraged CCBOER personnel not to put potentially damaging information concerning the breaches in writing. (Doc. 31-8 at 2)

what the upshot of Dial's July 2021 forensic effort was. Exercising minimal diligence, however, Ms. Herzog, other attorneys copied on the email, and CCBOER management should have confirmed whether Dial personally searched the desktop and requested documentation showing the desktop had been searched for available .ost files.[10]

Demonstrating the pattern of negligence or bad faith, on May 10, 2022, Ms. Herzog, copying county employees Wesley Vickers and Tracie Vickers, claimed that no .ost files would be available "as Ms. Hampton used web access." (Doc. 1-4 at 4, ¶9) County Manager Vickers and County Clerk Vickers both used the same county email system and would have known that emails were preserved on county desktop computers, not solely on a web-based site.

Despite the seriousness of the alleged crimes, pending post-election litigation, inquiries from the Secretary of State investigators, HBS and CCBOER also failed to secure the computers, preserve essential required records, stop the overwriting of files, or conduct the most basic due

---

[10] CCBOER responded to a May 2, 2022 Open Records Request from Ms. Marks (specifically asking for documentation of such a search), stating that no records documenting this purported search were found. (Doc. 1-4 at 4 ¶9)

diligence when requested to do so. A responsible official or attorney would have ordered immediate preservation and forensic examination to ensure that records of potential criminal activity would be preserved.[11] CCBOER and HBS's reliance on a IT tech who had not routinely set up county systems to retain required official communications and records, gave conflicting responses to routine use of .ost files, and had not disclosed experience in forensic examination or preservation of ESI, simply cannot be explained. CCBOER and HBS do not even try to explain it other than to claim they had "no reason" to engage a competent litigation support or forensics consultant to evaluate the status of the ESI and preserve it, despite the broad and serious crimes allegedly committed. Herzog and Rowell were aware of such public allegations no later than March 2022.

CCBOER claims again it followed "best practices" by consulting with Mr. Dial, and Dial represented that he was unable to retrieve Hampton's emails. CCBOER does not even attempt to respond to Kevin

---

[11] It is notable that after being notified no later than March 2022 of the suspected breaches and their severity, CCBOER and counsel have still to this day undertaken no effort to investigate or review the breaches, the internal failures, or the security impacts on their election infrastructure. Instead, it appears their efforts have been primarily directed toward concealing the evidence of the unlawful breaches.

Skoglund's declaration that CCBOER's position is "false." "The emails for Misty Hampton…were located exactly ***where any IT professional would expect to find them and easily discovered by anyone who put in a small amount of effort to search for them***." The details of Mr. Skoglund's review are set forth in CGG's Reply, but CCBOER and HBS do not address the damning facts presented.[12] (Emphasis added).

CCBOER also says nothing about the GBI seizure of Ms. Hampton's desktop computer in June 2023, or about the fact that CCBOER and HBS had been informed the seizure would occur before it happened, giving them planning time for records preservation. Nor do they deny that the GBI permitted CCBOER to copy and retain any of the resident files, but that CCBOER chose not to retain the files subject to the subpoenas (and Open Records laws) despite knowing there were multiple law enforcement investigations and lawsuits ongoing regarding the breaches where CCBOER had extensive records preservation duties. The decisions made by HBS and CCOBER failed to meet even the most

---

[12] *See* Skoglund Declaration, filed on February 20, 2024, as Exhibit 2 to the Sanctions Motion (Doc. 60-2).

minimal required practices of attorneys, much less approach "best practices."

## V.    <u>Conclusion</u>

Plaintiff seeks to address the misconduct of CCBOER and HBS as detailed in its Motion for Sanctions. In addition to the monetary penalties sought for sanctions, Plaintiff also requested the Court order the production of discovery materials improperly withheld by CCBOER. Such relevant documents may be required by Plaintiffs in any possible future proceedings in the *Curling* case. CCBOER and HBS should not be rewarded for their defiance of the Rules, Subpoenas, and this Court's Orders.

Respectfully submitted this 9th day of May 2024.

*/s/ William Daniel Davis*
WILLIAM DANIEL DAVIS
Georgia Bar No. 746811
CARY ICHTER, *Pro Hac Vice*
Georgia Bar No. 382515
ddavis@ichterdaivs.com
cichter@ichterdavis.com
**ICHTER DAVIS LLC**
400 Interstate N. Pkwy, SE
Suite 860
Atlanta, Georgia 30339
(404) 869-7600

and

*/s/ Bruce P. Brown*
BRUCE P. BROWN
Georgia Bar No. 064460
bbrown@brucepbrownlaw.com
**BRUCE P. BROWN LAW LLC**
1123 Zonolite Rd. NE, Suite 6
Atlanta, Georgia 30306
(404) 881-0700

*Attorneys for Coalition for Good Governance*

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2024, a copy of the foregoing **Plaintiff CGG's Response to CCBOER's Surreply Brief (Doc. 78)** was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send notification of such filing to all attorneys of record.

*/s/ William Daniel Davis*
William Daniel Davis
Georgia Bar No. 382515
ddavis@ichterdavis.com

*Attorneys for Coalition for Good Governance*