# EXHIBIT 4

**Excerpts from Deposition of Robert Gabriel Sterling**

**October 12, 2022**

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION
3
4
     Donna Curling, et al.,
5
                   Plaintiffs,
6                                       CIVIL ACTION FILE
           vs.
7                                       NO. 1:17-cv-02989-AT
     Brad Raffensberger, et
8    al.,
9                  Defendants.
     ~~~~~~~~~~~~~~~~~~~~~~~~~~
10
11
12
                VIDEO 30(b)(6) DEPOSITION OF
13                 SECRETARY OF STATE
                        THROUGH
14             ROBERT GABRIEL STERLING
15
16                 October 12, 2022
17                    9:26 a.m.
18
19
            Suite 3250, One Atlantic Center
20              1201 W. Peachtree Street
                   Atlanta, Georgia
21
22
23
24
            S. Julie Friedman, CCR-B-1476
25

Page 2

```
 1              APPEARANCES OF COUNSEL
 2   On behalf of the Curling Plaintiffs:
 3        MORRISON & FOERSTER LLP
          DAVID D. CROSS, ESQ.
 4        VERONICA ASCARRUNZ, ESQ. (Via Zoom)
          JENNA CONAWAY, ESQ. (Via Zoom)
 5        HANNAH ELSON, ESQ. (Via Zoom)
          CAROLINE MIDDLETON, ESQ. (Via Zoom)
 6        DONNA PRICE, ESQ. (Via Zoom)
          Suite 900
 7        2100 L Street, NW
          Washington, DC  20037
 8        202.887.8795
          dcross@mofo.com
 9   AND
          KREVOLIN & HORST LLC
10        ADAM M. SPARKS, ESQ.
          HALSEY KNAPP, ESQ.
11        Suite 3250, One Atlantic Center
          1201 W. Peachtree Street NW
12        Atlanta, Georgia  30309
          404.835.8067
13        404.888.9577 Fax
          sparks@khlawfirm.com
14
     On behalf of the Coalition for Good Governance
15      Plaintiffs:
16        BRUCE P. BROWN LAW LLC
          BRUCE PERRIN BROWN, ESQ.
17        MARILYN MARKS, ESQ. (Via Zoom)
          Suite 6
18        1123 Zonolite Road
          Atlanta, Georgia  30306
19        404.386.6856
          bbrown@brucepbrownlaw.com
20
21
22
23
24
25
```

```
                                              Page 3

 1            APPEARANCES OF COUNSEL (CONTINUED)
 2    On behalf of the State Defendants:
 3         TAYLOR ENGLISH DUMA LLP
           BRYAN TYSON, ESQ.
 4         DIANE F. LaROSS, ESQ. (Via Zoom)
           BRYAN F. JACOUTOT, ESQ. (Via Zoom)
 5         Suite 200
           1600 Parkwood Circle
 6         Atlanta, Georgia  30339
           678.336.7228
 7         dlaross@taylorenglish.com
      AND
 8         ROBBINS ALLOY BELINFANTE LITTLEFIELD LLC
           ALEXANDER DENTON, ESQ. (Via Zoom)
 9         ANNA EDMONDSON, ESQ. (Via Zoom)
           DANIELLE HERNANDEZ, ESQ. (Via Zoom)
10         CAREY A. MILLER, ESQ. (Via Zoom)
           JAVIER PICO-PRATS, ESQ. (Via Zoom)
11         VINCENT R. RUSSO, ESQ. (Via Zoom)
           500 14th Street NW
12         Atlanta, GA  30318
           678.701.9381
13         cmiller@robbinsfirm.com
14
      Also Present:
15         Duncan Buell
           Donna Curling
16         Susan Greenhalgh
           Joseph Oluwasegun
17         Kevin Skoglund
           Danielle Stucchi, Paralegal
18          Krevolin & Horst LLC
           Ernestine Thomas-Clark
19         Scott Bridwell, Videographer
20
21
22
23
24
25
```

Page 74

1    see this?

2             No.

3             Are you aware of anything along these

4    lines?

5             No.

6             Where do you go at that point on those

7    fronts?

8        Q.    Well, that's a great question, Mr.

9    Sterling.  Did --

10       A.    Oh, one of -- one of --

11       Q.    You were dealing --

12       A.    -- the things --

13       Q.    Well, let me answer your question.

14       A.    Go ahead.

15       Q.    You --  You were dealing with a county

16   that you had already found was unreliable where you

17   had an open investigation, a rogue county that

18   included members of the Coffee County Election Board

19   like Eric Chaney, right?

20       A.    Yes.

21       Q.    Okay.  So the Secretary's Office conducted

22   an investigation in May of 2021 relying, as I

23   understand it, largely, if not entirely on feedback

24   from a county where it already knew that members of

25   the Coffee County Election Board that were still

Page 75

1    there were not reliable people.  That's how you

2    reached the conclusion that this didn't happen was

3    you -- you asked the County, and the County that you

4    already said you couldn't trust.

5         A.    I didn't say --

6         Q.    And they said we didn't do it.

7         A.    Misty was the one we said we couldn't

8    definitely trust at all, because she had been

9    misleading already, obviously.

10             The secondary part of this, too, if I

11   remember correctly, it was discussed -- and this is

12   one of those things where it's not within a report;

13   this just kind of came up -- that Mr. Barnes was

14   going to try to pull the security tapes.

15   Unfortunately, this is where a left hand and a right

16   hand didn't seem to know which -- what each other

17   were doing.

18             He went to ask for the tapes around that

19   period of time.  They were no longer in the security

20   system on that side.  Unbeknownst to him, as I

21   understand it, Misty Hampton had done an ORR for

22   those tapes, I guess, to try to prove her innocence

23   on the question of the hourly timing of her --  I

24   don't know.  I can't -- as to why she did a ORR at

25   that period of time.  But they existed in another

Page 76

1    system that Mr. Blanchard -- sorry -- that Mr.
2    Barnes was unaware of, so we knew --
3            Steps had been taken, and we discussed
4    that.  We had no reason to believe Mr. Barnes was
5    unreliable, 'cause he was new; and the county
6    attorney, like we said, had seemed to want to be
7    cooperative to get to that point as well.
8            So Misty, from the point of the
9    Secretary's Office, seemed to be the problem child
10   more than anything else; and she was sort of leading
11   the --  We had no reason at that point to have any
12   issues around potentially the board, 'cause she's
13   going to be leaving the board when she did that
14   videotape; and they were all, hmm, yes.  We get it,
15   but there was no reason to think that they were going
16   to mislead on those fronts.  Everybody --
17       Q.    Didn't you --  Didn't you know that the
18   video that was put up on YouTube was actually
19   authorized by the board?
20           Eric Chaney is there in the video.
21       A.    Yes.  But my point is:  In a normal
22   situation, you don't assume that every single person
23   is not going to tell the truth.  I mean --
24       Q.    Except it --
25       A.    -- that'd be a conspiracy that's a little

Page 80

Case 1:17-cv-02989-AT Document 1645 Filed 02/21/25 Page 80 of 22

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12         Q.    Okay.  The Secretary's Office is aware

13   that every county in this -- that every county

14   election office in the state has video surveillance,

15   right?

16              Let me --  Let me ask a better question.

17   You were aware that this county elections office has

18   video surveillance, right?

19         A.    Yes.

20         Q.    Okay.  Why didn't you ask for that?

21   Wouldn't that be step one?

22         A.    I believe I just explained to you that

23   James Barnes went to their --  As I understand it was

24   explained to us --  And this is verbal.  There's no

25   unfortunate --  There's no e-mail about this.
```

```
 1            He went to them and said, well, we did --
 2    That's all been deleted by now.
 3            He was unaware that Misty Hampton had done
 4    an ORR.  Because like I said, the left hand and right
 5    hand didn't know what they were doing.
 6            So even if we had gone to ask them, we
 7    would have gone through James Barnes, who would have
 8    gone to the County and perhaps gone to the county
 9    attorney; but that's a hypothetical at this point,
10    because he said it doesn't exist.
11        Q.    Wait.  But you guys are the -- are --
12    are --
13            You're the Secretary's Office.  You have
14    law enforcement authority to conduct an investigation
15    into election security breaches, right?
16        A.    Potential ones, yes.
17        Q.    Okay.  Why in the world would you rely on
18    James Barnes, who was brand new to the office,
19    instead of sending your investigator yourself to find
20    out whether that surveillance video existed?
21            Wouldn't that be the normal course of a --
22    of a -- of a sound investigation?
23        A.    If the person who --
24            MR. TYSON:  Object to form.
25            THE WITNESS:  If the person who reported
```

Page 82

1      it is dealing with their own internal people and

2      says the stuff you need doesn't exist, no.

3      Normally, you would not send somebody at that

4      point.  No.  That doesn't make any sense.

5           We're going to not take your -- not --

6      You're new to this.  You reported this.  Now we

7      think you're going to try to cover it up, and

8      we're going to go deeper into it?

9      Q.   No, no.  I'm not suggesting that.  I --

10     I'm --  I'm asking a very different question.

11          James Barnes is brand new to the office at

12     this point.  He's been there about five to six weeks,

13     right?

14     A.   Correct.

15     Q.   Okay.  Instead of relying on someone brand

16     new to the office, no background there whatsoever,

17     why not send your investigator down to speak with the

18     members of the election board with people like Tracie

19     Vickers and others who -- who have at lot more

20     history and a lot more background on what might have

21     happened?

22     A.   Because the gentleman who reported it

23     says, I've looked.  I'm asking this.  Nobody's seen

24     anything.  We have no evidence.  We've asked for

25     videotapes.  They don't exist.

Page 83

```
 1          At that point what else are they going to
 2  do, if those are the point?  So --
 3       Q.    What we did --
 4       A.    -- again, knowing --
 5       Q.    -- ask for the video, which we did.
 6             MR. TYSON:  Let him answer the question,
 7       please.
 8             THE WITNESS:  Wait.  David --
 9       Q.    (By Mr. Cross)  Well, you asked --
10       A.    We --
11       Q.    -- a question.
12       A.    We asked a question for the videos.  They
13  said it didn't exist, because it wasn't in that
14  particular system.  It wouldn't occur to most people
15  to think if the security people in charge of this
16  tell us it doesn't exist, it's going to exist
17  somewhere else because a random person who's been
18  fired or resigned, due to be fired, did an ORR.  It
19  was a lucky for us and for y'all and unfortunate
20  thing for Misty now, because this is actually proof
21  that she did things that were not -- that were
22  untoward.
23          You can look back with perfect vision,
24  20/20, in the rear view mirror.  I get that.
25          But the situation we had is we had tons of
```

Page 84

1    these kinds of claims everywhere; and, again, we were
2    trying to get into --  Actually, it's a different
3    time.  I apologize.
4           This looked like another one of those many
5    claims that there was nothing there, and somebody
6    might have tried to do something, but there's no
7    evidence that was coming to the surface that would
8    rise to that point.
9           And we had the videotape, and we had them
10   claiming they couldn't do certification.  We sent the
11   chief of investigations in there, 'cause there was
12   actual stuff we could that was wrong.
13
14
15
16
17          You don't then expend resources on things
18   where it looks like this is a dead end.  That's not
19   what you do and --
20      Q.    In a --  In a county that you already have
21   identified through an open investigation was not a
22   reliable county.  A county that literally had held up
23   the presidential election, because they refused to
24   certify election results, you -- you -- you guys
25   thought that that was a reliable county to just

Case 5:23-nd-000829VABW DocumentDocument 164582-4led 01/21/2530972age 85Page440 of 22

```
 1    simply say, well, they say it didn't happen; and they
 2    don't have video so that's the end of that?
 3         A.    It's not --
 4              MR. TYSON:  Object to form.
 5              THE WITNESS:  It's not they said it didn't
 6         that.  We handed to our investigators.  The
 7         investigators, who are the law enforcement
 8         people, make those decisions; and they basically
 9         said there's nothing there.  We're moving on to
10         the next thing.
11              I mean, it's not like, again, with
12         hindsight being 20-20, yes.  You should go in to
13         go deeper on some of those things; but if we had
14         to spend resources on every single one of these
15         claims in a gajillion (ph.) ways in this
16         state --
17              I mean, I'm going to give you an example
18         just to put it in perspective for everything.
19         There was a claim of pristine ballots in Fulton
20         County.  I think we're all aware of that claim.
21         It was supposed to be in a particular batch.  We
22         had --  We sent two investigators down to that
23         batch.  They went through all of them.  I think
24         it was 20 man-hours, and they came back and said
25         there's nothing there.
```

Page 97

1     Q.   Right.  Mr.  --

2     A.   On May of 2021, he was just wrong; and I

3 said this interview, basically, everything in it is

4 conflated and -- and just incorrect, and that's why I

5 was so frustrated with the interview itself.

6     Q.   Okay.  So, remember, you're testifying

7 today not as you --

8     A.   Uh-huh.

9     Q.   -- but as Secretary's Office --

10    A.   Right.

11    Q.   -- right?

12         Okay.

13    A.   I was answering your question about what

14 Mike Hassinger and I knew specifically about that.

15    Q.   I --  I get that now.

16    A.   Okay.

17    Q.   So what I'm saying is, it is a fact that

18 the Secretary's Office, multiple individuals, from

19 Chris Harvey, to Michael Barnes, to Frances Watson,

20 to Pamela Jones, to Josh Blanchard, all of those

21 individuals were aware that the Secretary's Office

22 was investigating potential unauthorized access by

23 Cyber Ninjas to the Georgia voting system in Coffee

24 County in May of 2021.  Yes?

25         MR. TYSON:  Object to form.

```
 1            THE WITNESS:  Yes.  In the specific way
 2       you put that.
 3            Now by this point, they're two separate
 4       things.  Because at this point, it was like we
 5       now understand that with given the videotapes
 6       and everything.  I can't remember the date of
 7       that.
 8            But we really kicked it up into --  Okay.
 9       Once we saw that something had happened and that
10       was in July, that was like a new --  Not new
11       investigation; but, again a new phase of the
12       investigation.  That's what I was referring to
13       as now we've -- we've real --  We've handed to
14       GBI.  We do those items, and that's kind of the
15       difference between those things.
16            I mean, there is a -- obviously, a
17       timeline, and we'll probably get into some of
18       those things.
19            But that interview was just simply wrong.
20       He was incorrect --
21       Q.   (By Mr. Cross)  Okay.
22       A.      -- when he made those statements, and he
23  didn't have a chance to get briefed up, because he
24  was also surprised, because he wasn't supposed to
25  be --  It was supposed to be a action feel good kind
```

Page 99

1   of thing.

2       Q.    Okay.  So come back to Exhibit 7, the

3   Frances Watson --

4       A.    Yes, sir.

5       Q.    -- e-mail thread.  We do not have from the

6   State that we've seen any further communications,

7   e-mails, documents of any type regarding this

8   investigation beyond Miss Watson's May 11th e-mail.

9       A.    Correct.

10      Q.    Okay.  So do I understand correctly that

11  the investigation into the Cyber Ninjas' potential

12  access in Coffee County, that that ended or paused?

13        It --  It didn't go any -- any further

14  than what's reflected in Exhibit 7, because the

15  feedback from Mr. Barnes was we've not found any

16  indication of an unauthorized access?

17      A.    That, plus the --  He was going to go to

18  the IT and see.  Since we never heard back, there

19  was, I think, an assumption made of, well, we didn't

20  find anything there; and I know there was a

21  conversation.  Of course, my understanding of the

22  conversation, which it will be --

23        We asked for videos, and the security team

24  says they don't have them for this period of time;

25  and, again, that was the right hand, left hand thing,

Page 100

1   not knowing what they were doing.

2        Q.    So when a representative of the

3   Secretary's Office told 11 Alive, the local news

4   station, that the Office did not know about or begin

5   investigating Coffee County until -- until July of

6   2022, that's -- that's not an accurate statement,

7   right, 'cause the --

8        A.    David --

9        Q.    -- Office itself was investigating this in

10  May of 2021.

11       A.    Two separate investigations based on two

12  different sets of information.

13       Q.    I get that --  I get it.

14       A.    So you're choosing to put them together.

15  We're viewing it as two separate entities.  This is

16  a --  It's a different way of looking at it, I

17  suppose.

18            You're right.  Our office did look at it.

19  There was nothing to pursue that they could see at

20  that time from the evidence they had as a

21  professional, POST-certified law enforcement

22  investigators.

23            Now we have extra information that came,

24  because we had Mr. Persinger able to get into the

25  system.  We see, yes, there actually was an outside

Page 110

1    so it would have been the same.  Within a week or
2    two, I think, of that's when we -- when it was all
3    produced.
4          Q.    Right.  Ryan --
5          A.    He was the one, though, who -- who said
6    yes.  Let's open something on this.
7          Q.    Yeah.  Mr. Germany called for an
8    investigation into this in March of that year, right?
9          A.    Correct.  And it --  Like I said, I don't
10   know if it predated us getting the full -- full audio
11   or postdated it, but it was --  They were all
12   within --
13         Q.    Sure.
14         A.    -- you know, a week or two of each other,
15   I believe.
16         Q.    Okay.  So now we're in a timeframe where
17   you've got the investigation -- we can say with a
18   little "i," if you want -- from May of 2021 involving
19   Cyber Ninjas.
20         A.    Uh-huh.
21         Q.    You've now got the call where Mr. Hall
22   says they imaged everything.
23         A.    Uh-huh.
24         Q.    You've got the EMS server and the ICC in
25   your possession.  You've now got an investigation

1    opened into these allegations.

2            Why didn't the Secretary's Office at that

3    point obtain the surveillance video that we, the

4    Plaintiffs, later had to obtain months later?  Why

5    did it --  Why did we have to get that?

6        A.    I think, step one, we had decided kind of

7    internally was we wanted to get into the server first

8    to see what time this all -- so we could go back and

9    have binary questions we could ask the individuals.

10           Bob Guessum (ph.)?

11           MR. CROSS:  Bruce, you mean?

12           THE WITNESS:  Bruce.  Sorry.

13       Q.    (By Mr. Cross) Go ahead.  Go.

14       A.    I have a problem.  When I hear people

15   talking, I tend to try to listen; and it throws me

16   off.

17           MR. BROWN:  Okay.

18           THE WITNESS:  My problem not yours.

19           So Ryan and the chief investigator said

20       let's get into the server first before we start

21       trying to go down, start interviewing people who

22       we know.  Like Misty testified.  You're not

23       going to get good stuff out of them, so let's

24       get --  Let's get the actual evidence first and

25       see if something happened, so we start trying to

1    get into that first.

2         And, again, I don't know how widespread it

3    was known, 'cause this all kind of runs together

4    timelinewise.  There have been discussions about

5    them trying to get that videotape before, and it

6    didn't exist, according to the people we had

7    talked to, because it was in a different system

8    that those people were not aware of, and the

9    people we would have talked to --

10        Now if it'd gone to the county attorney

11   maybe; but, again, hindsight being 20-20.

12        So we wanted to see, try to get in the

13   system.  We had a hard time getting in the

14   system, and, you know, we have --  We're doing

15   many other things.  So we --

16        Again, a representative from Dominion came

17   down to try to get in.  They couldn't get in, so

18   they sent somebody else, I believe, in the

19   middle of April.  They couldn't get in, so we're

20   trying to get through, through May.

21        And like I said, May, June, finally, okay.

22   This isn't working.  We've got to try find a way

23   to get into this thing, so we can yes or no know

24   what happened on that front.

25        And, again, our gut reaction is it

Page 114

1    Administrative Services and the slow pay on some
2    of things for Mr. Persinger, so we were a bit
3    concerned.  Will he be able to do it or not.
4    Not that they were intentionally doing it.  It's
5    just state government.  They pay slow sometimes.
6         So they were discussing about doing that,
7    and I think --  I don't know.  I wasn't involved
8    in any direct discussions, 'cause he was with
9    the -- with the attorneys.  I know that --
10        Like I said, I think the -- the week of
11   July 4th, before July 4th was when he took
12   possession of it; and by the following week, he
13   had --  That's when we discovered that that had
14   happened.
15        So the videotape, obviously, since I think
16   it was already been told to us it wasn't there,
17   we're not going to go chase something --
18   double-check on it, I guess would be, for lack
19   of a better word for that.
20        And we also had some turnover, and so
21   maybe Sara Koth might not have been aware of
22   that on the front end.  I --  I couldn't say for
23   certain.  This didn't occur on that point.
24        And I think the only reason that
25   particular video camera was there was for the

Page 435

1                    C E R T I F I C A T E

2

3

4   STATE OF GEORGIA:

5   COUNTY OF FULTON:

6

7           I hereby certify the foregoing transcript

8       was taken down, as stated in the caption, and

9       the questions and answers thereto were reduced

10      to typewriting under my direction; that the

11      foregoing pages 1 through 434 represent a true,

12      complete, and correct transcript of the evidence

13      given upon said hearing, and I further certify

14      that I am not of kin or counsel to the parties

15      in the case; am not in the regular employ of

16      counsel for any of said parties; nor am I in

17      anywise interested in the result of said case.

18          This, the 17th day of October, 2022.

19

20

                        S. JULIE FRIEDMAN, CCR-B-1476

21

22

23

24

25