**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION**

COALITION FOR GOOD GOVERNANCE,
and DONNA CURLING,

            Plaintiffs,

      v.

COFFEE COUNTY BOARD OF
ELECTIONS & REGISTRATION,

          Defendant.

CASE NO.: 5:23-mc-1

## O R D E R

Plaintiff Coalition for Good Governance ("Coalition") filed a Motion for Sanctions Against Defendant Coffee County Board of Elections & Registration ("the Board of Elections" or "the Board") and Counsel.  Doc. 60.  This Motion is fully briefed and ready for ruling. Docs. 70, 73, 75, 78, 82.  After careful consideration of the entire record, I **DENY** Coalition's Motion for Sanctions.

## BACKGROUND

Plaintiffs Coalition and Donna Curling began this action by filing a motion to compel concerning two subpoenas issued in Curling v. Raffensperger, (referred to here as the "Curling case" or the "underlying litigation"), a case that was pending in the District Court for the Northern District of Georgia at the time.  Civil Action No. 1:17-cv-2989 (N.D. Ga. filed Aug. 8, 2017).  Doc. 1.  The Curling case concerned the design and implementation of Georgia's statewide electronic voting system.  See Order, Curling v. Raffensperger, Civil Action No. 1:17-cv-2989 (N.D. Ga. Nov. 10, 2023), ECF No. 1705 (order ruling on Defendants' motions for

summary judgment).  United States District Judge Amy Totenberg, the presiding judge in

Curling, conducted a bench trial that began on January 9, 2024, and concluded on February 1,

2024.  Judge Totenberg found the Curling plaintiffs lacked standing to bring their case and

dismissed it.  Id., ECF Nos. 1868, 1870.  The Board of Elections was not a party to the Curling

case, though Judge Totenberg expressly authorized the parties to serve third-party subpoenas on

the Board of Elections to obtain information about voting system breaches in Coffee County.

Doc. 1 at 9.  These breaches occurred at the Coffee County Board of Elections office in January

2021.  Id. at 4.  During the breaches, unauthorized individuals were permitted to access and copy

official voting software and data.  Id.

     Plaintiffs served two subpoenas on the Board of Elections in the middle of 2022.

Plaintiffs Donna Curling, Donna Price, and Jeffery Schoenberg (the "Curling Plaintiffs") served

the first subpoena on June 15, 2022.[1]  Doc. 1-2.  Coalition served the second subpoena on July

25, 2022.  Doc. 1-1.  Both subpoenas were issued under Federal Rule of Civil Procedure 45.

Both subpoenas requested documents, including Board of Elections records, communications,

and electronic files.  After a period of conferral, the Board of Elections responded, producing

responsive materials and privilege logs.  See Docs. 1-23, 25-2, 29.

     Plaintiffs brought a motion to compel before this Court on October 24, 2023.  Doc. 1.

The motion to compel largely concerned Plaintiffs' efforts to obtain documents related to Misty

Hampton, the former Coffee County Elections Supervisor.  Plaintiffs sought, but were unable to

obtain, emails to and from Ms. Hampton.  Doc. 1 at 6–10.  The Board of Elections stated that

Ms. Hampton's email records were no longer accessible because she was terminated on February

25, 2021, and the Board of Elections transferred Ms. Hampton's Microsoft 365 software user

---

[1]    Donna Price and Jeffery Schoenberg are plaintiffs in the Curling case.  They are not parties to the miscellaneous action filed in this Court.

license to a new employee.  Doc. 1-9 at 3.  The Board of Elections also stated that it could not recover Ms. Hampton's emails from the desktop computer she used during her employment.  Id. at 4.  Plaintiffs also believed that Ms. Hampton used a gray or silver laptop computer in her work for the Board, doc. 1-10 at 2, but it was unclear who owned the laptop, and no one has been able to locate the device.

While the Curling case was proceeding, the Georgia Bureau of Investigation ("GBI") began investigating the Coffee County election breach.  The investigation ultimately led to a criminal prosecution in Fulton County Superior Court, in which Hampton was named as a defendant.  As part of its investigation, the GBI obtained and executed a search warrant that resulted in the GBI seizing Hampton's desktop computer from the Board of Elections on June 12, 2023.  Doc. 1 at 13.  Unlike the Board of Elections, the GBI was able to successfully recover many of Hampton's emails and other documents from the desktop computer.  Plaintiffs learned about the recovery through filings in the criminal case on October 5, 2023.  Id. at 12–13.

I granted in part and denied in part Plaintiffs' motion to compel on December 22, 2023.  Doc. 41.  I denied as moot Plaintiffs' request for emails and documents on Hampton's desktop computer.  That issue was resolved when the Secretary of State for the State of Georgia produced a forensic image of the computer to Plaintiffs on November 17, 2023.  Id. at 5.  I denied Plaintiffs' requests to depose individuals about the silver laptop because this request was beyond the scope of the subpoenas at issue in Plaintiffs' motion.  Id. at 5–9.  I granted Plaintiffs' request for an itemized privilege log.  Id. at 12–15.  I denied Plaintiffs' request to compel additional searches for responsive material.  Id. at 15–19.

During the proceedings related to Plaintiffs' motion to compel, I explained my focus was on resolving the core discovery dispute given the impending trial and that any requests for

sanctions would be addressed later.  See id. at 1 n.1.  I noted Plaintiffs' desire to file a motion for sanctions once responsive materials were produced.  Upon ruling on Plaintiffs' motion to compel, I directed Plaintiffs to file any motion seeking sanctions for the Board's past conduct. Id.

Coalition now moves for sanctions based on the Board of Elections' response to the subpoenas.  Doc. 60.  Specifically, Coalition contends the Board improperly withheld video security records, emails, and other documents.  Id. at 4–9.  Coalition argues the Board improperly asserted privilege to withhold certain documents and the Board and its counsel acted in bad faith.  Id. at 10–13.  Coalition moves for attorney's fees and costs under Federal Rules of Civil Procedure 26(g) and 37(a), 28 U.S.C. § 1927, and the Court's inherent authority.  Id. at 14–28.  The Board opposes the Motion.

**LEGAL STANDARDS**

Coalition invokes different legal bases for the imposition of sanctions: Federal Rule of Procedure 26(g); Federal Rule of Civil Procedure 37(a); 28 U.S.C. § 1927; and the Court's inherent authority.  Here, I set forth the standard for each legal theory, but I conclude that Rules 26(g) and 37(a) are inapplicable.

**I.    Rule 26(g)**

Rule 26 governs party disclosures and general discovery obligations.  Under Rule 26(g), "every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name[.]"  Fed. R. Civ. P. 26(g)(1).  "By signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry[,] with respect to a disclosure, it is complete and correct as of the time it is made[.]"  Fed. R. Civ. P. 26(g)(1)(A).  "If a certification violates this rule without substantial

justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both." Fed. R. Civ. P. 26(g)(3).

Under Rule 26, a lawyer must "make a reasonable inquiry into the factual basis of his response, request, or objection." Fed. R. Civ. P. 26 advisory committee's note to 1983 amendment. "The duty to make a 'reasonable inquiry' is satisfied if the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances." Id. "It is an objective standard similar to the one imposed by Rule 11." Id. "In making the inquiry, the attorney may rely on assertions by the client and on communications with other counsel in the case as long as that reliance is appropriate under the circumstances." Id. "Ultimately, what is reasonable is a matter for the court to decide on the totality of the circumstances." Id.

"Rule 26(g) does not require the signing attorney to certify the truthfulness of the client's factual responses to a discovery request." Id. "Rather, the signature certifies that the lawyer has made a reasonable effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand." Id. A sanction under Rule 26(g) "may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation." Fed. R. Civ. P. 26(g)(3).

## II.     Rule 37(a) Sanctions

Rule 37(a) requires an award of "the movant's reasonable expenses incurred in making the motion [to compel], including attorney's fees" if "the motion is granted[.]" Fed. R. Civ. P. 37(a)(5)(A). The Rule includes three exceptions, stating fees are not mandatory if: "(i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was

5

substantially justified; or (iii) other circumstances make an award of expenses unjust."

"Substantially justified means that reasonable people could differ as to the appropriateness of the

contested action." Maddow v. Procter & Gamble Co., 107 F.3d 846, 853 (11th Cir. 1997).  Also,

courts may "apportion the reasonable expenses for the motion" if the motion is granted in part

and denied in part.  Fed. R. Civ. P. 37(a)(5)(C).

**III.    28 U.S.C. § 1927**

Under § 1927, "[a]ny attorney or other person admitted to conduct cases in any court of

the United States or any Territory thereof who so multiplies the proceedings in any case

unreasonably and vexatiously may be required by the court to satisfy personally the excess costs,

expenses, and attorneys' fees reasonably incurred because of such conduct."  "[A]n attorney

multiplies proceedings 'unreasonably and vexatiously' within the meaning of the statute only

when the attorney's conduct is so egregious that it is 'tantamount to bad faith.'"  Amlong &

Amlong, P.A. v. Denny's, Inc., 500 F.3d 1230, 1239 (11th Cir. 2007) (quoting Avirgan v. Hull,

932 F.2d 1572, 1582 (11th Cir. 1991)).  "A party [may] demonstrate[] bad faith by delaying or

disrupting the litigation or hampering enforcement of a court order."  Barnes v. Dalton, 158 F.3d

1212, 1214 (11th Cir. 1998).  This is an objective standard, and "objectively reckless conduct is

enough to warrant sanctions even if the attorney does not act knowingly and malevolently."

Amlong & Amlong, 500 F.3d at 1241.  Mere negligent conduct is not enough to satisfy the bad-

faith standard; the attorney must have acted knowingly or recklessly to act with bad faith.  Id. at

1241–42.

**IV.    Inherent Authority**

Courts have the inherent authority to control the proceedings before them, which includes

the authority to impose "reasonable and appropriate sanctions."  Martin v. Automobili

Lamborghini Exclusive, Inc., 307 F.3d 1332, 1335 (11th Cir. 2002).  In narrowly defined circumstances, federal courts have inherent power to assess attorney's fees against counsel. Roadway Express, Inc. v. Piper, 447 U.S. 752, 765 (1980).  A court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons or when a party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.  Chambers v. NASCO, Inc., 501 U.S. 32, 45–46 (1991).  "The key to unlocking a court's inherent power is a finding of bad faith."  Purchasing Power, LLC v. Bluestem Brands, Inc., 851 F.3d 1218, 1223 (11th Cir. 2017) (citing Sciarretta v. Lincoln Nat. Life Ins., 778 F.3d 1205, 1212 (11th Cir. 2015)).  This is a subjective bad-faith standard.  Id.

"Courts have held that requests for sanctions under § 1927 and the Court's inherent authority are similarly analyzed."  Mack v. Delta Air Lines, Inc., No. 113CV01162, 2014 WL 12628620, at *8 (N.D. Ga. Aug. 11, 2014), report and recommendation adopted, 2014 WL 12629941 (N.D. Ga. Sept. 24, 2014) (citing Amlong & Amlong, P.A. v. Denny's, Inc., 500 F.3d 1230, 1239 (11th Cir. 2007)).  "Whether sought under a court's inherent authority or § 1927, the burden of proof lies with the party seeking imposition of sanctions."  Id. at *9

### DISCUSSION

Coalition argues that the Board of Elections committed five sanctionable acts in response to the subpoenas.  Specifically, Coalition argues the Board: (1) improperly withheld security videos, doc. 60 at 4–6; (2) improperly withheld Misty Hampton's emails and falsely claimed the emails were not preserved, id. at 7–8; (3) improperly withheld other responsive documents and communications in addition to Hampton's emails, id. at 8–9; and (4) withheld responsive documents under improper privilege claims, id. at 10–12.  Coalition also argues (5) the Board's 30(b)(6) representative gave false, bad-faith testimony during his deposition.  Id. at 12–13.

Coalition further argues the Board's counsel acted improperly in response to the subpoenas and is subject to sanctions.

## I.      Sanctions Are Unavailable Under Rules 26(g) or 37(a)

Coalition seeks sanctions against a non-party—the Board—for its response to Plaintiffs' Rule 45 subpoenas issued in the underlying litigation, Curling v. Raffensperger.  Coalition invokes various legal provisions as a basis for sanctions, including Rules 26(g) and 37(a).  The Board of Elections is not a party to the Curling case.  As explained below, sanctions are not available under Rules 26(g) and 37(a) for a non-party like the Board.

Rule 45 subpoenas share similarities with discovery requests made under the Federal Rules of Civil Procedure 26 through 38.  For example, the scope of discovery allowed through non-party subpoenas is generally the same as the scope of discovery allowed under other discovery rules.  See Jordan v. Comm'r, Miss. Dep't of Corr., 947 F.3d 1322, 1329 (11th Cir. 2020) (holding Rule 26(b)'s relevancy requirement applies to subpoenas under Rule 45 (citing Fed R. Civ. P. 26(b)(1); Advisory committee note to the 1970 amendments to Rule 45)); Gamache v. Hogue, 595 F. Supp. 3d 1344, 1349 (M.D. Ga. 2022) ("The general rules of discovery outlined in Rule 26 govern the scope of a Rule 45 subpoena.").  However, there are important differences between the sanctions available under Rule 45 and the sanctions available under other Rules.

Rule 45 allows for sanctions in two circumstances.  First, courts must sanction parties or attorneys who unduly burden a person subject to a subpoena.  Fed. R. Civ. P. 45(d)(1).  Second, the court may also hold a person in contempt who fails to obey a subpoena or an order related to it.  Fed. R. Civ. P. 45(g).  "However, 'it would be rare for a court to use contempt sanctions without first ordering compliance with a subpoena.'"  Nat'l Comm'n for Certification of Crane

Operators, Inc. v. Nationwide Equip. Training, LLC, No. 1:20-CV-483, 2022 WL 9544306, at *2 (S.D. Ala. Oct. 14, 2022) (quoting Fed. R. Civ. P. 45(g) advisory committee note to 2013 amendment). "The advisory committee's note suggests a contemnor's initial failure to comply with a subpoena does not warrant sanctions without the Court first ordering compliance with that subpoena." Id.

Rule 26(g) does not provide for sanctions against non-parties subject to Rule 45 subpoenas. "Rule 26(g)'s plain language limits its applicability to parties." NML Cap. Ltd. v. Republic of Argentina, No. 2:14-CV-492, 2014 WL 3898021, at *8 (D. Nev. Aug. 11, 2014). In the context of Rule 45 subpoenas, Rule 26(g) applies to parties who issue and serve third-party subpoenas under Rule 45(d)(1). See Fed. R. Civ. P. 45 advisory committee note to the 1991 amendment ("Paragraph [(d)(1)] gives specific application to the principle stated in Rule 26(g) and specifies liability for earnings lost by a non-party witness as a result of a misuse of the subpoena."). But there is no basis for imposing Rule 26(g) sanctions against a non-party or a non-party's attorney based on a non-party's response to a Rule 45 subpoena. See Fed. R. Civ. P. 26(g) advisory committee note to 1983 amendment ("Rule 26(g) imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of *Rules 26 through 37*." (emphasis added)).

Similarly, Rule 37 sanctions cannot be imposed against a non-party Rule 45 subpoena recipient. Rule 37 applies expressly to motions to compel made under Rules 26(a), 30, 31, 33, and 34. Fed. R. Civ. P. 37(a)(3); see also United States for Use & Benefit of Am. Builders & Contractors Supply Co. v. Great Am. Ins., No. 3:12-MC-36, 2012 WL 12910657, at *1 (M.D. Fla. June 26, 2012) ("Because the instant motion involves a non-party, Rule 37 (which applies only to parties) is not applicable." (collecting cases)). "Rule 45 does not provide for an award of

attorneys' fees and expenses for bringing a motion to compel production of documents under [Rule 45] subpoenas." Patel v. Bhakta, No. 1:15-CV-562, 2015 WL 12159208, at *4 (N.D. Ga. Apr. 29, 2015) (collecting cases). Though Rule 45(d)(2)(B)(i) allows for the party serving a subpoena to move for an order compelling production, "there is no provision in Rule 45 for an award of expenses for bringing such a motion." Se. Mech. Servs., Inc. v. Brody, No. CIV.A.1:09CV0086, 2009 WL 3095642, at *12 (N.D. Ga. June 22, 2009), report and recommendation adopted, 2009 WL 3095196 (N.D. Ga. Sept. 24, 2009); see also Castleberry v. Camden County, 331 F.R.D. 559, 566 (S.D. Ga. 2019) (denying the plaintiff's request for costs incurred when opposing the defendant's motion to compel against a third party arising from a Rule 45 subpoena).

After careful consideration, I find no basis for sanctions against the Coffee County Board of Elections or its counsel under Rule 26(g) or Rule 37(a). The Board was not a party to the Curling litigation when it responded to Plaintiffs' subpoenas. The Rules do not expose non-party subpoena recipients to the same spectrum of sanctions parties potentially face under Rule 26(g) or Rule 37(a). Accordingly, I do not consider imposing any sanctions against the Board under Rules 26(g) or 37(a).[2]

I only consider whether the Board should be sanctioned under 28 U.S.C. § 1927 and the Court's inherent authority. Coalition asks for sanctions related to five different subjects: (1) production of security videos; (2) production of Misty Hampton's emails; (3) production of other documents stored on a particular desktop computer; (4) the Board's privilege assertions; and (5) statements and omissions made at the Board's Rule 30(b)(6) deposition. I address each subject and whether sanctions should be imposed.

---

[2]    To be sure, the Court's contempt authority can provide a mechanism for ensuring non-parties will comply with Rule 45 subpoenas, but Coalition does not contend the Board should be found in contempt.

## II.    Video Records

Security videos of the Board's office attracted significant interest from Plaintiffs and others long before Plaintiffs served their subpoenas.  Coffee County officials relied on elections office security videos to terminate Ms. Hampton and Ms. Hampton's assistant, Jil Ridlehoover. The Coffee County manager analyzed video records from November 30, 2020 to February 19, 2021, to determine that Ms. Hampton worked fewer hours than she claimed.  Doc. 75-5 at 172–73; Doc. 75-8.  The manager compared Ms. Hampton's timesheets to the times she arrived and left the office, as shown on the videos.  Id.  Ms. Hampton was terminated on February 25, 2021. Doc. 75-5 at 149.

### A.    Security Videos, Generally

Coalition argues that the Board improperly withheld security videos in response to Plaintiffs' subpoenas.  Doc. 60 at 4–6.  In response to the subpoenas, the Board produced recordings of the interior and exterior of the Board's office building ("the elections office") from November 15, 2020 to February 26, 2021.  Doc. 60-2 at 10; Doc. 75-4 at 4.  Nevertheless, Coalition argues the disclosure of the videos was late and the late disclosure hindered its efforts to depose certain witnesses.  Much of Coalition's argument relies on the history of the video records before Plaintiffs issued their subpoenas.  Notably, Plaintiffs did not seek any relief related to the video recordings in their motion to compel.

Several different interested parties sought to obtain copies of the videos.  It appears that some of those parties may have believed the videos would provide insight into the January 2021 breaches.  For example, Ms. Hampton submitted an open records request for the Board's video records on March 31, 2021.  Doc. 75-6 at 2.  The Board provided her with the requested videos on July 15, 2021.  Doc. 75-7.  Tabitha Paulk, the president of the Coffee County NAACP, also

made an open records request for videos of the elections office in February or March 2021.

<u>See</u> Doc. 75-4 at 4; Doc. 75-10 at 5–9.  Her request was processed, and the videos were provided to her on or around April 15, 2021.  Doc. 75-4 at 5; Doc. 82-2.  The record is unclear as to which specific video records Ms. Paulk requested or received.  Apparently, some of the video records that Ms. Paulk received overlapped with the video records the Board ultimately produced to Plaintiffs in response to their subpoena.  <u>See</u> Doc. 75-4 at 4–5.  On March 4, 2022, Marilyn Marks, Coalition's Executive Director, requested security videos of the elections office from November 16 through November 20, 2020, via a Georgia public records request.  <u>See</u> Doc. 1-3 at 3.  Counsel for the Board of Elections responded there were no such records because these security videos were copied over in the regular course of business.  <u>Id.</u>

Plaintiffs state the Board, in response to the numerous open records requests, "repeatedly falsely represented that key responsive records, including the [v]ideos [from the four cameras covering the exterior and interior of its office], did not exist, had been lost, or were otherwise inaccessible."  Doc. 60 at 4.  In response to the Board's assertions, Plaintiffs asked for the production of documents and records, especially the videos and Ms. Hampton's emails, and for the Board's counsel to explain why these materials had not been produced.  The videos were produced to Plaintiffs after the GBI began investigating the breaches and obtained the videos.  <u>Id.</u> at 5.  Plaintiffs maintain that the production of the videos after several depositions prejudiced their discovery efforts and "prolonged and impeded discovery of the documented evidence of the breaches."  <u>Id.</u> at 6.  Plaintiffs contend they had to complete unnecessarily inefficient efforts for discovery and investigation based on the Board's initial and repeated false, misleading assertions, which "exposed a patterns of misrepresentation and obstruction . . . ."  <u>Id.</u>

**B.      Production of Videos in Response to Plaintiffs' Subpoena**

The Curling Plaintiffs served their subpoena on June 15, 2022, and Coalition served its subpoena on July 25, 2022.  Docs. 1-1, 1-2.  Both subpoenas included broad requests for records related to the January 2021 breaches.  The Coalition subpoena contained a request that expressly seeks video recordings: "All Documents including video recordings and Communications related to or concerning the employment termination of Misty Hampton and Jil Ridlehoover."  Doc. 1-1 at 22.  The Curling subpoena contained a similar request for "documents that evidence, refer to, or reflect" the events surrounding the unauthorized access of Coffee County's election system. Doc. 1-2.  The Curling subpoena did not expressly request video recordings, but it did broadly define "document" to include recordings.

The Board responded to the Curling Plaintiffs' subpoena August 1, 2022, doc. 75-1, and Coalition's subpoena on August 26, 2022, doc. 75-2.[3]  Both responses were signed by Anthony A. Rowell, an attorney.  In response to many of Plaintiffs' requests for documents, the Board stated that it had no responsive materials other than those provided to Ms. Marks in response to the previous open records requests.  Doc. 75-1 at 4–8; Doc. 75-2 at 3–17.  In response to the request for video recordings related to Hampton and Ridlehoover's terminations, the Board responded, "Please find enclosed."  Doc. 75-2 at 16.  In a separate email, an attorney for the Board, Jennifer Herzog, explained that the Board's security videos were automatically copied over, but the Board would produce any footage that had been retained for the purposes of responding to a prior open records request.  Doc. 78-1 at 2–3.  The Board produced exterior security camera videos the next day, on August 27, 2022.  Doc. 60 at 6.

---

[3]      Though the subpoenas originally demanded earlier compliance deadlines, it appears Plaintiffs and the Board negotiated these response times.  See Docs. 1-10, 73-1.

On September 8, 2022, and, again, on September 14, 2022, counsel for Coalition emailed counsel for the Board and specifically requested interior office security camera videos.  Doc. 70-7 at 11–15 (requesting videos from November 1, 2020 to June 30, 2021).  Coalition insisted that the Board possessed interior video recordings that had not yet been produced.  Counsel for Coalition demanded a thorough search for responsive videos.  Id.  On September 15, 2022, counsel for the Board replied to the email, stating, "[W]e are working in earnest on supplementation and do expect to have further records to provide." Id. at 11. The Board produced interior camera videos on September 17, 2022.  Doc. 60 at 6.

### C.    The Board's Production of Video Records Is Not a Basis for Sanctions

Coalition argues that the Board of Elections and its counsel improperly withheld the video records it eventually produced.  Coalition argues the Board and its counsel wrongfully denied the existence of the videos until the GBI demanded them in a criminal investigation. Doc. 60 at 5, 20.  Coalition asserts the Board's subpoena responses and objections were "demonstrably false," and the Board's counsel failed to confirm the Board's responses were complete and correct.  Doc. 75 at 9–10.  Coalition argues the Board knew the videos existed because the videos were a basis to fire Ms. Hampton and were provided to Ms. Hampton and Ms. Paulk through open records requests.  Id. at 10–13.  Coalition argues the late disclosure of the videos prejudiced its efforts in discovery, particularly with regard to depositions taken before the disclosure.  Doc. 60 at 6.  In response, the Board argues there is no evidence that any videos were withheld improperly or withheld in bad faith.  Doc. 73 at 24–26; Doc. 78 at 8–10.

Having considered the entire record before the Court, I conclude there is no evidence that the exterior videos were withheld at all, let alone improperly or in bad faith.  The record shows that Plaintiffs and the Board negotiated the Board's response deadlines.  Coalition fails to show

the Board's August 26, 2022 response was untimely or incomplete.  The Board stated they would produce videos in the response and produced the exterior videos the next day.  Nothing about this suggests any improper withholding of the exterior video.

Coalition also fails to show the interior videos were withheld in bad faith.  Even if the Board had provided these interior videos in response to open records requests in April and July 2021, Coalition has not shown that the Board could immediately locate and produce the videos more than a year later.  Coalition provides no other evidence on this issue other than speculation that the Board only produced the videos because the GBI demanded them.  At most, Coalition has shown a nominal delay in the Board producing the videos in response to the subpoena and some initial inconsistency on whether the videos existed, which was quickly resolved.  This record demonstrates successful conferral and collaboration, not bad faith.  Moreover, these videos were all produced by September 2022—more than a year before Coalition filed its motion to compel in this Court.[4]  Because Coalition fails to show the Board withheld the videos in bad faith or that counsel acted in a manner tantamount to bad faith with respect to the videos, sanctions are not appropriate.

## III.    Misty Hampton's Emails

Plaintiffs and the parties making open-records requests sought emails to and from Ms. Hampton that they thought would shed light on the January 2021 breaches.  Upon receiving the requests, the Board asked Charles Dial, a Coffee County information technology ("IT") consultant, to search for and produce the emails.[5]  Mr. Dial then informed the Board that the

---

[4]    Coalition did not seek any relief concerning the video recordings in its Motion.

[5]    Mr. Dial is the owner of Southeast Georgia Computer Consulting & Engineering ("SGCCE") and its "senior consultant/technician."  Doc. 78-4 at 2.  SGCCE and Mr. Dial have served as Coffee County's IT consultant for more than 10 years.  Id.

emails could not be located, and the Board told Plaintiffs the same. Eventually, the GBI seized a desktop computer from the Board that had been used by Ms. Hampton. The GBI was able to locate Ms. Hampton's emails on the computer, and the emails were provided to Plaintiffs.

Coalition argues that the Board should be sanctioned for its failure to produce Hampton's emails, even though Plaintiffs eventually obtained those emails through the GBI investigation. Doc. 60 at 7–8. Coalition contends that Mr. Dial falsely represented that the emails were not preserved on Ms. Hampton's desktop computer after she resigned. Id. Coalition also argues the Board's counsel failed to properly investigate whether the emails were indeed lost. Id.

In response, the Board argues it should not be sanctioned because its reliance on Mr. Dial's representations was substantially justified. Doc. 73 at 14–16. The Board argues the challenges of finding the emails on Ms. Hampton's desktop computer presented unique circumstances that make imposing any sanctions unjust. Id. at 16–17. Also, the Board highlights that Plaintiffs were eventually able to obtain the requested emails.

### A.    Searches for Ms. Hampton's Emails Before the Subpoenas

As noted above, various parties made open records requests to the Board that asked for Ms. Hampton's email. Upon receiving the requests, the Board and its counsel asked Mr. Dial to search for Ms. Hampton's emails. Mr. Dial told Coffee County employees, employees and members of the Board, and the Board's counsel that he could not locate Ms. Hampton's email. See Doc. 73-3 at 8 (Declaration of Jennifer Herzog). Mr. Dial reiterated this point several times and explained in detail why he was not able to recover the emails. Docs. 73-6, 73-7, 73-8, 75-11.

### B.    The Board's Response to the Subpoenas

On August 24, 2022, Ms. Herzog asked Mr. Dial to review her draft responses to Coalition's subpoena. Ms. Herzog planned to respond that Ms. Hampton's emails were no

longer accessible because their Microsoft 365 licenses were replaced, IT exhausted all efforts to recover the emails, and the County had searched the desktop computers in the elections office for responsive documents.  Doc. 75-13 at 2.  Mr. Dial stated, "Jennifer[,] this is all correct."  Id.  The County Manager asked Mr. Dial whether he had personally searched the desktop computer.  Doc. 75-14 at 2.  There is no response from Dial in the record.

The Board did not produce Ms. Hampton's emails in response to Plaintiffs' subpoenas, stating that the emails were lost when Ms. Hampton was terminated.  Counsel for the Board and counsel for Plaintiffs discussed the status of Ms. Hampton's emails around the time of Plaintiffs' subpoena and the Board's response.  Doc. 78-1.  On August 18, 2022, counsel for the Curling Plaintiffs asked counsel for the Board to confirm whether Ms. Hampton's emails could be found on a backup server or in archive data.  Id. at 6.  Counsel for the Board replied on August 26, 2022, at the same time it responded to the Coalition subpoena, with a response approved by Mr. Dial:

> IT has confirmed that the former Election Supervisor Misty Hampton's and Jill Riddlehoover's email accounts are no longer accessible.  Coffee County has a limited number of licenses available under Microsoft 365, and it was the regular practice of IT to replace the new employee of each position with that license when a former employee of the same position was for whatever reason no longer employed by the county, and when that is done, unless previously archived, the former employees' emails are no longer accessible.  In this situation, the County did attempt to preserve Hampton's emails, as you will see in emails provided previously to Ms. Marks, but IT unfortunately was unsuccessful in same.  The County has since implemented an email archiving system.  I have been advised that IT has exhausted all efforts and advised that Hampton's emails are not accessible or recoverable.
>
> . . . .
>
> [I]t is my understanding that IT and the County Clerk have searched Hampton's desktop computer which is the same computer used by Barnes and current Election Supervisor Rachel Roberts for responsive records, and of course also searched the phone and laptop previously referenced.

Id. at 3.

Mr. Dial was incorrect.  Ms. Hampton's emails were recoverable.  The GBI recovered the emails from Ms. Hampton's desktop computer after the GBI seized it from the Board on June 12, 2023.  Doc. 1 at 12–13.  Plaintiffs obtained copies of the emails from in November 2023.  Doc. 60-2 at 4–5.  Coalition's expert in election security, cybersecurity, and election technology states he found Hampton's emails in an ".ost" file "exactly where any IT professional would expect to find them and easily discovered by anyone who put in a small amount of effort to search for them." Id.  The .ost file for Hampton contained 8,572 emails.  Id. at 5.

Coalition asserts that Hampton's emails included responsive communication relevant to the Curling litigation.  Doc. 60 at 8.  Coalition argues it was prejudiced by the late discovery of these emails only weeks before trial.  Id.

Coalition has not shown that the Board or its counsel withheld Ms. Hampton's emails in bad faith.  There is no evidence that any Board of Elections official or employee knew that Ms. Hampton's emails were recoverable from the desktop computer before the GBI seized it.  Moreover, Mr. Dial explained, in detail, why he believed he could not recover Ms. Hamptons emails, and he reiterated that point several times.  Coalition does not point to any evidence that would suggest the Board should not have relied on Mr. Dial's representations, other than the fact that GBI succeeded where Mr. Dial failed.  That alone is not enough to support the imposition of sanctions under the Court's inherent authority sanctions or § 1927.  At most, Coalition suggests that counsel for the Board could have pressed for a more rigorous search for Ms. Hampton's emails.  Even if true, Coalition fails to show the level of recklessness or bad faith required for inherent authority or § 1927 sanctions.

## IV.    Other Documents Found on the Desktop Computer

Coalition argues that the forensic image of the desktop computer revealed "hundreds of potentially responsive emails and other documents" that the Board had failed to produce. Doc. 60 at 8.  Coalition argues these emails and documents were preserved on the desktop computer and on the Coffee County's central archiver.[6]  Id.  The Board does not respond to these allegations.

Coalition points to only two sets of emails on the desktop computer that it claims were responsive but not produced.  First, Coalition found emails related to a statement that Mr. Barnes provided to the Georgia Secretary of State investigator.  In the statement, Mr. Barnes described the storage and security of election equipment at the Coffee County Board of Elections when he (Mr. Barnes) took office as supervisor.  Docs. 30-1, 30-2, 30-3.

Second, Coalition also found an email exchange between Ms. Roberts and Ms. Herzog from July 15, 2022.  Doc. 31-8.  Ms. Roberts had asked Secretary of State officials if it was necessary to recertify the election results, given that it had been "published that the former Election Supervisor gave access to the voting machines . . . ."  Id. at 3.  Ms. Herzog advised Ms. Roberts to be more cautious about sending such emails, citing future discovery requests and open records requests.  Ms. Herzog stated there was no evidence of improper access.  Ms. Herzog advised Ms. Roberts to send the Secretary of State a clarifying email stating the improper access was merely an allegation and there was no information supporting improper access.  Id. at 2–3.

Based on these two sets of emails, Coalition argues there were approximately 1,000 unproduced responsive email found on the forensic image and "approximately 145 responsive emails and documents among thousands of additional documents from Hampton, Barnes's, and

---

[6]    Coalition does not define "central archiver," nor does Coalition use this term again in its Motion. Doc. 60 at 8.

Roberts's' files that had not been produced." Doc. 75 at 17; Doc. 60-2 at 5. Coalition argues the Board withheld these items in bad faith.

Coalition's argument is unconvincing. Coalition does not clearly identify any responsive materials found on the forensic image other than the two email exchanges described above.[7] Coalition states these unproduced (and unidentified) emails were responsive to Plaintiffs' subpoenas but provide no further information. Additionally, Coalition provides no evidence of bad faith or recklessness other than the Board's failure to produce the documents. Nothing excludes negligence, oversight, or technological failure as the reason the Board failed to produce additional materials. Ultimately, Coalition merely speculates that the Board acted in bad faith, which is not enough. Coalition must demonstrate the Board or its counsel engaged in the level of recklessness or bad-faith, and Coalition has failed to carry that burden.

## V.    Privilege Claims

Coalition argues the Board improperly asserted attorney-client privilege to withhold documents that should have been produced. Doc. 60 at 10. The Board argues it should not be sanctioned because it provided Plaintiffs with privilege logs in accordance with the Court's order, Plaintiffs had an opportunity to challenge the Board's privilege assertions, and the Board withdrew its privilege assertions as to each of the challenged documents. Doc. 73 at 17–18.

### A.    Background of the Privilege Dispute

The Board provided a privilege log with its initial response to the Curling Plaintiffs' subpoena on August 1, 2022. See Doc. 29 at 1–2; see also Doc. 25-2 at 2–3. The Board attached an updated privilege log to its response to Coalition's subpoena on August 26, 2022. Doc. 29-2. These privilege logs did not identify specific documents that had been withheld. Instead, the

---

[7]    Of course, the desktop computer also contained Hampton's emails, which had not been produced, but Hampton's emails have already been addressed.

Board provided category-based logs that identified broad categories of withheld documents and communications.  See id. at 2–5.

Coalition challenged the sufficiency of the Board's privilege category-based privilege logs in its motion to compel.  Doc. 1.  I determined that the Board's initial privilege logs were not sufficient and ordered it to provide a new one.  I explained that category-based logs may be appropriate if an itemized log presented an undue burden, but the Board had not shown any undue burden.  Doc. 41 at 12–15.  I ordered the Board to provide an itemized privilege log.  Id. The Board complied and provided Plaintiffs a 311-page privilege log identifying more than 2,600 items.  See Doc. 60 at 10.  I set a schedule for privilege challenges and requests for sanctions.  Doc. 41 at 1.

Plaintiffs timely filed a motion challenging the Board privilege assertion for 25 withheld items, styled as a motion for in camera review.[8]  Doc. 51.  Before the Court addressed Plaintiff's motion, the Board agreed to produce the 25 documents to Plaintiffs (on the condition that Plaintiffs would withdraw their motion).  Doc. 52.  Plaintiffs subsequently withdrew their motion challenging the Board's privilege assertions.  Docs. 57, 59.

Coalition now argues the Board should be sanctioned for asserting an improper privilege claim for the 25 documents Plaintiffs previously challenged.  Doc. 60 at 10–12.  Coalition argues these purported improper privilege claims "raise questions as to hundreds of other privilege log entries and documents withheld," but Plaintiffs did not have enough time to analyze all the privilege assertions before the deadline for privilege challenges.  Id. at 11–12.  Coalition also

---

[8]    Plaintiffs initially objected to at least 90 privilege assertions in the itemized log, which the parties resolved through conferral.  See Doc. 51 at 2–3.

argues the Board produced the category-based privilege logs in bad faith to delay Plaintiffs' ability to challenge the Board's privilege claims.[9] Id. at 16–17.

### B.    Coalition Does Not Identify Any Improper Privilege Claims

Coalition points to its withdrawn motion for in camera review to support its argument the Board made improper privilege claims. Doc. 60 at 10 (citing Doc. 51). In its motion for in camera review, Plaintiffs argued that 25 of the documents the Board identified as privileged in its log were not privileged (or the privilege was waived) because Charles Dial, an independent IT contractor, was an author or recipient of these documents. Doc. 51 at 3–6. In response, the Board agreed to produce the 25 challenged documents if Plaintiffs would withdraw the motion for in camera review. Doc. 52. The Board never conceded that the 25 documents were not privileged. Coalition ultimately withdrew its motion for in camera review. Doc. 57.

Coalition now argues the Board improperly withheld the 25 challenged documents, but it fails to show that the Board improperly asserted the documents were privileged. Coalition acknowledged in its motion for in camera review that communication with an independent contractor may be privileged if it meets a five-part test. Doc. 51 at 5–6. There is nothing to show the challenged documents did not, at least arguably, meet such a test. Coalition does not sufficiently describe the 25 challenged documents in a way that would allow the Court to make any informed assessment about privilege. And nothing in the record suggests the Board lacked a good-faith basis for withholding these documents. Accordingly, nothing about these 25

---

[9]    Coalition also complains about the adequacy of the itemized privilege log, stating it lacks "document titles, email subject lines, or to/from identifications, with inaccurate dates and times of transmission on 847 email attachments, and only with a Bates number and privilege assertion." Doc. 60 at 10; Doc. 75 at 6–8. Coalition claims it cannot understand the Board's privilege assertions with such limited information. However, the time for privilege challenges has passed. Coalition did not mention this issue in its withdrawn motion for in camera review. Therefore, I do not address the adequacy of the itemized privilege log.

documents "rais[es] questions as to hundreds of other privilege log entries and documents withheld," as Coalition argues.  Doc. 60 at 11–12.  This argument is unconvincing.

Coalition also complains that it did not have enough time to review the Board's privilege assertions before the Court-imposed deadline for challenging privilege assertions.  Coalition's argument is unconvincing.  Plaintiffs—not the Board—proposed January 22, 2024, as the deadline for privilege challenges.  Doc. 42.  I imposed Plaintiff's requested deadline and then extended the deadline at Plaintiffs' request over the Board of Elections' opposition.  See Docs. 46, 50.  Plaintiffs had 26 days to review the privilege log and bring privilege challenges after the Board produced the log.  Twenty-six days is more than double the time I gave the Board to compose its privilege log, which included end-of-the-year holidays.  Thus, Coalition had more than adequate time to identify any improper privilege assertions and bring them to the Court's attention.  At a minimum, Coalition could have asked for another extension of time for challenging privilege assertions, but it failed to do so.  Coalition's argument regarding the amount of time for challenging the Board's privilege assertion fails.

### C.    Sanctions Are Not Appropriate for the Initial Privilege Logs

Coalition also argues that the Board should be sanctioned because the Board's initial category-based privilege logs were improper and were used only as a delay tactic.  In response, the Board argues it was reasonable to provide category-based logs, and it points to the massive 311-page itemized log that the Board ultimately produced.  Doc. 73 at 18.

The Board's argument is convincing.  In my Order directing the Board to produce an itemized privilege log, I noted ample authority for category-based privilege logs when itemized logs present an undue burden.  Doc. 41 at 14.  Though I concluded that the Board failed to show an undue burden, the Board presented a colorable, good-faith argument for using a category-

based log.  Moreover, the lengthy itemized log the Board ultimately provided shows that the Board faced a significant burden in developing an itemized log.  The Board simply failed to demonstrate undue burden in opposition to Plaintiffs' motion to compel.

Additionally, Coalition's argument that the Board provided category-based privilege logs as a bad-faith delay tactic is undermined by the record.  When Plaintiffs objected to the first privilege log on August 18, 2022, the Board provided an updated privilege log only eight days later on August 26, 2022, in an attempt to address Plaintiffs' objections.  See Doc. 73 at 19. Plaintiffs raised no further objections until October 17, 2023, just before filing their motion to compel, asking the Court to order the Board to provide a new privilege log.  Id.  In other words, Plaintiffs accepted and did not challenge the Board's revised privilege log for more than a year, at which point they filed the motion to compel in this Court.  On this record, Coalition fails to show that the Board acted in bad faith.

## VI.    Deposition Testimony

Coalition argues that the Board's 30(b)(6) representative, Wendell Stone, should have provided testimony about the GBI's investigation of the January 2021 breach during his 30(b)(6) deposition.  Doc. 60 at 12–13; Doc. 70-6 at 2–3.[10]  Mr. Stone was a member of the Board and its vice chair.  Doc. 60 at 12.  Coalition argues that counsel for the Board should have corrected the record before ending the deposition.  Doc. 70-6 at 2–3.  In response, the Board argues there is no evidence Mr. Stone was dishonest during the deposition.  Doc. 73 at 26.

---

[10]      Initially, Coalition argued Mr. Stone gave false testimony during his September 1, 2022 deposition.  Doc. 60 at 12–13.  Coalition asserted Mr. Stone met with the GBI three weeks earlier on August 8, 2022, but Mr. Stone testified at his deposition on September 1, 2022, that he was unaware of a GBI investigation.  Coalition's argument was based on a mistake about the timeline.  Mr. Stone's meeting with the GBI was actually on September 8, 2022, a week after his deposition.  Doc. 73-5 at 2.  Coalition corrected this portion of its Motion for Sanctions, instead arguing that Mr. Stone should have known about and testified to other GBI activity that occurred before the deposition.  Doc. 70-6 at 2–3.

As background, a GBI agent met with various Coffee County officials on August 30, 2022. The GBI agent interviewed the Elections Supervisor, Rachel Roberts, on August 30, 2022, at the Board of Elections' office. Doc. 70-6 at 8–9. The agent also met with the County's human resources manager at the County Board of Commissioner's office. Id. at 11. Later, the agent picked up a hard drive containing surveillance video of the Board of Elections office. Id. at 13. The agent had coordinated with Ms. Herzog to receive the video. Id.

Mr. Stone testified on September 1, 2022, that he was unaware of a GBI investigation. The Board was represented by Stephen Delk during Mr. Stone's 30(b)(6) deposition. Doc. 73-5 at 5. Mr. Stone was asked, "Are you aware of any investigation of Coffee County by the Secretary of State, the SEB, or the GBI in the breach in 2021 of Coffee County's elections system?" Id. at 220. Mr. Stone answered, "I'm not aware." Id. Mr. Stone also testified that the GBI had not contacted him and he did not know if the GBI had contacted anyone he knew, including his lawyer. Id. at 220–21; see also id. at 261.

Coalition has not shown Mr. Stone gave any false testimony or that he testified in bad faith. Nothing in the record shows the GBI agent who visited Coffee County on August 30, 2022, met with Mr. Stone during the visit. There is no direct or circumstantial evidence suggesting Mr. Stone was even aware of the August 30, 2022 visit. Nothing indicates Mr. Stone regularly spoke with Ms. Roberts or anyone else about the Board's business, such that he would have learned about the GBI's August 30, 2022 visit prior to his September 1, 2022 deposition. Consequently, Coalition fails to show any subjective bad faith by the Board through Mr. Stone's testimony.

Coalition also fails to show any sanctionable conduct by the Board's counsel during Mr. Stone's deposition. Nothing in the record shows Mr. Delk knew of the GBI's visit to Coffee

County two days earlier.  Mr. Delk and Ms. Herzog worked at the same firm together, but Coalition fails to provide any basis for imputing Ms. Herzog's knowledge of the GBI investigation to Mr. Delk at the time of the deposition.  For example, Coalition does not point to anything that would indicate Ms. Herzog spoke to Mr. Delk between August 30, 2022 and September 1, 2022.  Furthermore, even if Mr. Delk knew (or could have known) about the August 30, 2022 GBI visit at the time of Mr. Stone's deposition, Coalition does not show Mr. Delk was obligated to expand on Mr. Stone's otherwise truthful testimony.  Coalition does not explain how a failure to correct Mr. Stone's truthful testimony shows objective bad faith, recklessness, or conduct tantamount to bad faith for § 1927 sanctions.  Coalition also fails to explain how counsel's conduct would demonstrate subjective bad faith to support the imposition of inherent authority sanctions.[11]

### CONCLUSION

For the reasons explained above, I **DENY** Coalition's Motion for Sanctions.

**SO ORDERED**, this 7th day of April, 2025.

_____
BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[11]    Coalition also contends a Board member, Andy Thomas, gave the GBI false testimony about his relationships with other Board members.  Doc. 60 at 13.  Coalition fails to explain how Mr. Thomas's testimony to the GBI relates to Plaintiffs' subpoenas, the Board's response, or the sanctions Coalition seeks.